# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

TAYLOR BUDOWICH, an individual, )
2109 J Street, #202 )
Sacramento, California 95816, )
 )
and )
 )
CONSERVATIVE STRATEGIES, INC., )
a California for profit corporation, )
2109 J Street, #202 )
Sacramento, California 95816, )
 )
   Plaintiffs, )
 )
vs. )
 )
NANCY PELOSI, in her official )
capacity as Speaker of the United States )
House of Representatives, )
 )
BENNIE G. THOMPSON, in his official )
capacity as Chairman of the House Select )
Committee to Investigate the January 6th )
Attack on the United States Capitol, )
Rayburn House Office Building, 2466, )
Washington, DC 20515, )
 )
ELIZABETH L. CHENEY, in her official )
capacity as a Member of the United States )
House of Representatives, )
Longworth House Office Building )
Washington, D.C. 20515, )
 )
ADAM B. SCHIFF, in his official )
capacity as a Member of the United States )
House of Representatives, )
Longworth House Office Building )
Washington, D.C.  20515, )
 )
JAMIE B. RASKIN, in his official )
capacity as a Member of the United States )
House of Representatives, )
Longworth House Office Building )
Washington, D.C.  20515, )

-1-

SUSAN E. LOFGREN, in her official      )
capacity as a Member of the United States   )
House of Representatives,               )
Longworth House Office Building         )
Washington, D.C.  20515,               )
                                        )
ELAINE G. LURIA, in her official        )
capacity as a Member of the United States   )
House of Representatives,               )
Longworth House Office Building         )
Washington, D.C.  20515,               )
                                        )
PETER R. AGUILAR, in his official       )
capacity as a Member of the United States   )
House of Representatives,               )
Longworth House Office Building         )
Washington, D.C.  20515,               )
                                        )
STEPHANIE MURPHY, in her official       )
capacity as a Member of the United States   )
House of Representatives,               )
Longworth House Office Building         )
Washington, D.C.  20515,               )
                                        )
ADAM D. KINZINGER, in his official      )
capacity as a Member of the United States   )
House of Representatives,               )
Longworth House Office Building         )
Washington, D.C.  20515,               )
                                        )
SELECT COMMITTEE TO INVESTIGATE         )
THE JANUARY 6TH ATTACK ON THE           )
UNITED STATES CAPITOL,                  )
Longworth House Office Building         )
Washington, D.C. 20515, and             )
                                        )
J.P. MORGAN CHASE BANK, N.A.,           )
10 S. Dearborn Street                   )
Chicago, Illinois 60603,                )
                                        )
            Defendants.                 )
_____     )

## COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

*It is equally evident, that none of [our three branches of Government] ought to possess, directly or indirectly, an overruling influence over the others, in the administration of their respective powers.  It will not be denied, that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it.*

James Madison, The Federalist No. 48, p. 276
(C. Rossiter ed. 1961).

### INTRODUCTION

1.      Plaintiffs, Taylor Budowich and Conservative Strategies, Inc., bring this Complaint for Declaratory and Injunctive relief to invalidate and prohibit the enforcement of a subpoena from a select committee of the U.S. House of Representatives (the "Select Committee") issued in whole or part— without any legal authority—in violation of the Constitution and laws of the United States.[1]

2.      The Select Committee wrongly seeks to compel Mr. Budowich's financial institution to provide private banking information to the Select Committee that it lacks the lawful authority to seek and to obtain.  The Select Committee acts absent any valid legislative power and threatens to violate longstanding principles of separation of powers by performing a law enforcement function absent authority to do so.  Without intervention by this Court, Mr. Budowich will suffer irreparable harm by having a third party involuntarily produce his private and personal financial information.

---

[1] Because the undersigned does not possess a full and complete copy of the Select Committee subpoena, Plaintiffs reserve the right to add any other companies associated with Taylor Budowich that have an account at JP Morgan Chase and which are subject to the Select Committee subpoena. Defendant JPMorgan has only provided Plaintiff with the cover page of the subpoena at issue, but not the schedule, definitions, specific request, scope, or items sought.  See JPMorgan Subpoena (attached hereto as **Exhibit B**).

3.     For months, Mr. Budowich has consistently cooperated with the Select Committee in good faith.  This includes Mr. Budowich producing documents and appearing for his deposition over his objections to cooperate with the committee.

4.     While Mr. Budowich was attending his deposition proceedings in Washington, D.C., his financial institution, Defendant JP Morgan Chase Bank, N.A. ("JPMorgan"), transmitted to Mr. Budowich a letter dated December 21, 2021, stating that JPMorgan will produce documents pursuant to a subpoena received from the Select Committee unless Mr. Budowich, by December 24, 2021, at 5:00 p.m. EST, provides JPMorgan with "documentation legally obligating it to stop taking such steps."  See Correspondence from JPMorgan (attached hereto as **Exhibit A**).  Mr. Budowich received this letter at 7:00 p.m. EST on December 23, 2021.

5.     Despite Congress, this Court, and banking institutions across the nation being closed for the holiday weekend and the Select Committee's investigation into past events does not present any exigency or immediacy, the Select Committee has refused to extend the deadline for when JPMorgan could produce documents and Mr. Budowich could file this lawsuit to object.

6.     Mr. Budowich has not been afforded the opportunity to review the subpoena at issue in order to ascertain the extent or scope of information and records requested; moreover, the Select Committee has dispensed with all procedural rules, failed to accord due process, and neglected to provide formal notice and a sufficient period of time to respond and/or object, as required by the Right to Financial Privacy Act ("RFPA"), 12 U.S.C. § 3405, and thereby attempted to railroad JPMorgan into unlawfully producing Mr. Budowich's private and personal

financial records on Christmas Eve, without any opportunity to seek review and redress by the judiciary.

## PARTIES

1.      Plaintiff Taylor Budowich is a citizen of the state of California.  Mr. Budowich is also the sole owner of Conservative Strategies, Inc.

2.      Conservative Strategies, Inc. is a California for-profit company with its principal place of business in Sacramento, California.

3.      Defendant Nancy Pelosi ("Speaker Pelosi") is a Democrat member of the U.S. House of Representatives and Speaker of the House.

4.      Defendant Bennie G. Thompson ("Chairman Thompson") is a Democrat member of the U.S. House of Representatives and Chairman of the "Select Committee to Investigate the January 6th Attack on the United States Capitol" (the "Select Committee").  The subpoenas challenged herein were issued under his authority as Chair of the Select Committee.

5.      Defendant Elizabeth L. Cheney is a Republican member of the U.S. House of Representatives and member of the Select Committee.

6.      Defendant Adam B. Schiff is a Democrat member of the U.S. House of Representatives and members of the Select Committee.

7.      Defendant Jamie B. Raskin is a Democrat member of the U.S. House of Representatives and members of the Select Committee.

8.      Defendant Susan E. Lofgren is a Democrat member of the U.S. House of Representatives and members of the Select Committee.

9.      Defendant Elaine G. Luria is a Democrat member of the U.S. House of Representatives and members of the Select Committee.

10.     Defendant Peter R. Aguilar is a Democrat member of the U.S. House of Representatives and members of the Select Committee.

11.     Defendant Stephanie Murphy is a Democrat member of the U.S. House of Representatives and members of the Select Committee.

12.     Defendant Adam D. Kinzinger is a Republican member of the U.S. House of Representatives and members of the Select Committee.

13.     Defendant Select Committee is a select committee created by House Resolution 503 ("H. Res. 503") passed by the U.S. House of Representatives on June 30, 2021.

14.     JPMorgan is a financial banking institution and is the responding party to the Subpoena.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction in accordance with 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States, as well as 28 U.S.C. § 2201-02, which provides for declaratory relief.

16.     This Court also has subject matter jurisdiction in accordance with the Right to Financial Privacy Act, to wit:  12 U.S.C. §§ 3416 and 3418, which provide for a private right of action and injunctive relief.

17.     This Court has personal jurisdiction over Speaker Pelosi because she sponsored H.Res. 503 and oversaw its passage in the House.

18.     This Court has personal jurisdiction over Chairman Thompson because he presides over the Select Committee and, on information and belief, issued the JPMorgan Subpoena from his office address in Washington, D.C.

19.     This court has personal jurisdiction over Elizabeth L. Cheney, Adam B. Schiff, Jamie B. Raskin, Susan E. Lofgren, Elaine G. Luria, Peter R. Aguilar, Stephanie Murphy, Adam D. Kinzinger because they serve as members of the Select Committee that issued the subpoena at issue from Washington, D.C.

20.     This Court has personal jurisdiction over the Select Committee because it is locatedand operates in Washington, D.C.

21.     The Court has personal jurisdiction over JP Morgan because JP Morgan transacts business in the District; the claim arises from business transacted in the District; and JP Morgan has minimum contacts with the District such that the Court's exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice.

22.     Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claim occurred in Washington, D.C.

## RELEVANT FACTS

23.     In a well-known episode on January 6, 2021, a large group of protestors in Washington, D.C., entered the U.S. Capitol, breached security, and disrupted the counting of Electoral College votes until order was restored. The U.S. Department of Justice has arrested morethan 500 individuals in connection with the activities on January 6th.

**A.**     **Formation, Composition, and Authority of the Select Committee.**

24.     Earlier this year, Congress considered establishing a "National Commission to Investigate the January 6 Attack on the United States Capital Complex."

25.     Chairman Thompson introduced H.R. 3233 on May 14, 2021.  H.R. 3233 would have established the Commission for four "purposes":

a. "To investigate and report upon the facts and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex (hereafter referred to as the "domestic terrorist attack on the Capitol") and relating to the interference with the peaceful transfer of power, including facts and causes relating to the preparedness and response of the United States Capitol Police and other Federal, State, and local law enforcement in the National Capitol Region and other instrumentality of government, as well as the influencing factors that fomented such attack on American representative democracy while engaged in a constitutional process."

b. "To examine and evaluate evidence developed by relevant Federal, State, and local governmental agencies, in a manner that is respectful of ongoing law enforcement activities and investigations regarding the domestic terrorist attack upon the Capitol, regarding the facts and circumstances surrounding such terrorist attack and targeted violence and domestic terrorism relevant to such terrorist attack."

c. "To build upon the investigations of other entities and avoid unnecessary duplication by reviewing the findings, conclusions, and recommendations of other Executive Branch, congressional, or independent bipartisan or non-partisan commission investigations into the domestic terrorist attack on the Capitol and targeted violence and domestic terrorism relevant to such terrorist attack, including investigations into influencing factors related to such terrorist attack."

d. "To investigate and report to the President and Congress on its findings, conclusions, and recommendations for corrective measures that may include changes in law, policy, procedures, rules, or regulations that could be taken to prevent future acts of targeted violence and domestic terrorism, including to prevent domestic terrorist attacks against American democratic institutions, improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans, and strengthen the security and resilience of the Nation and American democratic institutions against domestic terrorism."

26.    The Commission would have included a bipartisan group of ten members:  (1) a "Chairperson" "appointed jointly by the Speaker of the House of Representatives and the majority leader of the Senate"; (2) a "Vice Chairperson" "appointed jointly by the minority leader of the House of Representatives and the minority leader of the Senate"; (3) "two members . . . appointed by the Speaker of the House of Representatives"; (4) "two members . . . appointed by the minority leader of the House of Representatives"; (5) "two members . . . appointed by the

majority leader of the Senate"; and (6) "two members . . . appointed by the minority leader of the Senate." BecauseDemocrats control both chambers in the current Congress, the Commission would have included five members appointed by Democrats and five members appointed by Republicans.

27.   The House passed H.R. 3233 on May 19, 2021.

28.   The Senate considered a cloture motion to proceed on H.R. 3233 on May 28, 2021. The motion failed by a vote of 54 yeas and 35 nays.

29.   On June 28, 2021, Speaker Pelosi introduced H. Res. 503, "Establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol." Two days later, the House passed H. Res. 503 on a near party-line vote of 222 yeas and 190 nays.

30.   Only two Republicans, Rep. Liz Cheney of Wyoming and Rep. Adam Kinzinger of Illinois, voted in favor of H. Res. 503.

31.   In contrast to H.R. 3233, which contemplated an evenly balanced Commission, H. Res. 503 instructs the Speaker of the House to appoint thirteen members to the Select Committee, only five of which "shall be appointed after consultation with the minority leader."

32.   Speaker Pelosi appointed Chairman Thompson, the original sponsor of H.R. 3233, to serve as Chair of the Select Committee and appointed six additional Democrat members: Rep. Zoe Lofgren of California, Rep. Adam Schiff of California, Rep. Pete Aguilar of California, Rep. Stephanie Murphy of Florida, Rep. Jamie Raskin of Maryland, and Rep. Elaine Luria of Virginia.  She also appointed Republican Rep. Liz Cheney of Wyoming without any designation of position. 167 Cong. Rec. H3597 (2021).

33.   House Minority Leader Kevin McCarthy recommended five Republican membersto serve on the Select Committee, consistent with H. Res. 503: Rep. Jim Banks of

Indiana, to serve as Ranking Member, and Rep. Rodney Davis of Illinois, Rep. Jim Jordan of Ohio, Rep. Kelly Armstrong of North Dakota, and Rep. Troy Nehls of Texas, to serve as additional minority members.

34.     Speaker Pelosi did not appoint Rep. Banks to serve as Ranking Member, nor did she appoint any other of Minority Leader McCarthy's recommended minority members. In a public statement, she acknowledged that her refusal to appoint the members recommended by the Minority Leader was an "unprecedented decision." Nancy Pelosi, Speaker, U.S. House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol (July 21, 2021), https://www.speaker.gov/newsroom/72121-2 (last visited Dec. 24, 2021).

35.     Instead, Speaker Pelosi appointed Rep. Adam Kinzinger and Rep. Liz Cheney— the only other Republicans who voted in favor of H. Res. 503—and left four vacancies. See 167 Cong. Rec. H3885 (2021).

36.     Without reference to any authority, on September 2, 2021, Chairman Bennie Thompson announced in a press release that "he has named Representative Liz Cheney (R-WY) to serve as the Vice Chair of the Select Committee." See Press Release, Bennie Thompson,Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, ChairmanThompson Announces Representative Cheney as Select Committee Vice Chair (Sept. 2, 2021), https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair. H. Res. 503 does not mention a vice chair, much less authorize the chair to appoint a vice chair. See generally H. Res. 503, 117th Cong. (2021).

37.     The official letterhead of the Select Committee indicates that Bennie Thompson is "Chairman" and lists the other members, including Cheney and Kinzinger, without designation. <u>See</u> Correspondence and Subpoena by Select Committee (attached hereto as **Exhibit C**). The Select Committee's website provides a list of its members, including Thompson as Chairman, but no other members receive designation. <u>See</u> Membership, Select Comm. to Investigate the Jan. 6 Attack on the U.S. Capitol, <u>https://january6th.house.gov/about/membership</u> (last visited Dec. 24, 2021).

38.     H. Res. 503 provides that "[t]he Select Committee may not hold a markup of legislation."

39.     H. Res. 503 sets forth the purposes of the Select Committee, which are substantially similar to those of the Commission contemplated by H.R. 3233, except that H. Res. 503 omits the fourth purpose:  "[t]o investigate and report to the President and Congress on its findings, conclusions, and recommendations for corrective measures that may include changes in law, policy, procedures, rules, or regulations. "

40.     H. Res. 503 establishes three "functions" of the Select Committee: (1) to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) to "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) to "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures described in subsection (c) as it may deem necessary."

41.     Subsection (c) of Section 4 describes three categories of "corrective measures": "changes in law, policy, procedures, rules, or regulations that could be taken" (1) "to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts

targeted at American democratic institutions"; (2) "to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans"; and (3) "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism."

42.     H. Res. 503 provides that "[t]he chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress." Section 3(b)(1) of H. Res. 8 provides that, "[d]uring the One Hundred Seventeenth Congress, the chair of a standing committee. . . , upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee."

**B.     Activities of the Select Committee.**

43.     Since its inception in July 2021, the Select Committee has held only one public hearing.  During that hearing, the Select Committee heard testimony from officers of the U.S. Capitol Police and D.C. Metropolitan Police Departments who were present at the Capitol on January 6, 2021.

44.     The Select Committee has issued a wide range of subpoenas for documents and the testimony of witnesses.

45.     In August, the Select Committee demanded records from fifteen different social media companies, including Facebook, Reddit, Twitter, and YouTube. See Press Release, Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, Select Committee Demands Records related to January 6th Attack from Social Media

Companies (Aug. 27, 2021).  The subpoenas directed these companies to produce all internal company policies and actions taken relating to "misinformation" about the 2020 election, efforts to interfere with the 2020 election or electoral results, violent domestic extremists, foreign interference with the 2020 election, and more.

46.     The Select Committee has also issued numerous subpoenas seeking the production of documents and compelled testimony from individual witnesses, including more than a dozen former Trump Administration officials.

**C.     Mr. Budowich's Cooperation with the Select Committee.**

47.     The Select Committee served Mr. Budowich with a subpoena requesting a wide range of documents and for Mr. Budowich's deposition.  See **Exhibit C**.

48.     Mr. Budowich complied with the subpoena, producing more than 1,700 pages of documents and providing roughly four hours of sworn testimony.

49.     Included in Mr. Budowich's production were "documents sufficient to identify all account transactions for the time period December 19, 2020, to January 31, 2021, in connection with the Ellipse Rally."  Mr. Budowich provided such documents.

50.     Additionally, Mr. Budowich, at his deposition, answered questions concerning payments made and received regarding his involvement in the planning of a peaceful, lawful rally to celebrate President Trump's accomplishments.

51.     Despite Mr. Budowich's continuing cooperation with the Select Committee, upon arriving home from his deposition before the Select Committee in Washington, D.C., Mr. Budowich had a notice from his bank that he had until 5:00 p.m. the next day, Christmas Eve, to respond.

52.     The Select Committee's deceptive tactics to ambush Mr. Budowich and deprive him of a meaningful opportunity to object to the production of personal financial records demonstrates a lack of good faith by the Select Committee.

## THE SUBPOENAS ARE INVALID

**A.**     **The subpoenas are not validly issued by a duly authorized committee.**

53.     The composition of the House Select Committee to Investigate the January 6th Attack on the United States Capitol is governed by Section 2 of H. Res. 503. Section 2(a) states "Appointment Of Members.—The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503 117th Cong.(2021).

54.     Speaker Pelosi has appointed only nine members to the Select Committee:  seven Democrats and two Republicans.  None of these members was appointed from the selection of five GOP congressman put forth by Minority Leader Kevin McCarthy.

55.     Authorized congressional committees have subpoena authority implied by Article I of the Constitution.  McGrain v. Daugherty, 273 U.S. 135, 174 (1927).  The Select Committee, however, is not an authorized congressional committee because it fails to comport with its own authorizing resolution, House Resolution 503.

56.     Congress' failure to act in accordance with its own rules is judicially cognizable. Yellin v. United States, 374 U.S. 109, 114 (1963).  This is particularly significant where a person's fundamental rights are involved.

57.     Speaker Pelosi failed to appoint members consistent with the authorizing resolutionof the Select Committee.  Pelosi has appointed only nine members of Congress to

serve on the Select Committee; whereas the authorizing resolution instructs the Speaker "shall" appoint thirteen members.  H. Res. 503 § 2(a), 117th Cong. (2021).

58.     Further, of those nine members Speaker Pelosi has appointed, none of them was appointed after consultation with the minority member, as is required by the authorizing resolution.H. Res. 503 § 2(a), 117th Cong. (2021).

59.     Thus, the Select Committee as it currently stands—and stood at the time it issued the subpoenas in question—has no authority to conduct business because it is not a duly constitutedSelect Committee. Chairman Thompson's subpoenas are invalid and unenforceable.

60.     Chairman Thompson derives the authority to issue subpoenas solely from § 5(c)(6) of the Select Committee's authorizing statute, but this authority is qualified, not absolute. The Select Committee chairman may not order the taking of depositions without consultation with the ranking minority member of the Select Committee.

**B.**     **The subpoenas are not issued to further a valid legislative purpose.**

61.     The subpoena issued to JPMorgan was issued by the Select Committee as part of an unconstitutional attempt to usurp the Executive Branch's authority to enforce the law and to expose what the Select Committee believes to be problematic actions by a political opponent. Congress has no authority to issue subpoenas for these purposes.

62.     This is evidenced by numerous statements by members of the Select Committee. For example, Representative Luria recently told CNN about the Committee: "[T]hat's exactly why we're conducting this investigation to find out all the facts, . . . and . . . hold people accountable who are responsible." See https://www.cnn.com/2021/12/21/politics/january-6-committee-criminal-referrals/index.html (last visited Dec. 24, 2021).

63.     Congress has no freestanding power to issue subpoenas. Instead, its investigative powers are ancillary to its legislative authority.  See Trump v. Mazars USA, LLP, 140 S. Ct. 2019, 2031(2020).  Because of this tie between the investigative and legislative powers, Congress may only issue subpoenas that serve a valid legislative purpose.

64.     Law enforcement and the punishment of perceived legal wrongs are not valid legislative purposes.  To the extent Congress seeks to utilize subpoenas to investigate and punish perceived criminal wrongdoing, it unconstitutionally intrudes on the prerogatives of the Executive Branch.

65.     Similarly, a desire to "expose for the sake of exposure" cannot sustain a congressional subpoena. See Watkins v. United States, 354 U.S. 178, 200 (1957). Bringing information to light for the sake of bringing it to light is not a valid legislative end.

66.     Even if Congress uses a subpoena to seek information relevant to contemplated legislation, the subpoena may still be invalid if the contemplated legislation would be unconstitutional—such as an impermissible limit on the conduct or authority of the executive. See McGrain v. Daugherty, 273 U.S. 135, 171 (1927); Kilbourn v. Thompson, 103 U.S. 168, 195 (1880); Nixon v. Fitzgerald, 457 U.S. 731, 749 (1982).

67.     The legislative purpose inquiry analyzes whether a particular subpoena serves a valid purpose, not whether an investigation as a whole serves a valid purpose.  See Trump v. MazarsUSA, LLP, 140 S. Ct. 2019, 2031 (2020).

68.     The Select Committee has failed to identify any legislative purpose served by its Subpoena.  It has not considered any draft legislation, nor has it provided any explanation for why its request would further any valid legislative end.

69.     Instead of identifying any valid end or proposed legislation, the Select Committee has issued public statements explicitly identifying law enforcement and the desire to expose for the sake of exposure as its motivations for subpoenaing targets of its investigation.

70.     Chairman Thomas and Vice-Chair Cheney have reiterated in their public statements that the purpose of their investigation is to ensure "those responsible are held accountable," to "tell[] the complete story of the unprecedented and extraordinary events of January 6th," and to "get answers for the American people about what happened on January 6th." See The Law Enforcement Experience on January 6th: Hearing Before the H. Select Committee to Investigate the January 6th Attack on the United States Capitol, 117th Cong. (2021) Statement of Elizabeth Cheney, Vice-Chair); Press Release, Thompson & Cheney Statement on Pentagon Officials' Reported Actions After January 6th (Sept. 16, 2021); Press Release, Thompson Statement on Cooperation of Witnesses (Oct. 14, 2021).

71.     The Select Committee's authorizing resolution also fails to identify its legislative purpose. It is vague to the point of meaninglessness, authorizing the Select Committee to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol, including facts and circumstances relating to . . . entities of the public and private sector as determined relevant by the Select Committee for such investigation."

72.     Nor is the nature of the information sought by the subpoena of a kind that would further a valid legislative purpose.

73.     The subpoena seeks personal financial material that is irrelevant to any conceivable legislation and not pertinent to any purported purpose of the Select Committee.

74.     This information has no bearing on any contemplated constitutional legislation. It is relevant only to serve the Select Committee's stated purpose of engaging in ad-hoc law enforcement and its unstated purpose of antagonizing its political adversaries.

**C.     The JPMorgan Subpoena Violates the Right to Financial Privacy Act.**

75.     The JPMorgan Subpoena requires JPMorgan to produce Mr. Budowich's financial records without a Certificate of Compliance, as required by 12 U.S.C. § 3403(b).

76.     The Select Committee did not provide Mr. Budowich notice formal notice and a sufficient period of time to object and/or respond, as required by the 12 U.S.C. § 3405.

77.     On December 23, 2021, Mr. Budowich received a letter dated December 21, 2021, from JPMorgan notifying him of its duty to comply with the subpoena.  The letter provided that JPMorgan would comply with the subpoena unless Mr. Budowich provides a legal document obligating it not to comply by 5:00 p.m. EST on December 24, 2021.  Of course, this provided Mr. Budowich with no opportunity to obtain relief.  This Court had officially closed for the holiday weekend by the time Mr. Budowich received "notice" of the subpoena from JPMorgan.

78.     Whatever financial information that could possibly be relevant to the Select Committee's investigation was produced by Mr. Budowich. Any requests in the JPMorgan Subpoena that exceed the scope of the subpoena served personally on Mr. Budowich would lack pertinency and violate the Constitution.

79.     Mr. Budowich has a reasonable expectation of privacy in his personal financial records.

80.     The Fourth Amendment enumerates the right of private individuals to be free fromunreasonable search and seizure by the government into their persons, houses, papers, and

effects.It also protects a person's reasonable privacy expectations. <u>See</u> <u>Katz v. United States</u>, 389 U.S. 347, 351 (1967).

81.     The Fourth Amendment restricts the ability of the Select Committee to issue sweeping subpoenas untethered from any valid legislative purpose. <u>See</u> <u>Oklahoma Press Pub. Co.v. Walling</u>, 327 U.S. 186, 196 (1946).

82.     A Congressional subpoena must be reasonable.  An all-encompassing subpoena for personal, nonofficial documents falls outside the scope of Congress' legitimate legislative power.  <u>See</u> <u>Trump v. Mazars USA, LLP</u>, 140 S. Ct. 2019, 2040 (2020).

83.     The Select Committee's subpoena to JPMorgan is duplicative of records already received by the Select Committee or exceeds the scope of the Select Committee's the lawfully authorized purpose of the Select Committee.  <u>See</u> <u>McPhaul v. United States</u>, 364 U.S. 372, 381 (1960).

## D.     <u>Compelled production of financial records under the JPMorgan Subpoena would violate the First Amendment.</u>

84.     The subpoena of Mr. Budowich's private financial records violates his right to free association and chills the exercise of his and others free speech rights in a political context.

85.     The Committee's subpoena of Mr. Budowich's private financial records requests data which Mr. Budowich has already provided the Select Committee.

86.     Additionally, Mr. Budowich used his financial accounts to engage in protected advocacy and other speech, as well as private, personal and lawful activities.

87.     All of these associational and expressive activities are protected by the First Amendment.  <u>See</u> <u>Buckley v. Valeo</u>, 424 U.S. 1, 64 (1976); <u>Black Panther Party v. Smith</u>, 661 F.2d 1243, 1267 (D.C. Cir. 1981); <u>Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n</u>, 333 F.3d 168, 179 (D.C. Cir. 2003).

88.     The Committee has no legitimate purpose for seeking the protected information demanded by the subpoena. Mr. Budowich has already provided the Select Committee with responsive financial documents. Additional information will not meaningfully aid the Select Committee in any valid pursuit.

89.     Even if it had a valid reason to seek protected information, the Select Committee has put in place no safeguards to protect Mr. Budowich's rights.  It provided Mr. Budowich with no notice of the subpoena and has provided him with no opportunity to assert objections or other legal protections over the demanded information.  The entirety of the demanded information, including that which is constitutionally or otherwise protected, will be turned over to the Select Committee to do with as it pleases.

90.     The JPMorgan Subpoena is also a clear effort to chill the speech of the Select Committee Member's political adversaries.

91.     The body that issued this subpoena is composed of 9 members, 7 of whom belong to the political party that opposed the President who Mr. Budowich now serves in a professional capacity.

92.     As noted above, the subpoena served no substantive purpose in the Select Committee's investigation—it will not turn up any new relevant information.

93.     Allowing an entirely partisan select committee of Congress to subpoena the personal and private financial records of individuals would work a massive chilling of current and future, political, and associational and free speech rights.

94.     The Select Committee's asserted interest is insufficient and its alternative means of obtaining this information are too obvious to justify such a drastic chilling of speech.

## PRAYER FOR RELIEF

Wherefore, Plaintiff asks the Court to enter judgment in his favor and against Defendants and to order the following relief:

a.  A declaratory judgment that the JPMorgan Subpoena is ultra vires, unlawful, and unenforceable;

b.  A declaratory judgment that the JPMorgan Subpoena serves no valid legislative purpose and exceed the Select Committee's Constitutional authority;

c.  A declaratory judgment that compliance with the JPMorgan Subpoena would violate the Right to Financial Privacy Act, 12 U.S.C. §§ 3401-22;

d.  A declaratory judgment that the JPMorgan Subpoena violates Mr. Budowich's First Amendment rights;

e.  A declaratory judgment that the JPMorgan Subpoena violates Mr. Budowich's Fourth Amendment rights;

f.  In the alternative, an order modifying the JPMorgan Subpoena to seek only unprivileged information that does not infringe on Mr. Budowich's constitutional rights;

g.  An injunction quashing the JPMorgan Subpoena and prohibiting its enforcement by Defendants;

h.  An injunction prohibiting Defendants from imposing sanctions for noncompliance with the JPMorgan Subpoena;

i.  An injunction prohibiting Defendants from inspecting, using, maintaining, or disclosing any information obtained as a result of the JPMorgan Subpoena;

j.  An award in favor of Plaintiff of his actual damages, pursuant to 12 U.S. Code § 3417(a)(2);

k.  An award in favor of Mr. Budowich of punitive damages, pursuant to 12 U.S. Code § 3417(a)(3), as Defendants' violation is willful or intentional;

l.  An award in favor of Mr. Budowich for his reasonable expenses, including attorneys' fees and costs, incurred as a result of the JPMorgan Subpoena, pursuant to 12 U.S. Code § 3417(a)(4); and

m.  Any and all other relief that the Court deems just and proper.

Date:  December 27, 2021                    Respectfully submitted,

**s/ Christopher W. Dempsey**
CHRISTOPHER W. DEMPSEY
D.D.C. Bar ID:  AR0006
Daniel K. Bean (*Pro hac vice* forthcoming)
Jared J. Burns (*Pro hac vice* forthcoming)
ABEL BEAN LAW, P.A.
100 N Laura Street, Suite 501
Jacksonville, Florida 32202
Telephone:  (904) 944-4100
Fax:  (904) 944-4122
Email: cdempsey@abelbeanlaw.com