## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| TAYLOR BUDOWICH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 1:21-cv-03366-JEB |
| | ) | |
| NANCY PELOSI, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AMENDED EMERGENCY MOTION
## FOR TEMPORARY RESTRAINING ORDER
## AND/OR PRELIMINARY INJUNCTION

*Our republic endures because of the wisdom of our Constitution, enshrined in three co-equal branches of government, serving as checks and balances on each other . . . . No one is above the law.*
Defendant Pelosi, Sept. 24, 2019.

## INTRODUCTION

In accordance with Federal Rule of Civil Procedure 65 and LCvR 65.1, Plaintiffs Taylor Budowich and Conservative Strategies, Inc. ("Plaintiffs"), respectfully move for entry of a mandatory preliminary injunction and temporary restraining order mandating that Defendants Pelosi, Thompson, Cheney, Schiff, Raskin, Lofgren, Luria, Aguilar, Murphy, Kinsinger, and the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee Defendants") disgorge, promptly return, sequester, or destroy private financial records belonging to Plaintiffs, which the Select Committee Defendants received from Defendant JPMorgan in violation of the Right to Financial Privacy Act, 12 U.S.C. §§ 3401-23, and pursuant to an *ultra vires* Congressional Subpoena seeking information not calculated to materially aid any valid legislative purpose.

Plaintiffs further respectfully request entry of a prohibitory injunction and temporary restraining order precluding the Select Committee Defendants from any use or derivative use of private financial records belonging to Plaintiffs, and prohibiting the Select Committee Defendants from taking any further steps to enforce compliance with its Congressional Subpoena challenged herein, until such time as this Court enters final judgment resolving on the merits all claims presented by Plaintiffs in their Complaint (Dkt. No. 3).

## **FACTS & BACKGROUND**

On or about November 22, 2021, the Select Committee served Plaintiff Budowich with a Congressional Subpoena for production of documents and testimony at a deposition.  See Congressional Subpoena of Taylor Budowich (attached hereto as **Exhibit A**).  The Congressional Subpoena requested, *inter alia*, identification of all financial accounts for which Plaintiff Budowich was the direct or indirect beneficial owner, or over which he exercised control, into which funds were transferred or withdrawn for any purpose in connection with the Ellipse Rally, along with documents sufficient to identify all account transactions for the time period December 19, 2020, to January 31, 2021, in connection with the Ellipse Rally.  See Exhibit A at pp. 5-6.

The Select Committee set December 6, 2021, as Plaintiff Budowich's deadline for production of documents and December 16, 2021, as the date of Plaintiff Budowich's deposition. Id. at p. 1.  However, per the request of counsel for Plaintiff Budowich, the Select Committee subsequently agreed to extend its deadline for production of documents to December 13, 2021, and rescheduled Plaintiff Budowich's deposition for December 22, 2021.  See Select Committee Correspondence (attached hereto as **Exhibit C**).

On or about December 14, 2021, counsel for Plaintiff Budowich produced to the Select Committee three-hundred ninety-one (391) documents responsive to the Congressional Subpoena,

including all financial account transactions for the time period December 19, 2020, to January 31, 2021, in connection with the Ellipse Rally.  See Correspondence to Select Committee (attached hereto as **Exhibit D**).  Counsel for Plaintiff Budowich made supplemental production of forty-nine (49) additional documents on December 17, 2021.  See Exhibit D at p. 5.  Additionally, Plaintiff Budowich traveled to Washington, D.C. at his own expense and sat for a four (4) hour deposition before the Select Committee on December 22, 2021.

After learning that the Select Committee had subpoenaed financial information of other individuals, counsel for Plaintiffs transmitted correspondence to Defendant JPMorgan noting that Plaintiffs objected to the production of any private financial records pursuant to any Congressional Subpoena and requesting immediate notification should Defendant JPMorgan be served with a Congressional Subpoena.  See Correspondence to JPMorgan (attached hereto as **Exhibit E**).  That correspondence was received by JPMorgan at 5:41 a.m. EST on December 22, 2021.  See Exhibit E at p. 2.

Unbeknownst to Plaintiff Budowich, on or about November 23, 2021, the Select Committee served Defendant JPMorgan with a Congressional Subpoena for production of documents, at least in part requiring production of private financial records belonging to Plaintiff Budowich.[1]  See Congressional Subpoena to JPMorgan (attached hereto as **Exhibit B**).  The Select Committee initially set December 7, 2021, as Defendant JPMorgan's deadline for production of documents.  See Exhibit B at p. 1.  However, prior to December 7, 2021, the Select Committee extended Defendant JPMorgan's production deadline until December 24, 2021, a date specifically requested by Defendant JPMorgan.  See Correspondence with Select Committee (attached hereto as **Exhibit J**).

---

[1] Counsel for Plaintiffs received an incomplete copy of the Congressional Subpoena to JPMorgan at 5:00 p.m. EST on December 24, 2021.  See JPMorgan Correspondence (attached as **Exhibit K**).

At 2:33 p.m. EST on December 21, 2021, while Plaintiff Budowich was in Washington, D.C. for his deposition before the Select Committee, Defendant JPMorgan sent correspondence to Plaintiff Budowich at an address in Sacramento, California, advising that it received a Congressional Subpoena for his private financial records and would produce the same on December 24, 2021 at 5:00 p.m.  See Correspondence from JPMorgan (attached hereto as **Exhibit F**).   Related to his travel from Washington, D.C., Plaintiff Budowich did not receive this correspondence from Defendant JPMorgan until 7:00 p.m. EST on December 23, 2021.   He immediately informed counsel of the JPMorgan letter.   Counsel for Plaintiffs then immediately contacted Defendant JPMorgan to object to any production of his private financial records and request an extension of time for Defendant JPMorgan's production to the Select Committee.  See Correspondence with JPMorgan (attached hereto as **Exhibit G**).

On December 24, 2021, counsel for Plaintiffs – via telephone conversation and in writing to both the Select Committee and Defendant JPMorgan – requested an extension of Defendant JPMorgan's production deadline until January 3, 2021, in light of the long holiday weekend and federal government closures.   See Correspondence to Select Committee (attached hereto as **Exhibit H**); Correspondence to JPMorgan (attached hereto as **Exhibit I**); Correspondence from Select Committee (attached hereto as **Exhibit J**).   Despite prior extensions freely granted by the Select Committee related to document production by both Plaintiff Budowich and Defendant JPMorgan, the Select Committee and Defendant JPMorgan refused to extend the 5:00 p.m. EST on December 24, 2021 production deadline, notwithstanding their notice that Plaintiff Budowich "intend[ed] to exercise his legal rights in court" and that refusing to allow an extension of time would make Defendant JPMorgan "complicit in preventing its customer, who it promised to treat with equity and fairness . . . from having his day in court," in light of federal government and

national public holidays in the United States as designated at 5 U.S.C. § 6103.  See Exhibit I at p. 1.  Defendant JPMorgan then proceeded to produce Plaintiffs' private financial records to the Select Committee. Despite willingly producing Plaintiffs' private financial records, JPMorgan later argued to this Court, along with the Select Committee, that Plaintiffs' request to enjoin production of his private financial records was moot given that it had already produced the financial records at issue. JPMorgan made this argument even though it had itself directly created the circumstance it averred precluded this Court from granting meaningful relief.[2]

## LEGAL STANDARD

To obtain a temporary restraining order, the moving party must demonstrate: (1) a substantial likelihood of success on the merits; (2) that the moving party would suffer irreparable injury if the temporary restraining order were not granted; (3) that such an order would not substantially injure other interested parties; and (4) that such an order furthers the public interest.[3] See Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). Courts evaluate these four factors on a sliding scale.  Fraternal Ord. of Police Libr. of Cong. Lab. Comm. v. Libr. of Cong., 639 F. Supp. 2d 20, 23–24 (D.D.C. 2009) (citing Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1999)).  "If plaintiffs make an exceptionally strong

---

[2] It is apparently a standard business practice of Defendant JPMorgan to withhold production of financial records pursuant to a subpoena upon an objection by its customer.  Defendant JPMorgan has not yet proffered any explanation for why it failed to follow this business practice in the instant matter.  Defendant JPMorgan's production notwithstanding objections by counsel for Plaintiff, prior notice, and knowledge that Plaintiffs intended to seek judicial intervention, all create a strong and fair inference that it actively colluded with the Select Committee in an attempt "immunize the subpoena from challenge" based on "the fortuity that documents sought by a congressional subpoena are not in the hands of a party claiming injury from the subpoena."  United States v. AT&T Co., 567 F.2d 121, 129 (D.C. Cir. 1977).

[3] The standard for obtaining a temporary restraining order does not differ from that of a preliminary injunction.

showing on one factor, they need not make as strong a showing on the remaining factors.  For example, if plaintiffs make[] a strong showing of irreparable harm and there is no substantial harm to defendants, the Court applies a correspondingly lower standard for likelihood of success." Id. (citing WMATC v. Holiday Tours, 559 F.2d 841, 843 (D.C. Cir. 1977)).

Plaintiffs previously moved for an order temporarily restraining Defendant JPMorgan from producing documents to the Select Committee.  (Dkt. No. 2).  However, in light of actions by the Select Committee Defendants and Defendant JPMorgan, the circumstances now require a mandatory injunction. Although some courts have applied a heightened standard for mandatory injunctions, the United States Court of Appeals District of Columbia Circuit has never opined on the issue.  See Singh v. Carter, 185 F. Supp. 3d 11, 17 n.3 (D.D.C. 2016); Friends for All Child., Inc. v. Lockheed Aircraft Corp., 746 F.2d 816, 835 n.31 (D.C. Cir. 1984).  Moreover, applying a heightened standard for a mandatory injunction after Plaintiffs originally sought a prohibitory one would encourage prospective defendants to complete acts sought to be enjoined after receiving notice that the actions will be subject to imminent injunction proceedings.

As the United States Court of Appeals District of Columbia Circuit has held, a party acts at their peril by completing acts sought to be enjoined.  F.T.C. v. Weyerhaeuser Co., 648 F.2d 739, 741 (D.C. Cir. 1981). This is because "[i]t has long been established that where a party with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo." Porter v. Lee, 328 U.S. 246, 251 (1946); see also Weyerhaeuser, 648 F.2d at 741 (quoting Porter, 328 U.S. at 251). In accordance with this authority, the normal injunction standard applies here.

The actions of the Select Committee Defendants and Defendant JPMorgan are analogous to the defendants' conduct involved in Weyerhaeuser. 648 F.2d at 741.  In that matter, the Federal

Trade Commission ("FTC") sought to enjoin Weyerhaeuser and its subsidiary from purchasing a competitor, arguing that such action was anticompetitive. Id. at 740. The district court denied the FTC's motion for preliminary injunction; the FTC informed the Weyerhaeuser defendants that it intended to appeal that order and seek injunctive relief before an appropriate court of appeal. Id. at 740–41. Nonetheless, the Weyerhaeuser defendants went on to complete the transaction. Id. at 741. The United States Court of Appeals District of Columbia Circuit ordered the parties to return to the *status quo* at the time the district court denied the motion for preliminary injunction, relying on the United States Supreme Court's decision in Porter. Id.

In this instance, Plaintiffs informed both the Select Committee Defendants and Defendant JPMorgan that they intended to challenge the Congressional Subpoena at issue. In response, the Select Committee Defendants and Defendant JPMorgan refused to extend the date and time for production and Defendant JPMorgan ultimately produced private financial records of Plaintiffs to the Select Committee despite having notice of its customer's forthcoming challenge. From time of actual notice of the Congressional Subpoena up through and including the production concerned, all of Defendants' actions occurred outside this Court's regular business hours —by design.

Furthermore, as noted above, Defendant JPMorgan routinely declines to produce documents in response to a subpoena when it is informed of a customer challenge that could preclude the production of such documents.   By contrast and contrary to JPMorgan's apparent standard business practice, in the instant matter, Defendant JPMorgan disclosed private financial records of Plaintiffs despite being informed that Plaintiffs intended to immediately challenge the subpoena by filing an action in this Court.  Under these circumstances, the Court should restore the *status quo* as the Select Committee Defendants and Defendant JPMorgan had well-documented

notice that Plaintiffs intended to judicially challenge the Congressional Subpoena involved.  <u>See</u> Exhibits E-J.

Finally, immediate judicial intervention is required to vindicate the entitlement of Plaintiffs to secure judicial review of their constitutional claims.  "Courts routinely issue injunctions to stay the status quo when" events might otherwise "moot the losing party's right to appeal."  <u>John Doe Co. v. CFPB</u>, 235 F. Supp. 3d 194, 206 (D.D.C. 2017); <u>see also</u> <u>Ctr. For Int'l Envtl. Law v. Office of U.S. Trade Rep.</u>, 240 F. Supp. 2d 21, 22-23 (D.D.C. 2003) (explaining that the movant makes "a strong showing of irreparable harm" where disclosure would moot any appeal); <u>John Doe Agency v. John Doe Corp.</u>, 488 U.S. 1306, 1309, (1989) (Marshall, J., in chambers) ("The fact that disclosure would moot that part of the Court of Appeals' decision requiring disclosure . . . create[s] an irreparable injury.").  Under the unique facts of this case – in particular, prior notice by the Select Committee Defendants and Defendant JPMorgan of the instant legal challenge – the only manner in which to preserve the *status quo* as it should be and would have been absent any wrongdoing by Defendants, is to enter a mandatory injunction returning the *status quo* to what it was at the time of notice, as did the United States Court of Appeals for the District of Columbia Circuit in <u>Weyerhaeuser</u>.

## **LEGAL ARGUMENT**

## I.   <u>PLAINTIFFS DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS</u>.

### A.  The Select Committee Defendants and Defendant JPMorgan Violated the RFPA.

The Right to Financial Privacy Act ("RFPA"), 12 U.S.C. §§ 3401-23, provides: "No financial institution, or officers, employees or agent of the financial institution, may provide to any Government authority access to or copies of, or the information contained in, the financial records of any customer except in accordance with the provision of this chapter.  <u>See</u> 12 U.S.C. § 3403(a).

The RFPA additionally provides:  "A financial institution shall not release the financial records of a customer until the Government authority seeking such records *certifies in writing* to the financial institution that it has complied with the applicable provisions of this chapter."  See 12 U.S.C. § 3403(b) (emphasis added); see also 12 U.S.C. § 3411 ("deliver the records to the Government authority *upon receipt of the certificate required* under section 3402(b) of this title") (emphasis added).

> In pertinent part, the RFPA provides:
>
> [N]o Government authority may have access to or obtain copies of, or the information contained in the financial records of any customer from a financial institution unless the financial records are reasonably described and . . . such financial records are disclosed in response to an administrative subpoena or summons which meets the requirements of section 3405 of this title . . . [or] such financial records are disclosed in response to a formal written request which meets the requirements of section 3408 of this title.

12 U.S.C. §§ 3402(2), (5).  Both 12 U.S.C. §§ 3405 (administrative subpoena or summons) and 3408 (formal written request) require that a copy of the subpoena or request "have been served upon the customer or mailed to his last known address on or before the date on which the subpoena or summons was served on the financial institution" together with a formal statutory notice allowing ten (10) days from the date or service or fourteen (14) days from the date of mailing the required notice. See 12 U.S.C. §§ 3405, 3408.  Additional provisions of RFPA establish the right of a financial institution customer to challenge a request for their financial records in an appropriate United States District Court, and that proceedings involving such challenges should be completed or decided within seven (7) calendar days of the filing of any Government response.  See 12 U.S.C. § 3410(a)-(b).

The RFPA unequivocally provides jurisdiction for challenges by customers of financial institutions or actions to enforce RFPA provisions in any appropriate United States District Court.

<u>See</u> 12 U.S.C. § 3416.  The RFPA further provides for liability of agencies or departments of the United States or financial institutions upon violation of RFPA provisions, including liability for fines, actual damages sustained, punitive damages for "willful or intentional" violations, and an award of costs and reasonable attorney's fees as determined by the Court.  <u>See</u> 12 U.S.C. § 3417(a). The RFPA also provides for disciplinary action by agents or employees of departments or agencies where "an officer or employee acted willfully or intentionally with respect to the violation."  <u>See</u> 12 U.S.C. § 3417(b).  Finally, "in addition to any other remedy," the RFPA provides for injunctive relief, which "shall be available to require that the procedures of this chapter are complied with." <u>See</u> 12 U.S.C. § 3418.

## 1.   *The RFPA Applies to the Select Committee Congressional Subpoena.*

The RFPA applies to any "Government authority," which is broadly defined as "any agency or department of the United States, or any officer, employee, or agent thereof . . . ."  <u>See</u> 12 U.S.C. § 3401(c).  It is anticipated that counsel for the Select Committee Defendants will argue that the RFPA does not apply to Congress.  This position is inconsistent with the plain and unambiguous statutory text of the RFPA provision at issue.

First, by its express terms, the RFPA applies to "any Government authority" which is defined as "any agency or department of the United States . . . ."  <u>See</u> 12 U.S.C. §§ 3403(a), 3401(3).  As the United States Supreme Court has opined, "the phrase *any* . . . suggests a broad meaning" that when "[r]ead naturally . . . has an expansive meaning, that is, one or some indiscriminately of whatever kind."  <u>Ali v. Fed. Bureau of Prisons</u>, 552 U.S. 214, 219 (2008) (internal citations and quotations omitted).

As the "cardinal canon" of statutory construction, Courts must "presume that a legislature says in a statute what it means and means in a statute what is says there . . . [and] when the words

of a statute are unambiguous, then, this first canon is also the last:  judicial inquiry is complete." Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n, 533 F.3d 810, 816 (D.C. Cir. 2008) (citing Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992)).  When the words of a statute are unambiguous, the Courts have "no need to employ, nor any legitimate purpose in employing, canons of construction designed to reconcile confusing language."  Atkinson v. Inter-American Dev. Bank, 156 F.3d 1335, 1341 (D.C. Cir. 1998); see also United States v. Hunt, 526 F.3d 739, 744 (11th Cir. 2008) ("When the text of a statute is plain . . . [the Court] need not concern [itself] with contrary intent or purpose revealed by the legislative history.").

The terminology "any Government authority" defined as "any agency or department of the United States, or any officer, employee, or agent thereof" is so categorically plain and unambiguous that now United States Circuit Judge Ketanji Brown Jackson without hesitation or comment noted that "RFPA provides that a *federal government entity* may subpoena a bank to obtain financial records . . . ."  Nicksolat v. U.S. Dep't of Transp., 277 F. Supp. 3d 122, 124 (D.D.C. 2017).  This Court should conclude the same.

Another "fundamental canon of statutory construction" is that words should be "interpreted as taking their ordinary, contemporary, common meaning  . . . at the time Congress enacted the statute."  Wis. Cent. Ltd. v. United States, 138 S. Ct. 2067, 2074 (2018).  In accordance with the record and this authority, the term "Government authority" cannot be narrower than its ordinary meaning.  The Legislative Branch is both an agency and department of the United States Government.

### 2.   The U.S. House of Representatives is an Agency of the United States.

The U.S. House of Representatives is defined and characterized as a "Legislative Branch Agency" within the Legislative Branch of the United States Government.  See "Branches of the

U.S. Government," USAGov ("Official Guide to Government Information and Services") (available at https://www.usa.gov/branches-of-government#item-214496) (last visited Jan. 3, 2022) (attached hereto as **Exhibit L**).  The reality is just like the United States Botanic Garden, United States Capitol Police, and United States Capitol Visitor Center, the United States House of Representatives operates, at least in part, in an administrative capacity and is therefore a "Government authority" and "agency . . . of the United States" for purposes of 12 U.S.C. § 3401(3).

The applicability of the RFPA to the Select Committee proceedings at issue should come as no surprise given the nature of the express objectives and proclaimed goals of the Select Committee, to wit:  "investigate and report upon the facts, circumstances, and causes relating to [] January 6, 2021," "examine and evaluate evidence developed by relevant Federal, State, and local governmental agencies regarding the facts and circumstances" of January 6, 2021," and "build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other executive branch, congressional, or independent bipartisan or nonpartisan commission investigations."  See H. Res. 503, § 3(1)-(3).  These are purely and quintessentially law enforcement functions, the kind of which are squarely governed by the RFPA.

To demonstrate this point, the Congressional Subpoena to Defendant JPMorgan itself notes that production may be made "to any authorized staff member or the U.S. Marshals Service."  See Exhibit B at p. 1.  The U.S. Marshals Service is an Executive Branch agency.  See 28 U.S.C. § 561; see also U.S. Marshals Service Policy Directives (attached hereto as **Exhibit M**) at Section 11.2(C)(2)(d) (governing Congressional Subpoenas) and Section 11.1(D)(1)(a) ("Government Civil Process . . . subpoena . . . originating from a government agency or U.S. District Court.").  It is clear that while the Select Committee originates from a Legislative Branch entity, it is operating

as a *de facto* "agency . . . of the United States . . . ."  See 12 U.S.C. § 3401(3); see also Daniel

Chaitin, "Capitol Riot Investigators 'Engaged' With US Marshals," Washington Examiner (Oct.

14, 2021) (Defendant Murphy:  "We have engaged with a wide variety of law enforcement offices,

including the U.S. Marshals, in order to issue the subpoenas . . . [and] we will use all of the agencies

and all of the tools at our disposal to issue the subpoenas and enforce them."); Tom Hamburger,

"Thompson Says Jan. 6 Committee . . . Weighing Criminal Referrals, Washington Post (Dec. 23,

2021) (Defendant Thompson:  "I can assure you that if a criminal referral would be warranted,

there would be no reluctance on the part of this committee to do that.").

### 3.   *The U.S. House of Representatives is a Department of the United States.*

Congress is commonly referred to as a "department" of the federal government.  See, e.g.,

Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972); Nixon v. Admin'r Gen.

Servs., 433 U.S. 425, 443 (1977) ("each of the three general *departments* of government (must

remain) entirely free from the control or coercive influence, direct or indirect, of either of the others

. . . .") (emphasis added); see also Oetjen v. Cent. Leather Co., 246 U.S. 297, 311 (1918) (referring

"to the executive and legislative – 'the political' – *departments* of the government"); Ping v. United

States, 130 U.S. 581, 628 (1889) ("the legislative *department* of the government") (emphasis

added); Marbury v. Madison, 5 U.S. 137, 177 (1803) (referring to the Judicial Branch as the

"judicial department"); Schneider v. Kissinger, 412 F.3d 190, 194 (D.C. Cir. 2005) (referring to

the executive and legislative "*departments*" of the government) (emphasis added).

### 4.   *The Purpose, Context, Structure, and Internal Provisions of the RFPA Demonstrate the Act Applies to Congress.*

Even if this Court were to look beyond the plain and unambiguous statutory text of 12

U.S.C. § 3401(3), it should apply "the familiar interpretative canon *noscitur a sociis*," which means

"a word is known by the company it keeps" and dictates that the Court should "look to the context

in which the words appear." McDonnell v. United States, 136 S. Ct. 2355, 2368 (2016) (citing Yates v. United States, 135 S. Ct. 528, 1085 (2015)).

The term "any Government authority" is defined as "any agency or department of the United States . . . ." 12 U.S.C. §§ 3403(a), 3401(3). This provision is broad and expansive. It was also enacted in response to the United States Supreme Court decision in United States v. Miller, 425 U.S. 435, 440 (1976), which held that a bank customer had no Fourth Amendment right to prevent a bank from disclosing his financial records in response to a grand jury subpoena. SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735, 745 n.15 (1984).

The RFPA was "designed to strike a balance between customers' right of privacy and the need for law enforcement agencies to obtain financial records pursuant to legitimate investigations." O'Brien, 467 U.S. at 746 (quoting H. Rep. No. 95-1383, at 33 (1978)). The impetus behind the RFPA was to protect a customer's right of privacy concerning disclosure of financial records without qualification as to the character of the federal government entity seeking the records.

If Congress wanted to exempt itself from the RFPA, it had the chance and declined to do so. A draft bill submitted by the United States Department of Justice and the Treasury Department would have explicitly covered access to financial records by Congress and distinguished Congress from "any agency or department of the United States." See Electronic Funds Transfer & Financial Privacy: Hearings on S. 2096, S. 2293, & 1460 Before the Subcomm. On Financial Institutions of the S. Comm. on Banking, Housing & Urban Affairs, 95th Cong. 397 (1978). However, given the already broad and expansive definition of Government authority at 12 U.S.C. § 3401(3), Congress apparently felt no need to exempt itself.

Further, at 12 U.S.C. § 3413(j), the RFPA specially exempts circumstances where "financial records are being sought by the Government Accountability Office." See 12 U.S.C. § 3413(j). The United States Government Accountability Office ("GAO") is a Legislative Branch government agency that provides auditing, evaluation, and investigative services for Congress. See Bowsher v. Synar, 478 U.S. 714, 731 (1986); Cause of Action v. NARA, 753 F.3d 210, 213-14 (D.C. Cir. 2014) (GAO is among the "legislative agencies"); see also U.S. Government Accountability Office (available at https://www.gao.gov/about) (last visited Jan. 3, 2022). If the RFPA was limited to the Executive Branch, as the Select Committee Defendants are expected to argue, then there would been no need to provide an exemption for the GAO, let alone a partial one. It follows that Congress appreciated that the RFPA applied to its activities, given that it specifically exempted certain of its authorities from the Act's coverage. But Congress did not intend to exclude itself from the RFPA's modest protections.

At the time it enacted the RFPA, unlike the present circumstances, Congress was more concerned with protecting individual rights to financial privacy than arguing it is above the law. It would be surprising if Congress determined to expand privacy rights of financial customers in their records, yet at the same time provided a wholesale exemption for its own subpoenas, which as documented in these proceedings, can be just as obtrusive as traditional law enforcement investigations by the Executive Branch.

It is anticipated the Select Committee Defendants will argue that the RFPA's definition of "Government authority" extends only to the Executive Branch and not more broadly to Congress.[4]

---

[4] Defendants are likely to argue that Trump v. Deutsche Bank AG, 943 F.3d 627, 645 (2d Cir. 2019) holds that Congress is not a "Government authority" under the RFPA. Although Deutsche Bank appears to be the only published circuit court opinion discussing whether the definition of "Government authority" applies to Congress, the Supreme Court expressly vacated the opinion and remanded the case. See Trump v. Mazars USA, LLP, 140 S. Ct. 2019, 2036 (2020). Additionally, that case did not consider all of the arguments raised by Plaintiffs here and ignored

That reading does not work.  To begin, the Select Committee Defendants would ask this Court to read an implied exception into the statutory scheme.  Although the RFPA contains a number of specific exemptions, see, e.g., 12 U.S.C. §§ 3413(c) (tax proceedings); 3413(g) (certain law-enforcement inquiries); 3413(i) (grand jury subpoenas), it does not provide a general exemption for congressional subpoenas.  "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."  United States v. Smith, 499 U.S. 160, 167 (1991).

Moreover, the statutory context confirms that Congress expected the RFPA to apply beyond the Executive Branch.  Notably, the statute specifically addresses the one circumstance where Congressional inquiries are not subject to the RFPA's procedures:  when the records request is from "a duly authorized committee or subcommittee of Congress" to "any officer or employee of a supervisory agency."   See 12 U.S.C. § 3412(d).  If Congressional Subpoenas were never intended to come within the RFPA's scope, there would be no reason to include this provision; any other interpretation would render this provision superfluous.  See Duncan v. Walker, 533 U.S. 167, 167 (2001) (judiciary must avoid "treat[ing] statutory terms as surplusage"); see also Nat'l Ass'n Mfrs. v. Dep't of Defense, 138 S. Ct. 617, 632 (2018) (stating that the judiciary is "obliged to give effect, if possible, to every word Congress used . . . .").  In contrast to any contrary reading, Plaintiffs' interpretation gives this provision a logical purpose:  when a supervisory agency has already obtained these documents (presumably in compliance with the RFPA's procedures), Congress is not required to go through the RFPA's notice and certification procedures anew.  Of course, the Congressional Subpoena at issue was directed to Defendant JPMorgan, and not a

---

Supreme Court precedent referring to the branches of government as "departments."  See Deutsche Bank, 943 F.3d at 645. Thus, Deutsche Bank rested on faulty logic to begin with, and in any event, is no longer good law.

supervisory agency; accordingly, 12 U.S.C. § 3412(d) provides no authority for the Select Committee's receipt of private financial records in this instance.

As noted above, the Select Committee seeks to conduct purely and quintessentially law enforcement prerogatives. Seeing this concern, in considering establishment of a "National Commission to Investigate the January 6 Attack on the United States Capitol Complex," at Section 6(d) of H.R. 3233, which mandated that "The subpoenas of the Commission shall be served in the manner provided for subpoenas issued by a United States district court under Fedeeral Rule of Civil Procedure for the United States district courts."  The Select Committee under H. Res. 503 introduced by Defendant Pelosi dispensed with this requirement.

In these proceedings, the Select Committee Defendants will argue that their authority knows no bounds.  If accepted, this argument would result in an unparalleled precedent in our Nation's history cautioned against by Montesquieu himself:   "if the judiciary power . . . [were] joined with the legislative, the life and liberty of the subject would be exposed to arbitrary controul; for the judge would be then the legislator."  See Montesquieu, The Spirit of the Laws 157 (A. Cohler et al. eds., 1989).   In other words, if Congress has unfettered authority, the Select Committee is therefore and necessarily free to investigate every detail of the personal life of any political opponent or associate with endless subpoenas to his accountants, bankers, lawyers, doctors, family, friends, and anyone else with information the Select Committee finds interesting. This cannot be the case.  Moreover, this result would betray the text, context, and purpose of the RFPA, as well as undermine the purpose that motivated the Act's passage, which is to provide safeguards and a process in light of the "serious concern for the privacy interests of individuals in their bank records."  Botero-Zea v. United States, 915 F. Supp. 614, 619 (S.D.N.Y. 1996).

Finally, it is anticipated that counsel for Select Committee Defendants will argue as evidence that the RFPA does not apply to targets of Congressional Subpoenas, that 12 U.S.C. § 3417(b) tasks the Office of Personnel Management ("OPM") with determining whether "disciplinary action is warranted against the agent or employee" of "any agency or department" found to have violated the RFPA, and Congress would not have charged OPM with holding proceedings against Congressional staff.  But Congress and its employees and/or agents are eligible for benefits administered by OPM, such as the Federal Employees Group Life Insurance Program, Civil Service Retirement System or Federal Employees Retirement System, and numerous other entitlements and allowances within the purview of OPM.  See Ida A. Brudnick, "Congressional Salaries and Allowances:  In Brief," Congressional Research Service (Apr. 11, 2018).  It follows and does not seem odd that Congress would refer jurisdiction for any disciplinary proceedings in connection with the RFPA to OPM for handling.

*   *   *

Congress is not exempt from the procedures outlined in the RFPA.  Accordingly, the RFPA covers the Congressional Subpoena at issue.  The Select Committee Defendants made no attempt to comply with the RFPA or its procedures and, of course, have not certified to Defendant JPMorgan that it provided the requisite notice to Plaintiffs in accordance with the RFPA.  See 12 U.S.C. § 3403(b); see also 12 U.S.C. § 3411.  Defendant JPMorgan therefore had no authority to disclose the private financial records of Plaintiffs pursuant to a Congressional Subpoena, a complete copy of which the Select Committee Defendants and Defendant JPMorgan continue refuse to provide counsel for Plaintiffs.  As such, Plaintiffs are likely to prevail on their RFPA claim.  Plaintiffs are thus entitled to relief in the form of a mandatory injunction Ordering the Select Committee Defendants to disgorge, promptly return, sequester, or destroy any and all

private financial records belonging to Plaintiffs, which the Select Committee Defendants received from Defendant JPMorgan in violation of the RFPA.

**B.  The Select Committee and its Congressional Subpoena are *Ultra Vires*.**

**1.  *The Select Committee is Not Duly Constituted.***

Plaintiffs are likely to succeed on the merits because it is clear that the Select Committee is operating *ultra vires*.  House Resolution 503, the resolution creating the Select Committee, requires that the Committee be comprised of thirteen members.  See H.R. 503, § 2(a) ("The Speaker *shall* appoint 13 Members to the Select Committee." (emphasis added)).  The Committee has, and has always had, only nine (9) members.  See https://january6th.house.gov/about/membership.  Further, Section 2(a) requires that five (5) of the thirteen (13) members "be appointed after consultation with the minority leader."  See H.R. 503, § 2(a).  There are only two (2) Republican members on the Select Committee, neither of which were recommended by the minority leader. As such, the Select Committee is not duly formed pursuant to its own authorizing charter.

The Supreme Court has repeatedly stated that Congress must observe its own rules. See, e.g., Yellin v. United States, 374 U.S. 109, 114 (1963) ("[L]egislative committee[s] ha[ve] been held to observance of [their] rules . . . ."); Gojack v. United States, 384 U.S. 702, 706–09 (1966) (overturning conviction for contempt of Congress because committee failed to follow its own rules); Christoffel v. United States, 338 U.S. 84, 90 (1949) (reversing criminal conviction because Congress failed to follow its own rules); see also, e.g., Shelton v. United States, 327 F.2d 601 (D.C. Cir. 1963) (reversing a conviction for failure to follow the rule of ratifying the defendant as a witness); Liveright v. United States, 347 F.2d 473 (D.C. Cir. 1965) (reversing a conviction for failure to follow the rule that the subcommittee chairman consult with the entire committee before

filing a subpoena); <u>United States v. Grumman</u>, 227 F. Supp. 227 (D.D.C. 1964) (holding that the committee failed to follow its own rules where the committee did not respond to a request for an executive session and where testimony served no goals but to expose the witness).

The separation of powers doctrine is no impediment here.  Although the judiciary normally avoids questions of congressional procedure and authority, the right to financial privacy of Plaintiffs is being violated by a Legislative Branch agency that fails to comply with its own authorizing charter.  The Court can intervene in such circumstances.  <u>See, e.g.</u>, <u>Watkins v. United States</u>, 354 U.S. 178, 187 (1957) ("There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress.").  Moreover, Plaintiffs are likely to prevail on their claim that any information that is pertinent to the Select Committee's investigation has already been produced to the Select Committee by Plaintiffs.  Accordingly, the Congressional Subpoena for the private financial records of Plaintiffs directed to Defendant JPMorgan lacks any connection to the Select Committee's stated objectives.

Further, as stated in the Complaint (Dkt. No. 3), the Select Committee's unauthorized investigation into the finances of private citizens exceeds its authority under the Constitution and violates the separation of powers doctrine.  <u>Watkins</u>, 354 U.S. at 178 ("Nor is the Congress a law enforcement or trial agency.  These are functions of the executive and judicial departments of government.").   Contrary to the statements of several members of the Select Committee, "[i]nvestigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible."  <u>Id</u>. at 187. Because the Select Committee was not only constituted as a *de facto* law enforcement entity, its actions offend the Constitution.

2. **The Select Committee and its Congressional Subpoena Lacks a Legitimate Legislative Purpose.**

Of the "Purposes" proclaimed by H. Res. 503, § 3(1)-(3) in constituting the Select Committee, notably absent is any declaration of intent to legislate.  To be clear, the Select Committee has not identified any legislative purpose – let alone a potential piece of legislation – that their Congressional Subpoena is intended or required to advance.  Rather, the Select Committee simply seeks to collect and "expose" the financial documents of its political opponents "for the sake of exposure," which purpose is illegitimate and provides no authority for the Congressional Subpoena at issue.  Watkins, 354 U.S. at 200.

The "legitimate legislative purpose" requirement stems directly from the Constitution itself.  "The powers of Congress . . . are dependent solely on the Constitution," and "no express power in that instrument" allows Congress to investigate individuals or to issue compulsory process.  Kilbourn v. Thompson, 103 U.S. 168, 182-89 (1880).  The Constitution instead permits Congress to enact certain kinds of legislation.  See, e.g., Art. I, § 8.  As such, the power of Congress to investigate "is justified solely as an adjunct to the legislative process."  Watkins, 354 U.S. at 197.  "Congress is not invested with a general power to inquire into private affairs.  The subject of any inquiry always must be one on which legislation could be had."  Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 504 n.15 (1975); see also Quinn v. United States, 349 U.S. 155, 161 (1955) ("[T]he power to investigate" does not "extend to an area in which Congress is forbidden to legislate.").

To "investigate" and "report," in a vacuum, are not legitimate legislative purposes that can justify subpoenaing a citizen's private financial records.  For more than a century, in fact, the United States Supreme Court has been quite "sure" that neither the House nor Senate "possesses the general power of making inquiry into the private affairs of the citizen."  Kilbourn, 103 U.S. at

190.  "[T]here is no congressional power to expose for the sake of exposure." Watkins, 354 U.S. at 200. "No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress." Id. at 187.

Additionally, because Congress must have a legitimate legislative purpose, it cannot use subpoenas to exercise "any of the powers of law enforcement." Quinn, 349 U.S. at 161.  Those powers "are assigned under our Constitution to the Executive and the Judiciary." Id.  Put simply, Congress is not "a law enforcement or trial agency," and congressional investigations conducted "for the personal aggrandizement of the investigators" or "to punish those investigated" are "indefensible."  Watkins, 354 U.S. at 187 ("Congress may not constitutionally require an individual to disclose his . . . private affairs except in relation to a valid legislative purpose.") (internal quotations omitted).  Our tripartite system of separated powers requires that "any one of the[] branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other." Kilbourn, 103 U.S. at 190-91.

Further, when a subpoena is issued by a single Committee, any legislative purpose is not legitimate unless it falls within that Committee's jurisdiction.  "The theory of a committee inquiry is that the committee members are serving as the representatives of the parent assembly in collecting information for a legislative purpose." Watkins, 354 U.S. at 200.  Congress therefore must "spell out that group's jurisdiction and purpose with sufficient particularity . . . in the authorizing resolution," which "is the committee's charter." Id. at 201. The Committee "must conform strictly to the resolution." Exxon Corp. v. FTC, 589 F.2d 582, 592 (D.C. Cir. 1978).  And when an investigation is "novel" or "expansive," the Courts will construe the Committee's jurisdiction "narrowly." Tobin v. United States, 306 F.2d 270, 275 (D.C. Cir. 1962).

As such, this Court must investigate whether the subpoenas are pertinent to any supposed legislative purposes, and narrow them if they are overbroad.  Pertinency "is a jurisdictional concept . . . drawn from the nature of a congressional committee's source of authority."  Watkins, 354 U.S. at 206.  It is both a defense to contempt and a ground for proactively enjoining a congressional subpoena.  See Bergman v. Senate Special Comm. on Aging, 389 F. Supp. 1127, 1130 (S.D.N.Y. 1975); Hearst v. Black, 87 F.2d 68, 71 (D.C. Cir. 1936).  While Congress does not violate the law every time an investigation turns out to be a dead end, the Courts must ensure that subpoenas are "reasonably relevant" to a legitimate legislative purpose.  McPhaul v. United States, 364 U.S. 372, 381-82 (1960).  And while courts give Congress some leeway to color outside the lines, they do not hesitate to narrow overbroad subpoenas "to the extent" they exceed a Committee's statutory or constitutional authority.  Bergman, 389 F. Supp. at 1130-31.  If the law were otherwise, then Congress could easily circumvent the Constitution by bundling illegitimate requests with legitimate ones.  That is why "[t]he burden is on the court to see that the subpoena is good in its entirety."  United States v. Patterson, 206 F.2d 433, 434 (D.C. Cir. 1953).

As the "crucial inquiry is whether a legislative purpose is being served," the United States Court of Appeals for the District of Columbia Circuit collected, synthesized, and articulated principles that control resolution of a case involving a legislative subpoena.  See Trump v. Mazars USA, LLP, 940 F.3d 710, 722-23 (D.C. Cir. 2019), vacated 140 S. Ct. 2019 (2020).  First, the Mazars court stated, "because the power of Congress . . . to investigate is co-extensive with [its] power to legislate, Congress may in exercising its investigative power neither usurp the other branches' constitutionally delegated functions nor violate individuals' constitutionally protected rights.  Congress may not conduct itself" as a law enforcement agency.  940 F.3d at 723 (internal quotations and citations omitted).  Second, "because the scope of [Congress's] power of inquiry

. . . is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution, Congress may investigate only those topics on which it could legislate . . . [and] [i]f no constitutional statute may be enacted on a subject matter, then the subject is off-limits to congressional investigators."   Id.   Finally, "congressional committees may subpoena only information calculated to materially aid their investigations . . . [thus] [e]ven a valid legislative purpose cannot justify a subpoena demanding irrelevant material."   Id.

With these principles in mind, in this instance, the Congressional Subpoena at issue presumably seeks financial records of a private citizen totally unrelated to any public office or position held within the administration of any Government authority.  Further, there is no declared remedial purpose of the Select Committee investigation except to "investigate" and "report."   See H. Res. 503, § 3(1)-(3).  Without a legislative purpose to serve, the Congressional Subpoena cannot be calculated to materially aid any investigation in furtherance of a power to legislate.  As a result, because the challenged Congressional Subpoena lacks any legitimate legislative purpose and the Select Committee is engaging in an impermissible law enforcement inquiry, the Select Committee therefore is without authority to compel production of Plaintiffs' private financial records and lacks any authorization or basis for their continued possession and use.

## II.   PLAINTIFFS WOULD SUFFER IRREPARABLE INJURY IF PRELIMINARY RELIEF WAS NOT GRANTED.

To be awarded injunctive relief, Plaintiffs must demonstrate that irreparable harm is likely. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  To demonstrate irreparable harm, "[t]he moving party must show '[t]he injury complained of is of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" Chaplaincy of Full Gospel Churches, 454 F.3d at 297 (quoting Wisc. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)).

The continuing failure and refusal of the Select Committee Defendants to return the private financial records of Plaintiffs to Defendant JPMorgan, as demanded, would result in irreparable harm to Plaintiffs.  First, given the nature of Plaintiff Budowich's occupation and line of business, his financial records contain information protected by the First Amendment concerning his clients. Second, aspects of Plaintiff Budowich's business dealings rely on discretion, such that disclosure of any payments by clients would chill and threaten the very existence of his enterprise.  Third, Plaintiff Budowich will suffer irreparable injury to his reputation and goodwill if his private financial records are not removed from the public domain and restored to the sole custody of his financial institution.

Plaintiff Budowich and his company provide communications strategy for politicians and prospective politicians.  Plaintiff Budowich and his entity are paid for these services.  Plaintiff and his company would be substantially and irrevocably harmed without the assurance of confidentiality for his clients.  Records of payments for political consultant services by Plaintiffs could provide members of the Select Committee and other political opponents an unfair political advantage by allowing them to see how, when, and to what degree potential political opponents spend for different services.  This raises serious First Amendment concerns, not only for Plaintiff Budowich, but also for his valued clients.  And Courts in this district have held that interference with First Amendment rights constitute an irreparable harm. See Carey v. Fed. Election Comm'n, 791 F. Supp. 2d 121, 134 (D.D.C. 2011) ("The First Amendment requires [courts] to err on the side of protecting political speech rather than suppressing it.") (quoting FEC v. Wis. Right to Life, 551 U.S. 449, 457 (2007) (internal quotations omitted)).

Second, Plaintiff Budowich and his entity are likely to lose clients if their financial records or dealings are disclosed to the Select Committee without any pertinent legislative purpose.

Although economic loss is not, standing alone, an irreparable harm, see Wisc. Gas Co., 758 F.2d at 674, "courts have recognized that economic loss may constitute 'irreparable harm' where a plaintiff's alleged damages are unrecoverable," Clarke v. Office of Fed. Hous. Enter. Oversight, 355 F. Supp. 2d 56, 65–66 (D.D.C. 2004) (citations omitted). Here, Plaintiff Budowich is unable to determine how many current and prospective clients he will lose if his financial records are disclosed; accordingly, money damages are inadequate and, like relief related to violation of a non-compete, injunctive relief is warranted here.

Third, Plaintiff Budowich and his business will suffer irreparable harm in the form of damage to their reputation and goodwill if the Select Committee is able to retain the private financial records of Plaintiffs.  Plaintiff Budowich's ability to ensure discretion is paramount to his ability to secure work.  If clients or prospective clients believe the amount of their payments, the timing of those payments, and other specific financial dealings – which are all legal and monitored by various agencies – are not protected, it would jeopardize the ability of Plaintiffs to do business altogether.  Specifically, the loss of client confidentiality will result in loss of client trust and goodwill because these clients expect that the information regarding their payments to Plaintiffs will remain confidential.   However, as the Select Committee has obtained this information indirectly through Defendant JPMorgan, without demonstrating its pertinency to a legislative purpose, then "clients [may] begin to feel that their personal information is not safe with [Plaintiffs], [and] this development might well lead to a loss of trust and goodwill." Morgan Stanley DW Inc. v. Rothe, 150 F. Supp. 2d 67, 78 (D.D.C. 2001) (finding irreparable harm and issuing a preliminary injunction).  The record is plain that Plaintiffs will suffer irreparable harm absent injunctive relief.

Finally, the irreparable harm presented by the continuing failure and refusal of the Select Committee Defendants to disgorge, promptly return, sequester, or destroy private financial records belonging to Plaintiffs, is particularly imminent and acute in light of the Select Committee's planned "televised hearings" and release of a "series of reports" to "reveal their findings" as it prepares to "go public" in the coming months.  See Associated Press, "Jan. 6 Committee Prepares to Go Public as Findings Mount," U.S. News (Jan. 2, 2022).  While it is a harm and affront to the right of financial privacy of Plaintiffs that the Select Committee Defendants have obtained the private financial records concerned, the gravity of the harm suffered by Plaintiffs will increase exponentially as the Select Committee makes public its findings, reports, and supporting evidence therefor.

## III.   AN ORDER GRANTING PRELIMINARY RELIEF WOULD NOT SUBSTANTIALLY INJURE OTHER INTERESTED PARTIES.

The Select Committee Defendants and Defendant JPMorgan will suffer no harm if the Court returns the parties to the *status quo* at the time Plaintiffs gave Defendants notice that Plaintiffs would seek judicial intervention. Such interim relief will afford the Court ample opportunity to carefully consider the merits of the matter while at the same time protecting Plaintiffs' rights.

The Select Committee is investigating past events with an objective of issuing a report. H.R. 503 § 3.  The Select Committee has no urgent need for the subpoenaed documents.  A slight delay in this process will not harm the Select Committee or any of its functions.  Indeed, Plaintiff Budowich has already identified all financial accounts for which he or his business was the direct or indirect beneficial owner, or over which he exercised control, into which funds were transferred or withdrawn for any purpose in connection with the Ellipse Rally, and produced to the Select Committee documents sufficient to identify all account transactions for the time period

December 19, 2020, to January 31, 2021, in connection with the Ellipse Rally.  See Exhibit A at pp. 5-6.  Plaintiff Budowich also appeared at a deposition before the Select Committee to answer under oath any questions it may have regarding his financial dealings.  As such, the Select Committee already possesses all information pertinent to the financial accounts and records of Plaintiffs responsive to its inquiry.

The Committees' "interest in receiving the records immediately" thus "poses no threat of irreparable harm to them."  See Shapiro v. U.S. Dep't of Justice, No. 13-555 (RDM), 2016 WL 3023980, at *7 (D.D.C. May 25, 2016) see also Election Privacy Info. Ctr. v. U.S. Dep't of Justice, 15 F. Supp. 3d 32, 47 (D.D.C. 2014) (explaining that a "desire to have [the documents] in an expedited fashion without more is insufficient to constitute irreparable harm").  Interim relief only "postpones the moment of disclosure . . . by whatever period of time may be required" to finally adjudicate the merits of this matter.  Providence Journal Co. v. Fed. Bureau of Investigation, 595 F.2d 889, 890 (1st Cir. 1979); see also Fund For Animals v. Norton, 281 F. Supp. 2d 209, 222 (D.D.C. 2003) (rejecting government's claim of harm in having its action "delayed for a short period of time pending resolution of this case on the merits"); 22nd Avenue Station, Inc. v. City of Minneapolis, 429 F. Supp. 2d 1144, 1152 (D. Minn. 2006) (similar); Inchcape Shipping Servs. Holdings Ltd. v. United States, No. 13-953 C, 2014 WL 12838793, at *3 (Fed. Cl. 2014) (similar). In any event, whatever interest the Select Committee might have in immediately obtaining these documents pales in comparison to Plaintiffs' interest in securing judicial review related to the production of their private financial records.

## IV.   AN ORDER GRANTING PRELIMINARY RELIEF WOULD FURTHER THE PUBLIC INTEREST.

The public interest weighs strongly in favor of Plaintiffs as the public interest will not be harmed by the issuance of the requested preliminary relief.  The public has no right to Plaintiffs'

private financial documents.  Further, any delay in the Select Committee obtaining such documents would not impact the public interest.

Moreover, the public has an interest in ensuring that elected members of government do not abuse their powers by acting in an unconstitutional manner that infringes the rights of citizens. Congress "does not have an interest" in violating the Constitution, the RFPA, or its own Rules and Resolutions, Amarin Pharma, Inc. v. FDA, 119 F. Supp. 3d 196, 237 (S.D.N.Y. 2015), and the public "clearly" has "an interest in the government maintaining procedures that comply with constitutional requirements," ACORN v. FEMA, 463 F. Supp. 2d 26, 36 (D.D.C. 2006) (citing O'Donnell Const. Co. v. District of Columbia, 963 F.2d 420, 429 (D.C. Cir. 1992)).  As such, the public interest is best served by mandating return and limiting use of the private financial records that the Select Committee was not entitled or authorized to receive.

The Constitution entrusts this Court to determine whether Congress has "assumed a power which could only be properly exercised by another branch of the government." Kilbourn, 103 U.S. at 192.  Denying Plaintiffs interim relief would "abdicate the responsibility placed by the Constitution upon the judiciary to insure that the Congress" has not acted illegitimately in issuing the Congressional Subpoena at issue for production of confidential financial documents. Watkins 354 U.S. at 198-99.  Beyond any doubt, allowing the Select Committee Defendants and Defendant JPMorgan to evade judicial review clearly runs contrary to the public interest.

## **CONCLUSION**

Plaintiffs demonstrate a substantial likelihood of success on the merits because the Select Committee Defendants and Defendant JPMorgan violated the RFPA, which applies to the Congressional Subpoena at issue because the U.S. House of Representatives is a "Government authority" and both an agency and department of the United States.  Further, the purpose, context,

structure, and internal provisions of the RFPA demonstrate the Act applies to Congress. Additionally, the Select Committee and it Congressional Subpoena are *ultra vires*, as the Committee is not duly constituted and lacks a legitimate legislative purpose.  Moreover, Plaintiffs would suffer irreparable injury if preliminary relief was not granted; an order granting preliminary relief would not substantially injure other interested parties, and an order granting preliminary relief would further the public interest.

WHEREFORE, Plaintiffs respectfully request: (a) entry of a mandatory preliminary injunction and temporary restraining order mandating that Defendants Pelosi, Thompson, Cheney, Schiff, Raskin, Lofgren, Luria, Aguilar, Murphy, Kinsinger, and the Select Committee disgorge, promptly return, sequester, or destroy private financial records belonging to Plaintiffs, which the Select Committee Defendants received from Defendant JPMorgan; (b) entry of a prohibitory injunction and temporary restraining order precluding the Select Committee Defendants from any use or derivative use of private financial records belonging to Plaintiffs, and prohibiting the Select Committee Defendants from taking any further steps to enforce compliance with the Congressional Subpoena challenged herein, until this Court enters final judgment resolving on the merits all claims presented by Plaintiffs; along with (c) any and all other relief that the Court deems just and proper.

Date:  January 4, 2022       Respectfully submitted,

              **ABEL BEAN LAW, P.A.**

              ***s/ Christopher W. Dempsey***
              CHRISTOPHER W. DEMPSEY
              D.D.C. Bar No.:  AR0006
              DANIEL K. BEAN
              JARED J. BURNS (PHV Pending)
              100 N Laura Street, Suite 501
              Jacksonville, Florida 32202
              Telephone:  (904) 944-4100

Fax:  (904) 944-4122
Email: cdempsey@abelbeanlaw.com
dbean@abelbeanlaw.com
jburns@abelbeanlaw.com

*Attorneys for Plaintiffs*