**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TAYLOR BUDOWICH, *et al*.,

                    Plaintiffs,

          v.                                           Case No. 1:21-cv-3366-JEB

NANCY PELOSI, *et al*.,

                    Defendants.


**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**AMENDED EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**


OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001


*Counsel for the Congressional Defendants*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 3

A.    The January 6 Attack ............................................................................. 3

B.    The Formation of the Select Committee ............................................... 3

C.    The Select Committee's Subpoenas Concerning Plaintiffs ................... 5

D.    Procedural History ................................................................................. 6

ARGUMENT ...................................................................................................... 7

I.    APPLICABLE LEGAL STANDARD ...................................................... 7

II.   PLAINTIFFS CANNOT DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF
      SUCCESS ON THE MERITS ................................................................ 9

      A.    The Court Lacks Subject Matter Jurisdiction ........................... 9

            1.  The Speech or Debate Clause Bars the Relief Sought .................. 9

            2.  This Court Lacks Jurisdiction Because Neither the House nor the Select
                Committee Has Waived Sovereign Immunity ................ 13

      B.    Plaintiffs' Challenges to the Select Committee's Authority to Issue the
            Subpoena Fail ............................................................................ 14

            1.  The Select Committee Is Validly Constituted Under House Rules ............... 14

            2.  The Select Committee Has a Valid Legislative Purpose ................................ 19

      C.    The Right to Financial Privacy Act Does Not Entitle Plaintiffs to Relief ........... 24

            1.  The Financial Privacy Act Does Not Apply to Committees of Congress........ 25

            2.  Conservative Strategies Is Not a "Person" Protected by the Financial
                Privacy Act ........................................................................ 32

III.  PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF
      IRREPARABLE HARM ...................................................................... 33

      A.    Plaintiffs' Financial Records Do Not Constitute Political Speech Protected
            by the First Amendment ......................................................... 34

i

B.      Plaintiffs' Supposed Financial and Reputational Interests Do Not Support a
            Temporary Restraining Order .............................................................................. 36

IV.    THE BALANCE OF EQUITIES WEIGHS HEAVILY IN FAVOR OF
          THE SELECT COMMITTEE. ......................................................................................... 38

V.     THE PUBLIC INTEREST SUPPORTS ALLOWING THE SELECT
          COMMITTEE TO CONDUCT ITS URGENT INVESTIGATION. ............................. 39

CONCLUSION...........................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aamer v. Obama*,
    742 F.3d 1023 (D.C. Cir. 2014) ...................................................................... 8

*Acosta v. Wellfleet Commc'ns, LLC*,
    No. 216CV02353GMNGWF, 2017 WL 5180425 (D. Nev. Nov. 8, 2017)...................... 33

*Action All. of Senior Citizens of Greater Phila. v. Sullivan*,
    930 F.2d 77 (D.C. Cir. 1991) ...................................................................... 29

*Adair v. England*,
    217 F.Supp.2d 1 (D.D.C. 2002) ...................................................................... 7

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*,
    840 F.Supp.2d 327 (D.D.C. 2012) .............................................................. 35, 36

*Al-Fayed v. C.I.A.*,
    254 F.3d 300 (D.C. Cir. 2001) ...................................................................... 8

*Ark. Dairy Co-op Ass'n, Inc. v. USDA*,
    573 F.3d 815 (D.C. Cir. 2009) ...................................................................... 8

*Barenblatt v. United States*,
    360 U.S. 109 (1959) .............................................................................. 23, 38

*Barker v. Conroy*,
    921 F.3d 1118 (D.C. Cir. 2019) .................................................................... 16

*Bean LLC v. John Doe Bank*,
    291 F. Supp. 3d 34 (D.D.C. 2018) .................................................. 23, 33, 34, 35

*Bostock v. Clayton Cty., Ga.*,
    140 S. Ct. 1731 (2020) .............................................................................. 25

*Broudy v. Mather*,
    460 F.3d 106 (D.C. Cir. 2006) .................................................................... 29

*\*Brown & Williamson Tobacco Corp. v. Williams*,
    62 F.3d 408 (D.C. Cir. 1995) ...................................................................... 12

*Burnap v. United States*,
    252 U.S. 512 (1920) ................................................................................ 27

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ................................................................. 8

*Clarke v. Office of Federal Housing Enterprise Oversight*,
    355 F. Supp. 2d (D.D.C. 2004) ............................................................. 36

*Cofield v. United States*,
    64 F. Supp. 3d 206 (D.D.C. 2014) ......................................................... 13

*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*,
    15 F. Supp. 2d 1 (D.D.C. 1997) ............................................................... 7

*Comm. on Ways & Means, U.S. House of Reps. v. U.S. Dep't of Treasury*,
    No. 1:19-CV-01974 (TNM), 2021 WL 5906031 (D.D.C. Dec. 14, 2021) ...... 19

*ConverDyn v. Moniz*,
    68 F. Supp. 3d 34 (D.D.C. 2014) ........................................................... 36

*Doe v. McMillan*,
    412 U.S. 306 (1973) ....................................................................... 10, 11

*Donovan v. National Bank*,
    696 F.2d 678 (9th Cir. 1983) ................................................................. 33

*Dorfmann v. Boozer*,
    414 F.2d 1168 (D.C. Cir.1969) ............................................................... 7

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975) .............................................................. 9, 10, 19, 23

*Elec. Privacy Info. Ctr. v. Dep't of Justice*,
    15 F. Supp. 3d 32 (D.D.C. 2014) ............................................................. 7

*Exxon Corp. v. F.T.C.*,
    589 F.2d 582 (D.C. Cir. 1978) ..................................................... 20, 37, 39

*F.T.C. v. Weyerhaeuser Co.*,
    648 F.2d 739 (D.C. Cir. 1981) ................................................................. 8

*Freytag v. Comm'r of Internal Revenue*,
    501 U.S. 868 (1991) ............................................................................. 27

*F.T.C. v. TRW, Inc.*,
    628 F.2d 207 (D.C. Cir.1980) ............................................................... 39

*Ghandi v. Police Dep't of City of Detroit*,
    747 F.2d 338 (6th Cir. 1984) ................................................................. 35

iv

*Gravel v. United States,*
  408 U.S. 606 (1972) ..................................................................................... 9, 10

*Gutierrez de Martinez v. Lamagno,*
  515 U.S. 417 (1995) ...................................................................................... 16

*Hearst v. Black,*
  87 F.2d 68 (D.C. Cir. 1936) ...................................................................... 12, 13

*Howard v. Off. of Chief Admin. Officer of U.S. House of Reps.,*
  720 F.3d 939 (D.C. Cir. 2013) ......................................................................... 9

*Hubbard v. United States,*
  514 U.S. 695 (1995) .................................................................................. 29, 30

*In re Chapman,*
  166 U.S. 661 (1897) ...................................................................................... 19

*In re Navy Chaplaincy,*
  516 F. Supp. 2d 119 (D.D.C. 2007) ................................................................ 7

*Judicial Watch, Inc. v. Schiff,*
  998 F.3d 989 (D.C. Cir. 2021) ..................................................................... 10

*Keener v. Congress,*
  467 F.2d 952 (5th Cir. 1972) ................................................................... 2, 13

*Kilbourn v. Thompson,*
  103 U.S. 168 (1880) ................................................................................. 10, 11

*Koi Nation of N. Calif. v. U.S. Dep't of Interior,*
  361 F. Supp. 3d 14 (D.D.C. 2019) ............................................................... 29

*Laird v. Tatum,*
  408 U.S. 1 (1972) .......................................................................................... 35

*Lane v. Peña,*
  518 U.S. 187 (1996) ...................................................................................... 13

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.,*
  5 F.3d 1508 (D.C. Cir. 1993) ........................................................................ 39

*McCarthy v. Pelosi,*
  5 F.4th 34 (D.C. Cir. 2021) ............................................................................ 9

*McGrain v. Daugherty,*
  273 U.S. 135 (1927) ............................................................................. *passim*

v

*McLean v. United States*,
    566 F.3d 391 (4th Cir. 2009) ........................................................................ 13

*McPhaul v. United States*,
    364 U.S. 372 (1960)..................................................................................... 23

*McSurely v. McClellan*,
    521 F.2d 1024 (D.C. Cir. 1975) ................................................................... 10

*Metzenbaum v. FERC*,
    675 F.2d 1282 (D.C. Cir. 1982)................................................................... 15

*Munaf v. Geren*,
    553 U.S. 684 (2008)....................................................................................... 2

*Nat'l Ass'n of Mfrs. v. Taylor*,
    582 F.3d 1 (D.C. Cir. 2009) ........................................................................ 34

*Natures Image, Inc. v. U.S. Dep't of Lab.*,
    No. 819MC00014DOCKESX, 2019 WL 4316514 (C.D. Cal. June 19, 2019) ............... 33

*Nixon v. Admin'r Gen. Servs.*,
    433 U.S. 425 (1977)..................................................................................... 29

*Olsen v. U.S. Dep't of Hous. & Urb. Dev.*,
    No. CIV. A. 95-3389, 1995 WL 686762 (E.D. La. Nov. 16, 1995) ................................ 33

*Pentagen Techns. Int'l, Ltd. v. Comm. on Appropriations of U.S. House of Reps.*,
    20 F. Supp. 2d 41 (D.D.C. 1998)................................................................. 10

*Ping v. United States*,
    130 U.S. 581 (1889)..................................................................................... 29

*Pittsburgh Nat'l Bank v. United States*,
    771 F.2d 73 (3d Cir. 1985)........................................................................... 32

*Porter v. Lee*,
    328 U.S. 246 (1946)....................................................................................... 8

*Rangel v. Boehner*,
    785 F.3d 19 (D.C. Cir. 2015) ............................................................. 9, 10, 11

*Rockefeller v. Bingaman*,
    234 F. App'x 852 (10th Cir. 2007) ........................................................... 2, 13

*Romag Fasteners, Inc. v. Fossil, Inc.*,
    140 S. Ct. 1492 (2020)................................................................................. 31

*Save Jobs USA v. U.S. Dep't of Homeland Security*,
  105 F. Supp. 3d 108 (D.D.C. 2015) ................................................................ 36, 37

*SEC v. Jerry T. O'Brien, Inc.*,
  467 U.S. 735 (1984) ........................................................................ 24, 25, 32

*\*Senate Permanent Subcomm. on Investigations v. Ferrer*,
  856 F.3d 1080 (D.C. Cir. 2017) .............................................................. 1, 11, 12

*Shelley v. Am. Postal Workers Union*,
  775 F.Supp.2d 197 (D.D.C. 2011) .................................................................. 8

*Shuler v. United States*,
  531 F.3d 930 (D.C. Cir. 2008) ...................................................................... 13

*Singh v. Carter*,
  185 F. Supp. 3d 11 (D.D.C. 2016) .................................................................. 7

*Spa Flying Serv., Inc. v. United States*,
  724 F.2d 95 (8th Cir. 1984) ........................................................................ 32

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
  No. CV 21-1946 (BAH), 2021 WL 3566594 (D.D.C. Aug. 12, 2021) ............................. 7

*Sussman v. U.S. Marshals Serv.*,
  494 F.3d 1106 (D.C. Cir. 2007) .................................................................... 16

*Tenney v. Brandhove*,
  341 U.S. 367 (1951) ................................................................................ 22

*Trump v. Deutsche Bank AG*,
  943 F.3d 627 (2d Cir. 2019) ................................................................ 28, 29, 31

*\*Trump v. Mazars USA, LLP*,
  140 S.Ct. 2019 (2020) .................................................................... *passim*

*Trump v. Mazars USA, LLP*,
  940 F.3d 710 (D.C. Cir. 2019) .................................................................... 21

*Trump v. Thompson*,
  20 F.4th 10 (D.C. Cir. 2021) ............................................................ 20, 21, 22

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
  933 F.3d 728 (D.C. Cir. 2019) .................................................................... 18

*United States v. Ballin*,
  144 U.S. 1 (1892) ............................................................................ 14, 15

*United States v. Brewster*,
408 U.S. 501 (1972) ............................................................................. 9, 10

*United States v. Chem. Found., Inc.*,
272 U.S. 1 (1926) .................................................................................. 16

*United States v. Daccarett*,
6 F.3d 37 (2d Cir. 1993) ........................................................................ 32

*United States v. Durenberger*,
48 F.3d 1239 (D.C. Cir. 1995) .............................................................. 15

*United States v. Flounoy*,
No. CR 50044, 2014 WL 12662319 (N.D. Ill. Feb. 26, 2014) ............... 26

*United States v. Harriss*,
347 U.S. 612 (1954) .............................................................................. 34

*United States v. Locke*,
471 U.S. 84 (1985) ................................................................................ 31

*United States v. Miller*,
425 U.S. 435 (1976) .............................................................................. 24

*United States v. R. Enters., Inc.*,
498 U.S. 292 (1991) .............................................................................. 24

*\*United States v. Rostenkowski*,
59 F.3d 1291 (D.C. Cir. 1995) .............................................................. 15

*United States ex rel. Totten v. Bombardier Corp.*,
380 F.3d 488 (D.C. Cir. 2004) .............................................................. 31

*Veitch v. Danzig*,
135 F. Supp. 2d 32 (D.D.C. 2001) .......................................................... 7

*Watkins v. United States*,
354 U.S. 178 (1957) .............................................................................. 20

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ...................................................................... 7, 8, 33, 37

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ...................................................... *passim*

*Young v. Dep't of Justice*,
882 F.2d 633 (2d Cir. 1989) .................................................................. 25

## **Statutes**

2 U.S.C. § 192 .......................................................................................................... 17

2 U.S.C. § 194 .......................................................................................................... 17

12 U.S.C. 3401 ............................................................................................... 24, 25, 32

12 U.S.C. 3402 ........................................................................................................ 32

12 U.S.C. 3403(a) .................................................................................................... 25

12 U.S.C. 3405(1) .................................................................................................... 26

12 U.S.C. 3408(2) .................................................................................................... 27

12 U.S.C. 3410(a) .................................................................................................... 33

12 U.S.C. 3412(d) .............................................................................................. 30, 31

12 U.S.C. 3413(j) ..................................................................................................... 30

12 U.S.C. 3417(a) .................................................................................................... 27

18 U.S.C. § 983(c)(3) ............................................................................................... 32

18 U.S.C. § 1001 ...................................................................................................... 29

26 U.S.C. §§ 8001–8005 .......................................................................................... 14

Pub. L. No. 107-306, § 602(1), 116 Stat. 2383, 2408 (2002) ..................................... 21

## **Constitutional Provisions**

U.S. Const. art. I, § 6, cl. 1 ........................................................................................ 9

U.S. Const. art. I, § 5, cl. 2 ...................................................................................... 14

## **Rules**

Fed. R. Crim. P. 17 .................................................................................................. 26

## **Legislative Authorities**

167 Cong. Rec. E1151, 117th Cong. (Oct. 27, 2021) ................................................ 21

167 Cong. Rec. H37, 117th Cong. (daily ed. Jan. 4, 2021) ................................................. 14, 18

167 Cong. Rec. H5748-69, 117th Cong. (daily ed., Oct. 21, 2021) ............................................. 17

167 Cong. Rec. H7667-76, 117th Cong. (daily ed., Dec. 14, 2021)............................................. 17

*Electronic Funds Transfer and Financial Privacy: Hearings on S. 2096, S. 2293 and S. 1460 Before the Subcomm. on Fin. Insts. of the Senate Comm. on Banking, Housing and Urban Affairs*, 95th Cong. 194 (1978) ............................................................................................. 28

H. Rep. No. 95-1383, 95th Cong. (1978)........................................................................... 25

H. Rep. No. 109-377, 109th Cong. (2006)...................................................................... 16, 19

H. Rep. No. 114-848, 114th Cong. (2016)............................................................................. 19

H. Res. 6, § 104(f)(1)(B), 116th Cong. (2019) ..................................................................... 18

H. Res. 6, § 201(b)(3), 116th Cong. (2019) ......................................................................... 18

H. Res. 24, § 2(a), 110th Cong. (2007)............................................................................... 18

H. Res. 437, § 2(a), 109th Cong. (2005) ........................................................................ 16, 19

H. Res. 503, 117th Cong. (2021) ............................................................................... *passim*

H. Res. 567, § 2(a), 113th Cong. (2014) ............................................................................. 19

H. Res. 730, 117th Cong. (2021) ...................................................................................... 17

H. Res. 851, 117th Cong. (2021) ...................................................................................... 17

## **Other Authorities**

*Black's Law Dict.* (5th ed. 1979) ..................................................................................... 26

*Black's Law Dict.* (6th ed. 1995) ..................................................................................... 26

California Secretary of State, Business Search – Entity Detail: Conservative Strategies, Inc., https://businesssearch.sos.ca.gov/CBS/Detail (last visited Jan. 7, 2022) ....................... 32

Emergency Application for a Recall and Stay of Mandate Pending the Filing and Disposition of a Writ of Certiorari, *Trump v. Deutsche Bank* AG, No. 19-760 (U.S. Dec 6, 2019).......... 29

Press Release, Kevin McCarthy, House of Representatives, McCarthy Statement about Pelosi's Abuse of Power on January 6th Select Committee (July 21, 2021), https://republicanleader.house.gov/mccarthy-statement-about-pelosis-abuse-of-power-on-january-6th-select-committee/ ............................................................................... 4

Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. To Investigate the Jan. 6 Attack on the U.S. Capitol (July 21, 2021), https://www.speaker.gov/newsroom/72121-2 ..................... 4

*Webster's New World Dict.* (1970) .............................................................................................. 26

*Webster's Third New International Dict.* (1971) ......................................................................... 26

# INTRODUCTION

Defendants Nancy Pelosi, in her official capacity as Speaker of the United States House of Representatives, the House Select Committee to Investigate the January 6th Attack on the U.S. Capitol, Bennie Thompson, in his official capacity as Chairman of the Select Committee, and Representatives Elizabeth Cheney, Adam Schiff, Jamie Raskin, Susan Lofgren, Elaine Luria, Peter Aguilar, Stephanie Murphy, and Adam Kinzinger, in their official capacities as Members of the United States House of Representatives (collectively, "Congressional Defendants") submit this memorandum of law in opposition to Plaintiffs' Amended Emergency Motion for a Temporary Restraining Order ("Motion").

In their Motion, Plaintiffs ask the Court to order the Congressional Defendants to return, destroy, and refrain from using material that the Select Committee has already received and that is relevant to the Select Committee's investigation of the January 6, 2021 attack on the U.S. Capitol.  For multiple independent reasons, the Court should deny this extraordinary application for mandatory injunctive relief.  For many of these same reasons, which all turn on governing principles of law, the Court should also now dismiss the Complaint.

As a threshold matter, the Court lacks subject matter jurisdiction to hear this dispute.  The Constitution's Speech or Debate Clause provides absolute immunity to Members and committees when performing legislative acts.  That clause and the constitutional separation of powers doctrine prohibit courts from, among other things, "ordering a congressional committee to return, destroy, or refrain from publishing" subpoenaed documents.  *Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080, 1086 (D.C. Cir. 2017).  Further, sovereign immunity prohibits litigation against Congress to which it has not consented, and no such consent has been

1

granted for this suit.  *See, e.g.*, *Rockefeller v. Bingaman*, 234 F. App'x 852, 855 (10th Cir. 2007); *Keener v. Congress*, 467 F.2d 952, 953 (5th Cir. 1972).

These doctrines—which Plaintiffs did not address at all in their Motion—together and independently mean that Plaintiffs cannot demonstrate that they are likely to succeed on the merits, and the Court must therefore deny their emergency Motion.  For the same reasons, the Court cannot adjudicate this dispute, and it should therefore dismiss Plaintiffs' Complaint.[1]

Even if the Court had subject matter jurisdiction, Plaintiffs cannot show that they are likely to succeed on the merits of any of their claims.

*First*, Plaintiffs' contention that the Select Committee is invalidly constituted fails because the Rulemaking Clause protects the House's right to make and interpret its own rules. And Plaintiffs' specific contentions—that the Select Committee cannot conduct business unless the Speaker appoints exactly thirteen Members after "consultation" with (and, in Plaintiffs' understanding, approval by) the Minority Leader—are belied by the text of the House's governing resolution and the indisputable facts surrounding the appointments.

*Second*, Plaintiffs' argument that the Select Committee lacks a valid legislative purpose is likewise fatally flawed.  The Supreme Court has instructed that Congressional committees are not required to identify a specific piece of legislation in advance of conducting an investigation of the pertinent facts.  It is sufficient that a committee's investigation concerns a subject on which legislation "could be had."  *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031-32 (2020).

*Third*, Plaintiffs' claim under the Right to Financial Privacy Act is also wrong.  The Act restricts only agencies and departments of the United States, and the Select Committee is neither.

---

[1]     In considering an application for injunctive relief, if a court determines that the "injunction rests on a question of law and it is plain that the plaintiff cannot prevail … the defendant is entitled to judgment."  *Munaf v. Geren*, 553 U.S. 674, 691 (2008).

*Finally*, Plaintiffs have failed to demonstrate they are likely to suffer irreparable harm in the absence of a temporary restraining order. Plaintiffs complain generally about their rights under the First Amendment, the risk of losing clients, and harm to their reputation. But the First Amendment does not protect Plaintiffs from disclosing information about their commercial relationships. Moreover, Plaintiffs fail to explain *how* the Select Committee's possession of documents material to its investigation will cause Plaintiffs to lose clients or suffer harm to their reputation. Plaintiffs' claim of harm is speculative and falls far short of outweighing the Select Committee and the public's immense interest in the investigation of the events of January 6.

For these and the other reasons set forth below, Plaintiffs' motion for emergency relief must be denied, and this case should be dismissed.

## BACKGROUND

### A.     The January 6 Attack

On January 6, 2021, rioters seeking to stop the peaceful transfer of power following the Presidential election of November 2020 launched an assault on the United States Capitol. H. Res. 503, 117th Cong. (2021), Preamble. As Plaintiffs describe the event, a large group "entered the U.S. Capitol, breached security, and disrupted the counting of Electoral College votes until order was restored." Compl. ¶ 23. This attack resulted in multiple deaths, physical harm to over 140 members of law enforcement, and terror and trauma among government employees, press, and Members of Congress. *See* H. Res. 503, Preamble.

### B.     The Formation of the Select Committee

In response to the attack, the House of Representatives adopted House Resolution 503, "Establish[ing] the Select Committee to Investigate the January 6th Attack on the United States Capitol." This resolution authorizes the Speaker of the House to appoint up to thirteen Members

to the Select Committee, five of whom "shall be appointed after consultation with the minority leader."  H. Res. 503, § 2(a).

Speaker Pelosi initially appointed seven Democrats and one Republican to the Select Committee.  Compl. ¶ 32.  Pursuant to the requirements of House Resolution 503, the Speaker consulted with House Minority Leader Kevin McCarthy, who recommended five Republicans for appointment to the Select Committee.  *Id.* ¶ 33.  The Speaker "spoke[]" with Minority Leader McCarthy and stated her intention to appoint three of the Members he had recommended.  Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6 Attack on the U.S. Capitol (July 21, 2021), https://www.speaker.gov/newsroom/72121-2.  However, the Speaker asked that Minority Leader McCarthy recommend two other Republicans to serve on the Select Committee in place of Reps. Jordan and Banks.  *Id.*  Minority Leader McCarthy declined and instead withdrew all five recommendations.  Press Release, Kevin McCarthy, House of Representatives, McCarthy Statement about Pelosi's Abuse of Power on January 6th Select Committee (July 21, 2021), https://republicanleader.house.gov/mccarthy-statement-about-pelosis-abuse-of-power-on-january-6th-select-committee/.  Speaker Pelosi then named an additional Republican to the Select Committee.  Compl. ¶ 35.

House Resolution 503 authorizes the Select Committee to: (1) "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) "issue a final report to the House containing such findings, conclusions, and

recommendations for corrective measures described in subsection (c) as it may deem necessary." H. Res. 503, § 4(a)(1)-(3).[2]

### C.      The Select Committee's Subpoenas Concerning Plaintiffs

In furtherance of its duty to "investigate the facts, circumstances, and causes" of the attack of January 6, the Select Committee issued subpoenas to certain government agencies, companies, and individuals, including Plaintiff Taylor Budowich and JPMorgan Chase Bank.

In a cover letter accompanying the subpoena to Budowich, Chairman Thompson explained that the Select Committee had "credible evidence" of Budowich's "involvement in and knowledge of the events within the Select Committee's inquiry."  Pls.' Mem. Ex. A at 3. Specifically, Chairman Thompson reported that the Select Committee had "reason to believe" that Budowich had "directed $200,000" from a source that was "not disclosed" to pay for an advertising campaign to encourage people to attend the "Stop the Steal" rally on January 6, in support of then-President Trump and his allegations of election fraud.  *Id.*  The subpoena to Budowich sought, among other things, records concerning financial transactions relating to the rally.  *Id.* at 5-6.

On November 23, 2021, the Select Committee issued a subpoena to JPMorgan Chase for certain of Budowich's financial records.  Pls.' Mem. at 3.

---

[2]     Subsection 4(c) describes three categories of corrective measures: "changes in law, policy, procedure, rules or regulations that could be taken" (1) "to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions"; (2) "to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans"; and (3) "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism."  H. Res. 503, § 4(c).

After the Select Committee agreed to an extension, Budowich produced 440 pages of documents.  Pls.' Mem. at 2-3.  In a letter accompanying transmission of the documents, Budowich asserted general objections, including an objection that the Select Committee was not "duly authorized" and objections based on the First, Fourth, and Fifth Amendments.  Pls.' Mem. Ex. D at 2.  Budowich nonetheless agreed to produce "all responsive documents in his possession, custody, or control."  *Id.* at 2-4.  On December 22, Budowich also appeared for a deposition where he answered questions concerning "payments made and received regarding his involvement in the planning of" the rally.  Compl. ¶ 50.

On December 16, counsel for Budowich wrote JPMorgan Chase to object to its disclosure of any of Plaintiffs' bank records "without a warrant."  Pls.' Mem. Ex. E.  On December 21, JPMorgan Chase notified Budowich that it had received a subpoena and that it would comply with the subpoena unless it received "documentation legally obligating it to stop taking such steps."  Pls.' Mem. Ex. F.  In subsequent correspondence, Plaintiffs' counsel contended that JPMorgan Chase would be in "willful or intentional" violation of the Right to Financial Privacy Act if it produced Plaintiffs' bank records.  Pls.' Mem. Ex. I.

On December 24, JPMorgan Chase produced to the Select Committee records responsive to the subpoena.  Pls.' Mem. at 5.

### D.     Procedural History

On December 24, 2021, Plaintiffs filed this action and sought a temporary restraining order to enjoin JPMorgan Chase from producing bank records in response to the subpoena. Plaintiffs did not include an affidavit or declaration with their submission.  During a December 29 hearing on Plaintiffs' motion, JPMorgan Chase informed the Court that the documents in question had already been produced to the Select Committee.  The Court therefore denied Plaintiffs' Motion as moot, but did so without prejudice.

On January 4, 2022, Plaintiffs filed an Amended Emergency Motion for Temporary Restraining Order, asking the Court to, among other things, issue a mandatory injunction ordering the Select Committee to "disgorge, promptly return, sequester, or destroy" the documents produced by JPMorgan Chase.  As with their first motion, Plaintiffs did not include any affidavit or declaration.

## ARGUMENT

## I.   APPLICABLE LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  The D.C. Circuit has instructed that "[t]he power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised."  *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (internal quotation marks omitted).  "Mandatory injunctions that would change the status quo are disfavored as an even more extraordinary remedy than the typical preliminary injunction, especially when directed at the United States Government."  *Strait Shipbrokers Pte. Ltd. v. Blinken*, No. CV 21-1946 (BAH), 2021 WL 3566594, at *6 (D.D.C. Aug. 12, 2021) (internal quotation marks and citations omitted).  Thus, courts have consistently required a party seeking a mandatory injunction to "meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction."  *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (internal quotation marks and citations omitted), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998).[3]

---

[3]       *See also, e.g.*, *Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016); *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014); *In re Navy Chaplaincy*, 516 F. Supp. 2d 119, 123 (D.D.C. 2007); *Adair v. England*, 217 F. Supp. 2d 1, 3 n. 6 (D.D.C. 2002); *Veitch v. Danzig*, 135 F. Supp. 2d 32, 35 & n. 2 (D.D.C. 2001).

Plaintiffs erroneously claim that the higher standard for a mandatory injunction does not apply because Defendants had notice that Plaintiffs intended to challenge the subpoena.  Pls.' Mem. at 7.  The cases cited by Plaintiffs, *F.T.C. v. Weyerhaeuser Co.*, 648 F.2d 739 (D.C. Cir. 1981), and *Porter v. Lee*, 328 U.S. 246 (1946), do not support this proposition.  Those cases involved defendants taking challenged action *after* a plaintiff had moved unsuccessfully for a preliminary injunction and *after* the plaintiff indicated its intention to file an interlocutory appeal. In contrast to those cases, at the time JPMorgan Chase produced the documents at issue, the parties here had not yet been to court at all. There is no basis to relieve Plaintiffs of meeting the higher standard associated with mandatory injunctions in this case.

Regardless of the applicable standard, for the reasons discussed below, Plaintiffs have failed to meet their burden of demonstrating that any injunctive relief here is warranted.

The factors that apply in evaluating requests for a temporary restraining order are identical to those in evaluating requests for preliminary injunctions.  *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 202-03 (D.D.C. 2011) (citing *Al-Fayed v. C.I.A.*, 254 F.3d 300, 303 n.2 (D.C. Cir. 2001)).  Plaintiffs must show: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *See Winter*, 555 U.S. at 20.  The first is the "most important factor," *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); failure to show likelihood of success on the merits is enough to defeat a motion for a preliminary injunction.  *See Ark. Dairy Co-op Ass'n, Inc. v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009).  Likewise, the failure to show irreparable harm is a sufficient ground to deny the preliminary injunction "even if the other three factors entering the calculus" weigh in favor. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

8

II.     **PLAINTIFFS CANNOT DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS**

A.     **The Court Lacks Subject Matter Jurisdiction**

The Constitution's Speech or Debate Clause and the doctrine of sovereign immunity each preclude this Court from hearing Plaintiffs' challenge to the Select Committee's issuance of the subpoenas and from compelling the relief requested.

1.     **The Speech or Debate Clause Bars the Relief Sought**

This Court lacks subject matter jurisdiction because the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1, bars Plaintiffs' suit.  That Clause provides absolute immunity to Members of Congress and committees for all "legislative acts," *see, e.g.*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504-05 (1975).  That immunity is not merely a defense.  Rather, because the Select Committee's issuance of the subpoena to JPMorgan Chase pursuant to House Resolution 503 is plainly a legislative act, the Clause "operates as a jurisdictional bar."  *Howard v. Off. of Chief Admin. Officer of U.S. House of Reps.*, 720 F.3d 939, 941 (D.C. Cir. 2013).

By "freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct," *Gravel v. United States*, 408 U.S. 606, 618 (1972), the Clause both "preserve[s] the independence and … integrity of the legislative process," *United States v. Brewster*, 408 U.S. 501, 524 (1972), and "reinforc[es] the separation of powers," *Eastland*, 421 U.S. at 502.  It also prevents litigation that would "divert [legislators'] time, energy, and attention from their legislative tasks," *id*. at 503, or lessen their ability "to represent the interests of their constituents," *Rangel v. Boehner*, 785 F.3d 19, 23 (D.C. Cir. 2015) (internal quotation marks omitted).

"[I]t is long settled that the Clause's protections range beyond just the acts of speaking and debating."  *McCarthy v. Pelosi*, 5 F.4th 34, 38 (D.C. Cir. 2021), *pet. for cert. pending*, No.

9

21-395.  Indeed, the "Supreme Court has consistently read the Speech or Debate Clause

'broadly' to achieve its purposes."  *Rangel*, 785 F.3d at 23 (quoting *Eastland*, 421 U.S. at 501).

To that end, courts have routinely applied this immunity to bar suits challenging "legislative

acts," *Doe v. McMillan*, 412 U.S. 306, 311-12 (1973), which are those that are "generally done in

a session of the House by one of its members in relation to the business before it."  *Kilbourn v.*

*Thompson*, 103 U.S. 168, 204 (1880); *see Gravel*, 408 U.S. at 624.  The protections of the Clause

extend not only to Congress but to its committees as well.  *See, e.g.*, *Eastland*, 421 U.S. at 501;

*McSurely v. McClellan*, 521 F.2d 1024, 1036-37 (D.C. Cir. 1975) (en banc); *Pentagen Techs.*

*Int'l, Ltd. v. Comm. on Appropriations of U.S. House of Reps.*, 20 F. Supp. 2d 41, 43-45 (D.D.C.

1998).  Speech or Debate immunity shields all acts that "occur in the regular course of the

legislative process," *Brewster*, 408 U.S. at 525, and it bars Plaintiffs' suit.

　　　　The Select Committee's subpoena to JPMorgan Chase fits squarely within the Clause's

protections.  As the D.C. Circuit recently reaffirmed, "[i]ssuance of subpoenas … has long been

held to be a legitimate use of Congress of its power to investigate."  *Judicial Watch, Inc. v.*

*Schiff*, 998 F.3d 989, 992 (D.C. Cir. 2021) (citations omitted).  Courts have long recognized that

"[t]he power to investigate and to do so through compulsory process plainly falls within" the

legislative sphere, *Eastland*, 421 U.S. at 504, because "legislative activities" include "authorizing

an investigation pursuant to which … materials were gathered."  *McMillan*, 412 U.S. at 313.

　　　　As the Supreme Court has explained, investigations and subpoenas are "indispensable

ingredient[s] of lawmaking."  *Eastland*, 421 U.S. at 505.  "Without information, Congress would

be shooting in the dark, unable to legislate 'wisely or effectively.'"  *Trump v. Mazars USA, LLP*,

140 S. Ct. 2019, 2031 (2020) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927)); *see*

*also Eastland*, 421 U.S. at 504 ("A legislative body cannot legislate wisely or effectively in the

absence of information respecting the conditions which the legislation is intended to affect or change.").

The House voted to create the Select Committee to investigate the worst attack on the United States Capitol since the War of 1812.  The Select Committee seeks to learn as much as possible about what led to, and occurred during, the acts of domestic terrorism aimed at Congress itself, in order to prevent any such future acts of violence against any branch of the United States Government.  The Select Committee's authority is consistent with that charter, which includes customary investigatory powers such as the right to issue subpoenas.  *See* H. Res. 503, § 5(c)(4); *see also* House Rule XI 2(m)(1).  Moreover, the Select Committee is authorized to issue a final report, including recommendations for legislation.  *See* H. Res. 503, § 4(a)(3).  Accordingly, the Select Committee's activities reside in the "legislative sphere."

Plaintiffs' arguments about the Select Committee's formation and its adherence to House rules are wrong on the merits, *see infra* at 14-19, but in any event they have no bearing on whether Plaintiffs' suit is barred by the Speech or Debate Clause.  As the D.C. Circuit has explained, similar arguments are "made in almost every Speech or Debate Clause case" and have "been rejected time and again."  *Rangel*, 785 F.3d at 24.  The Clause prevents a court from exercising jurisdiction when "a plaintiff alleges that [the act] violated the House Rules … or even the Constitution."  *Id.* at 24 (citing *Kilbourn*, 103 U.S. at 203, and *McMillan*, 412 U.S. at 312-13).  "Such is the nature of absolute immunity, which is—in a word—absolute."  *Id.*

Furthermore, the Speech or Debate Clause prevents a federal court from granting the relief Plaintiffs seek: ordering a Congressional committee to return materials in its possession. *See Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080 (D.C. Cir. 2017). In *Ferrer*, the D.C. Circuit rejected a plaintiff's demand that a Congressional committee return

11

documents produced in response to a subpoena.  As the court explained, "the separation of powers, including the Speech or Debate Clause, bars this court from ordering a Congressional committee to return, destroy, or refrain from publishing the subpoenaed documents" because the Clause "affords Congress a privilege to use materials in its possession without judicial interference."  *Id.* at 1086 (internal quotation marks omitted); *see also Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 416 (D.C. Cir. 1995) (applying a similar analysis even where (unlike here) the plaintiff alleged that Members of Congress acquired documents illegally, and explaining that the Speech or Debate Clause "permits Congress to conduct investigations and obtain information without interference from the courts").

Unable to cite any case where a court has ordered a Congressional committee to return or destroy documents produced by a third party in response to a Congressional subpoena, Plaintiffs cite *dicta* in *Hearst v. Black*, 87 F.2d 68, 71 (D.C. Cir. 1936), on the general powers of a Congressional committee and the ability of a court to assert jurisdiction over a federal agency.  Pls.' Mem. at 23.  Plaintiffs, however, omit that the D.C. Circuit in that case addressed the very question presented here and held that there was no judicial authority to order a Congressional committee already in the possession of documents produced by a third party to return such documents:

> [T]he universal rule, so far as we know it, is that the legislative discretion in discharge of its constitutional functions, whether rightfully or wrongfully exercised, is not a subject for judicial interference.
>
> The Constitution has lodged the legislative power exclusively in the Congress.  ***If a court could say to the Congress that it could use or could not use information in its possession, the independence of the Legislature would be destroyed and the constitutional separation of the powers of government invaded.  Nothing is better settled than that each of the three great departments of***

> *government shall be independent and not subject to be controlled*
> *directly or indirectly by either of the others.*

*Hearst*, 87 F.2d at 71-72 (emphasis added).

Consistent with the holdings of *Ferrer, Brown & Williamson*, and *Hearst*, the Speech or Debate Clause and the Constitutional separation of powers doctrine prohibit issuance of the order that Plaintiffs here seek.

Because binding Circuit precedent precludes Plaintiffs' suit and the relief they seek, Plaintiffs cannot show that they are likely to succeed on the merits.  This Court should deny Plaintiffs' motion and dismiss the suit for lack of jurisdiction.  *See supra* n.1.

### 2.     This Court Lacks Jurisdiction Because Neither the House nor the Select Committee Has Waived Sovereign Immunity

Plaintiffs' suit is separately barred by the doctrine of sovereign immunity, which prohibits litigation against the United States to which it has not consented.  *Shuler v. United States*, 531 F.3d 930, 932 (D.C. Cir. 2008).  That protection "extends to the United States Congress when it is sued as a branch of government." *McLean v. United States*, 566 F.3d 391, 401 (4th Cir. 2009) (citing *Keener v. Congress*, 467 F.2d 952, 953 (5th Cir. 1972)); *accord Cofield v. United States*, 64 F. Supp. 3d 206, 213-14 (D.D.C. 2014) (same).  As a result, "sovereign immunity forecloses ... claims against the House of Representatives and Senate as institutions, and Representative[s] and Senator[s] as individuals acting in their official capacities."  *Rockefeller v. Bingaman*, 234 F. App'x 852, 855 (10th Cir. 2007) (internal quotation marks omitted).

Plaintiffs here bear the burden to identify an applicable waiver of sovereign immunity that is "unequivocally expressed in statutory text."  *Lane v. Peña*, 518 U.S. 187, 192 (1996) (waiver "will not be implied").  Yet Plaintiffs have pointed to no such waiver, and none exists.

Denial of Plaintiffs' motion and dismissal of their suit is thus required under this independent ground as well.  *See supra* n.1.

### B.   Plaintiffs' Challenges to the Select Committee's Authority to Issue the Subpoena Fail

Even if the Court had subject matter jurisdiction, Plaintiffs' challenges to the validity of the Select Committee and its authority to issue the subpoena to JPMorgan Chase fail on the merits.  Plaintiffs argue (1) that the Committee is not properly constituted pursuant to House Resolution 503 and (2) that it lacks a valid legislative purpose.  Both arguments are badly flawed.

### 1.   The Select Committee Is Validly Constituted Under House Rules

By way of background, the House utilizes four distinct kinds of Committees, each of which are established and governed by various House Rules, statutes, House resolutions, or on an *ad hoc* basis.  *See, e.g.*, Rules of the House of Representatives, Rule X, 117th Cong. (2021) (rules governing standing Committees); 26 U.S.C. §§ 8001–8005 (establishing the Joint Committee on Taxation); H. Res. 503 (establishing the Select Committee).  Apart from standing Committees, the House Rules state that "[t]he Speaker shall appoint all select, joint, and conference committees ordered by the House."  House Rule I.11.  Further, by unanimous consent, on January 4, 2021, the House expressly authorized the Speaker to "make appointments authorized by law or by the House."  *See* 167 Cong. Rec. H37, 117th Cong. (daily ed. Jan. 4, 2021).

The Rulemaking Clause provides that "Each House may determine the Rules of its Proceedings."  U.S. Const. art. I, § 5, cl. 2.  The Clause has long been construed to give broad discretion to Congress to establish—and interpret—its own rules, so long as those rules do not "ignore constitutional restraints or violate fundamental rights."  *United States v. Ballin*, 144 U.S.

1, 5 (1892).  For example, in *Ballin*, faced with the question of how to interpret the Quorum

Clause of Article I, section 5, the Supreme Court held that, because the Constitution does not

specify how to determine when a majority is present to constitute a quorum, "it is therefore

within the competency of the house to prescribe any method which shall be reasonably certain to

ascertain the fact."  *Id.* at 6.

The D.C. Circuit has likewise emphasized the deference owed to Congress in determining

its own rules.  While "the Rulemaking Clause is not an absolute bar to judicial interpretation of

the House Rules," *United States v. Rostenkowski*, 59 F.3d 1291, 1305 (D.C. Cir. 1995), "judicial

interpretation of an ambiguous House Rule runs the risk of the court intruding into the sphere of

influence reserved to the legislative branch under the Constitution."  *Id.* at 1306.  Thus, a court

may interpret internal rules of a House of Congress *only* where such interpretation "requires no

resolution of ambiguities."  *United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995).

"Where, however, a court cannot be confident that its interpretation is correct, there is too great a

chance that it will interpret the Rule differently than would the Congress itself; in that

circumstance, the court would effectively be making the Rules—a power that the Rulemaking

Clause reserves to each House alone."  *Rostenkowski*, 59 F.3d at 1306-07; *accord Metzenbaum v.*

*FERC*, 675 F.2d 1282, 1287 (D.C. Cir. 1982) ("To decide otherwise would subject

Congressional enactments to the threat of judicial invalidation on each occasion of dispute over

the content or effect of a House or Senate rule.").

Plaintiffs advance several arguments for their view that the composition of the Select

Committee does not comport with House Resolution 503.  As discussed below, they read the

Resolution incorrectly.  But to the extent there is any ambiguity, the Court cannot override the

reasonable interpretation by the House of its own rules and procedures.  *See Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019).

Further supporting the validity of the Select Committee, under well-established precedent, Speaker Pelosi, Chairman Thompson, and Members of the Select Committee, like all government officials, enjoy a "presumption of regularity" that, absent a contrary showing, requires the Court to conclude that official duties were properly discharged.  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (internal quotation marks omitted).  None of the allegations in the Complaint nor the arguments in Plaintiffs' Motion come close to demonstrating the "clear evidence to the contrary," *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926), required to overcome that presumption.

In light of the foregoing principles, Plaintiffs' arguments that the Select Committee is not validly constituted under House Resolution 503 are incorrect.

*First*, Plaintiffs complain that the Speaker has appointed only nine Members to the Select Committee, rather than the thirteen allowed for by the Resolution.  Pls.' Mem. at 19.  But House Resolution 503 does not require that *all* thirteen Members be appointed for the Select Committee to be validly constituted or to conduct business.  *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995) (recognizing that "shall" sometimes means "may").  Indeed, there is House precedent for such a select committee having fewer than its full allotment of Members.  In the 109th Congress, for instance, the House created the Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, which allowed for twenty Members, using similar language.  *See* H. Res. 437, § 2(a), 109th Cong. (2005) ("The select committee shall be composed of 20 members appointed by the Speaker ….").  House Speaker Dennis Hastert appointed only eleven Members, all of whom were from the Republican majority party.  *See* H.

Rep. No. 109-377, ii, 109th Cong. (2006) (listing Members appointed by Speaker Hastert). Moreover, House Resolution 503 expressly contemplates the possibility of "vacancies" and directs that such vacancies be filled "in the same manner as the original appointment," but does not provide a specific timeline for the filling of such vacancies.  H. Res. 503, § 2(c).  Nor does House Resolution 503 provide that the Select Committee becomes invalid or that it must suspend all action when vacancies arise.  *Id.*

The fact that the full House has affirmatively taken up and ratified actions of the Select Committee further supports the conclusion that the Select Committee is duly constituted. Specifically, the full House approved both the Select Committee's referrals of Steven Bannon and Mark Meadows for contempt of Congress.  *See* H. Res. 730, 117th Cong. (2021) (Bannon); H. Res. 851, 117th Cong. (2021) (Meadows).  Both resolutions were reported by the Select Committee, debated on the House floor, and approved by the full House without any procedural point of order raised that the Select Committee lacked the proper authority because it was assertedly not validly constituted.  *See* 167 Cong. Rec. H5748-69, 117th Cong. (daily ed., Oct. 21, 2021) (no point of order raised during debate and vote on Bannon); *id.* at H7667-76 (daily ed., Dec. 14, 2021) (same for debate and vote on Meadows).  As a matter of House practice, it is inconceivable that the full House would adopt the product of a body that was invalid in the first instance.[4]

*Second*, Plaintiffs complain that the Republican Members of the Select Committee were not recommended by the Minority Leader.  Pls.' Mem. at 19.  As explained above, the power to

---

[4]     The Department of Justice has filed an indictment against Bannon for contempt of Congress based on the referral the House made pursuant to the contempt of Congress statutes, 2 U.S.C. §§ 192, 194.  *See* Indictment, *United States v. Bannon*, 1:21-cr-670-CJN (D.D.C. Nov. 12, 2021), ECF No. 1.  The Justice Department's decision to proceed with an indictment is further evidence that no reasonable basis exists to dispute the validity of the Select Committee's composition.

appoint Members to select Committees rests exclusively with the Speaker.  *See* House Rule I.11 ("The Speaker shall appoint all select, joint, and conference committees ordered by the House."); 167 Cong. Rec. H37, 117th Cong. (daily ed. Jan. 4, 2021) (authorizing Speaker to "accept resignations and to make appointments authorized by law or by the House").

House Resolution 503 is not to the contrary.  Had the House intended a binding role for the Minority Leader, it could have provided for such a requirement.  For instance, in the 116th Congress, the House created two Select Committees, both of which required that a portion of the Members be appointed by the Speaker "on the recommendation of the Minority Leader."  *See* H. Res. 6, § 104(f)(1)(B), 116th Cong. (2019) (Select Committee on the Climate Crisis); *id.* at § 201(b)(3) (Select Committee on the Modernization of Congress).  Similarly, had the House wanted to delegate appointment power directly to the Minority Leader, it knew how to do so. *See*, *e.g.*, H. Res. 24, § 2(a), 110th Cong. (2007) (creating the House Democracy Assistance Commission and allowing nine Members to "be appointed by the Minority Leader of the House of Representatives").

In contrast, when creating the Select Committee, the House did neither, instead deliberately selecting the phrase "after *consultation* with the Minority Leader," H. Res. 503, § 2(a) (emphasis added), which plainly allows the Speaker greater authority and opportunity regarding the appointment of minority party Members.  "Consultation" means to "seek[] advice or information of.'"  *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750 (D.C. Cir. 2019) (internal quotation marks omitted).  The term itself does not explain how and to what extent such advice or information need be considered, nor whether it must be accepted.  And this language is entirely consistent with House practice and precedent: the same language was used in the resolutions that created both the Hurricane Katrina select committee,

18

*see* H. Res. 437, § 2(a), 109th Cong. (2005), as well as the Select Committee on the Events

Surrounding the 2012 Terrorist Attack in Benghazi, *see* H. Res. 567, § 2(a), 113th Cong. (2014).

No points of order or other procedural objections were raised as to the filing of either select

committee's final report.  *See* H. Rep. No. 109-377, 109th Cong. (2006); H. Rep. No. 114-848,

114th Cong. (2016).

Here, there can be no serious contention that House Resolution 503 was not followed: the

Minority Leader *was* consulted.  The Minority Leader made several suggestions to the Speaker

regarding minority party Members to serve on the Select Committee, and the Speaker even

announced her intention to appoint three of the five minority party Members that the Minority

Leader recommended.  That the Speaker—using the authority provided to her by the House

Rules, the January 4, 2021 Order of the House, and House Resolution 503—made different

selections as to two of the Members, and that the Minority Leader subsequently withdrew his

recommendations, does not make the Select Committee improperly constituted, nor does it

invalidate any of its actions.

### 2.        The Select Committee Has a Valid Legislative Purpose

A Congressional request for information must "concern a subject on which legislation

could be had."  *Mazars*, 140 S. Ct. at 2031-32 (quoting *Eastland*, 421 U.S. at 506).  It is

"certainly not necessary," however, that the applicable resolution "declare in advance" what a

committee "meditate[s] doing when the investigation conclude[s]."  *In re Chapman*, 166 U.S.

661, 670 (1897).  Even if a resolution does not expressly state its legislative purpose, such a

purpose is presumed to exist so long as Congress has jurisdiction over the subject matter of the

resolution.  *McGrain*, 273 U.S. at 177; *see also Comm. on Ways & Means, U.S. House of Reps.

v. U.S. Dep't of Treasury*, No. 1:19-CV-01974 (TNM), 2021 WL 5906031, at *5 (D.D.C. Dec.

14, 2021) (summarizing relevant Supreme Court precedent and concluding that "the legitimate legislative purpose bar is a low one, and the purpose need not be clearly articulated").

Courts must "presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties." *Exxon Corp. v. F.T.C.*, 589 F.2d 582, 589 (D.C. Cir. 1978).  Accordingly, when Congress is investigating a subject matter "on which legislation could be had," *Mazars*, 140 S. Ct. at 2031 (internal quotation marks omitted), "the presumption should be indulged" that the legislation is "the real object" of the investigation, *McGrain*, 273 U.S. at 178; *see also Watkins v. United States*, 354 U.S. 178, 200 (1957) (stating that the motives of committee Members in conducting their investigation "would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served").

Here, the Select Committee has a valid legislative purpose.  The Select Committee is operating pursuant to a House Resolution that expressly authorizes the Select Committee to investigate specified topics and to propose legislative measures.  *See* H. Res. 503, § 4(a), (c); *see also supra* at 5 n.2.  Indeed, the D.C. Circuit recently rejected a similar challenge to the Select Committee's legislative purpose in *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), *pet. for cert. pending*, No. 21-932.  There, the court held that the Select Committee "plainly has a 'valid legislative purpose' and its inquiry 'concern[s] a subject on which legislation could be had.'"  *Id.* at 41 (quoting *Mazars*, 140 S. Ct. at 2031-32).

As the D.C. Circuit recognized, the Select Committee's investigation could lead Congress to, for example: (1) "pass laws imposing more serious criminal penalties on those who engage in violence to prevent the work of governmental institutions;" (2) "amend the Electoral Count Act to shore up the procedures for counting electoral votes and certifying the results of a presidential

election;" (3) "allocate greater resources to the Capitol Police and enact legislation to 'elevat[e] the security posture of the United States Capitol Complex,'"; or (4) "revise the federal government's 'operational plans, policies, and procedures' for 'responding to targeted violence and domestic terrorism[.]'" *Thompson,* 20 F.4th at 42 (quoting H. Res. 503 § 4(a)(2)(B), (D)).  To name but a few more examples, Congress could pass laws that mandate better cooperation between Congressional security offices and the Federal Bureau of Investigation and the Department of Defense, impose structural reforms on Executive Branch agencies to prevent their abuse for antidemocratic ends, or prevent campaign fundraising based on knowing misrepresentations regarding election fraud.  *See also* 167 Cong. Rec. E1151, 117th Cong. (Oct. 27, 2021) (remarks by Vice Chair Cheney adopted by Chairman Thompson identifying other potential legislation).[5]

Plaintiffs nonetheless argue that "the Select Committee has not identified any legislative purpose—let alone a potential piece of legislation—that their Congressional subpoena is intended or required to advance."  Pls.' Mem. at 21.  This argument is unavailing for two reasons.

---

[5]      Congressional investigations into attacks against the United States are solidly grounded in historical precedent.  In 1814, the House initiated an investigation "into the causes of the success of the enemy"— the British—"in his late enterprises," including burning the Capitol, 28 Annals of Congress 310 (1814).  Similarly, after the attack on Pearl Harbor, Congress authorized a ten-member joint committee to investigate "the facts relating to the events and circumstances leading up to or following the attack made by Japanese armed forces upon Pearl Harbor."  *Joint Committee on the Investigation of the Pearl Harbor Attack, Pearl Harbor Attack: Hearings before the Joint Committee on the Investigation of the Pearl Harbor Attack*, 79th Cong. 4 (1945) (text of authorizing resolution).  And in recent times, Congress established the National Commission on Terrorist Attacks Upon the United States in the wake of Sept. 11 to "examine and report upon the facts and causes relating to the terrorist attacks of Sept. 11, 2001." Intelligence Authorization Act for Fiscal Year 2003, Pub. L. No. 107-306, § 602(1), 116 Stat. 2383, 2408 (2002).

*First*, as noted above, a Congressional committee's authorizing resolution need not identify any specific legislation that it intends to enact.  *See, e.g.*, *Trump v. Mazars USA, LLP*, 940 F.3d 710, 719-20 (D.C. Cir. 2019), *vacated and remanded on other grounds,* 140 S. Ct. 2019 (2020) ("It mattered not that the Senate's authorizing resolution lacked an 'avow[al]' that legislative action was had in view' because … 'the subject to be investigated was ... [p]lainly [a] subject ... on which legislation could be had' and such legislation 'would be materially aided by the information which the investigation was calculated to elicit.'") (quoting *McGrain*, 273 U.S. at 176-77).  Rather, "[t]o find that a committee's investigation has exceeded the bounds of legislative power it must be *obvious* that there was a usurpation of functions exclusively vested in the Judiciary or the Executive."  *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951) (emphasis added).  No such usurpation exists here, let alone an obvious one.

*Second*, the Select Committee's authorizing resolution *does* contemplate legislative action and even identifies certain areas of focus.  Specifically, it states that one of the functions of the Select Committee will be to "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures" as it considers necessary.  H. Res. 503, § 4(a)(3).  The Resolution defines "corrective measures" as, *inter alia*:

> *changes in law* ... that could be taken (1) to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions; (2) to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans; and (3) to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism.

*Id.* § 4(c) (emphasis added).  This explicit description of potential legislative action is more than sufficient to demonstrate a valid legislative purpose.  *See Thompson*, 20 F.4th at 42.

Plaintiffs also argue that, even if the Select Committee has a valid legislative purpose, its investigation, and specifically, the subpoena issued to JPMorgan Chase, is not relevant to that purpose. Pls.' Mem. at 22-23. Again, Plaintiffs are incorrect. "Congress's power of inquiry— with process to enforce it—is an essential and appropriate auxiliary to the legislative function." *Mazars*, 140 S. Ct. at 2031 (internal quotation marks omitted). Its "power to investigate is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Eastland*, 421 U.S. at 504 n.15 (internal quotation marks omitted); *see also Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 44 (D.D.C. 2018). "The power of inquiry has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate." *Barenblatt v. United States*, 360 U.S. 109, 111 (1959). "In determining the proper scope of a legislative subpoena, this Court may only inquire as to whether the documents sought by the subpoena are not plainly incompetent or irrelevant to any lawful purpose [of the Select Committee] in the discharge of [its] duties." *McPhaul v. United States*, 364 U.S. 372, 381 (1960) (internal quotation marks omitted).

The relevance of the records sought from JPMorgan Chase is clear. House Resolution 503 explicitly authorizes the Select Committee to investigate "influencing factors that contributed to the domestic terrorist attack on the Capitol" including "financing." H. Res. 503, § 4(a)(1)(B). Budowich has already acknowledged his role in financing events on January 6 that culminated in the attack on the Capitol. *See* Compl. ¶ 50. For example, Budowich produced to the Select Committee responsive documents that "concern[ed] advertising, financing, and the transfer or expenditure of funds in support of the Ellipse Rally [the January 6, 2021 rally held by Women for America First on the Ellipse in Washington D.C. on January 6, 2021]." Pls.' Mem.

23

Ex. D at 2; *see also id.* at 3 (agreeing to produce documents identifying the financial accounts with which Budowich was associated that dealt with transfer of funds related to the Ellipse Rally as well as all account transactions for those funds between December 19, 2020 and January 31, 2021 in connection with the Ellipse Rally).

The Select Committee's subpoena to JPMorgan Chase for records of Budowich's account and that of his company, Conservative Strategies, is the next logical step for the investigation to uncover how the events of January 6 might have been financed.  The documents gathered from JPMorgan Chase will also allow the Select Committee to verify the information already provided to it by Budowich and determine whether further inquiry is necessary.  The Supreme Court has stated that a subpoena is to be enforced "unless the district court determines that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the ... investigation." *United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991).  Here, it is reasonable and likely that the records from JPMorgan Chase will produce information relevant to the investigation, given that Budowich has, by producing documents responsive to these requests, already acknowledged that he was involved in financing events on January 6, 2021.

Accordingly, in light of the valid legislative purpose of the Select Committee's investigation, Plaintiffs cannot succeed on the merits of any argument that the JPMorgan Chase subpoena was outside the scope of the Select Committee's authority.

### C.    The Right to Financial Privacy Act Does Not Entitle Plaintiffs to Relief

Plaintiffs argue that they have demonstrated a substantial likelihood of success on the merits because the JPMorgan Chase subpoena violates the Right to Financial Privacy Act, 12 U.S.C. § 3401 *et seq.*  Congress enacted that statute in response to the Supreme Court's decision in *United States v. Miller*, 425 U.S. 435, 440 (1976), which held that a bank customer had no

Fourth Amendment right to prevent a bank from disclosing his financial records in response to grand jury subpoenas. *See SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 745 n.15 (1984).

The Financial Privacy Act was "designed 'to strike a balance between customers' right of privacy and the need of law enforcement agencies to obtain financial records pursuant to legitimate investigations." *Id.* at 746 (quoting H. Rep. No. 95-1383, 95th Cong., at 33 (1978)). "The most salient feature of [the statute] is the narrow scope of the entitlements it creates." *Id.* at 745; *see also Young v. Dep't of Justice*, 882 F.2d 633, 636 (2d Cir. 1989) ("[I]t would be reading too much into the Act to conclude that Congress intended to cloak bank records with an impenetrable veil of privacy in all contexts.").

Here, the Financial Privacy Act does not entitle Plaintiffs to any form of relief because it does not apply to committees of Congress and does not confer a cause of action on corporate entities, such as Conservative Strategies.  In addition, with respect to Budowich, he has failed to satisfy the procedural requirements of the statute.  Thus, contrary to Plaintiffs' assertion that they would be likely to succeed on the merits, any Financial Privacy Act cause of action would inevitably be dismissed for failure to state a claim.

> 1.    **The Financial Privacy Act Does Not Apply to Committees of Congress**

By its terms, the Financial Privacy Act prohibits "any Government authority" from obtaining records of a customer from a financial institution "except in accordance with the provisions of this chapter."  12 U.S.C. § 3403(a).  The statute defines "Government authority" as "any agency or department of the United States, or any officer, employee, or agent thereof."  *Id.* § 3401(3).  Plaintiffs argue that the Select Committee is bound by the Financial Privacy Act's requirements because "[t]he Legislative Branch is both an agency and department of the United

States Government." Pls.' Mem. at 11. That argument runs contrary to the plain meaning of the terms "agency" and "department," as well as the context and structure of the statute.

As an initial matter, to interpret the statute the Court must consider "the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1738 (2020). Webster's Dictionary at the time of the Financial Privacy Act's enactment defined agency as "an *administrative division* of the government with specific functions." Agency, *Webster's New World Dict.* (1970) (emphasis added).[6] Similarly, the definition of "department" in contemporary dictionaries undermines any claim that the term applies to legislative bodies. *See Webster's Third New International Dict.* (1971) (defining "department" as "an *administrative* division or branch of a national or municipal government") (emphasis added)); *Black's Law Dict.* (5th ed. 1979) (defining "department" as "[o]ne of the major *administrative* divisions *of the executive branch* of the government") (emphases added)).

Multiple provisions of the statute underscore that Congress intended "Government authority" to mean an Executive Branch agency or department. The statute provides several mechanisms for a "Government authority" to obtain financial records, but "only if" the records are sought for a "legitimate law enforcement inquiry." 12 U.S.C. § 3405(1) (administrative subpoena and summons); *id.* § 3407(1) (judicial subpoena); *id.* § 3408(3) (formal written request); *see also id.* § 3406(a) (permitting disclosure to a "Government authority" only with "a search warrant pursuant to the Federal Rules of Criminal Procedure"). As Plaintiffs note,

---

[6]      Black's Law Dictionary did not include a definition of "federal agency" until its Sixth Edition in 1995, but that edition defined it as "[a] department or other instrumentality of the *executive branch* of the federal government." Agency, *Black's Law Dict.* (6th ed. 1995) (emphasis added).

Congress may not engage in law enforcement activities or issue a criminal subpoena.[7]  It would

make no sense for Congress to have included itself as an "agency or department" generally

prohibited from obtaining customer financial documents, but not to have a disclosure exception

for Congressional subpoenas.  As a parallel, the statute permits the customer to file a motion to

quash "an administrative summons or judicial subp[o]ena," or to file an application "to enjoin a

Government authority from obtaining financial records pursuant to a formal written request."  *Id.*

§ 3410(a).  It provides no mechanism for challenging a Congressional subpoena.

> The Financial Privacy Act's other uses of the phrase "agency or department" underscore

that the term refers to Executive Branch entities.  For example, Section 3408 permits a

Government authority to request financial records only if, among other requirements, "the

request is authorized by regulations promulgated by the head of the agency or department."  12

U.S.C. § 3408(2).  Congress does not have a "head of the agency or department."  *See Freytag v.*

*Comm'r of Internal Revenue*, 501 U.S. 868, 886 (1991) ("The term head of a department

means ... the Secretary in charge of a great division of *the executive branch* of the government,

like the State, Treasury, and War, who is a member of the Cabinet." (emphasis added) (alteration

in original) (quoting *Burnap v. United States*, 252 U.S. 512, 515 (1920)).

---

[7]      Plaintiffs argue that because the Select Committee is performing "purely and quintessentially law enforcement functions" it is governed by the Financial Privacy Act.  Pls.' Mem. at 12.  As evidence of this, Plaintiffs argue that the subpoena permits a responsive production to be made to the U.S. Marshals Service.  *Id.* at 12-13.  As an initial matter, Plaintiffs misread the subpoena, which only permits *service* by the Marshals Service.  *See* Pls.' Mem. Ex. B at 1.  But, in any event, the reference proves nothing: the Marshals Service engages in a variety of functions throughout government, in particular on behalf of the Judiciary, which does not convert each body that employs the Marshals Service into a law enforcement agency.  For example, Rule 17 of the Federal Rules of Criminal Procedure permits a court to direct the Marshals Service to serve subpoenas on behalf of an indigent defendant who cannot afford process costs.  Fed. R. Crim. P. 17(b), (d); *see, e.g.*, *United States v. Flounoy*, No. CR 50044, 2014 WL 12662319, at *1 (N.D. Ill. Feb. 26, 2014).  That does not mean that the court or the defendant are engaged in a "law enforcement function," nor does it render them a "Government authority."

In addition, the Financial Privacy Act provides for an array of civil penalties for "[a]ny agency or department of the United States or financial institution" that violates its requirements, including punitive damages for willful or intentional violations.  12 U.S.C. § 3417(a).  Under Plaintiffs' reading of "any agency or department," Congress silently subjected itself to punitive damages and other monetary liability—a reading of the statute that is particularly implausible given Congress's absolute immunity under the Speech or Debate Clause.  *See supra* at 9-13.

The legislative history of the Financial Privacy Act also firmly supports the textual basis to conclude that Congress did not intend the statute to apply to itself or its committees.  During consideration of the Financial Privacy Act, the Department of Justice proposed an alternative bill with the definition of "Government authority" that Plaintiffs now advance; specifically, the Justice Department's bill would have "extend[ed] these important procedures and privacy rights to cover investigations by the *Legislative* as well as the Executive Branch."  *Electronic Funds Transfer and Financial Privacy: Hr'gs on S. 2096, S. 2293 and S. 1460 Before the Subcomm. on Fin. Insts. of the Senate Comm. on Banking, Housing & Urban Affairs*, 95th Cong. 194 (1978) (emphasis added).  The proposal would have defined "Government authority" to mean "the Congress of the United States, or any agency or department of the United States or of a State or political subdivision, or any officer, employee or agent of any of the foregoing."  *Id.* at 397; *see id.* at 161 (Congressional Research Service report noting that the Justice Department bill—unlike two Senate bills—protects "against unauthorized access *by Congress*" (emphasis added)).  But Congress declined to adopt that language, instead limiting Executive Branch agencies'—not its own—access to customer financial records, with exceptions for law enforcement activities.[8]

---

[8]     Plaintiffs argue that Congress's decision not to adopt the Justice Department's proposed bill language demonstrates a belief that such language was unnecessary to include Congress in the statute's definition of "Government authority," *see* Pls.' Mem. at 14, but they cite no support

The only court to have addressed the question whether Congress is a "Government authority" under the Financial Privacy Act is the Second Circuit in *Trump v. Deutsche Bank AG*, 943 F.3d 627 (2d Cir. 2019).  While Plaintiffs are correct that that decision was vacated on other grounds by *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020), the Supreme Court did not address the Second Circuit's Financial Privacy Act holding, which was not challenged in that Court.  *See* Emergency Application for a Recall and Stay of Mandate Pending the Filing and Disposition of a Writ of Certiorari, *Trump v. Deutsche Bank AG*, No. 19-760 (U.S. Dec. 6, 2019).  Thus, "the persuasiveness of [that] portion of the decision remains both appropriate for consideration and citation."  *Koi Nation of N. Calif. v. U.S. Dep't of Interior*, 361 F.Supp.3d 14, 52 n.17 (D.D.C. 2019) (citing *Action All. of Senior Citizens of Greater Phila. v. Sullivan*, 930 F.2d 77, 82 (D.C. Cir. 1991)); *see also Broudy v. Mather*, 460 F.3d 106, 120 & n.8 (D.C. Cir. 2006).  Relying on dictionary definitions, the statute's structure and context, and its legislative history, the Second Circuit persuasively held that a committee of Congress is not a "department" of the United States and thus is not a government authority under the Financial Privacy Act. *Deutsche Bank*, 943 F.3d at 641-43.[9]

Plaintiffs' anticipatory counterarguments are unconvincing.

---

in the legislative record for that farfetched proposition.  Moreover, the proposed language in the Justice Department bill makes clear that its drafters understood the distinction between Congress on the one hand and Executive Branch agencies and departments on the other, because it would have defined "Government authority" to mean "the Congress of the United States, *or* any agency or department of the United States."  *Hr'gs on S. 2096, S. 2293 and S. 1460*, *supra*, 95th Cong. at 397 (emphasis added).

[9]     The plaintiff in that case, former President Trump, did not contend that the Congressional committee that had issued the subpoena in question was an "agency" of the federal government; thus, the Second Circuit's opinion addressed only whether a Congressional committee was a "department," and held that it was not.  *See id.* at 641.

*First*, Plaintiffs point to definitions of the terms "agency" and "department" on government websites, Pls.' Mem. at 11-12; cases that refer generally to "departments of government," *id.* at 13 (citing *Nixon v. Admin'r Gen. Servs.*, 433 U.S. 425, 443 (1977) (emphasis omitted); and more than a century-old Supreme Court decision that referred to the "legislative department," *id.* (citing, *inter alia*, *Ping v. United States*, 130 U.S. 581, 628 (1889)) (emphasis omitted). Conspicuously absent from Plaintiffs' discussion is the Supreme Court's far more recent decision in *Hubbard v. United States*, 514 U.S. 695 (1995), in which, in the context of 18 U.S.C. § 1001, the Court criticized an earlier decision that "amalgamated all three branches" as "department[s]" of the Government as "seriously flawed." *Id.* at 702. The Court stated that "while we have occasionally spoken of the three branches of our Government ... as 'departments,' that locution is not an ordinary one. Far more common is the use of 'department' to refer to a component of the Executive Branch." *Id.* at 699 (internal citation and alteration omitted).

*Second*, Plaintiffs point to various provisions of the statute that they claim support their position, but all are based on misleading and selective quotation of the Financial Privacy Act's provisions. For example, Plaintiffs argue that Section 3413(j) contains an exemption "where financial records are sought by the Government Accountability Office ['GAO']," which is a Legislative Branch agency, and therefore, because Congress exempted a specific agency within the Legislative Branch, it must not have intended to exempt itself. Pls.' Mem. at 15 (quoting 12 U.S.C. § 3413(j)). But the full text of Section 3413(j) makes clear that it exempts records sought by GAO "pursuant to an authorized proceeding, investigation, examination or audit *directed at a government authority*." 12 U.S.C. § 3413(j) (emphasis added). Thus, that provision itself distinguishes GAO from a government authority.

30

Similarly, Plaintiffs argue that Section 3412(d) "addresses the one circumstance where Congressional inquiries are *not* subject to the Financial Privacy Act's procedures: when the records request is from 'a duly authorized committee or subcommittee of Congress's to 'any officer or employee of a supervisory agency.'" Pls.' Mem. at 16 (quoting 12 U.S.C. § 3412(d)). This argument selectively quotes that provision and reads it out of context. Section 3412 governs "[u]se of information," and its provisions apply to the handling of financial records *already obtained by a government authority*. *See, e.g.*, 12 U.S.C. § 3412(a) (setting forth requirements for inter-agency transfers of "[f]inancial records originally obtained pursuant to this chapter"). Subsection (d) says nothing about records requests *from* Congress. It simply provides that officers or employees of supervisory agencies (*i.e.*, Executive Branch agencies that oversee the financial sector) may transfer records in their possession *to* Congress without adhering to the statute's requirements concerning inter-agency transfers.[10]

*Third*, Plaintiffs argue that the statute *must* apply to Congress because otherwise Congress's authority "knows no bounds." Pls.' Mem. at 17; *see id.* (arguing it "cannot be the case" that "Congress has unfettered authority"). But courts are not free to graft onto statutes prohibitions that are contained nowhere in the text. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) ("Nor does this Court usually read into statutes words that aren't there"). As the D.C. Circuit has stated, "our job is reading statutes as written, not rewriting them

---

[10]     Plaintiffs concede that the Select Committee's subpoena to JPMorgan Chase does not involve the transfer of information already obtained by a government agency to a Congressional committee, but somehow read the inapplicability of Section 3412(d) to this situation as demonstrating that it "provides no authority for the Select Committee's receipt of private financial records in this instance." Pls.' Mem. at 17. Again, the statute says nothing about Congress's *receipt* of records. It regulates the use of financial information by the Executive Branch only, much as it regulates the collection of financial records by Executive Branch authorities only.

'in an effort to achieve that which Congress is perceived to have failed to do.'" *United States ex. rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497 (D.C. Cir. 2004) (quoting *United States v. Locke*, 471 U.S. 84, 95 (1985)).  To hold, as Plaintiffs urge, that the Financial Privacy Act restricts Congress because it "cannot be" otherwise would violate that bedrock principle and present obvious separation of powers concerns.[11]

In sum, the plain text, structure, and legislative history of the Financial Privacy Act all support one conclusion: Congress is not a "Government authority" as that term is defined in the statute, and accordingly the Financial Privacy Act does not apply to the Select Committee's subpoena to JPMorgan Chase.

## 2.  Conservative Strategies Is Not a "Person" Protected by the Financial Privacy Act

Plaintiffs' challenge under the Financial Privacy Act fails for the additional reason that the statute offers no protection to Conservative Strategies.  The Financial Privacy Act "carefully limits the kinds of customers to whom it applies[.]" *Jerry T. O'Brien, Inc.*, 467 U.S. at 745.  By its terms, the Act protects "the financial records of any customer from a financial institution."  12 U.S.C. § 3402.  It defines "customer" to mean "any person or authorized representative of such person who utilized or is utilizing any service of a financial institution, or for whom a financial institution is acting or has acted as a fiduciary," and, in turn, defines "person" as "an individual or a partnership of five or fewer individuals." *Id.* § 3401(4)-(5).  Conservative Strategies is a

---

[11]     Plaintiffs' final argument attempts to counter the Second Circuit's observation that because the Financial Privacy Act directs the Office of Personnel Management ("OPM") to take disciplinary action to counter violations of the Act, it is unlikely Congress would have subjected its own staff to such disciplinary action from OPM, "the lead personnel agency for civilian employees in the Executive Branch." *Deutsche Bank*, 943 F.3d at 642 (internal quotation marks and alteration omitted).  Plaintiffs' counterargument is that Congressional staff are entitled to retirement benefits administered by OPM.  Pls.' Mem. at 18.  It is not clear why that fact suggests anything about Congress's intentions in this wholly separate context.

corporation incorporated in the State of California.  California Secretary of State, Business

Search – Entity Detail: Conservative Strategies, Inc., https://businesssearch.sos.ca.gov/

CBS/Detail (last visited Jan. 7, 2022); *see also* Compl. ¶ 2.  A corporation, plainly, is not an

individual or a partnership; thus, it is not a person under the statute, and therefore not a customer.

Based on this unambiguous textual authority, courts have consistently held that

"corporations are not protected" under the Financial Privacy Act.  *United States v. Daccarett*, 6

F.3d 37, 51 (2d Cir. 1993), *abrogated on other grounds by* 18 U.S.C. § 983(c)(3); *accord*

*Pittsburgh Nat'l Bank v. United States*, 771 F.2d 73, 75 (3d Cir. 1985); *Spa Flying Serv., Inc. v.*

*United States*, 724 F.2d 95, 96 (8th Cir. 1984).[12]  So too here: as a corporation, Conservative

Strategies is not entitled to the protections of the statute.

We also note that Plaintiffs have failed to comply with the Financial Privacy Act's strict

procedural requirements for challenging a subpoena.  By failing to attach the necessary affidavit

or sworn statement to any of their filings, Plaintiffs do not satisfy the plain requirements of the

statute.  *See* 12 U.S.C. § 3410(a).  Plaintiffs' Motion can be denied on this ground alone.

## III.   PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF IRREPARABLE HARM

Plaintiffs' conclusory and unsubstantiated speculation of harm fails to satisfy their heavy

burden of establishing irreparable injury absent a mandatory injunction.  Indeed, Plaintiffs'

failure to establish irreparable injury independently requires denial of their motion.  As the

---

[12]     *See also, e.g.*, *Natures Image, Inc. v. U.S. Dep't of Lab.*, No. 819MC00014DOCKESX, 2019 WL 4316514, at *2 (C.D. Cal. June 19, 2019); *Acosta v. Wellfleet Commc'ns, LLC*, No. 216CV02353GMNGWF, 2017 WL 5180425, at *5 (D. Nev. Nov. 8, 2017); *Olsen v. U.S. Dep't of Hous. & Urb. Dev.*, No. CIV. A. 95-3389, 1995 WL 686762, at *2 (E.D. La. Nov. 16, 1995). Courts have similarly held that the Financial Privacy Act does not apply to other kinds of entities that are not partnerships of five or fewer individuals. *See, e.g.*, *Donovan v. National Bank*, 696 F.2d 678, 683 (9th Cir. 1983) (employee benefit plan); *Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 48 (D.D.C. 2018) (limited liability company).

Supreme Court has emphasized, regardless of a plaintiff's showing with respect to the other factors, "[o]ur frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Such injury "must be both certain and great; it must be actual and not theoretical.'" *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). Moreover, "[b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Wis. Gas*, 758 F.2d at 674. Rather, "[t]he movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id.* Plaintiffs argue that they will suffer two types of harm, neither of which constitutes irreparable harm warranting an injunction.

### A.    Plaintiffs' Financial Records Do Not Constitute Political Speech Protected by the First Amendment

Plaintiffs argue that they will suffer irreparable harm absent a mandatory injunction because the records sought by the JPMorgan Chase subpoena implicate Budowich's and his clients' First Amendment rights. Pls.' Mem. at 25. Specifically, Plaintiffs argue that the disclosure of "[r]ecords of payments for political consultant services by Plaintiffs could provide members of the Select Committee and other political opponents an unfair political advantage," which "raises serious First Amendment concerns." *Id.* Courts have routinely rejected arguments, however, that compelled disclosure of information regarding contributors, clients, and associates of organizations involved in political activities implicates the First Amendment. As the D.C. Circuit has explained, "[m]ore than fifty years ago, the Supreme Court held that the public disclosure of 'who is being hired, who is putting up the money, and how much' they are spending to influence legislation is 'a vital national interest.'" *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 6 (D.C. Cir. 2009) (citing *United States v. Harriss*, 347 U.S. 612, 625-26 (1954)).

Moreover, another court in this district has considered and rejected precisely this type of First Amendment argument.  In *Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34 (D.D.C. 2018), a research firm that provided strategic intelligence, opposition research, and due diligence services sought an injunction against a Congressional subpoena issued to its bank seeking financial records.  *Id.* at 38-39.  The research firm argued, *inter alia*, that the disclosure of these financial records would intrude on its First Amendment rights, specifically its freedom of association.  *Id.* at 45-46.  The court, in denying the injunction, first noted that the research firm, like Plaintiffs here, provided "commercial transactions [that] do not give rise to associational rights," protected by the First Amendment, "even where the subjects of those transactions are protected by the First Amendment."  *Id.* at 46.  Therefore, the court concluded that, while the work done by the research firm "conducted on behalf of its clients may have been political in nature, [its] commercial relationship with those clients was not, and thus that relationship does not provide [the research firm] with some special First Amendment protection from subpoenas." *Id.*

Likewise, here, though the work of Budowich's clients may include conduct protected by the First Amendment, the disclosure that he and his company assisted those clients in that work is not.  Therefore, Plaintiffs have not demonstrated any First Amendment harm that can serve as a basis to demonstrate the existence of irreparable harm.  *See Ghandi v. Police Dep't of City of Detroit*, 747 F.2d 338, 347 (6th Cir. 1984) (noting that injunctive relief is not available based merely on conclusory assertions that "the exercise of first amendment rights is being 'chilled' by the mere existence, without more, of governmental investigative and data-gathering activity." (quoting *Laird v. Tatum*, 408 U.S. 1, 10 (1972)).

**B.    Plaintiffs' Supposed Financial and Reputational Interests Do Not Support a Temporary Restraining Order**

Plaintiffs also claim they are likely to suffer irreparable harm because they will lose clients and because they will suffer damage to their reputation and goodwill.  Pls.' Mem. at 25-26.  Neither of these injuries is sufficient to establish irreparable harm.

"The loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms."  *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012).  "It is well settled in this Circuit that 'economic loss does not, in and of itself, constitute irreparable harm.'"  *Id.* (quoting *Wisconsin Gas*, 758 F.2d at 674).  "[T]he only circumstance in which this Circuit has endorsed a finding of irreparable harm based on monetary loss" is when "alleged losses 'threaten[ ] the very existence'" of a business.  *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 47 (D.D.C. 2014) (quoting *Wisconsin Gas,* 758 F.2d at 674).  Here, though Plaintiffs make one conclusory claim to that effect, *see* Pls.' Mem. at 25, they provide no further elaboration.  This is insufficient to establish that they will suffer irreparable harm absent a mandatory injunction.

Regardless, even if Plaintiffs' alleged economic losses could constitute irreparable harm, they have failed to provide any evidence to support their conclusory allegations.  *See Air Transp. Ass'n of Am.*, 840 F. Supp. 2d at 336 ("For economic harm to constitute irreparable injury, however, Plaintiffs must adequately describe and quantify the level of harm its members face." (internal quotation marks omitted)).  Instead of fulfilling this requirement, Plaintiffs attempt to evade it by arguing that their inability to do so makes the damages "unrecoverable" and therefore "irreparable."  Pls.' Mem. at 26.  This argument is unavailing.  "[T]he mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm."

*Save Jobs USA v. U.S. Dep't of Homeland Security*, 105 F. Supp. 3d 108, 114 (D.D.C. 2015)

(internal quotation marks omitted).

Further, Plaintiffs' reliance on *Clarke v. Office of Federal Housing Enterprise Oversight*,

355 F. Supp. 2d 56 (D.D.C. 2004), in making this argument is misplaced.  In *Clarke,* the court

held that the plaintiff seeking an injunction had demonstrated irreparable harm when his

quantifiable economic losses would nonetheless be unrecoverable because the defendant would

be shielded by various statutes from actions seeking to recover those damages.  *Id.* at 66.  That

ruling does not stand for the proposition that economic loss constitutes irreparable harm merely

because the individual seeking injunctive relief asserts that he is unable to quantify that harm.

Moreover, such a position would obliterate the requirement that an injury sufficient to constitute

irreparable harm must be "certain," "great," and "actual, not theoretical."  *Wisconsin Gas*, 758

F.2d at 674.  If Plaintiffs are unable to specify their damages, they cannot demonstrate that such

damages are anything more than speculation.  Speculative loss is not enough to constitute

irreparable harm.  *Save Jobs USA*, 105 F. Supp. 3d at 114.

Plaintiffs also argue that they face "particularly imminent and acute" harm by the Select

Committee's continued retention of the JPMorgan Chase records given the Select Committee's

stated intention to reveal its findings publicly.  Pls.' Mem. at 27.  Plaintiffs have provided no

evidence to support their allegation that the Select Committee intends to reveal the information

contained in these specific documents, much less in the near future.

Although Plaintiffs suggest that the harm they face can be caused by the Select

Committee's possession of the records at issue, it appears that the true outcome they fear is

distribution of these records to the public at large.  *Cf. Exxon Corp. v. F.T.C.*, 589 F.2d 582, 589

(D.C. Cir. 1978) ("We have heretofore held that release of information to the Congress does not

constitute 'public disclosure.'").  There is nothing about the Select Committee's possession or

review of documents material to its investigation that is likely to cause harm to Plaintiffs.

Indeed, "[t]he courts must presume that the committees of Congress will exercise their powers

responsibly and with due regard for the rights of affected parties."  *Exxon Corp.*, 589 F.2d at 589.

The fact that Congress's possession of documents renders it possible that the documents will be

publicly disclosed is insufficient to demonstrate irreparable harm.  *See Winter,* 555 U.S. at 22

(holding that a preliminary injunction may not be issued based on the mere "possibility" of

irreparable harm).

## IV.    THE BALANCE OF EQUITIES WEIGHS HEAVILY IN FAVOR OF THE SELECT COMMITTEE.

The balance of the equities strongly supports denial of the requested injunction—

especially its extraordinary attempt to force disgorgement of documents the Select Committee

already has in its possession.  Plaintiffs have not proven that they would suffer any injury from

their bank's decision to produce its financial records to the Select Committee in the same manner

that countless entities—including entities directly involved in protected speech activities—

routinely produce financial records in response to civil discovery subpoenas, government

administrative subpoenas or civil investigative demands, grand jury subpoenas, and the like.

By contrast, the Select Committee's interests in prompt compliance with the subpoena

and the unimpeded use of documents already submitted by the subpoena recipient are of the

highest order.  *See supra* at 23-24 (citing *Barenblatt*, 360 U.S. at 111); *see also McGrain*, 273

U.S. at 175 ("[W]here the legislative body does not itself possess the requisite information—

which not infrequently is true—recourse must be had to others who do possess it.").

Here, the Select Committee is investigating matters of immense national importance.

And Plaintiffs' role in planning, organizing, and profiting from activities on January 6 are critical

to that investigation.  The Select Committee's interest in proceeding with its investigation is self-evident, and injunctive relief would directly hinder and frustrate that ongoing investigation.  The balance of the equities thus heavily favors denial of Plaintiffs' Motion.

### V.   THE PUBLIC INTEREST SUPPORTS ALLOWING THE SELECT COMMITTEE TO CONDUCT ITS URGENT INVESTIGATION.

For the same reasons, the public interest strongly supports denial of relief.  Plaintiffs' contrary argument rests on the same flawed arguments refuted above and ignores the clear and compelling public interest in the speedy and efficient conduct of the Select Committee's investigation.  Even in the less pressing context of administrative investigations, which derive from statutory authority (whereas Congress's power of investigation is derived from the Constitution itself), the D.C. Circuit has "recognized a strong public interest in having" such "investigations proceed 'expeditiously and without impediment.'"  *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (quoting *F.T.C. v. TRW, Inc.,* 628 F.2d 207, 210 (D.C. Cir. 1980)).  *A fortiori*, the public interest in expeditious and unimpeded Congressional investigations is compelling.  *Exxon Corp.*, 589 F.2d at 593 (there is a "clear public interest in maximizing the effectiveness of the investigatory powers of Congress.  The welfare of the public is a factor to be weighed in determining whether or not to issue an injunction, and the investigatory power is one that the courts have long perceived as essential to the successful discharge of the legislative responsibilities of Congress.") (internal citations omitted).  It is difficult to imagine a Congressional investigation of greater national significance than this one.  The public interest in permitting the Select Committee to proceed with its investigation is self-evident and compels rejection of Plaintiffs' Motion.

## **CONCLUSION**

Plaintiffs have failed to meet the high burden necessary to obtain the extraordinary

remedy of a mandatory preliminary injunction.  For the reasons set forth above, Plaintiffs'

Motion should be denied, and this case should be dismissed.

Respectfully submitted,

/s/  *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C.  20515
(202) 225-9700
Douglas.Letter@mail.house.gov

-and-

SHER TREMONTE LLP
Justin M. Sher
Michael Tremonte[*]
Noam Biale[*]
Maya Brodziak[*]
Kathryn E. Ghotbi[*]
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
JSher@shertremonte.com
MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

-and-

40

ARNOLD & PORTER
John A. Freedman
Paul Fishman
Amy Jeffress
601 Massachusetts Ave, NW
Washington,  D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com

Dated:  January 12, 2022

---

\* Appearing pursuant to 2 U.S.C. § 5571(a).

41

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2022, I caused the foregoing document to be filed via the CM/ECF system for the U.S. District Court for the District of Columbia, which I understand caused a copy to be served on all registered parties.

*/s/ Douglas N. Letter*
Douglas N. Letter