**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TAYLOR BUDOWICH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 1:21-cv-03366-JEB |
| | ) | |
| NANCY PELOSI, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**REPLY IN SUPPORT OF**
**AMENDED EMERGENCY MOTION FOR**
**TEMPORARY RESTRAINING ORDER**

The Select Committee would have this Court believe that the Constitution—except for the Speech or Debate Clause—does not apply to Congress.  The Select Committee argues that it can subpoena records carte blanche, regardless of whether it complies with the Constitution, federal statutes, or its own governing Resolution.  Not only does the Select Committee argue that it can subpoena whomever for whatever documents without any limitation, supervision, or interference, it contends it can do so surreptitiously.  Of course, our constitutional system of government does not allow for such unfettered governmental intrusion.

In accordance with this Court's Order dated January 5, 2022, FED. R. CIV. P. 65, and LCvR 7(d), 65.1, Plaintiffs Taylor Budowich and Conservative Strategies, Inc.,[1] respectfully submit this Reply in Support of their Amended Emergency Motion for Temporary Restraining Order (Dkt. No. 14) ("TRO Motion") and incorporated Memorandum of Law in Opposition to the Select Committee Defendants' Motion to Dismiss (Dkt. No. 23).

---

[1] Despite multiple requests, Plaintiffs have not received a copy of the congressional subpoena at issue.  Accordingly, Plaintiffs reserve the right to add entities, related to Mr. Budowich, that have had their financial records improperly disclosed.

## INTRODUCTION

This Court is confronted with the intersection of:  (1) an individual's constitutionally protected rights to freedom of speech and association, against unreasonable search and seizure, and entitlements to privacy under both common law and legislative authority; (2) against the backdrop of the weighty public interest in investigating the causes and circumstances of the January 6, 2021, events at the Capitol; (3) as conducted by a Select Committee that lacks the requisite number of Members pursuant to its authorizing Resolution, has expanded the breadth of its investigation beyond any legitimate legislative purpose, and which seeks to conduct its affairs absent any judicial oversight or supervision.  This aggregation of factors strongly suggests the Select Committee—itself a lawmaking entity component—has abrogate its own rules, which necessarily makes its acts and authority *ultra vires* and suspect. Our constitutional system of government does not allow for such unfettered, unrestrained, and unlimited governmental authority.  Nor should it tolerate the specific intrusions complained of here, which seem to inevitably flow from neglect of the principle that "power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it."  James Madison, The Federalist No. 48, p. 276 (C. Rossiter ed. 1961).

## I.     THE COURT HAS JURISDICTION TO REMEDY THE SELECT COMMITTEE'S WRONGS.

### A.     Precedent Authorizes Injunctive and Declaratory Relief against Congress, its Committees, and their Members; Additionally, Congress waived Sovereign Immunity under the RFPA.

Sovereign immunity does not foreclose relief or preclude this Court's jurisdiction. Sovereign immunity is inapplicable here because the Larson-Dugan exception applies and Congress waived sovereign immunity under the Right to Financial Privacy Act, 12 U.S.C. §§

3401-23 ("RFPA").  See Larson v. Domestic & Foreign Com. Corp., 337 U.S. 682, 689 (1949);
Dugan v. Rank, 372 U.S. 609, 621–23 (1963).

Under the Larson-Dugan exception, "'suits for specific relief against officers of the
sovereign' allegedly acting 'beyond statutory authority or unconstitutionally' are not barred by
sovereign immunity." Pollack v. Hogan, 703 F.3d 117, 120 (D.C. Cir. 2012) (quoting Larson, 337
U.S. at 693); see also Dugan, 372 U.S. at 621–22.  "The exception is based on the principle that
such *ultra vires* action by a federal officer 'is beyond the officer's powers and is, therefore, not the
conduct of the sovereign.'"  Id. (quoting Larson, 337 U.S. at 690).  This exception comports with
Supreme Court precedent unequivocally stating that Courts can, and should, review legislative
subpoenas issued to third parties that are resisted by the individuals whose information is sought.
See Eastland v. U. S. Servicemen's Fund, 421 U.S. 491, 501 n.14 (1975) ("On this record the Court
of Appeals correctly held that the District Court properly entertained this action initially.").  More
recently, the Supreme Court explained that congressional subpoenas are "subject to several
limitations" and that "recipients of legislative subpoenas retain their constitutional rights
throughout the course of an investigation."  Mazars, 140 S. Ct. at 2032.  Of course, this authority
necessarily implies applicability of Larson-Dugan to members of Congress who act
unconstitutionally or *ultra vires* in connection with a congressional subpoena.  See id.; see also
Bergman v. Senate Special Comm. on Aging, 389 F. Supp. 1127, 1130 (S.D.N.Y. 1975) (limiting
a Congressional subpoena as overbroad).

The determination of whether the Larson-Dugan exception applies often "merges with" the
merits.  Jud. Watch, Inc. v. Schiff, 474 F. Supp. 3d 305, 314 (D.D.C. 2020), aff'd, 998 F.3d 989
(D.C. Cir. 2021).  The same is true here.  The Larson-Dugan exception applies if the Court finds
that the Select Committee acted *ultra vires*—by issuing subpoenas when not validly constituted

and unrelated to a legislative purpose—and unconstitutionally—by issuing subpoenas that violate Plaintiffs' First, Fourth, and Fifth Amendment rights and the Separation of Powers doctrine. Thus, aside from Congress's express waiver of sovereign immunity in the RFPA, the Court should also find that the Larson-Dugan exception applies because the Select Committee's actions were unconstitutional and *ultra vires*.

Additionally, Congress expressly waived sovereign immunity in the RFPA. Section 3417(a) of the RFPA, titled "Liability of agencies or departments of United States or financial institutions" states that "[*a*]*ny agency or department of the United States* or financial institution obtaining or disclosing financial records or information contained therein in violation of this chapter *is liable to the customer* to whom such records relate . . . ." 12 U.S.C. § 3417. This language is a clear waiver of sovereign immunity. See Hohman v. Eadie, 894 F.3d 776, 782 (6th Cir. 2018) (stating that Section 3417 "creates a private cause of action for violations of the Act and waives the United States' sovereign immunity for certain claims . . . ."). Accordingly, sovereign immunity presents no constitutional or prudential bar to this action.

## B. The Speech or Debate Clause Does Not Preclude Review.

Under the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1, members of Congress are protected from suit for actions within the "legitimate legislative sphere." See Eastland, 421 U.S. at 503 (quoting Doe v. McMillan, 412 U.S. 306, 314 (1973)). Courts have, especially in the District of Columbia Circuit, interpreted the privilege broadly. See, e.g., Rangel v. Boehner, 785 F.3d 19, 23 (D.C. Circuit 2015). But, contrary to the Select Committee's argument, Response in Opp. (Dkt. No. 23) at p. 11, the clause is not limitless.

The Supreme Court has repeatedly emphasized that "[l]egislative immunity does not, of course, bar all judicial review of legislative acts." Powell v. McCormack, 395 U.S. 486, 503

(1969); see Gravel v. United States, 408 U.S. 606, 624 n.15 (1972) ("This Court has not hesitated to sustain the rights of private individuals when it found Congress was acting outside its legislative role."); Kilbourn v. Thompson, 103 U.S. 168, 199 (1880).  This is because the Speech or Debate Clause is "designed to preserve legislative independence, not supremacy" and Courts must "apply the Clause in such a way as to insure the independence of the legislature without altering the historic balance of the three co-equal branches of Government."  United States v. Brewster, 408 U.S. 501, 508 (1972).  Here, the Select Committee, believed to be acting in concert with a private financial institution, intentionally thwarted an individual's right to seek review of a congressional subpoena that is patently unconstitutional and *ultra vires*.  Under the unique and egregious facts of this case, the Speech or Debate Clause does not immunize the unlawful acts of the Select Committee.

Further, although the issuance of congressional subpoenas has been held to be a "legislative act," Eastland, 421 U.S. at 504, that does not end the analysis.  The Select Committee invites the Court to gloss over the details and hold that because a subpoena was issued by a legislative committee it is immune from review.  But this argument ignores Supreme Court precedent.  It is elementary that any congressional subpoena must have a valid legislative purpose.  Stated differently, the content a congressional subpoena seeks must be pertinent to the legislative purpose and functions of the Select Committee.  See, e.g., Eastland, 421 U.S. at 505–07 (analyzing whether the subpoena was related to a legitimate legislative purpose); Mazars, 140 S. Ct. at 2031–32 ("The subpoena must serve a valid legislative purpose.").

At least one other court has limited a congressional subpoena because its breadth exceeded a congressional committee's legislative purpose.  Bergman v. Senate Special Comm. on Aging, 389 F. Supp. 1127 (S.D.N.Y. 1975) (declaring congressional subpoena overbroad because it

sought "any" and "all" financial records which necessarily included documents unrelated to the committee's investigation at issue).  Courts have the power to limit such congressional overreach because, contrary to the Select Committee's arguments, "the [Speech or Debate] Clause does not and was not intended to immunize congressional investigatory actions from judicial review. Congress' investigatory power is not, itself, absolute." United States v. Am. Tel. & Tel. Co., 567 F.2d 121, 129 (D.C. Cir. 1977). Otherwise, drawing out the Select Committee's argument, a legislative committee investigating federal court security, for example, could subpoena individual judges' "information held by schools, archives, internet service providers, e-mail clients, and financial institutions," Mazars, 140 S. Ct. at 2035, all without any legislative purpose or need and without any checks, balances, or recourse.

Plaintiffs do not dispute that the Select Committee at issue in these proceedings has some legislative purpose.  Improving the training and readiness of the Capitol Police and interagency cooperation among law enforcement and intelligence agencies are legitimate, valid areas for potential legislation following the events of January 6, 2021.  See H.R. 503 § 4(b)(1), (c); see also Trump v. Thompson, 20 F.4th 10, 35 (D.C. Cir. 2021).  Plaintiffs also do not dispute that *some* of the records Plaintiff Budowich had already provided to the Select Committee are relevant to its investigation, as they demonstrate the lack of a causal connection between Plaintiffs and what occurred at the Capitol on January 6, 2021.  But the breadth and entirety of private financial records requested by the Select Committee are not relevant to any legislative purpose.

### 1.   *Plaintiff Budowich cooperated extensively with the Select Committee.*

Plaintiff Budowich recognizes it is "the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action . . . ." Watkins v. United States, 354 U.S. 178, 187–88 (1957).  As such, Plaintiff Budowich produced to the Select

Committee three-hundred ninety-one (391) documents responsive to a congressional subpoena, including all financial account transactions for the time period December 19, 2020, to January 31, 2021.  See TRO Motion, Exhibit D (Dkt. No. 14-4).  Plaintiff Budowich additionally made supplemental production of forty-nine (49) additional documents on December 17, 2021.  Id. at p. 5.  Further, Plaintiff Budowich traveled to Washington, D.C., at his own expense, and sat for a four (4) hour deposition before the Select Committee on December 22, 2021.  As a result, the Select Committee had a "viable alternative source" and "already has access" to the information its congressional subpoena presumably requests.  See Thompson, 20 F4th at 42-43.  This necessarily obviates any legislative purpose or compelling need for that same information.

Moreover, this process adequately balanced the Select Committee's investigative interests with Plaintiffs' constitutional and statutory rights, as their attorneys reviewed and winnowed out irrelevant documents consistent with their professional obligations of candor, good faith, and fair dealing.  That the Select Committee seeks to go beyond what counsel for Plaintiffs have already determined is relevant to the inquiry concerned necessarily makes the congressional subpoena at issue "broader than reasonably necessary to support Congress's legislative objective . . . ." Mazars, 140 S. Ct. at 2035; see also Senate Select Comm. v. Nixon, 498 F.2d 725, 731-32 (D.C. Cir. 1974) ("subpoenaed evidence [must be] demonstrably critical to the responsible fulfillment of the Committee's functions.").  In other words, Plaintiff Budowich's extensive cooperation with the Select Committee's investigation makes unnecessary the congressional subpoena at issue.

### 2.    *The Congressional subpoena at issue is unreasonably broad.*

Upon information and belief, the Select Committee is targeting financial records well beyond the events of January 6, 2021, up to and including the present.  There is no legislative purpose for such an unreasonably expansive scope of private financial records sought by the Select

Committee.  Plaintiffs' private financial records outside of December 2020 and January 2021—

which were already provided—have no relation to any legislative task of the Select Committee.

See Mazars, 140 S. Ct. at 2031 ("[A] congressional subpoena is valid only if it is 'related to, and

in furtherance of, a legitimate task of the Congress.'" (quoting Watkins, 354 U.S. at 178).

> **C.    Under the Unique and Egregious Facts of this Case, the Court Possesses Authority to Order Disgorgement and Return of Private Financial Records Belonging to Plaintiffs.**

> **1.    *Plaintiffs were willfully and intentionally deprived of judicial review.***

The traditional application of the Speech or Debate Clause concerning documents already

in Congress's possession is inapplicable here.  The Select Committee argues that the Speech or

Debate Clause precludes the Court from ordering the return of documents already in its possession.

See Response in Opp. (Dkt. No. 23) at pp. 11–13 (citing Senate Permanent Subcomm. on

Investigations v. Ferrer, 856 F.3d 1080, 1086 (D.C. Cir. 2017); Brown & Williamson Tobacco

Corp. v. Williams, 62 F.3d 408, 416 (D.C. Cir. 1995); Hearst v. Black, 87 F.2d 68, 71 (D.C. Cir.

1936)).  However, extending the Speech or Debate Clause to the facts of this case would

unconstitutionally extend the privilege from a protection of the independence of the legislature

into a weapon allowing Congress to surreptitiously eliminate any checks on its authority.  The

Supreme Court has cautioned against such an expansion of the privilege.  See Brewster, 408 U.S.

at 516 ("We would not think it sound or wise, simply out of an abundance of caution to doubly

insure legislative independence, to extend the privilege beyond its intended scope, its literal

language, and its history, to include all things in any way related to the legislative process.").

In most situations, individuals have an opportunity to challenge a congressional subpoena

without implicating the Speech or Debate Clause, and, thus, allowing the judiciary to remain an

appropriate check on the legislature.  First, in cases where an individual is subpoenaed directly,

the individual can refuse to comply with an unlawful subpoena and challenge it as part of a contempt proceeding.  See Watkins, 354 U.S. at 188; Yellin v. United States, 374 U.S. 109, 114 (1963); Gojack v. United States, 384 U.S. 702, 706–09 (1966).  The second situation arises where Congress subpoenas an individual's information from a third party. In those situations, the individual can sue the third-party to enjoin compliance with the subpoena and challenge the subpoena's validity.  See Mazars, 140 S. Ct. at 2028, 2035 (stating that constitutional "concerns are no less palpable here because the subpoenas were issued to third parties."); see also United States v. Am. Tel. & Tel. Co., 567 F.2d 121, 129 (D.C. Cir. 1977) ("[T]he fortuity that documents sought by a congressional subpoena are not in the hands of a party claiming injury from the subpoena should not immunize that subpoena from challenge by that party." (citing Eastland, 421 U.S. at 513 (Marshall, J., concurring)).

Here, Plaintiffs were not afforded the opportunity to challenge the subpoena before Defendant JPMorgan disclosed private financial records of Plaintiffs despite that JPMorgan and the Select Committee had actual written and verbal notice that Plaintiffs were bringing an imminent legal challenge to the congressional subpoena.  Plaintiffs were given less than twenty-four (24) hours to file a complaint and motion for temporary restraining order *and* obtain a court order restraining Defendant JPMorgan from releasing the private financial records.  This all occurred on a federal holiday—Christmas Eve.  This Court was closed.  Congress was closed. Banks were closed.  Nonetheless, the Select Committee refused to extend the deadline for compliance so that Plaintiffs' challenge could be adjudicated by the Court.  The Court should not endorse the Select Committee's intentional actions to "sidestep constitutional requirements . . . . The Constitution does not tolerate such ready evasion; it 'deals with substance, not shadows.'" Mazars, 140 S. Ct. at 2035 (quoting Cummings v. Missouri, 4 Wall. 277, 325 (1867)).

To be sure, Ferrer, Brown & Williamson, and Hearst all broadly support the Select Committee's contention that the Court cannot order the return of documents in Congress's possession.  See Response in Opp. (Dkt. No. 23) at pp. 11–13 (citing Ferrer, 856 F.3d at 1086; Brown & Williamson, 62 F.3d at 416; Hearst, 87 F.2d at 71).  But none of these authorities contemplated Congress using the Speech or Debate Clause as a sword to intentionally thwart *any* challenge to a congressional subpoena where the Committee *was on actual notice* of a forthcoming legal challenge.

In Ferrer, the individual subject of the subpoena had the opportunity to challenge the subpoena in court, and his challenge failed.  Ferrer, 856 F.3d at 1084–85.  Additionally, the D.C. Circuit declined to address "whether courts are powerless to enjoin individual members – or the committees of which they are a part – from disseminating investigative materials whose contents have no relationship to legislative functions or whose distribution would arguably violate the law." Id. at 1087.  That is exactly what Plaintiffs seek here:  an order returning only those private financial records that are unrelated to the legislative purposes of the Select Committee and that were obtained by the Select Committee in direct violation of RFPA.

Nor is the relief sought here precluded by Brown & Williamson.  62 F.3d at 411–12.  In that case, Congress was provided documents that were stolen by a paralegal from her law firm's client.  Id.  Brown & Williamson did not involve a situation, as here, where Congress was the improper actor.  Instead, the Brown & Williamson court expressly acknowledged that the Speech or Debate Clause would not insulate Congress unless it acted "in a procedurally regular manner." Id. at 416, 422.  Specifically, Brown & Williamson limited the protection because the court "very much doubt[ed] that Congress c[ould] with impunity appropriate Americans' private property or maintain possession of any and all privileged documents." Id. at 416, 422.

In this instance, the Select Committee has not acted in a "procedurally regular manner." Putting aside that it is not validly formed under its own initiating Resolution, the Select Committee still ordered that Defendant JPMorgan produce private financial records knowing Plaintiffs were to imminently challenge the congressional subpoena but were unable to receive any court ruling before the arbitrary and unreasonable Christmas Eve deadline that the Select Committee willfully and intentionally refused to extend.

Lastly, Hearst similarly does not foreclose the relief Plaintiffs seek because it, too, is distinguishable from the conduct of the Select Committee and Defendant JPMorgan.  In Hearst, the plaintiff challenged past actions taken by the Federal Communications Commission in concert with a Senate Committee.  87 F.2d at 68–69.  In that case, the Senate Committee was not alerted to a forthcoming legal challenge.  Id.  Additionally, the plaintiff challenged only the actions of the Federal Communications Commission and not the power of the Committee involved.  Id. at 70. The proceedings in Hearst were different from those presented here, wherein Plaintiffs challenge the pertinency of the records to the legislative purpose of the Select Committee, having alerted the Select Committee and Defendant JPMorgan of their intention to immediately lodge a legal challenge to the congressional subpoena.

In accordance with this authority, the Court can return the parties to the *status quo* at the point the Select Committee intentionally attempted to thwart judicial review of its third-party congressional subpoena after receiving an actual and *bona fide* notice of an imminent legal challenge.  This narrow framework correctly balances individual rights with the need for an independent legislature and should be applied here.[2]

_____

[2] Finally, relief requested by Plaintiffs would give force and serve justice to the long-standing legal maxim *commodum ex injuria sua nemo habere debet*, which expresses the common-sense equitable proposition that no party should profit or derive advantage from its own wrong, injurious behavior, or unconscionable act that has an immediate and necessary relation to a matter in

**D.      The RFPA Waives Speech or Debate Clause Immunity.**

Under the RFPA, Congress waived Speech or Debate Clause immunity by authorizing suits against it.  See 12 U.S.C. § 3417.  Although the Supreme Court has never definitively determined to what extent Congress can waive the Speech or Debate Clause protections, see United States v. Helstoski, 442 U.S. 477, 490 (1979), Congress itself has indicated that it can do so.  In passing the Congressional Accountability Act of 1995, 2 U.S.C. §§ 1301–1438, Congress authorized suits against it for money damages and injunctive relief.  Despite waiving sovereign immunity in the Accountability Act, Congress expressly retained its members' rights under the Speech or Debate Clause.  By doing so, Congress acknowledged that it can waive Speech or Debate Clause protections. Specifically, Section 1413 states that "[t]he authorization to bring judicial proceedings under sections 1405(f)(3), 1407, and 1408 of this title shall not constitute a waiver of . . . the privileges of any Senator or Member of the House of Representatives under article I, section 6, clause 1, of the Constitution . . . ." 2 U.S.C. § 1413. Thus, when authorizing suits against it, Congress knows how to specifically retain the privileges of its members but chose not to do so in the context of RFPA.  Instead, Congress did the opposite by authorizing disciplinary action against congressional employees for willful or intentional violations of RFPA.  See 12 U.S.C. § 3417(b). As such, the Speech or Debate Clause does not prohibit an action against the Select Committee or its members for violating RFPA.

---

litigation.  Northwell Health, Inc. v. Lamis, No. 18-cv-1178, 2019 WL 4688704, *3 (S.D.N.Y. 2019) (citing Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc., 792 F. Supp. 969, 969 (S.D.N.Y. 1992)); Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 245 (1933)); see also PenneCom B.V. v. Merrill Lynch & Co., 372 F.3d 488, 493 (2d Cir. 2004).

II.   **THE SELECT COMMITTEE AND ITS CONGRESSIONAL SUBPOENA ARE *ULTRA VIRES*.**

A.   **The Select Committee is Not Duly Constituted.**

Although the Constitution allows each house to make its own rules, Congress "may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained."  United States v. Ballin, 144 U.S. 1, 5 (1892).  Here, the Select Committee failed to comply with its authorizing resolution in two specific ways, each of which independently invalidates the congressional subpoena at issue.

Putting aside any potential ambiguity in the phrase "consultation with," the Select Committee's response makes clear it has not complied with the unambiguous language of its authorizing Resolution.  House Resolution 503 states: "The Speaker *shall* appoint 13 Members to the Select Committee, 5 of whom shall be appointed *after* consultation with the minority leader." See H. Res. 503 § 2(a).  The Select Committee, by its own admission, has violated this rule in two ways.  First, the Select Committee lacks thirteen (13) members.  This requirement—*shall*—is unambiguous.  Id.  The Court should decline the Select Committee's invitation to interpret "shall" to mean "may".  See Response in Opp. (Dkt. No. 23) at p. 16.  Moreover, the composition of prior committees is irrelevant to whether the Select Committee itself is operating *ultra vires*.[3]

Second, the Speaker did not appoint five (5) members *after* consultation with the minority leader.  Recognizing Speaker Pelosi's version of events, the Speaker appointed only one (1) member after consulting with Minority Leader McCarthy.  Even accepting the Select Committee's

---

[3] The Select Committee Defendants attempts to garner support for their investigation by reference to the Select Committee on the Events Surrounding the 2012 Terrorist Attack in Benghazi.  See Defs.' Response in Opp. at 11 (Dkt. No. 23 at pp. 18-19).  Notably, the Benghazi Select Committee was comprised of twelve (12) members, consistent with its authorizing Resolution, and bipartisan, as constituted by seven (7) majority and five (5) minority members.  See H. Res. 567, § 2(a), 113th Cong. (2014).

interpretation of "consulting with" to mean "discussing with a person and then doing whatever you want anyway," the Speaker still failed to appoint five (5) minority Members *after* doing so.  See Response in Opp. (Dkt. No. 23) at p. 4 (explaining the process by which Speaker Pelosi failed to appoint the requisite number of members to the Select Committee).  If the House of Representatives had wanted a Select Committee with only nine (9) members, all of whom would be appointed by the Speaker without any consultation with the Minority Leader, it could have passed a Resolution providing as much.  It chose not to.  And now the Speaker has overridden the directive of the entire Chamber.  Her refusal to follow the edicts of House Resolution 503 make *ultra vires* any and all actions of the Select Committee.

The Select Committee's argument that it is validly formed because the contempt resolutions for Mark Meadows and Steve Bannon were "approved by the full House *without any procedural point of order raised that the Select Committee lacked the proper authority because it was assertedly not validly constituted*" is alarming.  See Defs.' Opp. at 17 (Doc. 23 at 29).  Assuredly, the Select Committee knows that because the Rules Committee *waived all points of order* for those resolutions, it was impossible for any member to contest the authority of the improperly constituted Select Committee. See H. Res. 727 (waiving all points of order for the Bannon contempt resolution); H. Res. 848 (waiving all points of order for the Meadows contempt resolution).[4] That the Select Committee would make this argument further demonstrates that the Select Committee believes it is unrestrained by any rules and can operate above the law.

---

[4] Even though the Rules Committee waived all points of order for these resolutions, Representative Banks nonetheless contested the validity of the Select Committee during the debate of Mr. Bannon's contempt resolution.  See 167 Cong. Rec. H5759–60.  In the end, Mr. Bannon's contempt resolution passed by a mere twenty-seven (27) votes.  Id. at H5768–69.  The validity of the Select Committee was also challenged during the debate of Mr. Meadows's contempt resolution, which passed by only fourteen (14) votes.  See 167 Cong. Rec. H7667–76.

**B.      The Select Committee Has Exceeded its Legislative Purpose.**

The Select Committee seeks to collect and "expose" the financial documents of its political opponents "for the sake of exposure."   Watkins, 354 U.S. at 200.   As explained at length in Plaintiffs' TRO Motion (Dkt. No. 14) at I.B.2., pp. 21-24, this purpose is illegitimate and provides no authority for the congressional subpoena at issue.   To be clear, "there is no congressional power to expose for the sake of exposure." Watkins, 354 U.S. at 200. "No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress." Id. at 187.

Congress is not "a law enforcement or trial agency," and congressional investigations conducted "for the personal aggrandizement of the investigators" or "to punish those investigated" are "indefensible."   Watkins, 354 U.S. at 187 ("Congress may not constitutionally require an individual to disclose his . . . private affairs except in relation to a valid legislative purpose.").   Nor is Congress permitted to act on the premise that others have engaged in misconduct or under circumstances that are pervaded with the key features of a bill of attainder, a legislative act that determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial.  See United States v. Brown, 381 U.S. 437, 445 (1965); United States v. Lovett, 328 U.S. 303, 315-316 (1946); Ex parte Garland, 4 Wall. 333, 377, 18 L.Ed. 366 (1867); Cummings v. Missouri, 4 Wall. 277, 323, 18 L.Ed. 356 (1867).

Yet in this instance, while the Select Committee originates from a legislative entity, it is operating as a *de facto* law enforcement agency with the express aim of "expos[ing] for the sake of exposure" as forbidden by the Supreme Court.   See Watkins, 354 U.S. at 200; see also  CNN Politics, "Expose Each and Every Level:  Lawmaker Makes Promise for Jan. 6 Hearings" (Jan. 16, 2022)  (available  at  https://www.cnn.com/videos/politics/2022/01/16/rep-jamie-raskin-january-6th-hearings-dotb-acostanr-vpx.cnn) (last visited Jan. 17, 2022) (Defendant Raskin:  The Select

Committee is going to "expose each and every level of it . . . the closer you get to Donald Trump . . . a religious and political cult of personality . . . outside of our Constitutional order"); CNN Politics, "January 6 Committee Says It Would Make Criminal Referrals . . . Could Be Long Way Off" (Dec. 21, 2021) (available at https://www.cnn.com/2021/12/21/politics/january-6-committee-criminal-referrals/index.html) (Defendant Luria: "[I]f we determine that criminal actions were taken . . . that will be forwarded from the committee and (in) the appropriate manner to the Department of Justice . . . . [T]hat's exactly why we're conducting this investigation to find out all the facts, . . . and . . . hold people accountable who are responsible."); Tom Hamburger, "Thompson Says Jan. 6 Committee . . . Weighing Criminal Referrals, Washington Post (Dec. 23, 2021) (Defendant Thompson: "I can assure you that if a criminal referral would be warranted, there would be no reluctance on the part of this committee to do that.").

The public record here reveals an "impermissible law-enforcement purpose, behind the Committee's subpoena." Mazars, 940 F.3d at 726. By its own admission, the Select Committee has expressly avowed its purpose to "expose" and to seek to initiate criminal proceedings. Such an "express avowal of the [Select Committee's] object" offers strong evidence of its *de facto* law-enforcement purpose. Id. at 725 (weighing evidence "closely tied in time and subject matter to the subpoena" at issue to determine whether legislative or impermissible law-enforcement purpose existed); McGrain, 273 U.S. at 178; Shelton v. United States, 404 F.2d 1292, 1297 (D.C. Cir. 1968) (identifying "statements of the members of the committee" as "sources [that might] indicate the existence of a legislative purpose"). The Select Committee public statements demonstrate that its actions far exceed its narrow, legitimate legislative purpose into actions impermissible for a congressional committee.

III.   **PLAINTIFFS ARE ENTITLED TO THE CONGRESSIONAL SUBPOENA UNDER THE COMMON LAW RIGHT OF ACCESS.**

For the Court to determine whether the scope of the subpoena exceeds any valid legislative purpose, the Court—and to accord due process and fairness, Plaintiffs—must review the congressional subpoena.  In Washington Legal Foundation v. U.S. Sentencing Commission (WLF II), 89 F.2d 897 (D.C. Cir. 1996) the District of Columbia Circuit examined the Common Law Right of Access.  The Court noted: "In the courts of this country—including the federal courts—the common law bestows upon the public a right of access to public records and documents."  WLF II, 89 F.2d at 902 (citing Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978)) (internal quotations omitted).  The Court went on to note, the rule applies to all three (3) Departments of Government, including Congress.  Id. (citing Schwartz v. U.S. Dep't of Justice, 435 F. Supp. 1203 (D.D.C. 1977), aff'd 595 F.2d 888 (D.C. Cir. 1979).  Moreover, the Speech or Debate Clause does not provide an absolute protection from disclosure, including pursuant to the common law right of access.  Jud. Watch, Inc. v. Schiff, 998 F.3d 989, 995-96 (D.C. Cir. 2021) (Henderson, J. concurring).

Whether a document must be disclosed pursuant to common law right of access involves a two-step inquiry:  "First, the court must decide whether the document sought is a public record.  If the answer is yes, then the court should proceed to balance the government's interest in keeping the document secret against the public's interest in disclosure."  WLF II, 89 F.2d at 902 (internal citations and quotations omitted).  A "public record" subject to the common law right of access "is a government document created and kept for the purpose of memorializing an official action, decision, statement, or other matter of legal significance, broadly conceived."  Id. at 899.  "[A] subpoena issued by the Congress . . . is an 'official action' that constitutes a 'matter of legal significance, broadly conceived.'"  Jud. Watch, 998 F.3d 989 at 995.  Because the Select

-17-

Committee subpoena at issue was issued on official letterhead of Congress and signed by the Chairman of the Select Committee, it is therefore a public record subject to the common law right of access.  See TRO Motion, Exhibit B.  As such, the common law right of access applies to the congressional subpoena at issue.

Moreover, in the matter of Select Committee subpoenas for private financial information, there are no "specific interests favoring secrecy" that "outweigh the general and specific interests favoring disclosure," when properly focusing on the "specific nature of the governmental and public interests as they relate to the document itself, as well as the general public interest in the openness of governmental processes."  Wash. Legal Found v. U.S. Sent'g Comm'n (WLF I), 17 F.3d 1446, 1452 (D.C. Cir. 1994).  The Select Committee investigation is a public undertaking with understandable public interest.  As noted previously, the Select Committee appears to realize this as Defendants frequently make public statements about the progress of their investigation and have repeatedly promised public hearings early this year.  See TRO Motion (Dkt. No. 14) at p. 25.  Aside from this, the "right of access is fundamental to our democracy," WLF I, 17 F.3d at 1452, an open investigation will "gain in public understanding of an immensely important historical occurrence," and "[p]ublic confidence in a procedure as political and public as [investigating January 6, 2021] is an important consideration justifying disclosure."  Judicial Watch, 998 F.3d at 997 (Henderson, J., concurring) (quotation marks omitted) (quoting Warner Commc'ns, 435 U.S. at 602; In re Comm. on the Judiciary, 951 F.3d 589, 601 (D.C. Cir. 2020)).  By its own admission in this litigation, "the Select Committee's interests in prompt compliance with the subpoena and the unimpeded use of documents . . . are of the highest order" and "critical."  See Response in Opp. (Dkt. No. 23) at p. 38.  Finally, by their own actions, the Select Committee Defendants have largely eroded any interest in maintaining confidentiality of its investigative files.

Aside from these general and specific interests at stake, it is impossible for this Court to accurately determine the pertinence, scope, and breadth of the Select Committee's request to Defendant JPMorgan—which are inextricably intertwined with whether the Select Committee has exceeded its legislative purpose—without reviewing a full and complete copy of the congressional subpoena.   As stated above, upon information and belief, the Select Committee is targeting financial records well beyond the events of January 6, 2021, up to and including the present. Simply, the Select Committee must provide the Court and Plaintiffs with a complete copy of the congressional subpoena for the Court to reach an accurate and fair determination of this motion. Accordingly, concomitant with any relief provided, this Court should enter an Order directing production of a full and complete copy of the congressional subpoena to Defendant JPMorgan for Plaintiffs' private financial records.

## IV.    <u>THE RFPA APPLIES TO CONGRESS</u>.

Congress surely appreciates how to exempt itself from legislative action.   Under the RFPA, the term "any Government authority" is defined as "any agency or department of the United States . . . ."   <u>See</u> 12 U.S.C. §§ 3403(a), 3401(3).   This provision is broad and expansive.   It was also enacted in response to the United States Supreme Court decision in <u>United States v. Miller</u>, 425 U.S. 435, 440 (1976), which held that a bank customer had no Fourth Amendment right to prevent a bank from disclosing his financial records in response to a grand jury subpoena.   <u>SEC v. Jerry T. O'Brien, Inc.</u>, 467 U.S. 735, 745 n.15 (1984).   It would have been incongruous with this intent to make RFPA applicable to all government authorities but Congress.   And Congress surely knows how to expressly exempt itself from statutes.   <u>See, e.g.</u>, Freedom of Information Act ("FOIA"), 5 U.S.C. § 551(1)(A) ("does not include . . . the Congress").[5]

---

[5] Plaintiffs rely on their arguments on RFPA as articulated at Section I.A. of their TRO Motion (Dkt. No. 14) at pp. 8-18.

Additionally, inasmuch the Select Committee argues for deference to its interpretation of the RFPA in these proceedings, such deference is unwarranted.  See supra at p. 16, n. 3.  In Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984), the Supreme Court instructed reviewing courts to defer to agencies when an ambiguous statute explicitly or implicitly delegates the task of interpretation to the agency.  First, however, the Court must assess "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter."  Chevron, 467 U.S. at 841.  In this initial inquiry into congressional intent, the Court is "not required to grant any particular deference to the agency's parsing of statutory language or its interpretation of legislative history." Rettig v. Pension Benefit Guar. Corp., 744 F.2d 133, 141 (D.C. Cir. 1984).  The intent of Congress is clear:  its actions are governed by the RFPA, just as any other "Government authority," except those specifically exempted.  See, e.g., 12 U.S.C. § 3413(j) (exempting the United States Government Accountability Office, which is a legislative entity). Any argument to the contrary by the Select Committee would concede its status as an agency.

Moreover, the Select Committee is not entitled to deference here because it is not acting on behalf of the entire House of Representatives in this action. Contrary to Trump v. Thompson, 20 F.4th 10, 37 (D.C. Cir. 2021), where the court was confronted by a "unified" judgment of the Political Branches, here, the Court can only be assured that the Select Committee Defendants represent their own interests and not those of the House of Representatives at large.  Conspicuously absent from any pleadings filed on behalf of the Select Committee is assurance by the Bipartisan Legal Advisory Group "BLAG" of the House of Representatives as to the position of the full House.[6]  Accordingly, the Select Committee Defendants speak only for themselves in these

---

[6] Any pleadings purporting to represent the position of the U.S. House of Representatives customarily contain at their outset the following language: "The House of Representatives

proceedings and are entitled to no deference as Congress.  See Mazars, 940 U.S. at 726 (leaving

open question whether Congress is entitled to deference).

## V.   PLAINTIFFS WOULD SUFFER IRREPARABLE INJURY IF PRELIMINARY RELIEF WAS NOT GRANTED.

The Supreme Court considered in Watkins, the corrosive and irreparable harm associated

with involuntary disclosure of information identifying protected associations within the context of

a notorious, controversial, political, and historical event. There, the Supreme Court stated:

> Abuses of the investigative process may imperceptibly lead to
> abridgment of protected freedoms. The mere summoning of a
> witness and compelling him to testify, against his will, about his
> beliefs, expressions or associations is a measure of governmental
> interference. And when those forced revelations concern matters
> that are unorthodox, unpopular, or even hateful to the general public,
> the reaction in the life of the witness may be disastrous. This effect
> is even more harsh when it is past beliefs, expressions or
> associations that are disclosed and judged by current standards
> rather than those contemporary with the matters exposed. Nor does
> the witness alone suffer the consequences. Those who are identified
> by witnesses and thereby placed in the same glare of publicity are
> equally subject to public stigma, scorn and obloquy. Beyond that,
> there is the more subtle and immeasurable effect upon those who
> tend to adhere to the most orthodox and uncontroversial views and
> associations in order to avoid a similar fate at some future time. That
> this impact is partly the result of non-governmental activity by
> private persons cannot relieve the investigators of their
> responsibility for initiating the reaction.

Watkins, 354 U.S. at 197-98.  This same litany of likely and irreparable harms is about to play out

in the context of Plaintiffs' private financial records as the Select Committee plan "televised

---

Bipartisan Legal Advisory Group, which consists of the Speaker, Majority Leader, Majority Whip,
Republican Leader, and Republican Whip, 'speaks for, and articulates the institutional position of,
the House in all litigation matters.' Rule II.8(b), Rules of the House of Representatives, 116th
Cong., available at https://rules.house.gov/sites/democrats.rules.house.gov/files/116-1/116-
House-Rules-Clerk.pdf.  The Republican Leader and the Republican Whip do not agree with
intervention by the House here." See United States v. Nagarwala, No. 19-1015, Dkt. No. 24 at p.
1, n. 1 (6th Cir.).  As such, the Court should accord no deference to the position and arguments of
the Select Committee Defendants in these proceedings.

hearings" and release of a "series of reports" to "reveal their findings" as it prepares to "go public" in the coming months.  See Associated Press, "Jan. 6 Committee Prepares to Go Public as Findings Mount," U.S. News (Jan. 2, 2022).  As such, without immediate mandatory and prohibitory injunctive relief, as requested by Plaintiffs, they will suffer irreparable harm and injury.[7]

## **CONCLUSION**

Plaintiffs demonstrate a substantial likelihood of success on the merits because the Select Committee Defendants and Defendant JPMorgan violated the RFPA, which applies to the congressional subpoena at issue because the House of Representatives is a "Government authority" and both an agency and department of the United States.  Further, the purpose, context, structure, and internal provisions of the RFPA demonstrate the Act applies to Congress.  Additionally, the Select Committee and its congressional subpoena are *ultra vires*, as the Committee is not duly constituted and lacks a legitimate legislative purpose for the likely expansive scope of private financial records sought.  Moreover, Plaintiffs would suffer irreparable injury if preliminary relief was not granted; an order granting preliminary relief would not substantially injure other interested parties; and an order granting preliminary relief would further the public interest.

WHEREFORE, Plaintiffs respectfully request: (a) entry of a mandatory preliminary injunction and temporary restraining order mandating that Defendants Pelosi, Thompson, Cheney, Schiff, Raskin, Lofgren, Luria, Aguilar, Murphy, Kinsinger, and the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee Defendants") disgorge, promptly return, sequester, or destroy private financial records belonging to Plaintiffs, which the Select Committee Defendants received from Defendant JPMorgan; (b) entry of mandatory prohibitory injunction and temporary restraining order precluding the Select

---

[7] Plaintiffs rely on their arguments on irreparable harm as articulated at Section II of their TRO Motion (Dkt. No. 14) at pp. 24-27.

Committee Defendants from any use or derivative use of private financial records belonging to Plaintiffs, and prohibiting the Select Committee Defendants from taking any further steps to enforce compliance with the Congressional subpoena challenged herein, until this Court enters final judgment resolving on the merits all claims presented by Plaintiffs; and (c) entry of an Order denying Select Committee's Motion to Dismiss; along with (d) any and all other relief that the Court deems just and proper, specifically including production of the Congressional subpoena at issue.

Date:  January 18, 2022

Respectfully submitted,

**ABEL BEAN LAW, P.A.**

***s/ Christopher W. Dempsey***
CHRISTOPHER W. DEMPSEY
DANIEL K. BEAN
JARED J. BURNS
100 N Laura Street, Suite 501
Jacksonville, Florida 32202
Telephone:  (904) 944-4100
Fax:  (904) 944-4122
Email: cdempsey@abelbeanlaw.com
dbean@abelbeanlaw.com
jburns@abelbeanlaw.com

***Attorneys for Plaintiffs***