**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TAYLOR BUDOWICH, and

CONSERVATIVE STRATEGIES, INC.
a California for profit corporation,

      Plaintiffs,

v.                                  Case No. 1:21-cv-03366-JEB

NANCY PELOSI, in her official capacity as Speaker
Of the United States House of Representatives

BENNIE G. THOMPSON, in his official capacity
as Chairman of the House Select Committee to
Investigate the January 6 Attack on the United States
Capitol; Rayburn House Office Building, 2466,
Washington, DC 20515

ELIZABETH L. CHENEY, in her official capacity as
a Member of the United States House of Representatives,
Longworth House Office Building
Washington, D.C.  20515

ADAM B. SCHIFF, in his official capacity as
a Member of the United States House of Representatives,
Longworth House Office Building
Washington, D.C.  20515

JAMIE B. RASKIN, in his official capacity as
a Member of the United States House of Representatives,
Longworth House Office Building
Washington, D.C.  20515

SUSAN E. LOFGREN, in her official capacity as
a Member of the United States House of Representatives,
Longworth House Office Building
Washington, D.C.  20515

ELAINE G. LURIA, in her official capacity as
a Member of the United States House of Representatives,
Longworth House Office Building
Washington, D.C.  20515

PETER R. AGUILAR, in his official capacity as
a Member of the United States House of Representatives,
Longworth House Office Building
Washington, D.C.  20515

STEPHANIE MURPHY, in her official capacity as
a Member of the United States House of Representatives,
Longworth House Office Building
Washington, D.C.  20515

ADAM D. KINZINGER, in his official capacity as
a Member of the United States House of Representatives,
Longworth House Office Building
Washington, D.C.  20515

SELECT COMMITTEE TO INVESTIGATE THE
JANUARY 6TH ATTACK ON THE UNITED STATES
CAPITOL, Longworth House Office Building
Washington, D.C.  20515

J.P. MORGAN CHASE BANK, N.A.,
10 S. Dearborn Street
Chicago, Illinois 60603,

     Defendants.

_____/

## AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Plaintiffs, Taylor Budowich and Conservative Strategies, Inc., respectfully bring

this Amended Complaint for Declaratory and Injunctive relief, and incorporated request for

other remedies and relief, to invalidate and prohibit the enforcement of a subpoena from the

Select Committee to Investigate the January 6th Attack on the United States Capitol of the U.S.

House of Representatives (the "Select Committee") issued in whole or part in violation of the

Constitution and laws of the United States.

2.     The Select Committee wrongly compelled Mr. Budowich's financial institution

to provide private banking information for which it lacked the lawful authority to seek and to

obtain.  The Select Committee acted and is acting beyond its legislative power and threatens to violate longstanding principles of separation of powers by performing a law enforcement function absent authority to do so by issuing an *ultra vires* Congressional Subpoena seeking information not calculated to materially aid any valid legislative purpose.

3.     From November 22, 2021 to present, Mr. Budowich has consistently cooperated with the Select Committee in good faith.  Mr. Budowich's cooperation included producing documents and appearing for a deposition over his well-founded objections in an effort to cooperate with the Select Committee.

4.     While Mr. Budowich was attending his deposition in Washington, D.C., his financial institution, Defendant JP Morgan Chase Bank, N.A. ("JPMorgan"), having received on November 23, 2021, a subpoena from the Select Committee for Mr. Budowich's and his company Conservative Strategies, Inc.'s financial records, intentionally delayed notifying Mr. Budowich of the subpoena for nearly an entire month.  Specifically, JPMorgan transmitted to Mr. Budowich a letter dated December 21, 2021, stating that JPMorgan would produce documents pursuant to the subpoena, unless Mr. Budowich, by December 24, 2021, at 5:00 p.m. EST, provided JPMorgan with "documentation legally obligating it to stop taking such steps." Mr. Budowich received this letter from JPMorgan at 7:00 p.m. EST on December 23, 2021.

5.     Despite Congress, this Court, and banking institutions across the nation being closed for the holiday weekend and that the Select Committee's investigation into past events does not present any exigency or immediacy, the Select Committee refused to extend the deadline for when JPMorgan could produce documents in order to provide Mr. Budowich with an opportunity to seek judicial relief.  Further, JPMorgan itself refused to extend its arbitrary and self-imposed Christmas Eve production deadline despite reasonable requests by Mr. Budowich.

6.     As a consequence, Mr. Budowich was deprived of any prior opportunity to review the subpoena at issue in order to ascertain the extent or scope of information and records requested, and to request judicial intervention and relief prior to production by JPMorgan of his private financial records to the Select Committee.

7.     Moreover, the Select Committee and JPMorgan dispensed with all procedural rules, failed to accord due process, and neglected to provide formal notice and sufficient time to respond and/or object, as required by the Right to Financial Privacy Act ("RFPA"), 12 U.S.C. § 3405.  Instead, JPMorgan proceeded to unlawfully produce Mr. Budowich's private and personal financial records on Christmas Eve, thus depriving Mr. Budowich of any meaningful opportunity to seek judicial review and redress prior to its production.

8.     Additionally, the Select Committee now takes the position that its subpoena was not continuing and that the end date for documents—"to the present"—is the date the subpoena was issued, to wit:  November 23, 2021.  (ECF No. 28).   Yet JPMorgan has refused to advise whether it produced any private financial records of Plaintiff beyond November 23, 2021, and likewise, has yet to provide Plaintiffs with copies of their own private financial records that JPMorgan provided to the Select Committee, despite Plaintiffs' written request for the same on February 7, 2022.

**PARTIES**

9.     At all relevant times, Plaintiff Taylor Budowich was and is a citizen of the state of California.  Mr. Budowich is also the sole owner of Conservative Strategies, Inc.

10.     Conservative Strategies, Inc. is a California for-profit company with its principal place of business in Sacramento, California.

11.     Defendant Nancy Pelosi ("Speaker Pelosi") is a Democrat member of the U.S. House of Representatives and Speaker of the House.

12.     Defendant Bennie G. Thompson ("Chairman Thompson") is a Democrat member of the U.S. House of Representatives and Chairman of the "Select Committee to Investigate the January 6th Attack on the United States Capitol" (the "Select Committee").  The subpoena challenged herein were issued under his authority as Chair of the Select Committee.

13.     Defendant Elizabeth L. Cheney is a Republican member of the U.S. House of Representatives and member of the Select Committee.

14.     Defendant Adam B. Schiff is a Democrat member of the U.S. House of Representatives and member of the Select Committee.

15.     Defendant Jamie B. Raskin is a Democrat member of the U.S. House of Representatives and member of the Select Committee.

16.     Defendant Susan E. Lofgren is a Democrat member of the U.S. House of Representatives and member of the Select Committee.

17.     Defendant Elaine G. Luria is a Democrat member of the U.S. House of Representatives and member of the Select Committee.

18.     Defendant Peter R. Aguilar is a Democrat member of the U.S. House of Representatives and member of the Select Committee.

19.     Defendant Stephanie Murphy is a Democrat member of the U.S. House of Representatives and member of the Select Committee.

20.     Defendant Adam D. Kinzinger is a Republican member of the U.S. House of Representatives and member of the Select Committee.

21.     Defendant Select Committee is a Select Committee created by House Resolution 503 ("H. Res. 503") passed by the House of Representatives on June 30, 2021.

22.     JPMorgan is a financial banking institution and is the responding party to the Subpoena.

## JURISDICTION & VENUE

23.     This Court has subject matter jurisdiction in accordance with 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States, as well as 28 U.S.C. § §§ 2201-02, which provide for declaratory relief.

24.     This Court also has subject matter jurisdiction in accordance with the Right to Financial Privacy Act, 12 U.S.C. §§ 3416 and 3418, which provide for a private right of action and injunctive relief.

25.     Supplemental jurisdiction also exists pursuant to 28 U.S.C. § 1367.

26.     This Court has personal jurisdiction over Speaker Pelosi because she sponsored H.Res. 503 and oversaw its passage in the House.

27.     This Court has personal jurisdiction over Chairman Thompson because he presides over the Select Committee and issued the JPMorgan Subpoena from his office address in Washington, D.C.

28.     This court has personal jurisdiction over Elizabeth L. Cheney, Adam B. Schiff, Jamie B. Raskin, Susan E. Lofgren, Elaine G. Luria, Peter R. Aguilar, Stephanie Murphy, Adam D. Kinzinger because they serve as members of the Select Committee that issued the subpoena at issue from Washington, D.C.

29.     This Court has personal jurisdiction over the Select Committee because it is located and operates in Washington, D.C.

30.     The Court has personal jurisdiction over JPMorgan because JPMorgan transacts business in the District of Columbia; the claim arises from business transacted in the District of Columbia; and JPMorgan has minimum contacts with the District of Columbia such that the Court's exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice.

31.     Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claim occurred in Washington, D.C.

**FACTS & BACKGROUND**

32.     In a well-known episode on January 6, 2021, a large group of protestors in Washington, D.C., entered the U.S. Capitol, breached security, and disrupted the counting of Electoral College votes until order was restored.  The U.S. Department of Justice arrested more than five-hundred (500) individuals in connection with the activities on January 6th.

**A.     Formation, Composition, and Authority of the Select Committee.**

33.     In 2021, Congress considered establishing a "National Commission to Investigate the January 6 Attack on the United States Capital Complex."

34.     Chairman Thompson introduced H.R. 3233 on May 14, 2021.  H.R. 3233 would have established the Commission for four (4) "purposes":

    a.  "To investigate and report upon the facts and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex (hereafter referred to as the "domestic terrorist attack on the Capitol") and relating to the interference with the peaceful transfer of power, including facts and causes relating to the preparedness and response of the United States Capitol Police and other Federal, State, and local law enforcement in the National Capitol Region and other instrumentality of government, as well as the influencing factors that fomented such attack on American representative democracy while engaged in a constitutional process."

    b.  "To examine and evaluate evidence developed by relevant Federal, State, and local governmental agencies, in a manner that is respectful of ongoing law enforcement activities and investigations regarding the domestic terrorist attack upon the Capitol, regarding the facts and circumstances surrounding such terrorist attack and targeted violence and domestic terrorism relevant to such terrorist attack."

    c.  "To build upon the investigations of other entities and avoid unnecessary duplication by reviewing the findings, conclusions, and recommendations of other Executive Branch, congressional, or independent bipartisan or non-partisan commission investigations into the domestic terrorist attack on the Capitol and targeted violence and domestic terrorism relevant to such terrorist attack, including investigations into influencing factors related to such terrorist attack."

   d.  "To investigate and report to the President and Congress on its findings, conclusions, and recommendations for corrective measures that may include changes in law, policy, procedures, rules, or regulations that could be taken to prevent future acts of targeted violence and domestic terrorism, including to prevent domestic terrorist attacks against American democratic institutions, improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans, and strengthen the security and resilience of the Nation and American democratic institutions against domestic terrorism."

35.    The Commission would have included a bipartisan group of ten members:  (1) a "Chairperson" "appointed jointly by the Speaker of the House of Representatives and the majority leader of the Senate"; (2) a "Vice Chairperson" "appointed jointly by the minority leader of the House of Representatives and the minority leader of the Senate"; (3) "two members . . . appointed by the Speaker of the House of Representatives"; (4) "two members . . . appointed by the minorityleader of the House of Representatives"; (5) "two members . . . appointed by the majority leader of the Senate"; and (6) "two members . . . appointed by the minority leader of the Senate."  Because Democrats control both chambers in the current Congress, the Commission would have included 5 members appointed by Democrats and 5 members appointed by Republicans.

36.    The House passed H.R. 3233 on May 19, 2021.

37.    The Senate considered a cloture motion to proceed on H.R. 3233 on May 28, 2021.

38.    The motion failed by a vote of 54 yeas and 35 nays.

39.    On June 28, 2021, Speaker Pelosi introduced H. Res. 503, "Establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol." Two days later, the House passed H. Res. 503 on a near party-line vote of 222 yeas and 190 nays. Only two (2) Republicans, Rep. Liz Cheney of Wyoming and Rep. Adam Kinzinger of Illinois, voted in favor of H. Res. 503.

40.     In contrast to H.R. 3233, which contemplated an evenly balanced Commission, H. Res. 503 instructs the Speaker of the House to appoint thirteen (13) members to the Select Committee, five (5) of which "shall be appointed after consultation with the minority leader."

41.     Speaker Pelosi appointed Chairman Thompson, the original sponsor of H.R. 3233, to serve as Chair of the Select Committee and appointed six (6) additional Democrat members: Rep. Zoe Lofgren of California, Rep. Adam Schiff of California, Rep. Pete Aguilar of California, Rep. Stephanie Murphy of Florida, Rep. Jamie Raskin of Maryland, and Rep. Elaine Luria of Virginia.   She also appointed Republican Rep. Liz Cheney of Wyoming without any designation of position. 167 Cong. Rec. H3597 (2021).

42.     House Minority Leader Kevin McCarthy recommended five (5) Republican members to serve on the Select Committee, consistent with H. Res. 503:  Rep. Jim Banks of Indiana, to serve as Ranking Minority Member, and Rep. Rodney Davis of Illinois, Rep. Jim Jordan of Ohio, Rep. Kelly Armstrong of North Dakota, and Rep. Troy Nehls of Texas, to serve as additional minority members.

43.     Speaker Pelosi did not appoint Rep. Banks to serve as Ranking Minority Member, nor did she appoint any of the other recommendations by Minority Leader McCarthy.  In a public statement, she acknowledged that her refusal to appoint the members recommended by the Minority Leader was an "unprecedented decision."  See Nancy Pelosi, Speaker, U.S. House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol (July 21, 2021), https://www.speaker.gov/newsroom/72121-2 (last visited Feb. 18, 2022). Instead, Speaker Pelosi appointed Rep. Adam Kinzinger and Rep. Liz Cheney— the only other Republicans who voted in favor of H. Res. 503—and left four vacancies.  See 167 Cong. Rec. H3885 (2021).

44.     Despite House Resolution 503 requiring thirteen members, Speaker Pelosi has refused to appoint additional members to the Select Committee.

45.     Without reference to any authority, on September 2, 2021, Chairman Thompson announced in a press release that "he has named Representative Liz Cheney (R-WY) to serve as the Vice Chair of the Select Committee." See Press Release, Bennie Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, ChairmanThompson Announces Representative Cheney as Select Committee Vice Chair (Sept. 2, 2021), https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair (last visited Feb. 18, 2022). H. Res. 503 does not mention a vice chair, much less authorize the chair to appoint a vice chair. See generally H. Res. 503, 117th Cong. (2021).

46.     The official letterhead of the Select Committee indicates that Thompson is "Chairman" and lists the other members, including Cheney and Kinzinger, without designation. See Congressional Subpoena of Taylor Budowich (attached hereto as **Exhibit A**). The Select Committee's website provides a list of its members, including Thompson as Chairman, but no other members receive designation. See Membership, Select Comm. to Investigate the Jan. 6 Attack on the U.S. Capitol,https://january6th.house.gov/about/membership (last visited Feb. 18, 2022).

47.     H. Res. 503 provides that "[t]he Select Committee may not hold a markup of legislation."

48.     H. Res. 503 sets forth the purposes of the Select Committee, which are substantially similar to those of the Commission contemplated by H.R. 3233, except that H. Res. 503 omits the fourth purpose: "[t]o investigate and report to the President and Congress on its findings,

conclusions, and recommendations for corrective measures that may include changes in law, policy, procedures, rules, or regulations. "

49.    H. Res. 503 establishes three (3) "functions" of the Select Committee: (1) to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) to "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) to "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures described in subsection (c) as it may deem necessary."

50.    Subsection (c) of Section 4 describes three (3) categories of "corrective measures": "changes in law, policy, procedures, rules, or regulations that could be taken" (1) "to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions"; (2) "to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans"; and (3) "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism."

51.    H. Res. 503 provides that "[t]he chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress." Section 3(b)(1) of H. Res. 8 provides that, "[d]uring the One Hundred Seventeenth Congress, the chair of a standing committee . . . , upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee."

B.      **Activities of the Select Committee.**

52.      Since its inception in July 2021, the Select Committee has held only one (1) public hearing.  During that hearing, the Select Committee heard testimony from officers of the U.S. Capitol Police and D.C. Metropolitan Police Departments who were present at the Capitol on January 6, 2021.

53.      The Select Committee has issued a wide range of subpoenas for documents and testimony of witnesses.  See Chelsey Cox, "Who has been subpoenaed so far by the Jan. 6 committee?"      USA      Today      (Feb.      15,      2022),      available      at https://www.usatoday.com/story/news/politics/2021/11/10/jan-6-committee-whos-been-subpoenaed/6378975001/ (last visited Feb. 18, 2022).

54.      In August 2021, the Select Committee demanded records from fifteen (15) different social media companies, including Facebook, Reddit, Twitter, and YouTube.  See Press Release, Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, Select Committee Demands Records related to January 6th Attack from Social Media Companies (Aug. 27, 2021).  The subpoenas directed these companies to produce all internal company policies and actions taken relating to "misinformation" about the 2020 election, efforts to interfere with the 2020 election or electoral results, violent domestic extremists, foreign interference with the 2020 election, and more.

55.      The Select Committee also issued numerous subpoenas seeking the production of documents and compelled testimony from individual witnesses, including more than a dozen former Trump Administration officials.

C.      **Plaintiff Budowich's Cooperation with the Select Committee.**

56.      Mr. Budowich was in Nevada on January 6, 2021, and did not participate in any rally or other political event on that date.

57.     On or about November 22, 2021, the Select Committee served Mr. Budowich with a Congressional Subpoena for production of documents and testimony at a deposition.  See Exhibit A.

58.     The Congressional Subpoena requested, *inter alia*, identification of all financial accounts for which Mr. Budowich was the direct or indirect beneficial owner, or over which he exercised control, into which funds were transferred or withdrawn for any purpose in connection with the Ellipse Rally, along with documents sufficient to identify all account transactions for the time period December 19, 2020, to January 31, 2021, in connection with the Ellipse Rally. See Exhibit A at pp. 5-6; see also Congressional Subpoena to JPMorgan (attached hereto as **Exhibit B**).

59.     The Select Committee set December 6, 2021, as Mr. Budowich's deadline for production of documents and December 16, 2021, as the date of Mr. Budowich's deposition. Id. at p. 1.  However, per the request of counsel for Mr. Budowich, the Select Committee subsequently agreed to extend its deadline for production of documents to December 13, 2021, and rescheduled Mr. Budowich's deposition for December 22, 2021.  See Select Committee Correspondence (attached hereto as **Exhibit C**).

60.     On or about December 14, 2021, counsel for Mr. Budowich produced to the Select Committee three-hundred ninety-one (391) documents responsive to the Congressional Subpoena, including all financial account transactions for the time period December 19, 2020, to January 31, 2021, in connection with the Ellipse Rally.  See Correspondence to Select Committee (attached hereto as **Exhibit D**).

61.     Counsel for Mr. Budowich made supplemental production of forty-nine (49) additional documents, constituting 1,700 pages of production, on December 17, 2021.  See Exhibit D at p. 5.

62.     Included in Plaintiff Budowich's production were "documents sufficient to identify all account transactions for the time period December 19, 2020, to January 31, 2021, in connection with the Ellipse Rally."

63.     Additionally, Mr. Budowich traveled to Washington, D.C. at his own expense and sat for a four (4) hour deposition before the Select Committee on December 22, 2021.

64.     At his deposition, Mr. Budowich answered questions concerning payments made and received regarding his involvement in the planning of a peaceful, lawful rally to celebrate President Trump's accomplishments.

**D.**     **Production of Private Financial Records by Defendant JPMorgan.**

65.     In an abundance of caution, on December 16, 2021, counsel for Plaintiffs transmitted correspondence to Defendant JPMorgan noting that Plaintiffs objected to the production of any private financial records pursuant to any Congressional Subpoena and requesting immediate notification should Defendant JPMorgan be served with a Congressional Subpoena.  See Correspondence to JPMorgan (attached hereto as **Exhibit E**).

66.     That correspondence was received by JPMorgan at 5:41 a.m. EST on December 22, 2021.  See Exhibit E at p. 2.

67.     Unbeknownst to Mr. Budowich, on or about November 23, 2021, the Select Committee served Defendant JPMorgan with a Congressional Subpoena for production of documents, requiring production of Plaintiffs' private financial records.  See Exhibit B.

68.     The Select Committee initially set December 7, 2021, as Defendant JPMorgan's deadline for production of documents.  See Exhibit B at p. 1.   However, prior to December 7, 2021, the Select Committee extended Defendant JPMorgan's production deadline until December 24, 2021, a date specifically requested by Defendant JPMorgan.  See Correspondence with Select Committee (attached hereto as **Exhibit J**).

69.   At 2:33 p.m. EST on December 21, 2021, while Mr. Budowich was in Washington, D.C. for his deposition before the Select Committee, and prior to receiving correspondence by counsel for Plaintiffs demanding notice of any Congressional Subpoena, Defendant JPMorgan sent correspondence to Mr. Budowich at an address in Sacramento, California, advising that it received a Congressional Subpoena for his private financial records and would produce the same on December 24, 2021 at 5:00 p.m.  See Correspondence from JPMorgan (attached hereto as **Exhibit F**).

70.   Related to his travel from Washington, D.C., Mr. Budowich did not receive this correspondence from Defendant JPMorgan until 7:00 p.m. EST on December 23, 2021.  He immediately informed counsel of the JPMorgan letter.

71.   Counsel for Plaintiffs then immediately contacted Defendant JPMorgan to object to any production of his private financial records and request an extension of time for Defendant JPMorgan's production to the Select Committee.  See Correspondence with JPMorgan (attached hereto as **Exhibit G**).

72.   On December 24, 2021, counsel for Plaintiffs – via telephone conversation and in writing to both the Select Committee and Defendant JPMorgan – requested an extension of Defendant JPMorgan's production deadline until January 3, 2022, in light of the long holiday weekend and federal government closures.  See Correspondence to Select Committee (attached hereto as **Exhibit H**); Correspondence to JPMorgan (attached hereto as **Exhibit I**); Correspondence from Select Committee (attached hereto as **Exhibit J**).   Despite prior extensions freely granted by the Select Committee related to document production by both Mr. Budowich and Defendant JPMorgan, the Select Committee and Defendant JPMorgan refused to extend the December 24, 20215:00 p.m. EST production deadline, notwithstanding their notice that Mr. Budowich "intend[ed] to exercise his legal rights in court" and that refusing to allow

an extension of time would make JPMorgan "complicit in preventing its customer, who it promised to treat with equity and fairness . . . from having his day in court," in light of federal government and national public holidays in the United States as designated at 5 U.S.C. § 6103. See Exhibit I at p. 1.

73.     Defendant JPMorgan then proceeded to produce private financial records of Plaintiffs to the Select Committee and later argue along with the Select Committee at a hearing before this Court that Plaintiffs' request to enjoin production of his private financial records was moot given that it had already produced the financial records at issue, even though it had itself directly created the circumstance it averred preclude this Court from granting meaningful relief in this action.

74.     Defendant JPMorgan's deliberate tactics and gamesmanship were designed to ambush Plaintiffs, gain unfair advantage, and deprive Plaintiffs of any meaningful opportunity to object to the production of private financial records, all of which demonstrates a lack of good faith by the Select Committee Defendants and Defendant JPMorgan.

75.     Chief Executive Officer of Defendant JPMorgan, Jamie Dimon, has made numerous public remarks demonstrating his animus and disdain for former President Donald J. Trump.

**THE SUBPOENAS ARE INVALID**

**A.     The subpoena at issue was not validly issued by a duly authorized committee.**

76.     The composition of the House Select Committee to Investigate the January 6th Attack on the United States Capitol is governed by Section 2 of H. Res. 503. Section 2(a) states "Appointment Of Members.—The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503 117th Cong. (2021).

77.     Speaker Pelosi appointed only nine members to the Select Committee:  seven Democrats and two Republicans.  None of these members were appointed from the five congressmen recommended by Minority Leader McCarthy.

78.     Authorized congressional committees have subpoena authority implied by Article I of the Constitution.  McGrain v. Daugherty, 273 U.S. 135, 174 (1927).  The Select Committee, however, is not an authorized congressional committee because it fails to comport with its own authorizing resolution, House Resolution 503.

79.     Congress' failure to act in accordance with its own rules is judicially cognizable. Yellin v. United States, 374 U.S. 109, 114 (1963).  This is particularly significant where a person's fundamental rights are involved.  Moreover, the Select Committee "must conform strictly to [its] resolution." Exxon Corp. v. FTC, 589 F.2d 582, 592 (D.C. Cir. 1978).

80.     Speaker Pelosi failed to appoint members consistent with the authorizing resolution of the Select Committee.  Speaker Pelosi appointed only nine (9) members to serve on the Select Committee; whereas the authorizing resolution instructs the Speaker "shall" appoint thirteen (13) members.  H. Res. 503 § 2(a), 117th Cong. (2021).Further, of those nine (9) members Speaker Pelosi appointed, only one was appointed after consultation with the minority member, as is required by the authorizing resolution.See H. Res. 503 § 2(a), 117th Cong. (2021).

81.     Thus, the Select Committee as it currently stands—and stood at the time it issued the subpoenas in question—has no authority to conduct business because it is not duly constituted. Chairman Thompson's subpoenas were and are invalid and unenforceable.

82.     Chairman Thompson derives the authority to issue subpoenas solely from § 5(c)(6) of the Select Committee's authorizing statute, but this authority is qualified, not absolute.  The Select Committee chairman may not order the taking of depositions without consultation with

the ranking minority member of the Select Committee. As currently composed, the Select Committee has no ranking minority member.

**B.**   **The subpoenas are not issued to further a valid legislative purpose.**

83.    The subpoena issued to Defendant JPMorgan was issued by the Select Committee as part of an unconstitutional attempt to usurp the Executive Branch's authority to enforce the law and to expose what the Select Committee believes to be problematic actions by a political opponent.  Congress has no authority to issue subpoenas for these purposes.

84.    This is evidenced by numerous statements by members of the Select Committee. For example, Representative Luria told CNN about the Committee: "[T]hat's exactly why we're conducting this investigation to find out all the facts, . . . and . . . hold people accountable who are responsible." See https://www.cnn.com/2021/12/21/politics/january-6-committee-criminal-referrals/index.html (last visited Dec. 24, 2021); see also  CNN Politics, "Expose Each and Every Level:  Lawmaker Makes Promise for Jan. 6 Hearings" (Jan. 16, 2022) (available at https://www.cnn.com/videos/politics/2022/01/16/rep-jamie-raskin-january-6th-hearings-dotb-acostanr-vpx.cnn) (last visited Feb. 18, 2022) (Defendant Raskin:  The Select Committee is going to "expose each and every level of it . . . the closer you get to Donald Trump . . . a religious and political cult of personality . . . outside of our Constitutional order"); CNN Politics, "January 6 Committee Says It Would Make Criminal Referrals . . . Could Be Long Way Off" (Dec. 21, 2021)  (available  at  https://www.cnn.com/2021/12/21/politics/january-6-committee-criminal-referrals/index.html) (last visited Feb. 18, 2022) (Defendant Luria: "[I]f we determine that criminal actions were taken . . . that will be forwarded from the committee and (in) the appropriate manner to the Department of Justice . . . . [T]hat's exactly why we're conducting this investigation to find out all the facts, . . . and . . . hold people accountable who are responsible."); Tom Hamburger, "Thompson Says Jan. 6 Committee . . . Weighing Criminal

Referrals, Washington Post (Dec. 23, 2021) (last visited Feb. 18, 2022) (Defendant Thompson: "I can assure you that if a criminal referral would be warranted, there would be no reluctance on the part of this committee to do that.").

85.     Congress has no freestanding power to issue subpoenas. Instead, its investigative powers are ancillary to its legislative authority.  See Trump v. Mazars USA, LLP, 140 S. Ct. 2019, 2031 (2020).  Because of this tie between the investigative and legislative powers, Congress may only issue subpoenas that serve a valid legislative purpose.

86.     Law enforcement and the punishment of perceived legal wrongs are not valid legislative purposes.  To the extent Congress seeks to utilize subpoenas to investigate and punish perceived criminal wrongdoing, it unconstitutionally intrudes on the prerogatives of the Executive Branch.

87.     Similarly, a desire to "expose for the sake of exposure" cannot sustain a congressional subpoena. See Watkins v. United States, 354 U.S. 178, 200 (1957). Bringing information to light for the sake of bringing it to light is not a valid legislative end.

88.     Even if Congress uses a subpoena to seek information relevant to contemplated legislation, the subpoena may still be invalid if the contemplated legislation would be unconstitutional—such as an impermissible limit on the conduct or authority of the executive. See McGrain v. Daugherty, 273 U.S. 135, 171 (1927); Kilbourn v. Thompson, 103 U.S. 168, 195 (1880); Nixon v. Fitzgerald, 457 U.S. 731, 749 (1982).

89.     The legislative purpose inquiry analyzes whether a particular subpoena serves a valid purpose, not whether an investigation as a whole serves a valid purpose.  See Mazars, 140 S. Ct. at 2031.

90.     The Select Committee failed to identify any legislative purpose served by its Subpoena.  It has not considered any draft legislation, nor has it provided any explanation for why its request would further any valid legislative end.

91.     Instead of identifying any valid end or proposed legislation, the Select Committee issued public statements explicitly identifying law enforcement and the desire to expose for the sake of exposure as its motivations for subpoenaing targets of its investigation.

92.     The Select Committee's authorizing resolution also fails to identify its legislative purpose. It is vague to the point of meaninglessness, authorizing the Select Committee to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol, including facts and circumstances relating to . . . entities of the public and private sector as determined relevant by the Select Committee for such investigation."

93.     Nor is the nature of the information sought by the subpoena of a kind that would further a valid legislative purpose.

94.     The subpoena sought personal financial material that is irrelevant to any conceivable legislation and not pertinent to any purported purpose of the Select Committee. This information has no bearing on any contemplated constitutional legislation.  It is relevant only to serve the Select Committee's stated purpose of engaging in ad-hoc law enforcement and its unstated purpose of antagonizing its political adversaries.

**C.    The JPMorgan subpoena violated the Right to Financial Privacy Act.**

95.     The JPMorgan Subpoena requires Defendant JPMorgan to produce Mr. Budowich's financial records without a Certificate of Compliance, as required by 12 U.S.C. § 3403(b).

96.     The Select Committee did not provide Mr. Budowich and a sufficient period of time to object and/or respond, as required by 12 U.S.C. § 3405.

97.     On December 23, 2021, Mr. Budowich received a letter dated December 21, 2021, from Defendant JPMorgan notifying him of its duty to comply with the subpoena.  The letter provided that Defendant JPMorgan would comply with the subpoena unless Mr. Budowich provided a legal document obligating it not to comply by 5:00 p.m. EST on December 24, 2021. Of course, this provided Plaintiff Budowich with no opportunity to obtain relief.  This Court had officially closed for the holiday weekend by the time Plaintiff Budowich received "notice" of the subpoena from JPMorgan.

98.     Whatever financial information that could possibly be relevant to the Select Committee's investigation was previously produced by Plaintiff Budowich. Any requests in the JPMorgan Subpoena that exceeded the scope of the subpoena served personally on Plaintiff Budowich lacked pertinency and violate the Constitution.

99.     Plaintiff Budowich has a reasonable expectation of privacy in his personal financial records.

100.   The Fourth Amendment enumerates the right of private individuals to be free from unreasonable search and seizure by the government into their persons, houses, papers, and effects.It also protects a person's reasonable privacy expectations. See Katz v. United States, 389 U.S. 347, 351 (1967).

101.   The Fourth Amendment restricts the ability of the Select Committee to issue sweeping subpoenas untethered from any valid legislative purpose. See Oklahoma Press Pub. Co.v. Walling, 327 U.S. 186, 196 (1946).

102.   A Congressional subpoena must be reasonable.  An all-encompassing subpoena for personal, nonofficial documents falls outside the scope of Congress' legitimate legislative power.  See Mazars, 140 S. Ct. at 2040.

103.   The Select Committee's subpoena to JPMorgan is duplicative of records already received by the Select Committee or exceeds the scope of the Select Committee's the lawfully authorized purpose of the Select Committee.  See McPhaul v. United States, 364 U.S. 372, 381 (1960).

**D.     Compelled production of financial records under the JPMorgan Subpoena violated the First Amendment.**

104.   The subpoena of Plaintiff Budowich's private financial records violates his right to free association and chills the exercise of his and others free speech rights in a political context.

105.   The Committee's subpoena of Plaintiff Budowich's private financial records requests data which Mr. Budowich already provided the Select Committee.

106.   Additionally, Plaintiff Budowich used his financial accounts to engage in protected advocacy and other speech, as well as private, personal and lawful activities.

107.   All of these associational and expressive activities are protected by the First Amendment.  See Buckley v. Valeo, 424 U.S. 1, 64 (1976); Black Panther Party v. Smith, 661 F.2d 1243, 1267 (D.C. Cir. 1981); Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n, 333 F.3d 168, 179 (D.C. Cir. 2003).

108.   The Committee has no legitimate purpose for seeking the protected information demanded by the subpoena. Mr. Budowich already provided the Select Committee with responsive financial documents. Additional information will not meaningfully aid the Select Committee in any valid pursuit.

109.   Even if it had a valid reason to seek protected information, the Select Committee has put in place no safeguards to protect Mr. Budowich's rights.  It provided Mr. Budowich with no notice of the subpoena and provided him with no opportunity to assert objections or other legal protections over the demanded information.  The entirety of the demanded information,

including that which is constitutionally or otherwise protected, will be turned over to the Select Committee to do with as it pleases.

110.   The JPMorgan Subpoena is also a clear effort to chill the speech of the Select Committee Member's political adversaries.

111.   The body that issued this subpoena is composed of nine (9) members, seven (7) of whom belong to the political party that opposed the President who Mr. Budowich now serves in a professional capacity.

112.   As noted above, the subpoena served no substantive purpose in the Select Committee's investigation—it will not turn up any new relevant information.

113.   Allowing an entirely partisan select committee of Congress to subpoena the personal and private financial records of private individuals would work a massive chilling of current and future, political, and associational and free speech rights.

114.   The Select Committee's asserted interest is insufficient and its alternative means of obtaining this information are too obvious to justify such a drastic chilling of speech.

**CLAIMS FOR RELIEF**

**COUNT I**
**DECLARATORY JUDGMENT:  INVALID SUPBOENA**
**SELECT COMMITTEE NOT DULY AUTHORIZED**
**(ALL DEFENDANTS)**

115.   Plaintiffs adopt and reallege the allegations in Paragraphs 1-114 as if stated herein.

116.   House Resolution 503, the resolution creating the Select Committee, requires that the Committee be comprised of thirteen (13) members.  See H.R. 503, § 2(a) ("The Speaker shall appoint 13 Members to the Select Committee.").

117.   The Select Committee has, and has always had, only nine (9) members.

118.   Further, Section 2(a) requires that five (5) of the thirteen (13) members "be appointed after consultation with the minority leader."  See H.R. 503, § 2(a).

119.   There are only two (2) Republican members on the Select Committee, neither of whom were recommended by the minority leader. Additionally, only one member was appointed after Speaker Pelosi rejected Minority Leader McCarthy's recommendations.

120.   As such, the Select Committee is not duly formed pursuant to its own authorizing resolution.

121.   Consequently, the Select Committee is operating *ultra vires* and without authority thus nullifying and making void its subpoena for private financial records of Plaintiffs.

122.   As a direct and proximate result of the ultra vires, null, and void subpoena for private financial records by the Select Committee, Plaintiffs have suffered and will continue to suffer injury, including actual damages.

<u>**COUNT II**</u>
**DECLARATORY JUDGMENT:  INVALID SUPBOENA**
**NO VALID LEGISLATIVE PURPOSE**
**(ALL DEFENDANTS)**

123.   Plaintiffs adopt and reallege the allegations in Paragraphs 1-114 as if stated herein.

124.   The JPMorgan subpoena at issue seeks financial records of a private citizen totally unrelated to any public office or position held within the administration of any Government authority.

125.   Further, there is no declared remedial purpose of the Select Committee investigation except to "investigate" and "report." <u>See</u> H. Res. 503, § 3(1)-(3).

126.   Without a legislative purpose to serve, the JPMorgan subpoena cannot be calculated to materially aid any investigation in furtherance of a power to legislate.

127.   As a result, in issuing the challenged JPMorgan subpoena exceeds any legitimate legislative purpose, the Select Committee is engaging in an impermissible law enforcement inquiry, and it therefore lacks authority to compel production of the private financial records of Plaintiffs and lacks any authorization or basis for their continued possession and use.

128.   Moreover, the scope of the JPMorgan subpoena far exceeds any potential legitimate legislative purpose, rendering it invalid.

129.   As a direct and proximate result of JPMorgan's production of private financial records of Plaintiffs to the Select Committee acting under color of law, Plaintiffs have suffered and will continue to suffer injury, including actual damages.

**COUNT III**
**DECLARATORY JUDGMENT:**
**VIOLATION OF RIGHT TO PROCEDURAL DUE PROCESS**
**(ALL DEFENDANTS)**

130.   Plaintiffs adopt and reallege the allegations in Paragraphs 1-114 as if stated herein.

131.   The Due Process Clause of the Fifth Amendment to the United States Constitution provides that certain substantive rights – life, liberty, and property – cannot be deprived except pursuant to constitutionally adequate procedures.

132.   JPMorgan's production of private financial records of Plaintiffs to the Select Committee implicates certain protected liberty interests, to wit:   privacy, engagement in expressive speech, and associational rights.

133.   JPMorgan's production of private financial records of Plaintiffs to the Select Committee was and is in violation of the Due Process rights of Plaintiffs to constitutionally adequate procedures – nominally notice and an opportunity to be heard – considering the private interests affected, the risk of erroneous deprivation of those interests, government interest at stake, and the basic entitlement by Plaintiffs to procedures that minimize substantively unfair or mistaken deprivations.

134.   JPMorgan's production of private financial records of Plaintiffs to the Select Committee pursuant to an *ultra vires* subpoena was lacking in constitutionally adequate procedures.

135.   As a direct and proximate result of JPMorgan's production of private financial records of Plaintiffs to the Select Committee acting under color of law, Plaintiffs have suffered and will continue to suffer injury, including actual damages.

**COUNT IV**
**VIOLATION OF THE RIGHT**
**TO FINANCIAL PRIVACY ACT**
**(ALL DEFENDANTS)**

136.   Plaintiffs adopt and reallege the allegations in Paragraphs 1-114 as if stated herein.

137.   The Right to Financial Privacy Act ("RFPA"), 12 U.S.C. §§ 3401-23, provides: "No financial institution, or officers, employees or agent of the financial institution, may provide to any Government authority access to or copies of, or the information contained in, the financial records of any customer except in accordance with the provision of this chapter.  See 12 U.S.C. § 3403(a).

138.   The RFPA additionally provides:  "A financial institution shall not release the financial records of a customer until the Government authority seeking such records *certifies in writing* to the financial institution that it has complied with the applicable provisions of this chapter."  See 12 U.S.C. § 3403(b) (emphasis added); see also 12 U.S.C. § 3411 ("deliver the records to the Government authority *upon receipt of the certificate required* under section 3402(b) of this title") (emphasis added).

139.   In pertinent part, the RFPA provides that "no Government authority may have access to or obtain copies of, or the information contained in the financial records of any customer from a financial institution unless the financial records are reasonable described and . . . such financial records are disclosed in response to an administrative subpoena or summons which meets the requirements of section 3405 of this title . . . [or] such financial records are disclosed in response to a formal written request which meets the requirements of section 3408 of this title."  See 12 U.S.C. §§ 3402(2), (5).

140.   Both 12 U.S.C. §§ 3405 (administrative subpoena or summons) and 3408 (formal written request) require that a copy of the subpoena or request "have been served upon the customer or mailed to his last known address on or before the date on which the subpoena or summons was served on the financial institution" together with a formal statutory notice allowing ten (10) days from the date or service or fourteen (14) days from the date of mailing the required notice.  See 12 U.S.C. §§ 3405, 3408.

141.   Additional provisions of RFPA establish the right of a financial institution customer to challenge a request for their financial records in an appropriate United States District Court and that proceedings involving such challenges should be completed or decided within seven (7) calendar days of the filing of any Government response.  See 12 U.S.C. § 3410(a)-(b).

142.   Neither the Select Committee nor JPMorgan served upon Plaintiffs or mailed to their last known address a copy of the subpoena for private financial records at issue on or before the date on which the subpoena or summons was served on JPMorgan together with a formal statutory notice allowing ten (10) days from the date or service or fourteen (14) days from the date of mailing the required notice.  JPMorgan produced private financial records of Plaintiffs absent written certification by the Select Committee that it complied with the applicable provisions of the RFPA, as required by 12 U.S.C. §§ 3403(b), 3411.

143.   JPMorgan produced private financial records of Plaintiffs pursuant to an *ultra vires* congressional subpoena seeking information not calculated to materially aid any valid legislative purpose.

144.   JPMorgan produced private financial records of Plaintiffs notwithstanding its actual prior notice that Plaintiffs objected to production under, *inter alia*, the RFPA and other legal authorities, and knowledge that Plaintiffs would imminently seek judicial intervention on an emergency basis.

145.   JPMorgan's violation of the RFPA was willful and intentional.

146.   As a direct and proximate result of the violation of RFPA by the Select Committee and JPMorgan, Plaintiffs have suffered and will continue to suffer injury, including actual damages.

### COUNT V
### DECLARATORY JUDGMENT:
### VIOLATION OF FIRST AMENDMENT
### (ALL DEFENDANTS)

147.   Plaintiffs adopt and reallege the allegations in Paragraphs 1-114 as if stated herein.

148.   The First Amendment to the United States Constitution prohibits infringement upon the right to free speech, expression, and association.

149.   The Select Committee subpoena for private financial information relating to political adversaries infringes upon and suppresses the rights of Plaintiffs to free speech, expression, and association.

150.   The Select Committee subpoena's concomitant suppression of Plaintiffs' protected rights of free speech, expression, and association is neither necessary nor the least restrictive means to achieve any compelling purpose.

151.   As a direct and proximate result of the issuance of an invalid subpoena under color of law by the Select Committee and JPMorgan's production of private financial records of Plaintiffs to the Select Committee, Plaintiffs have suffered and will continue to suffer injury, including actual damages.

**COUNT VI**
**DECLARATORY JUDGMENT:**
**VIOLATION OF FOURTH AMENDMENT**
**(ALL DEFENDANTS)**

152.   Plaintiffs adopt and reallege the allegations in Paragraphs 1-114 as if stated herein.

153.   The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

154.   JPMorgan's production of private financial records of Plaintiffs to the Select Committee acting *ultra vires* and absent any warrant, legal authority, or justification deprived Plaintiffs of rights, privileges, or immunities secured and protected by the Fourth Amendment to the United States Constitution.

155.   As a direct and proximate result of the issuance of an invalid subpoena under color of law by the Select Committee and production by JPMorgan of private financial records of Plaintiffs to the Select Committee, Plaintiffs have suffered and will continue to suffer injury, including actual damages.

**COUNT VII**
**CONSTITUTIONAL VIOLATION:**
**INVASION OF PRIVACY**
**(DEFENDANT JPMORGAN)**

156.   Plaintiffs adopt and reallege the allegations in Paragraphs 1-114 as if stated herein.

157.   Under California law, Plaintiffs have a constitutionally protected privacy interest in their financial records.

158.   Plaintiffs had a reasonable expectation that their private financial records would not be disclosed without prior notice.

159.   Plaintiffs had a reasonable expectation that their private financial records would only be disclosed when relevant to a legitimate proceeding and with prior notice.

160.   Numerous statutes provide protection to California customers so that private financial records are not disclosed without notice and a showing of reasonableness.

161.   The records produced by JPMorgan to the Select Committee were extremely overbroad, provided without sufficient notice to Plaintiffs, unnecessary to further a legitimate purpose, and provided without any procedural safeguards or protections.

162.   Not only did the records produced contain Plaintiffs' private financial records, but because of Plaintiffs' work, included additional information regarding Plaintiffs' political affiliations.

163.   Moreover, the Select Committee has access to financial records that provide nonpublic information regarding Plaintiffs' political activities and business activities for political opponents to members of the Select Committee.

164.   JPMorgan did nothing to ensure that the Select Committee would protect Plaintiffs' private financial records.

165.   Thus, JPMorgan's actions violated social norms of California customers such that the disclosure was unacceptable as a matter of California public policy.

166.   Despite having ample opportunity to provide Plaintiffs with sufficient notice of the subpoena, JPMorgan intentionally provided Plaintiffs with insufficient notice to preclude their ability to challenge the subpoena.  JPMorgan did this to punish Plaintiffs for their political affiliations and associations.

167.   JPMorgan's actions constitute oppression, malice, and fraud.

168.   As a direct and proximate result of JPMorgan's unlawful and intentional acts calculated to deprive Plaintiffs of their right to seek judicial review and intervention, Plaintiffs have suffered and will continue to suffer injury, including actual damages.

**COUNT VIII**
**VIOLATION OF CALIFORNIA UNFAIR COMPETETION LAW**
**UNLAWFUL PRONG**
**(DEFENDANT JPMORGAN)**

169.   Plaintiffs adopt and reallege the allegations in Paragraphs 1-114 as if stated herein.

170.   This claim is for violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 1700, *et seq*.

171.   JPMorgan violated numerous California and federal laws by wrongly disclosing Plaintiffs' personal, private financial information.

172.   As a result of Defendant JPMorgan's unlawful conduct, Mr. Budowich has been required to purchase credit monitoring services to ensure that his financial information is not further misused.

173.   Additionally, as a result of JPMorgan's unlawful conduct, Mr. Budowich paid more for JPMorgan's banking services then he would have otherwise paid had he known that JPMorgan was not going to adequately protect his personal financial information.

174.   As alleged previously, JPMorgan intentionally provided Plaintiffs with insufficient notice regarding JPMorgan's production to the Select Committee.

175.   JPMorgan intended to preclude any opportunity to challenge the records requested by the subpoena, as evidenced by its refusal to delay production until Plaintiffs could obtain a court order on its motion for temporary restraining order.

176.   JPMorgan, after Plaintiffs informed it that they did not consent to release of their non-public personal information, nonetheless disclosed this information to the Select Committee.

177.   JPMorgan flouted customer safeguards and purposefully disclosed Plaintiffs' private financial records without any regard to the relevance, need, use, or subsequent protection of those private financial records.

178.   JPMorgan's actions violated numerous federal and state laws.

179.   Specifically, JPMorgan violated the California Financial Information Privacy Act by sharing Plaintiffs' non-public personal information despite Plaintiffs' express protestations against doing so. This action was in direct violation of the California Financial Code § 4052.5.

180.   JPMorgan's actions also violated the Graham-Leach-Bliley Act ("GLBA") which prohibits disclosure of Plaintiffs' non-public personal information. 15 U.S.C. § 6802(a).

181.   Under the GLBA, JPMorgan had "an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).   But JPMorgan's actions ignored that obligation.

182.   JPMorgan is a financial institution.

183.   JPMorgan disclosed Plaintiffs' nonpublic personal information.

184.   JPMorgan's conduct also violated the RFPA, as stated more fully in Count IV.

185.   The Select Committee did not have authority to request the information it requested from JPMorgan.   Moreover, the subpoena was not properly authorized because the Select Committee lacks the requisite number of members and the records sought are not pertinent to any legislative purpose.

**COUNT IX**
**VIOLATION OF CALIFORNIA UNFAIR COMPETETION LAW**
**UNFAIR PRONG**
**(DEFENDANT JPMORGAN)**

186.   Plaintiffs adopt and reallege the allegations in Paragraphs 1-114 as if stated herein.

187.   This claim is for violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 1700, *et seq*.

188.   California has a strong public policy of protecting consumers from disclosure of their private information. See, e.g., Cal. Const. art. I, § 1; Cal. Fin. Code § 4051 (West) ("The Legislature intends for financial institutions to provide their consumers notice and meaningful choice about how consumers' nonpublic personal information is shared or sold by their financial institutions [and that the] California Financial Information Privacy Act to afford persons greater privacy protections than those provided in Public Law 106-102, the federal Gramm-Leach-Bliley Act . . . ."); Cal. Civ. Code § 1798.1 ("The Legislature declares that ... all individuals have a right of privacy in information pertaining to them . . . ."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 (explaining that the Legislature's intent was to have a uniform policy state-wide regarding privacy policies on the Internet).

189.   Despite knowing Mr. Budowich was a California resident, JPMorgan implemented zero safeguards for personal financial information.

190.   Specifically, even after JPMorgan was informed that Plaintiffs were going to challenge the legality of the Select Committee's subpoena, JPMorgan nonetheless produced Plaintiffs' records.  This action demonstrated an utter disregard for the protection of Plaintiffs' private financial records and was immoral, unethical, oppressive, unscrupulous, and substantially injurious.

191.   The Select Committee now has Plaintiffs' private financial information without any agreement or protections to safeguard such information.

192.   Additionally, the Select Committee, because of JPMorgan's actions, have financial records that have no relation to any proffered legislative purpose.  Moreover, the Select Committee has access to financial records that provide nonpublic information regarding Plaintiffs' political activities and business activities for political opponents to members of the Select Committee.

193.   Had JPMorgan provided Plaintiffs with sufficient notice, Plaintiffs could have, and would have, informed JPMorgan that the records sought far exceeded those needed for any legislative purpose and JPMorgan could have negotiated a narrowed scope with the committee to protect the privacy of its customer.

194.   Additionally, had JPMorgan provided Plaintiffs with sufficient notice, Plaintiffs could have challenged the subpoena before the documents were unlawfully provided to the Select Committee and a court could have narrowed the scope of the subpoena to ensure the records sought were pertinent to the Select Committee's purpose.

195.   JPMorgan's actions to thwart any meaningful review of the subpoena were intentional with the purpose to injure Plaintiffs for exercising their First Amendment Rights under the United States Constitution and speech, assembly, and association rights under the California Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enters judgment in their favor and against Defendants and enters an Order granting the following relief:

(a) A declaratory judgment that the JPMorgan subpoena was and is *ultra vires*, unlawful, and unenforceable;

(b) A declaratory judgment that the JPMorgan subpoena served and serves no valid legislative purpose and exceed the Select Committee's constitutional authority;

(c) A declaratory judgment that compliance with the JPMorgan subpoena violated the Right to Financial Privacy Act, 12 U.S.C. §§ 3401-22;

(d) A declaratory judgment that the JPMorgan subpoena violated Mr. Budowich's First Amendment rights;

(e) A declaratory judgment that the JPMorgan subpoena violated Mr. Budowich's Fourth Amendment rights;

(f) A declaratory judgment that the JPMorgan subpoena violated Mr. Budowich's Fifth Amendment procedural due process rights;

(g) In the alternative, an order modifying the JPMorgan subpoena to seek only unprivileged information that does not infringe on Mr. Budowich's constitutional rights;

(h) An injunction quashing the JPMorgan subpoena and prohibiting its enforcement by Defendants;

(i) An injunction prohibiting the Select Committee from imposing sanctions for noncompliance with the JPMorgan subpoena;

(j) An injunction prohibiting the Select Committee from inspecting, using, maintaining, or disclosing any information obtained per the JPMorgan subpoena;

(k) An injunction mandating that the Select Committee Defendants disgorge, promptly return, sequester, or destroy private financial records belonging to Plaintiffs

(l) An award in favor of Plaintiff of his actual damages, pursuant to 12 U.S.C. § 3417(a)(2);

(m) An award in favor of Plaintiff of punitive damages, pursuant to 12 U.S.C. § 3417(a)(3), as Defendants' violation is willful or intentional;

(n) An award in favor of Plaintiff for his reasonable expenses, including attorneys' fees and costs, incurred as a result of the JPMorgan Subpoena, pursuant to 12 U.S.C. § 3417(a)(4);

(o) An award of general and special damages, damages for emotional distress, punitive damages, and all other relief the Court deems just and equitable, related to Defendant JPMorgan's violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 1700, *et seq*.

(p) Any and all other relief that the Court deems just and proper.

Date: February 18, 2022

Respectfully submitted,

**s/ Christopher W. Dempsey**
CHRISTOPHER W. DEMPSEY
D.D.C. Bar ID:  AR0006
Daniel K. Bean
Jared J. Burns
ABEL BEAN LAW, P.A.
100 N Laura Street, Suite 501
Jacksonville, Florida 32202
Telephone:  (904) 944-4100
Fax:  (904) 944.4122
Email: cdempsey@abelbeanlaw.com