**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TAYLOR BUDOWICH, *et al.*,                )
                                          )
                    Plaintiffs,           )
                                          )
vs.                                       )          Case No. 1:21-cv-03366-JEB
                                          )
NANCY PELOSI, *et al.*,                   )
                                          )
                    Defendants.           )
                                          )

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT**
**BY SELECT COMMITTEE DEFENDANTS**

The Select Committee continues to argue that the Speech or Debate Clause immunizes it from its own constitutional violations. This, of course, is not true. The Select Committee, as with all congressional committees, cannot violate individuals' constitutional and statutory rights without consequence. The Court here can fashion meaningful relief, and Plaintiffs have appropriately pled their causes of action that will allow the Court to do so.

In accordance with LCvR 7(b), Plaintiffs Taylor Budowich and Strategic Consultants, Inc., respectfully oppose the Motion to Dismiss Amended Complaint (ECF No. 33) filed by Defendants Pelosi, Thompson, Cheney, Schiff, Raskin, Lofgren, Luria, Aguilar, Murphy, Kinsinger, and the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee Defendants").

The Court has subject matter jurisdiction to review and redress the actions complained of by the Select Committee Defendants and Defendant J.P. Morgan Chase Bank, N.A. ("JPMorgan"), and Plaintiffs sufficiently state claims upon which this Court can grant meaningful relief. As such, Plaintiffs respectfully request the Court deny the Select Committee's Motion to Dismiss (ECF No. 33) for the reasons stated herein.

## FACTS & BACKGROUND

**I.    THE SELECT COMMITTEE SUBPOENAS.**

On November 22, 2021, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") served Plaintiff Budowich with a congressional subpoena for production of documents and testimony at a deposition. See Am. Compl., Ex. A (ECF No. 30-1). The congressional subpoena requested, *inter alia*, identification of all financial accounts for which Plaintiff Budowich was the direct or indirect beneficial owner, or over which he exercised control, into which funds were transferred or withdrawn for any purpose in connection with the Ellipse Rally, along with documents sufficient to identify all account transactions for the time period December 19, 2020, to January 31, 2021, in connection with the Ellipse Rally. Id., Ex. A at 5-6.

The Select Committee set December 6, 2021, as Plaintiff Budowich's deadline for production of documents and December 16, 2021, as the date of Plaintiff Budowich's deposition. Id., Ex. A at 1. However, at Plaintiff Budowich's request, the Select Committee agreed to extend its deadline for production of documents to December 13, 2021, and rescheduled Plaintiff Budowich's deposition to December 22, 2021. See id., Ex. C (ECF No. 30-3).

On December 14, 2021, counsel for Plaintiff Budowich produced to the Select Committee three-hundred ninety-one (391) documents responsive to the congressional subpoena, including all financial account transactions for the time period December 19, 2020, to January 31, 2021, in connection with the Ellipse Rally. See id., Ex. D (ECF No. 30-4). Counsel for Plaintiff Budowich made supplemental production of forty-nine (49) additional documents on December 17, 2021. See id., Ex. D at 5. Additionally, Plaintiff Budowich traveled to Washington, D.C. at his own expense and sat for a four (4) hour deposition before the Select Committee on December 22, 2021.

In an abundance of caution, on December 16, 2021, counsel for Plaintiffs transmitted correspondence to Defendant JPMorgan noting that Plaintiffs objected to the production of any

private financial records pursuant to any congressional subpoena and requesting immediate notification should Defendant JPMorgan be served with a congressional subpoena.  See id., Ex. E (ECF No. 30-5).  That correspondence was received by Defendant JPMorgan at 5:41 a.m. EST on December 22, 2021.  Id., Ex. E at 2.

Unbeknownst to Plaintiff Budowich, on November 23, 2021, the Select Committee served Defendant JPMorgan with a congressional subpoena for production of documents, at least in part requiring production of private financial records belonging to Plaintiff Budowich.  See id., Ex. B. The Select Committee initially set December 7, 2021, as Defendant JPMorgan's deadline for production of documents.  Id., Ex. B at 1.  However, before December 7, 2021, the Select Committee extended Defendant JPMorgan's production deadline until December 24, 2021, a date specifically requested by Defendant JPMorgan.  See id., Ex. C.

At 2:33 p.m. EST on December 21, 2021, while Plaintiff Budowich was in Washington, D.C. for his deposition before the Select Committee, and *before* receiving correspondence from counsel for Plaintiffs demanding notice of any congressional subpoena, Defendant JPMorgan sent correspondence to Plaintiff Budowich at an address in Sacramento, California, advising that it received a congressional subpoena for his private financial records and would produce those records on December 24, 2021 at 5:00 p.m.  See id., Ex. F.  Related to his travel from Washington, D.C., Plaintiff Budowich did not receive this correspondence from Defendant JPMorgan until 7:00 p.m. EST on December 23, 2021.  He immediately informed his counsel of the JPMorgan letter.  Counsel for Plaintiffs then immediately contacted Defendant JPMorgan to object to any production of his private financial records and request an extension of time for Defendant JPMorgan's production to the Select Committee.  See id., Ex. G (ECF No. 30-7).

On December 24, 2021, counsel for Plaintiffs—via phone conversation and in writing to both the Select Committee and Defendant JPMorgan—requested an extension of Defendant JPMorgan's

production deadline until January 3, 2021, in light of the long holiday weekend and federal government closures. See id., Exs. H, I, J. Despite prior extensions provided to both Plaintiff Budowich and Defendant JPMorgan, the Select Committee and Defendant JPMorgan refused to extend the December 24, 2021production deadline, notwithstanding their notice that Plaintiff Budowich "intend[ed] to exercise his legal rights in court" and that refusing to allow an extension of time would make Defendant JPMorgan "complicit in preventing its customer, who it promised to treat with equity and fairness . . . from having his day in court." See id., Ex. I at 1.

Defendant JPMorgan then proceeded to produce Plaintiffs' private financial records to the Select Committee. It then argued to this Court, along with the Select Committee, that Plaintiffs' request to enjoin production of their private financial records was moot given that it had already produced the financial records at issue. It made this argument notwithstanding that it had directly created the circumstances it now avers preclude this Court from granting meaningful relief.

Moreover, Defendant JPMorgan refuses to advise whether it produced Plaintiffs' private financial records to the Select Committee beyond November 23, 2021, notwithstanding the Select Committee's unequivocal declaration that its subpoena only compelled production of records up to and including November 23, 2021. Am. Compl. ¶ 8; see ECF No. 28 at ¶ 3. Defendant JPMorgan likewise failed to provide Plaintiffs copies of their own financial records as produced to the Select Committee. Plaintiffs remain without knowledge of what Defendant JPMorgan produced to the Select Committee and whether Defendant JPMorgan produced private financial records of Plaintiffs without any legal authority whatsoever. Considering these actions by the Select Committee Defendants and Defendant JPMorgan, Plaintiffs have sufficiently alleged  multiple causes of action that will provide them meaningful redress.

## II.   PROCEDURAL HISTORY.

On December 24, 2021, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief and Emergency Motion for Temporary Restraining Order ("TRO").  See ECF Nos. 1-2.  On December 29, 2021, the Court denied without prejudice Plaintiffs' TRO Motion.  On January 4, 2022, Plaintiffs filed an Amended Emergency Motion for TRO.  See ECF No. 14.  The Court heard arguments by the Parties on the Amended TRO Motion on January 20, 2022, and denied the motion.  See TRO Hr'g Tr. (ECF No. 26) at 32:9 to 35:1. This Court, however, declined to grant the Select Committee's motion to dismiss this matter entirely.  Id. at 36:16-21.

On February 18, 2022, Plaintiffs filed an Amended Complaint for Declaratory and Injunctive Relief, alleging six (6) declaratory judgment counts applicable to all Defendants—concerning the improper constitution of the Select Committee, lack of any valid legislative purpose, constitutional violations, and The Right to Financial Privacy Act, 12 U.S.C. §§ 3401-23—along with claims under the California Constitution and the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 1700, et seq., unlawful and unfair prongs, against Defendant JPMorgan.  See ECF No. 30 at ¶¶ 115-195.  Both the Select Committee and Defendant JPMorgan have now filed Motions to Dismiss averring that this Court lacks subject matter jurisdiction and that Plaintiffs failed to state a claims upon which relief can be granted.  See ECF Nos. 33-34. These motions should be denied.

## LEGAL STANDARD

## I.   MOTIONS TO DISMISS UNDER RULE 12(b)(1).

A motion to dismiss brought pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges a court's subject matter jurisdiction—that is, a court's power to hear a plaintiff's legal claims.  When a defendant files a Rule 12(b)(1) motion based on mootness—as is the case here— the burden is on the party asserting such jurisdictional bar to establish mootness. Reid v. Hurwitz, 920 F.3d 828, 832 (D.C. Cir. 2019). In deciding whether to grant the motion, a district court must "accept

all of the factual allegations in [the] complaint as true[.]" <u>Jerome Stevens Pharms., Inc. v. Food & Drug Admin.</u>, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005).

## II.   <u>MOTIONS TO DISMISS UNDER RULE 12(b)(6).</u>

A motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of a complaint's factual allegations in support of a plaintiff's legal claims. <u>See Howard Univ. v. Watkins</u>, 857 F. Supp. 2d 67, 71 (D.D.C. 2012). Thus, courts considering a motion to dismiss under Rule 12(b)(6) must accept as true all of the plaintiff's allegations of fact and must also "grant [a] plaintiff the benefit of all inferences that can be derived from the facts alleged[.]" <u>Sparrow v. United Air Lines, Inc.</u>, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks and citation omitted).

To withstand a Rule 12(b)(6) motion, the complaint need only set forth sufficient factual allegations to "state a claim to relief that is plausible on its face[,]" <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007), meaning that the complaint's "factual content [must] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged[,]" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). "A motion to dismiss for failure to state a claim upon which relief can be granted is generally viewed with disfavor and rarely granted." <u>Link v. U.S.</u>, 539 F. Supp. 2d 360,361 (D.D.C. 2008) (citing <u>Doe v. U.S. Dep't of Justice</u>, 753 F.2d 1092, 1102 (D.C. Cir.1985)). Rule 12(b)(6) "places th[e] burden on the moving party" to show that the complaint is legally insufficient. <u>Cohen v. Bd. of Trs. of the Univ. of D.C.</u>, 819 F.3d 476, 481 (D.C. Cir. 2016) (citing 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2015)). A court assessing whether a complaint states a claim is limited to a review of the four corners of the complaint, as well as any "documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies[.]" <u>Page v. Mancuso</u>, 999 F. Supp. 2d 269, 275 (D.D.C. 2013) (internal quotation marks and citations omitted).

**LEGAL ARGUMENT**

I.     **THE MOOTNESS DOCTRINE DOES NOT PRECLUDE REVIEW.**

   A.   **Plaintiffs Seek Damages and Proper Injunctive Relief and Challenge an Ongoing Policy and Practice of the Select Committee.**

Both Defendants argue that this case is moot. They are wrong for multiple reasons. Article III limits federal courts to deciding cases or controversies. See U.S. Const. art. III, § 2. A case becomes moot if "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." Reid, 920 F.3d at 832 (quotations omitted) (quoting Clarke v. United States, 915 F.2d 699, 701 (D.C. Cir. 1990). "In considering possible mootness [the court] assume[s] that the plaintiffs would be successful on the merits." Jud. Watch, Inc. v. Kerry, 844 F.3d 952, 955 (D.C. Cir. 2016).  The burden is on the party asserting such jurisdictional bar to establish mootness. Reid, 920 F.3d at 832. Of course, "it is impossible for a plaintiff, when she initially files a Complaint, to make plausible allegations supporting a mootness exception." Id. at 833. Therefore, the district court can focus on legal theories in addition to the facts alleged. Id.

First, both Defendants have failed to establish mootness. Reid, 920 F.3d at 832. "The burden of demonstrating mootness 'is a heavy one.'" Los Angeles Cnty. v. Davis, 440 U.S. 625, 631 (1979); Doe v. Harris, 696 F.2d 109, 112 (D.C. Cir. 1982) ("We conclude . . . that defendant-appellees have not shouldered the heavy burden of demonstrating mootness . . . ."). In their motions, Defendants ignore that Plaintiffs seek monetary damages and a return of their documents. See Off. of Thrift Supervision Dep't of Treasury v. Dobbs, 931 F.2d 956, 958 (D.C. Cir. 1991) ("[W]here the government retains property obtained through a subpoena, the controversy remains open as to the government's continued right to custody of those documents."); LaRouche v. Fowler, 152 F.3d 974, 977 (D.C. Cir. 1998) (stating that the mooting of requests for injunctive relief does not moot a case

in which claims for damages remain). These are future acts for which the Court can afford meaningful relief and that presently affect Plaintiffs' rights.

Second, this case is not moot because Plaintiffs' challenge an ongoing policy: the Select Committee's issuance of unnoticed, overbroad subpoenas that exceed a valid legislative purpose and are issued by a committee that is not duly formed. See Super Tire Eng'g Co. v. McCorkle, 416 U.S. 115, 124 (1974); Better Gov't Ass'n v. Dep't of State, 780 F.2d 86, 91 (D.C. Cir. 1986). More specifically, Plaintiffs challenge the legality of the Select Committee's authority to issue subpoenas despite not being formed in accordance with its authorizing charter; that issuing subpoenas to third parties without notice to the individual whose information is sought violates the Fifth Amendment; that the Select Committee's law enforcement purpose violates the separation of power's doctrine and the Fourth Amendment; that the Select Committee's targeting of former President Trump's supporters violates the First Amendment; along with other claims related to practices and conduct of the Select Committee. Ultimately, these are all ongoing policies of the Select Committee that are being challenged and for which there is a live controversy concerning their constitutionality. See McCorkle, 416 U.S. at 124; Better Gov't Ass'n, 780 F.2d at 91.

## B. **The Select Committee's Conduct and Actions are Capable of Repetition Yet Evading Review.**

Lastly, this case fits into the mootness exception for cases capable of repetition yet evading review. "This exception 'applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'" Cierco v. Lew, 190 F. Supp. 3d 16, 27 (D.D.C. 2016), aff'd Cierco v. Mnuchin, 857 F.3d 407 (D.C. Cir. 2017) (quoting FEC v. Wis. Right To Life, Inc., 551 U.S. 449, 462 (2007)). "To evade review, the challenged action must be incapable of surviving long enough to undergo Supreme Court review." J. T. v. D.C., 983 F.3d 516, 523–24 (D.C. Cir. 2020) (quoting United Bhd. of Carpenters & Joiners of Am. v. Operative Plasterers' &

Cement Masons' Int'l Ass'n of the U.S. & Can., 721 F.3d 678, 688 (D.C. Cir. 2013)). "As a rule of thumb, 'agency actions of less than two years' duration cannot be fully litigated prior to cessation or expiration, so long as the short duration is typical of the challenged action." Ralls Corp. v. Comm. on Foreign Inv. in U.S., 758 F.3d 296, 321 (D.C. Cir. 2014) (quoting Del Monte Fresh Produce Co. v. United States, 570 F.3d 316, 322 (D.C. Cir. 2009)).

The Select Committee's issuance of unlawful third-party subpoenas satisfies the "evading review" prong because the mere two-week response time is too short to fully adjudicate the issue. This is particularly true where the third-party, such as Defendant JPMorgan here, requires a court order—not just a legal challenge—to refuse to produce documents. Because these subpoenas typically provide a response time of merely two weeks, Am. Compl. at Exhibit B (providing two weeks to respond to subpoena); Harris v. U.S. House Select Cmte. to Investigate the Jan. 6th Attack on the U.S. Capitol, 1:21-cv-03290-CJN (ECF No. 1) (alleging that a two-week response time violates due process), a challenge to the subpoena cannot be fully litigated before the production of documents, see, e.g., Ralls Corp., 758 F.3d at 323 (finding that fifty-seven day response time evaded review despite party withdrawing its motion for TRO and preliminary injunction); J. T., 983 F.3d at 524 (finding that one-year is short enough to satisfy the "evading review" prong).

Plaintiffs also satisfy the second prong of this exception because there is a reasonable probability that Plaintiffs will be subject to the same action again. This prong does not require the exact same facts, but rather looks at "the legal questions it presents for decision." J. T., 983 F.3d at 524 (quoting PETA v. Gittens, 396 F.3d 416, 422–23 (D.C. Cir. 2005)). This prong "is not to be applied with excessive 'stringency'" and "a controversy need only be 'capable of repetition,' not 'more probable than not.'" Ralls Corp., 758 F.3d at 324 (quoting Honig v. Doe, 484 U.S. 305, 318 n.6 (1988)). "Moreover, when a complaint identifies official conduct as wrongful and the legality of

that conduct is vigorously asserted by the officers in question, the complainant may justifiably project repetition, albeit in a different setting, and involving different official actors." <u>Doe</u>, 696 F.2d at 113.

Here, it is likely that Select Committee Defendants will issue unnoticed subpoenas to additional third-parties that maintain Plaintiffs' private information. The Select Committee routinely issues third party subpoenas without notice to the impacted individuals. Am. Compl. at ¶¶ 67, 69; <u>see also, e.g.</u>, Pl.'s Mot. for Preliminary Injunction, <u>Republican Nat'l Cmte. v. Pelosi</u>, No. 1:22-cv-00659-TJK (ECF No. 8-1 at 4) ("The Select Committee provided no notification to the RNC that it had subpoenaed Salesforce and demanded RNC information."); Compl., <u>Harris</u>, 1:21-cv-03290-CJN (ECF No. 1) (explaining that the Select Committee subpoenaed Verizon for the plaintiff's records without notice to the plaintiff). The Select Committee has issued at least eighty-nine (89) subpoenas, and likely many more. <u>See</u> Mychael Schnell and Monique Beals, *These people have been subpoenaed by the Jan. 6 panel*, THE HILL, (available at:  https://thehill.com/policy/national-security/592861-these-people-have-been-subpoenaed-by-the-jan-6-panel/) (last visited Apr. 1, 2022); <u>see also</u> Claudia Grisales, *House Panel Investigating the Capitol Attack Orders 35 Companies to Preserve Records*, NPR, (available at:  https://www.npr.org/2021/08/30/1032615984/house-panel-investigating-the-capitol-attack-orders-35-companies-to-preserve-rec) (last visited Apr. 2, 2022) (hereinafter "*Telecomm Preservation Letters*") (explaining that the Select Committee requested telecommunications and social media companies to preserve records relating to a non-public list of individuals). It is expected, because of Plaintiff Budowich's ties to former President Trump and individuals who planned former President Trump's rally at the Ellipse on January 6, 2021, Am. Compl. at ¶¶ 55, 57–64, that the Select Committee will subpoena other third-parties that maintain Plaintiffs' private information. For example, Defendant JPMorgan is not Plaintiffs' only financial institution. Further, the Select Committee has issued unnoticed subpoenas to numerous individuals' cellular phone carriers. <u>See, e.g.</u>, <u>Harris</u>, 1:21-cv-03290-CJN (ECF No. 1); <u>Mitchell v. U.S. House</u>

Select Cmte. to Investigate the Jan. 6th Attack on the U.S. Capitol, 1:22-cv-00250-CJN (ECF No. 1);

*Telecomm Preservation Letters*. Thus, it is likely that Plaintiffs will be subject to additional unnoticed

subpoenas directed to third-parties maintaining their private information.

Additionally, the Select Committee's repeated assertions that its process was lawful, despite

allegations in the Amended Complaint to the contrary, allows Plaintiffs to "justifiably project

repetition, albeit in a different setting, and involving different official actors." Doe, 696 F.2d at 113.

In Doe, an Assistant United States Attorney subpoenaed the plaintiff's psychiatric medical records

from the VA without notice. Id. at 110. The plaintiff filed a lawsuit asserting that the unnoticed

subpoena had violated numerous laws and constitutional provisions. Id. The United States Attorney's

Office moved to dismiss the complaint as moot and, in support, submitted declarations stating that

"no use had been made of the VA records in connection with the grand jury matter, that in fact the

records were of no value to the investigation concerning fraudulent collection of unemployment

compensation, . . . that defendant law enforcement officers contemplated no future acquisition or use

of the records . . . that no copies of the records had been made, that no notes had been taken, and that

few persons had had access to the records." Id. at 110–11. The defendants also offered to surrender

the documents to the district court. Id. at 111. The district court dismissed the complaint as moot, but

the D.C. Circuit reversed, finding that the plaintiff's declaratory judgment action concerning an

executed subpoena remained a live controversy. Id. at 111, 114–15. The D.C. Circuit held that the

case was not moot because the United States Attorney's Office adamantly argued that its conduct was

lawful and the VA "supplied no indication in either forum that the VA would not again, upon official

request, release Doe's files without affording him notice and opportunity to object." Id. at 113.

In this instance, Select Committee Defendants have vigorously defended their actions,

repeatedly asserting that they are lawful and authorized. See generally ECF No. 30; see also Doe, 696

F.2d at 113 ("Defendant-appellees' insistence . . . that their conduct was lawful indicates a risk we

cannot dismiss as negligible that Doe may encounter repetition of the official conduct that gave rise to this suit."). Additionally, Defendant JPMorgan refuses to provide Plaintiffs with ten (10) days prior notice if it intends to produce additional documents to the Select Committee. See ECF No. 35; Doe, 696 F.2d at 113 (finding that because the VA provided no indication that it would not release plaintiff's records without notice and an opportunity to object, that "asserted apprehension concerning further VA disclosure of his existing or future records cannot be dismissed as fanciful."). Given the Select Committee's past conduct and actions, along with public comments by its Members regarding their investigation, it is likely that the Select Committee will subpoena other third-parties that maintain Plaintiffs' private information. Therefore, the Court should find that Defendants' actions are likely to recur and consequently that Plaintiffs' claims are not moot.

**C. Plaintiffs Will Suffer Irreparable Damages and Harm Absent Judicial Relief.**

Finally, the continuing failure and refusal of the Select Committee Defendants to return the private financial records of Plaintiffs to Defendant JPMorgan, as demanded, will result in irreparable harm to Plaintiffs.  First, given the nature of Plaintiff Budowich's occupation and line of business, his financial records contain information protected by the First Amendment concerning his clients. See Am. Compl. ¶¶ 104–14. Second, aspects of Plaintiff Budowich's business dealings rely on discretion, such that disclosure of any payments by clients would chill and threaten the very existence of his enterprise. Id. Third, Plaintiff Budowich will suffer irreparable injury to his reputation and goodwill if his private financial records are not removed from the public domain and restored to the sole custody of his financial institution.

The continuing failure and refusal of Select Committee Defendants to disgorge, promptly return, sequester, or destroy private financial records belonging to Plaintiffs, is particularly imminent and acute in light of the Select Committee's planned "televised hearings" and release of a "series of reports" to "reveal their findings" as it prepares to "go public" in the coming months.  See Associated

Press, "Jan. 6 Committee Prepares to Go Public as Findings Mount," U.S. News (Jan. 2, 2022).  While it is a harm and affront to the right of financial privacy of Plaintiffs that the Select Committee Defendants obtained the private financial records concerned, the gravity of the harm suffered by Plaintiffs is due to increase exponentially as the Select Committee makes public its findings, reports, and supporting evidence therefor.  See Benjamin Siegel & Katherine Faulders, "House Jan. 6 committee faces time crunch ahead of public hearings," ABC News (Mar. 30, 2022) (available at https://abcnews.go.com/US/house-jan-committee-faces-time-crunch-ahead-public/story?id=83765172) (last visited Apr. 8, 2022) (stating that public hearings to commence May 2022).

## II.   THE SELECT COMMITTEE AND ITS SUBPOENAS ARE *ULTRA VIRES*.

### A.  The Select Committee is Not Duly Constituted.

The Select Committee is operating *ultra vires*.  House Resolution 503, the resolution creating the Select Committee, requires that the Committee be comprised of thirteen (13) members.  See H.R. 503, § 2(a) ("The Speaker shall appoint 13 Members to the Select Committee."). The Committee has, and has always had, only nine (9) members.  See https://january6th.house.gov/about/membership. Further, Section 2(a) requires that five (5) of the thirteen (13) members "be appointed after consultation with the minority leader."  See H.R. 503, § 2(a).  There are only two (2) Republican members on the Select Committee, neither of which were recommended by the minority leader, and only one of which was appointed "after consultation with the minority leader." As such, the Select Committee is not duly formed pursuant to its own authorizing charter.

When a subpoena is issued by a single committee, any legislative purpose is not legitimate unless it falls within that committee's jurisdiction.  "The theory of a committee inquiry is that the committee members are serving as the representatives of the parent assembly in collecting information for a legislative purpose." Watkins v. United States, 354 U.S. 178, 200 (1957).  Congress

therefore must "spell out that group's jurisdiction and purpose with sufficient particularity . . . in the authorizing resolution," which "is the committee's charter." Id. at 201.

The Select Committee "must conform strictly to [its] resolution." Exxon Corp. v. Fed. Trade Comm'n, 589 F.2d 582, 592 (D.C. Cir. 1978) ("To issue a valid subpoena . . . a committee or subcommittee must conform strictly to the resolution establishing its investigatory powers . . . ."). When an investigation is "novel" or "expansive," the Courts will construe the committee's jurisdiction "narrowly." Tobin v. United States, 306 F.2d 270, 275 (D.C. Cir. 1962) ("when Congress authorizes a committee to conduct an investigation, the courts have adopted the policy of construing such resolutions of authority narrowly, in order to obviate the necessity of passing on serious constitutional questions"); see also United States v. Rumely, 345 U.S. 41, 45-46 (1953); Ashland Oil, Inc. v. Fed. Trade Comm'n, 409 F. Supp. 297, 305 (D.D.C. 1976) ("the Court must consider the relevant rules of the House, the authorizing resolution, the full committee's resolution by which the Subcommittee was authorized to proceed, and the nature and context of the legislative proceedings . . . .").

In this instance, House Resolution 503 requires that the Select Committee be comprised of thirteen (13) members.  See H.R. 503, § 2(a) ("The Speaker *shall* appoint 13 Members to the Select Committee.") (emphasis added).  The term "shall" connotes a mandatory obligation.  See Maine Comm. Health Options v. United States, 140 S. Ct. 1308, 1320 (2020) ("The first sign that the statute imposed an obligation is its mandatory language:  'shall.'  Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35 (1998) (observing that "shall" typically "creates an obligation impervious to discretion"); Anglers Conservation Network v. Pritzker, 809 F.3d 664, 671 (D.C. Cir. 2016) ("The traditional, commonly repeated rule is that 'shall' is mandatory and 'may' is permissive . . . legislation using 'shall' indicates a mandatory duty while legislation using 'may' grants

-14-

discretion"); <u>Kingdomware Tech., Inc. v. United States</u>, 579 U.S. 162, 171 (2016) (same).  Moreover, when a provision uses both "shall" and "may," it is a fair inference that the writers intended the ordinary distinction.  <u>Anglers</u>, 809 F.3d at 671 (citing <u>Lopez v. Davis</u>, 531 U.S. 230, 241 (2001)).  Of course, Congress is presumed to write precisely, <u>see</u> <u>Arcadia v. Ohio Power Co.</u>, 498 U.S. 73, 79 (1990) ("In casual conversation, perhaps, such absent-minded duplication and omission are possible, but Congress is not presumed to draft its laws that way."), and with knowledge of Supreme Court interpretations, <u>see</u>  <u>McNary v. Haitian Refugee Ctr., Inc.</u>, 498 U.S. 479, 496 (1991).

House Resolution 503 uses both "shall" and "may" in its provisions. Specifically, the Resolution provides that the Select Committee "shall" abide by certain requirements twenty-six (26) times and provides that it "may" exercise certain discretionary options sixteen (16) times.  <u>See</u> H.R. 503.  Moreover, House Resolution 503 contains both terms "shall" and "may" in the same provision, making impossible any argument that the House of Representatives intended to use the terms synonymously.  <u>See, e.g.</u>, H.R. 503, § 4(b)(2) ("Any report issued by the Select Committee *shall* be issued in unclassified form but *may* include a classified annex, a law enforcement-sensitive annex, or both.") (emphasis added).  Clearly, "shall" means "shall" in the context of House Resolution 503, and this Court should reject the Select Committee's implication that "shall" actually means "may" for purposes of ascertaining whether it is properly constituted.  <u>See</u> Select Committee Motion to Dismiss (ECF No. 33-1) at p. 12.  It is not.

The Select Committee was not at liberty to disregard its mandate and obligation to comprise itself of at least thirteen (13) members.  <u>See</u> H.R. 503, § 2(a).  Yet, as provided above, the Select Committee has always had only nine (9) members.  Without the requisite number of members required by House Resolution 503, the Select Committee is not duly constituted and thus lacks any authority or investigatory powers whatsoever.  <u>Exxon Corp.</u>, 589 F.2d at 592; <u>Tobin</u>, 306 F.2d at 275;

Rumely, 345 U.S. at 45-46.  Accordingly, any and all acts by the Select Committee to date are *ultra vires*.

While this may initially seem like a drastic proposition, the law requires such a declaration where a legislative committee elects at its own peril to proceed outside the parameters of its governing charter and source of authority.  *See* Exxon Corp., 589 F.2d at 592; Tobin, 306 F.2d at 275; Rumely, 345 U.S. at 45-46.  To hold otherwise would countenance the whims of individual legislators, which is the exact harm to be guarded against.  *See* Exxon Corp., 589 F.2d at 593; Ashland Oil, 409 F. Supp. at 305 ("Although the [legislative] investigatory power is penetrating and farreaching in scope. . . it is not unlimited . . . [its] boundaries are defined by its source." (citations and quotations omitted)).[1]

Further, the separation of powers doctrine is no impediment here.  Although the judiciary normally avoids questions of congressional procedure and authority, the right to financial privacy of Plaintiffs is being violated by a Legislative Branch agency that fails to comply with its own authorizing charter.  The Court can intervene in such circumstances.  *See, e.g.,* Watkins, 354 U.S. at 187 ("There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress.").

### B.   The Select Committee and its congressional subpoena Lack a Legitimate Legislative Purpose.

Of the "Purposes" proclaimed by H. Res. 503, § 3(1)-(3) in constituting the Select Committee, notably absent is any declaration of intent to legislate.  To be clear, the Select Committee has not

---

[1] Additionally, the Speaker did not appoint five (5) members *after* consultation with the minority leader.  Recognizing Speaker Pelosi's version of events, the Speaker appointed only one (1) member after consulting with Minority Leader McCarthy.  Even accepting the Select Committee's interpretation of "consulting with" to mean "discussing with a person and then doing whatever you want anyway," the Speaker still failed to appoint five (5) minority Members *after* doing so.  If the U.S. House of Representatives had wanted a Select Committee with only nine (9) members, all of whom would be appointed by the Speaker without any consultation with the Minority Leader, it could have passed a Resolution providing as much.  It chose not to.  And now the Speaker has overridden the directive of the entire Chamber.  Her refusal to follow the edicts of House Resolution 503 make *ultra vires* any and all actions of the Select Committee.

identified any legislative purpose—let alone a potential piece of legislation—that its congressional subpoena is intended or required to advance that was not already covered by the documents Plaintiff Budowich personally provided.  Rather, the Select Committee simply seeks to collect and "expose" the financial documents of its political opponents "for the sake of exposure," which purpose is illegitimate and provides no authority for the congressional subpoena at issue.  Watkins, 354 U.S. at 200.

Plaintiffs do not dispute that the Select Committee has some legislative purpose.  Improving the training and readiness of the Capitol Police and interagency cooperation among law enforcement and intelligence agencies are legitimate, valid areas for potential legislation following the events of January 6, 2021.  See H.R. 503 § 4(b)(1), (c); see also Trump v. Thompson, 20 F.4th 10, 35 (D.C. Cir. 2021).  Plaintiffs also do not dispute that *some* of the records Plaintiff Budowich had already provided to the Select Committee could be relevant to its investigation, as they demonstrate the lack of a causal connection between Plaintiffs and what occurred at the Capitol on January 6, 2021.  But the breadth and entirety of private financial records requested by the Select Committee are not relevant to any legislative purpose.

The "legitimate legislative purpose" requirement stems directly from the Constitution itself. "The powers of Congress . . . are dependent solely on the Constitution," and "no express power in that instrument" allows Congress to investigate individuals or to issue compulsory process.  See Kilbourn v. Thompson, 103 U.S. 168, 182-89 (1880).  The Constitution instead permits Congress to enact certain kinds of legislation.  See, e.g., U.S. Const. Art. I, § 8.  As such, the power of Congress to investigate "is justified solely as an adjunct to the legislative process."  Watkins, 354 U.S. at 197. "Congress is not invested with a general power to inquire into private affairs.  The subject of any inquiry always must be one on which legislation could be had."  Eastland v. U.S. Servicemen's Fund,

421 U.S. 491, 504 n.15 (1975); see also Quinn v. United States, 349 U.S. 155, 161 (1955) ("[T]he power to investigate" does not "extend to an area in which Congress is forbidden to legislate.").

To "investigate" and "report," in a vacuum, are not legitimate legislative purposes that can justify subpoenaing a citizen's private financial records.  For more than a century, the United States Supreme Court has been quite "sure" that neither the House nor Senate "possesses the general power of making inquiry into the private affairs of the citizen." Kilbourn, 103 U.S. at 190. "[T]here is no congressional power to expose for the sake of exposure." Watkins, 354 U.S. at 200. "No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress." Id. at 187.

Additionally, because Congress must have a legitimate legislative purpose, it cannot use subpoenas to exercise "any of the powers of law enforcement." Quinn, 349 U.S. at 161.  Those powers "are assigned under our Constitution to the Executive and the Judiciary." Id.  Put simply, Congress is not "a law enforcement or trial agency," and congressional investigations conducted "for the personal aggrandizement of the investigators" or "to punish those investigated" are "indefensible." Watkins, 354 U.S. at 187 ("Congress may not constitutionally require an individual to disclose his . . . private affairs except in relation to a valid legislative purpose.") (internal quotations omitted).  Our tripartite system of separated powers requires that "any one of the[] branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other." Kilbourn, 103 U.S. at 190-91.

As such, this Court must investigate whether the subpoenas are pertinent to any supposed legislative purposes, and narrow them if they are overbroad. See Eastland, 421 U.S. at 501 n.14 (stating that judicial inquiry into legislative purpose is appropriate).  Pertinency "is a jurisdictional concept . . . drawn from the nature of a congressional committee's source of authority." Watkins, 354 U.S. at 206.  It is both a defense to contempt and a ground for proactively enjoining a

congressional subpoena.  See Bergman v. Senate Special Comm. on Aging, 389 F. Supp. 1127, 1130 (S.D.N.Y. 1975); Hearst v. Black, 87 F.2d 68, 71 (D.C. Cir. 1936).  While Congress does not violate the law every time an investigation turns out to be a dead end, the Courts must ensure that subpoenas are "reasonably relevant" to a legitimate legislative purpose.  McPhaul v. United States, 364 U.S. 372, 381-82 (1960).  While courts give Congress some leeway to color outside the lines, they do not hesitate to narrow overbroad subpoenas "to the extent" they exceed a Committee's statutory or constitutional authority.  Bergman, 389 F. Supp. at 1130-31.  If the law were otherwise, then Congress could easily circumvent the Constitution by bundling illegitimate requests with legitimate ones.  That is why "[t]he burden is on the court to see that the subpoena is good in its entirety."  United States v. Patterson, 206 F.2d 433, 434 (D.C. Cir. 1953).

As the "crucial inquiry is whether a legislative purpose is being served," the District of Columbia Circuit collected, synthesized, and articulated principles that control resolution of a case involving a legislative subpoena.  See Trump v. Mazars USA, LLP, 940 F.3d 710, 722-23 (D.C. Cir. 2019) rev'd on other grounds 140 S. Ct. 2019 (2020).  First, the D.C. Circuit in Mazars stated, "because the power of Congress . . . to investigate is co-extensive with [its] power to legislate, Congress may in exercising its investigative power neither usurp the other branches' constitutionally delegated functions nor violate individuals' constitutionally protected rights.  Congress may not conduct itself" as a law enforcement agency.  See Mazars, 940 F.3d at 723 (internal quotations and citations omitted).  Second, "because the scope of [Congress's] power of inquiry . . . is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution, Congress may investigate only those topics on which it could legislate . . . [and] [i]f no constitutional statute may be enacted on a subject matter, then the subject is off-limits to congressional investigators."  Id. Finally, "congressional committees may subpoena only information calculated to materially aid their

investigations . . . [thus] [e]ven a valid legislative purpose cannot justify a subpoena demanding irrelevant material." Id.

With these principles in mind, in this instance, the congressional subpoena at issue seeks financial records of a private citizen totally unrelated to any public office or position held within the administration of any Government authority. Plaintiffs concede that the Select Committee has a valid legislative purpose for some of the activities it has undertaken. However, that a congressional committee may be acting pursuant to valid legislative purpose does not mean that it cannot exceed that purpose. A detailed review of the subpoena reveals its infirmities.

In its argument on the hearing for temporary restraining order, Plaintiffs focused on the tail end of the subpoena as an example of its over breadth. And a subpoena seeking records many months after the event in inquiry is overbroad. But it is the beginning date range of the subpoena that demonstrates its susceptibility for abuse. Where a limiting timeframe is provided at all, the subpoena requests records beginning from October 1, 2020. By the Select Committee Defendants' own admission, it is investigating the events of January 6, 2021 and claims the events were precipitated by President Trump's allegations of voter fraud. See ECF No. 33-1 at 3. Of course, in October 2020 the presidential election had not yet occurred and thus any activity relating to events of January 6th was inconceivable. Instead, October 2020 involved significant political activity related to President Trump's reelection, as well as every member of the House of Representatives and numerous senators. Thus, Plaintiffs' private financial information predating the 2020 election is patently irrelevant to any proffered legislative purpose of the committee; but such information could be politically advantageous for members of the Select Committee.

Further, there is no declared remedial purpose of the Select Committee investigation except to "investigate" and "report." See H. Res. 503, § 3(1)-(3). Without a legislative purpose to serve, the congressional subpoena cannot be calculated to materially aid any investigation in furtherance of a

power to legislate.   As a result, in issuing the challenged congressional subpoena is absent any legitimate legislative purpose, the Select Committee is engaging in an impermissible law enforcement inquiry, and it therefore lacks authority to compel production of the private financial records of Plaintiffs and lacks any authorization or basis for their continued possession and use.

Moreover, Plaintiffs produced any information pertinent to the Select Committee's investigation before the Select Committee's acquisition of their private financial records by Defendant JPMorgan.   Accordingly, the congressional subpoena for the private financial records of Plaintiffs directed to Defendant JPMorgan lacked any connection to the Select Committee's stated objectives.

Finally, as stated in the Amended Complaint (ECF No. 30), the Select Committee's unauthorized investigation into the finances of private citizens exceeds its authority under the Constitution and violates the separation of powers doctrine.   Watkins, 354 U.S. at 178 ("Nor is the Congress a law enforcement or trial agency.   These are functions of the executive and judicial departments of government.").   Contrary to the statements of several members of the Select Committee, Am. Compl. ¶ 84, "[i]nvestigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible."   Id. at 187. Because the Select Committee is operating as a *de facto* law enforcement entity, its actions offend the Constitution.

**III.   NEITHER SOVEREIGN IMMUNITY NOR THE SPEECH OR DEBATE CLAUSE PRECLUDE THIS COURT'S REVIEW OF THE SELECT COMMITTEE'S AND DEFENDANT JPMORGAN'S WRONGS.**

**A.   Precedent Authorizes Injunctive and Declaratory Relief against Congress, its Committees, and their Members; Additionally, Congress waived Sovereign Immunity under the RFPA.**

Sovereign immunity does not foreclose relief or preclude this Court's jurisdiction.   Sovereign immunity is inapplicable here because the Larson-Dugan exception applies and Congress waived sovereign immunity under the Right to Financial Privacy Act, 12 U.S.C. §§ 3401-23 ("RFPA").   See

Larson v. Domestic & Foreign Com. Corp., 337 U.S. 682, 689 (1949); Dugan v. Rank, 372 U.S. 609, 621–23 (1963).

Under the Larson-Dugan exception, "'suits for specific relief against officers of the sovereign' allegedly acting 'beyond statutory authority or unconstitutionally' are not barred by sovereign immunity." Pollack v. Hogan, 703 F.3d 117, 120 (D.C. Cir. 2012) (quoting Larson, 337 U.S. at 693); see also Dugan, 372 U.S. at 621–22. "The exception is based on the principle that such *ultra vires* action by a federal officer 'is beyond the officer's powers and is, therefore, not the conduct of the sovereign.'" Id. (quoting Larson, 337 U.S. at 690). This exception comports with Supreme Court precedent unequivocally stating that Courts can, and should, review legislative subpoenas issued to third parties that are resisted by the individuals whose information is sought. See Eastland v. U. S. Servicemen's Fund, 421 U.S. 491, 501 n.14 (1975) ("On this record the Court of Appeals correctly held that the District Court properly entertained this action initially."). More recently, the Supreme Court explained that congressional subpoenas are "subject to several limitations" and that "recipients of legislative subpoenas retain their constitutional rights throughout the course of an investigation." Mazars, 140 S. Ct. at 2032. Of course, this authority necessarily implies applicability of Larson-Dugan to members of Congress who act unconstitutionally or *ultra vires* in connection with a congressional subpoena. See id.; see also Bergman v. Senate Special Comm. on Aging, 389 F. Supp. 1127, 1130 (S.D.N.Y. 1975) (limiting a Congressional subpoena as overbroad).

The determination of whether the Larson-Dugan exception applies often "merges with" the merits. Jud. Watch, Inc. v. Schiff, 474 F. Supp. 3d 305, 314 (D.D.C. 2020), aff'd, 998 F.3d 989 (D.C. Cir. 2021). The same is true here. The Larson-Dugan exception applies if the Court finds that the Select Committee acted *ultra vires*—by issuing subpoenas when not validly constituted and unrelated to a legislative purpose—and unconstitutionally—by issuing subpoenas that violate Plaintiffs' First, Fourth, and Fifth Amendment rights and the Separation of Powers doctrine. Thus, aside from

Congress's express waiver of sovereign immunity in the RFPA, the Court should also find that the <u>Larson</u>-<u>Dugan</u> exception applies because the Select Committee's actions were unconstitutional and *ultra vires*.

Additionally, Congress expressly waived sovereign immunity in the RFPA. Section 3417(a) of the RFPA, titled "Liability of agencies or departments of United States or financial institutions" states that "[*a*]*ny agency or department of the United States* or financial institution obtaining or disclosing financial records or information contained therein in violation of this chapter *is liable to the customer* to whom such records relate . . . ." 12 U.S.C. § 3417. This language is a clear waiver of sovereign immunity. <u>See</u> <u>Hohman v. Eadie</u>, 894 F.3d 776, 782 (6th Cir. 2018) (stating that Section 3417 "creates a private cause of action for violations of the Act and waives the United States' sovereign immunity for certain claims . . . ."). Accordingly, sovereign immunity presents no constitutional or prudential bar to this action.

### B.     The Speech or Debate Clause Does Not Preclude Review.

Under the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1, members of Congress are protected from suit for actions within the "legitimate legislative sphere." <u>See</u> <u>Eastland</u>, 421 U.S. at 503 (quoting <u>Doe v. McMillan</u>, 412 U.S. 306, 314 (1973)). Courts have, especially in the District of Columbia Circuit, interpreted the privilege broadly. <u>See, e.g.</u>, <u>Rangel v. Boehner</u>, 785 F.3d 19, 23 (D.C. Circuit 2015). But, contrary to the Select Committee's argument, ECF No. 33-1 at 8, the clause is not limitless.

The Supreme Court has repeatedly emphasized that "[l]egislative immunity does not, of course, bar all judicial review of legislative acts." <u>Powell v. McCormack</u>, 395 U.S. 486, 503 (1969); <u>see</u> <u>Gravel v. United States</u>, 408 U.S. 606, 624 n.15 (1972) ("This Court has not hesitated to sustain the rights of private individuals when it found Congress was acting outside its legislative role.");

Kilbourn, 103 U.S. at 199 (1880).  This is because the Speech or Debate Clause is "designed to preserve legislative independence, not supremacy" and Courts must "apply the Clause in such a way as to insure the independence of the legislature without altering the historic balance of the three co-equal branches of Government."  United States v. Brewster, 408 U.S. 501, 508 (1972).  Here, the Select Committee, believed to be acting in concert with a private financial institution, intentionally thwarted an individual's right to seek review of a congressional subpoena that is patently unconstitutional and *ultra vires*.  Under the unique and egregious facts of this case, the Speech or Debate Clause does not immunize the unlawful acts of the Select Committee.

Further, although the issuance of congressional subpoenas has been held to be a "legislative act," Eastland, 421 U.S. at 504, that does not end the analysis.  The Select Committee invites the Court to gloss over the details and hold that because a subpoena was issued by a legislative committee it is immune from review.  But this argument ignores Supreme Court precedent.  It is elementary that any congressional subpoena must have a valid legislative purpose. Stated differently, the content a congressional subpoena seeks must be pertinent to the legislative purpose and functions of the Select Committee.  See, e.g., id. at 501 n.14 (explaining it was appropriate for the district court to analyze the subpoena to determine whether it furthered a valid legislative purpose), 505–07 (analyzing whether the subpoena was related to a legitimate legislative purpose); Mazars, 140 S. Ct. at 2031–32 ("The subpoena must serve a valid legislative purpose.").

At least one other court has limited a congressional subpoena because its breadth exceeded a congressional committee's legislative purpose.  Bergman, 389 F. Supp. at 1127 (declaring congressional subpoena overbroad because it sought "any" and "all" financial records which necessarily included documents unrelated to the committee's investigation at issue).  Courts have the power to limit such congressional overreach because, contrary to the Select Committee's arguments, "the [Speech or Debate] Clause does not and was not intended to immunize congressional

investigatory actions from judicial review.  Congress' investigatory power is not, itself, absolute."
United States v. Am. Tel. & Tel. Co., 567 F.2d 121, 129 (D.C. Cir. 1977). Otherwise, drawing out
the Select Committee's argument, a legislative committee investigating federal court security, for
example, could subpoena individual judges' "information held by schools, archives, internet service
providers, e-mail clients, and financial institutions," Mazars, 140 S. Ct. at 2035, all without any
legislative purpose or need and without any checks, balances, or recourse.

Additionally, the Select Committee conflates jurisdiction with immunity. Contrary to the
Select Committee's assertion, see ECF No. 33-1 at 7-8, the Speech or Debate Clause is not a
jurisdictional bar to suit—it is an immunity afforded members of Congress. See Powell, 395 U.S. at
503 ("Legislative *immunity* does not, of course, bar all judicial review of legislative acts. That issue
was settled by implication as early as 1803, see Marbury v. Madison, 1 Cranch (5 U.S.) 137, 2 L.Ed.
60, and expressly in Kilbourn v. Thompson, the first of this Court's cases interpreting the reach of
the Speech or Debate Clause." (emphasis added)). This is significant because a jurisdictional bar
would preclude the court from assessing the scope of the subpoena in relation to the legislative
purpose, whereas for immunity, the Court must assess the allegations to determine if such immunity
applies. See Payne v. D.C., 279 F.R.D. 1, 5 (D.D.C. 2011) ( discussing the "prerequisite[s] to the
application of legislative immunity . . . .). In determining whether the immunity applies, the Court
must look to whether: (1) the complained act "was undertaken within the 'legislative sphere[,]'" id.
(citations and quotations omitted); (2) the complained act was "political in nature rather than
legislative," see Brewster, 408 U.S. at 512; and (3) the complained act has a legitimate legislative
purpose, see Eastland, 421 U.S. at 501 n.14. Here, the Select Committee cannot satisfy these
prerequisites for immunity.

1.    *Plaintiff Budowich cooperated extensively with the Select Committee.*

Plaintiff Budowich recognizes it is "the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action . . . ." Watkins, 354 U.S. at 187–88.  As such, Plaintiff Budowich produced to the Select Committee three-hundred ninety-one (391) documents responsive to a congressional subpoena, including all financial account transactions for the time period December 19, 2020, to January 31, 2021.  Am. Compl. ¶¶ 58–60.  Plaintiff Budowich additionally made supplemental production of forty-nine (49) additional documents on December 17, 2021.  Id. ¶ 61.  Further, Plaintiff Budowich traveled to Washington, D.C., at his own expense, and sat for a four (4) hour deposition before the Select Committee on December 22, 2021.  Id. ¶¶ 63-64.  As a result, the Select Committee had a "viable alternative source" and "already has access" to the information its congressional subpoena presumably requests.  See Thompson, 20 F.4th at 42-43.  This necessarily obviates any legislative purpose or compelling need for that same information.

Moreover, this process adequately balanced the Select Committee's investigative interests with Plaintiffs' constitutional and statutory rights, as their attorneys reviewed and winnowed out irrelevant documents consistent with their professional obligations of candor, good faith, and fair dealing.  That the Select Committee seeks to go beyond what counsel for Plaintiffs have already determined is relevant necessarily makes the congressional subpoena at issue "broader than reasonably necessary to support Congress's legislative objective . . . ." Mazars, 140 S. Ct. at 2035; see also Senate Select Comm. v. Nixon, 498 F.2d 725, 731-32 (D.C. Cir. 1974) ("subpoenaed evidence [must be] demonstrably critical to the responsible fulfillment of the Committee's functions.").  In other words, Plaintiff Budowich's extensive cooperation with the Select Committee's investigation made the subpoena to JPMorgan unnecessary.

### 2.      *The Congressional subpoena at issue is unreasonably broad.*

The Select Committee is targeting financial records well beyond the events of January 6, 2021,

up to and including November 23, 2021.  See ECF No. 28 at ¶ 3.  There is no legislative purpose for

such an unreasonably expansive scope of private financial records sought by the Select Committee.

Plaintiffs' private financial records outside of December 2020 and January 2021—which were already

provided—have no relation to any legislative task of the Select Committee.  See Mazars, 140 S. Ct.

at 2031 ("[A] congressional subpoena is valid only if it is 'related to, and in furtherance of, a legitimate

task of the Congress.'" (quoting Watkins, 354 U.S. at 178).  Business and dealings by Plaintiffs

around Thanksgiving 2021—or, as explained previously, that predate the 2020 election—cannot

possibly have any logical relationship or relevance to the events that occurred on or around January

6, 2021.

### C.      **Under the Unique and Egregious Facts of this Case, the Court Possesses Authority to Order Disgorgement and Return of Private Financial Records Belonging to Plaintiffs.**

### 1.      *Plaintiffs were willfully and intentionally deprived of judicial review.*

The traditional application of the Speech or Debate Clause concerning documents already in

Congress's possession is inapplicable here.  The Select Committee argues that the Speech or Debate

Clause precludes the Court from ordering the return of documents already in its possession.  See ECF

No. 23 at 11–13 (citing Senate Permanent Subcomm. on Investigations v. Ferrer, 856 F.3d 1080, 1086

(D.C. Cir. 2017); Brown & Williamson Tobacco Corp. v. Williams, 62 F.3d 408, 416 (D.C. Cir.

1995); Hearst v. Black, 87 F.2d 68, 71 (D.C. Cir. 1936)).  However, extending the Speech or Debate

Clause to the facts of this case would unconstitutionally extend the privilege from a protection of the

independence of the legislature into a weapon allowing Congress to surreptitiously eliminate any

checks on its authority.  The Supreme Court cautioned against such an expansion of the privilege.

See Brewster, 408 U.S. at 516 ("We would not think it sound or wise, simply out of an abundance of

caution to doubly insure legislative independence, to extend the privilege beyond its intended scope, its literal language, and its history, to include all things in any way related to the legislative process.").

In most situations, individuals have an opportunity to challenge a congressional subpoena without implicating the Speech or Debate Clause, and, thus, allowing the judiciary to remain an appropriate check on the legislature. First, in cases where an individual is subpoenaed directly, the individual can refuse to comply with an unlawful subpoena and challenge it as part of a contempt proceeding. See Watkins, 354 U.S. at 188; Yellin v. United States, 374 U.S. 109, 114 (1963); Gojack v. United States, 384 U.S. 702, 706–09 (1966). The second situation arises where Congress subpoenas an individual's information from a third party. In those situations, the individual can sue the third-party to enjoin compliance with the subpoena and challenge the subpoena's validity. See Mazars, 140 S. Ct. at 2028, 2035 (stating that constitutional "concerns are no less palpable here because the subpoenas were issued to third parties."); see also Am. Tel. & Tel. Co., 567 F.2d at 129 ("[T]he fortuity that documents sought by a congressional subpoena are not in the hands of a party claiming injury from the subpoena should not immunize that subpoena from challenge by that party." (citing Eastland, 421 U.S. at 513 (Marshall, J., concurring)).

Here, Plaintiffs were not afforded the opportunity to challenge the subpoena before Defendant JPMorgan disclosed Plaintiffs' private financial records despite JPMorgan and the Select Committee having actual notice of Plaintiffs' imminent legal challenge. Plaintiffs were given less than twenty-four (24) hours to file a complaint and motion for temporary restraining order *and* obtain a court order restraining Defendant JPMorgan from releasing the private financial records. This all occurred on a federal holiday—Christmas Eve. This Court was closed. Congress was closed. Banks were closed. Nonetheless, the Select Committee refused to extend the deadline for compliance so that Plaintiffs' challenge could be adjudicated by the Court. Am. Compl. ¶¶ 65–75. The Court should not endorse the Select Committee's intentional actions to "sidestep constitutional requirements . . . . The

Constitution does not tolerate such ready evasion; it 'deals with substance, not shadows.'" Mazars, 140 S. Ct. at 2035 (quoting Cummings v. Missouri, 4 Wall. 277, 325 (1867)).

To be sure, Ferrer, Brown & Williamson, and Hearst all broadly support the Select Committee's contention that the Court cannot order the return of documents in Congress's possession. See ECF No. 23 at 11–13 (citing Ferrer, 856 F.3d at 1086; Brown & Williamson, 62 F.3d at 416; Hearst, 87 F.2d at 71), adopted by ECF No. 33-1 at 8. But none of these authorities contemplated Congress using the Speech or Debate Clause as a sword to intentionally thwart *any* challenge to a congressional subpoena where the Committee *was on actual notice* of a forthcoming legal challenge.

In Ferrer, the individual subject of the subpoena had the opportunity to challenge the subpoena in court, and his challenge failed. Ferrer, 856 F.3d at 1084–85. Additionally, the D.C. Circuit declined to address "whether courts are powerless to enjoin individual members – or the committees of which they are a part – from disseminating investigative materials whose contents have no relationship to legislative functions or whose distribution would arguably violate the law." Id. at 1087. That is exactly what Plaintiffs seek here: an order returning only those private financial records that are unrelated to the legislative purposes of the Select Committee and that were obtained by the Select Committee in direct violation of RFPA.

Nor is the relief sought here precluded by Brown & Williamson. 62 F.3d at 411–12. In that case, Congress was provided documents that were stolen by a paralegal from her law firm's client. Id. Brown & Williamson did not involve a situation, as here, where Congress was the improper actor. Instead, the Brown & Williamson court expressly acknowledged that the Speech or Debate Clause would not insulate Congress unless it acted "in a procedurally regular manner." Id. at 416, 422. Specifically, Brown & Williamson limited the protection because the court "very much doubt[ed] that Congress c[ould] with impunity appropriate Americans' private property or maintain possession of any and all privileged documents." Id. at 416, 422.

In this instance, the Select Committee has not acted in a "procedurally regular manner." Putting aside that it is not validly formed under its own initiating Resolution, the Select Committee still ordered that Defendant JPMorgan produce private financial records knowing Plaintiffs were to imminently challenge the congressional subpoena. And knowing that Plaintiffs were unable to receive a court ruling before the unreasonable Christmas Eve deadline that the Select Committee refused to extend. Further, the Supreme Court's insistence that the proper method for challenging a subpoena issued to a third-party is by suing to enjoin enforcement necessarily implies that the individual whose records are sought has notice of the subpoena. See Mazars, 140 S. Ct. at 2035; Eastland, 421 U.S. at 501 n.14.

Lastly, Hearst similarly does not foreclose the relief Plaintiffs seek because it, too, is distinguishable from the conduct of the Select Committee and Defendant JPMorgan.  In Hearst, the plaintiff challenged past actions taken by the Federal Communications Commission in concert with a Senate Committee.  87 F.2d at 68–69.  In that case, the Senate Committee was not alerted to a forthcoming legal challenge.  Id.  Additionally, the plaintiff challenged only the actions of the Federal Communications Commission and not the power of the Committee involved.  Id. at 70.  The proceedings in Hearst were different from those presented here, wherein Plaintiffs challenge the pertinency of the records to the legislative purpose of the Select Committee, having alerted the Select Committee and Defendant JPMorgan of their intention to immediately lodge a legal challenge to the congressional subpoena.

In accordance with this authority, the Court can return the Parties to the *status quo* at the point the Select Committee intentionally attempted to thwart judicial review of its third-party congressional subpoena after receiving an actual and *bona fide* notice of an imminent legal challenge.  This narrow framework correctly balances individual rights with the need for an independent legislature and

should be applied here.[2]   In the alternative, if this Court ultimately holds it is without authority to return the Parties to the *status quo*, it can at least compel the Select Committee to adopt proper safeguards and protections for handling of Plaintiffs' private financial records and information, especially in light of the imminent public hearings and reports promised by the Select Committee to the constituency at large.

### D.   The RFPA Waives Speech or Debate Clause Immunity.

Under RFPA, Congress waived Speech or Debate Clause immunity by authorizing suits against it.  See 12 U.S.C. § 3417.  Although the Supreme Court has never definitively determined to what extent Congress can waive the Speech or Debate Clause protections, see United States v. Helstoski, 442 U.S. 477, 490 (1979), Congress itself has indicated that it can do so.  In passing the Congressional Accountability Act of 1995, 2 U.S.C. §§ 1301–1438, Congress authorized suits against it for money damages and injunctive relief.  Despite waiving sovereign immunity in the Accountability Act, Congress expressly retained its members' rights under the Speech or Debate Clause.  By doing so, Congress acknowledged that it can waive Speech or Debate Clause protections.  Specifically, Section 1413 states that "[t]he authorization to bring judicial proceedings under sections 1405(f)(3), 1407, and 1408 of this title shall not constitute a waiver of . . . the privileges of any Senator or Member of the House of Representatives under article I, section 6, clause 1, of the Constitution . . . ." 2 U.S.C. § 1413. Thus, when authorizing suits against it, Congress knows how to specifically retain the privileges of its members but chose not to do so in the context of RFPA.  Instead, Congress

---

[2] Finally, relief requested by Plaintiffs would give force and serve justice to the long-standing legal maxim *commodum ex injuria sua nemo habere debet*, which expresses the common-sense equitable proposition that no party should profit or derive advantage from its own wrong, injurious behavior, or unconscionable act that has an immediate and necessary relation to a matter in litigation.  Northwell Health, Inc. v. Lamis, No. 18-cv-1178, 2019 WL 4688704, *3 (S.D.N.Y. 2019) (citing Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc., 792 F. Supp. 969, 969 (S.D.N.Y. 1992)); Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 245 (1933)); see also PenneCom B.V. v. Merrill Lynch & Co., 372 F.3d 488, 493 (2d Cir. 2004).

did the opposite by authorizing disciplinary action against congressional employees for willful or intentional violations of RFPA.  See 12 U.S.C. § 3417(b).  As such, the Speech or Debate Clause does not prohibit an action against the Select Committee or its members for violating RFPA.

**IV.**      **THE RIGHT TO FINANCIAL PRIVACY ACT APPLIES TO THE SELECT COMMITTEE AND CONCOMITANTLY DEFENDANT JPMORGAN.**

The Right to Financial Privacy Act, 12 U.S.C. §§ 3401-23 ("RFPA") provides for liability of agencies or departments of the United States or financial institutions upon violation of RFPA provisions, including fines, actual damages, punitive damages for "willful or intentional" violations, and an award of costs and reasonable attorney's fees as determined by the Court.  See 12 U.S.C. § 3417(a).  RFPA also provides for disciplinary action by agents or employees of departments or agencies where "an officer or employee acted willfully or intentionally with respect to the violation."  See id. § 3417(b).  Finally, "in addition to any other remedy," RFPA provides for injunctive relief, which "shall be available to require that the procedures of this chapter are complied with."  See id. § 3418.

In pertinent part, RFPA provides that:  "No financial institution, or officers, employees or agent of the financial institution, may provide to any Government authority access to or copies of, or the information contained in, the financial records of any customer except in accordance with the provision of this chapter."  Id. § 3403(a).  RFPA additionally mandates that "[a] financial institution shall not release the financial records of a customer until the Government authority seeking such records *certifies in writing* to the financial institution that it has complied with the applicable provisions of this chapter."  Id. § 3403(b) (emphasis added); see also § 3411 ("deliver the records to the Government authority *upon receipt of the certificate required* under section 3402(b) of this title" (emphasis added)).  Thus, contrary to the JPMorgan's arguments, RFPA does impose an obligation

on financial institutions.  See ECF No. 34 at 11.[3]

RFPA also provides that:

[N]o Government authority may have access to or obtain copies of, or the information contained in the financial records of any customer from a financial institution unless the financial records are reasonably described and . . . such financial records are disclosed in response to an administrative subpoena or summons which meets the requirements of section 3405 of this title . . . [or] such financial records are disclosed in response to a formal written request which meets the requirements of section 3408 of this title.

§§ 3402(2), (5).  Both §§ 3405 (administrative subpoena or summons) and 3408 (formal written request) require that a copy of the subpoena or request be "served upon the customer or mailed to his last known address on or before the date on which the subpoena or summons was served on the financial institution."  Additionally, the subpoena or request must be accompanied by a formal statutory notice that, within ten (10) days from the date or service or fourteen (14) days from the date of mailing the required notice, allows the customer to challenge the request for records.  See §§ 3405, 3408.  Additional provisions of RFPA establish the right of a financial institution customer to challenge a request for their financial records in an appropriate United States District Court and that those proceedings should be completed or decided within seven (7) calendar days of the filing of any Government response.  See § 3410(a)-(b).

**A.  RFPA Applies to the Select Committee Subpoena.**

RFPA applies to any "Government authority," which is broadly defined as "any agency or department of the United States, or any officer, employee, or agent thereof . . . ."  § 3401(c). JPMorgan's argument that RFPA does not apply to Congress is inconsistent with the plain and unambiguous statutory text.

_____

[3] Plaintiffs respectfully concede that RFPA does not apply to Conservative Strategies, Inc., which is not a "partnership of five or fewer individuals."  See 12 U.S.C. §§ 3401(4).

First, by its express terms, RFPA applies to "any Government authority" which is defined as "any agency or department of the United States . . . ."  §§ 3403(a), 3401(3).  As the United States Supreme Court has opined, "the phrase *any* . . .  suggests a broad meaning . . ." that when "[r]ead naturally . . . has an expansive meaning, that is, one or some indiscriminately of whatever kind."  Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 219 (2008) (internal citations and quotations omitted).

As the "cardinal canon" of statutory construction, courts must "presume that a legislature says in a statute what it means and means in a statute what is says there . . . [and] when the words of a statute are unambiguous, then, this first canon is also the last:  judicial inquiry is complete."  Public Citizen, Inc. v. Rubber Manufacturers Ass'n, 533 F.3d 810, 816 (D.C. Cir. 2008) (citing Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992)).  When the words of a statute are unambiguous, the courts have "no need to employ, nor any legitimate purpose in employing, canons of construction designed to reconcile confusing language."  Atkinson v. Inter-Am. Dev. Bank, 156 F.3d 1335, 1341 (D.C. Cir. 1998); see also United States v. Hunt, 526 F.3d 739, 744 (11th Cir. 2008) ("When the text of a statute is plain . . . [the Court] need not concern [itself] with contrary intent or purpose revealed by the legislative history.").

The terminology "any Government authority" defined as "any agency or department of the United States, or any officer, employee, or agent thereof" is so categorically plain and unambiguous that soon-to-be Supreme Court Associate Justice Ketanji Brown Jackson without hesitation or comment noted that "RFPA provides that a *federal government entity* may subpoena a bank to obtain financial records . . . ."  Nicksolat v. U.S. Dep't of Trans., 277 F. Supp. 3d 122, 124 (D.D.C. 2017). This Court should conclude the same.

Another "fundamental canon of statutory construction" is that words should be "interpreted as taking their ordinary, contemporary, common meaning  . . . at the time Congress enacted the statute."  Wis. Cent. Ltd. v. United States, 138 S. Ct. 2067, 2074 (2018).  In accordance with the

-34-

record and this authority, the term "Government authority" cannot be narrower than its ordinary meaning. The Legislative Branch is both an agency and department of the United States Government.

**B.  The U.S. House of Representatives is an Agency of the United States.**

The U.S. House of Representatives is defined and characterized as a "Legislative Branch Agency" within the Legislative Branch of the United States Government.  See "Branches of the U.S. Government," USAGov ("Official Guide to Government Information and Services") (available at https://www.usa.gov/branches-of-government#item-214496) (last visited Apr. 5, 2022).  Just like the United States Botanic Garden, United States Capitol Police, and United States Capitol Visitor Center, the United States House of Representatives operates, at least in part, in an administrative capacity and is therefore a "Government authority" and "agency . . . of the United States . . . ."  for purposes of RFPA.

The applicability of RFPA to the Select Committee proceedings at issue should come as no surprise given the nature of the express objectives and proclaimed goals of the Select Committee, to wit:   "investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021," "examine and evaluate evidence developed by relevant Federal, State, and local governmental agencies regarding the facts and circumstances" of January 6, 2021," and "build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other executive branch, congressional, or independent bipartisan or nonpartisan commission investigations."  See H. Res. 503, § 3(1)-(3). These are purely and quintessentially law enforcement functions, the kind of which are governed by RFPA.

To demonstrate this point, the congressional subpoena to Defendant JPMorgan itself notes that production may be made "to any authorized staff member or the U.S. Marshals Service."  See Am. Compl., Ex. B at 1.  The U.S. Marshals Service is an Executive Branch agency.  See 28 U.S.C.

§ 561; <u>see also</u> U.S. Marshals Service Policy Directives at Section 11.2(C)(2)(d) (governing congressional subpoenas) and Section 11.1(D)(1)(a) ("Government Civil Process . . . subpoena . . . originating from a government agency or U.S. District Court.").  It is clear that while the Select Committee originates from a Legislative Branch entity, it is operating as a *de facto* "agency . . . of the United States . . . ."  <u>See</u> 12 U.S.C. § 3401(3); <u>see also</u> Daniel Chaitin, "Capitol Riot Investigators 'Engaged' With US Marshals," Washington Examiner (Oct. 14, 2021) (Defendant Murphy:  "We have engaged with a wide variety of law enforcement offices, including the U.S. Marshals, in order to issue the subpoenas . . . [and] we will use all of the agencies and all of the tools at our disposal to issue the subpoenas and enforce them."); Tom Hamburger, "Thompson Says Jan. 6 Committee . . . Weighing Criminal Referrals, Washington Post (Dec. 23, 2021) (Defendant Thompson:  "I can assure you that if a criminal referral would be warranted, there would be no reluctance on the part of this committee to do that.").

**C.  <u>The U.S. House of Representatives is a Department of the United States</u>.**

Congress is commonly referred to as a "department" of the federal government.  <u>See, e.g.</u>, <u>Calif. Motor Transp. Co. v. Trucking Unlimited</u>, 404 U.S. 508, 510 (1972); <u>Nixon v. Admin'r of Gen. Servs.</u>, 433 U.S. 425, 443 (1977) ("each of the three general *departments* of government (must remain) entirely free from the control or coercive influence, direct or indirect, of either of the others . . . .") (emphasis added); <u>see also</u> <u>Oetjen v. Central Leather Co.</u>, 246 U.S. 297, 311 (1918) (referring "to the executive and legislative – 'the political' – *departments* of the government"); <u>Ping v. U.S.</u>, 130 U.S. 581, 628 (1889) ("the legislative *department* of the government") (emphasis added); <u>Marbury v. Madison</u>, 5 U.S. 137, 177 (1803) (referring to the Judicial Branch as the "judicial department"); <u>Schneider v. Kissinger</u>, 412 F.3d 190, 194 (D.C. Cir. 2005) (referring to the executive and legislative "*departments*" of the government) (emphasis added).

Indeed, in the five (5) years before and after passage of RFPA, the Supreme Court and the D.C. Circuit referred to Congress as a department at least six (6) times. See, e.g., Palmore v. United States, 411 U.S. 389, 406 (1973) ("Moreover, these courts, constituted as they were, and being closer to the legislative department . . . ."); Consumers Union of U. S., Inc. v. Periodical Correspondents' Ass'n, 515 F.2d 1341, 1346 (D.C. Cir. 1975) ("[W]e are of the opinion that this case is nonjusticiable because it involves matters committed by the Constitution to the Legislative Department . . . ."); Buckley v. Valeo, 424 U.S. 1, 271 (1976) (White, J., concurring in part and dissenting in part) ("The basic approach was that official power should be divided among the Executive, Legislative, and Judicial Departments."); Pacifica Found. v. F.C.C., 556 F.2d 9, 26 n.24 (D.C. Cir. 1977) (Bazelon, C.J., concurring) ("The Banzhaf court relied squarely on the announced policy of both the executive and legislative departments, which were themselves based on convincing evidence, that cigarettes are carcinogens."); Washington v. Confederated Tribes of Colville Indian Rsrv., 447 U.S. 134, 153 (1980) ("In these respects the present cases differ sharply from Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S. Ct. 1011, 55 L.Ed.2d 209 (1978), in which we stressed the shared assumptions of the Executive, Judicial, and Legislative Departments that Indian tribes could not exercise criminal jurisdiction over non-Indians."). Even the 93d Congress, only a few years before the passage of RFPA, referenced the legislative "department" in its "Rules Governing Periodical Press Gallery." See Cong. Directory, 93d Cong., 1st Sess., 1973, pp. 916-17 (prohibiting press gallery admittance to anyone "employed in any legislative or executive department of the Government."). Congress' referral to itself as a Department of the United States Government contemporaneous with its implementation of RFPA is persuasive evidence that it intended for RFPA to apply to the legislature.

### D. **The Purpose, Context, Structure, and Internal Provisions of RFPA Demonstrate the Act Applies to Congress**.

Even if this Court were to look beyond the plain and unambiguous statutory text of § 3401(3), it should apply "the familiar interpretive canon *noscitur a sociis*," which means "a word is known

by the company it keeps" and dictates that the Court should "look to the context in which the words appear." McDonnell v. U.S., 136 S. Ct. 2355, 2368 (2016) (citing Yates v. United States, 135 S. Ct. 528, 1085 (2015).

The term "any Government authority" is defined as "any agency or department of the United States . . . ." See 12 U.S.C. §§ 3403(a), 3401(3). This provision is broad and expansive. It was also enacted in response to the United States Supreme Court decision in United States v. Miller, 425 U.S. 435, 440 (1976), which held that a bank customer had no Fourth Amendment right to prevent a bank from disclosing his financial records in response to a grand jury subpoena. Nicksolat v. U.S. Dep't of Transp., 277 F. Supp. 3d 122, 124 (D.D.C. 2017) (Jackson, J.).

RFPA was designed to strike a balance between customers' right of privacy and the need for law enforcement agencies to obtain financial records pursuant to legitimate investigations. See H. Rep. No. 95-1383, at 33 (1978). The impetus behind RFPA was to protect a customer's right of privacy concerning disclosure of financial records without qualification as to what character of federal government entity was seeking the records.

If Congress wanted to exempt itself from RFPA, it had the chance and declined to do so. A draft bill submitted by the United States Department of Justice and the Treasury Department would have explicitly covered access to financial records by Congress and distinguished Congress from "any agency or department of the United States." See Electronic Funds Transfer & Financial Privacy: Hrgs. on S. 2096, S. 2293, & 1460 Before the Subcomm. On Fin. Insts. of the S. Comm. on Banking, Housing & Urban Affairs, 95th Cong. 397 (1978). However, given the already broad and expansive definition of Government authority at § 3401(3), Congress apparently felt no need to state the obvious.

Further, at § 3413(j), RFPA specially exempts circumstances where "financial records are being sought by the Government Accountability Office." § 3413(j). The United States Government Accountability Office ("GAO") is a Legislative Branch government agency that provides auditing,

evaluation, and investigative services for Congress.  See Bowsher v. Synar, 478 U.S. 714, 731 (1986);

Cause of Action v. NARA, 753 F.3d 210, 213-14 (D.C. Cir. 2014) (GAO is among the "legislative

agencies");   see   also   U.S.   Government   Accountability   Office   (available   at

https://www.gao.gov/about) (last visited Jan. 3, 2022).  If RFPA was limited to the Executive Branch,

then there would be no need to provide an exemption for the GAO, let alone a partial one.  It follows

that Congress appreciated that RFPA applied to its activities, given that it specifically exempted

certain of its authorities from the Act's coverage.  But Congress did not intend to exclude itself from

RFPA's modest protections.

At the time it enacted RFPA, unlike the present circumstances, Congress was more concerned

with protecting individual rights to financial privacy than arguing it is above the law.  It would be

surprising if Congress determined to expand privacy rights of financial customers, yet at the same

time provide a wholesale exemption for its own subpoenas.

The Select Committee Defendants argue that RFPA's definition of "Government authority"

extends only to the Executive Branch and not more broadly to Congress.  See ECF No. 33-1 at 13.

That reading does not work.  To begin, the Select Committee Defendants would ask this Court to

read an implied exception into the statutory scheme.  Although RFPA contains a number of specific

exemptions, see, e.g., §§ 3413(c) (tax proceedings); 3413(g) (certain law-enforcement inquiries);

3413(i) (grand jury subpoenas), it does not provide a general  exemption  for congressional

subpoenas.  "Where Congress explicitly enumerates certain exceptions to a general prohibition,

additional exceptions are not to be implied, in the absence of evidence of a contrary legislative

intent." United States v. Smith, 499 U.S. 160, 167 (1991).

Moreover, the statutory context confirms that Congress expected RFPA to apply beyond the

Executive Branch.  Notably, the statute specifically addresses the one circumstance where

Congressional inquiries are *not* subject to RFPA's procedures:  when the records request is from "a

duly authorized committee or subcommittee of Congress" to "any officer or employee of a supervisory agency."  § 3412(d).  If congressional subpoenas were never intended to come within RFPA's scope, there would be no reason to include this provision; any other interpretation would render this provision superfluous.  See Duncan v. Walker, 533 U.S. 167, 167 (2001) (stating that the judiciary must avoid "treat[ing] statutory terms as surplusage"); see also Nat'l Ass'n Manufacturers v. Dep't of Defense, 138 S. Ct. 617, 632 (2018) (stating that the judiciary is "obliged to give effect, if possible, to every word Congress used . . . .").  In contrast to any contrary reading, Plaintiffs' interpretation gives this provision a logical purpose:  when a supervisory agency has already obtained these documents (presumably in compliance with RFPA's procedures), Congress is not required to go through RFPA's notice and certification procedures anew.  Of course, the congressional subpoena at issue was directed to Defendant JPMorgan, and not a supervisory agency; accordingly, § 3412(d) provides no authority for the Select Committee's receipt of private financial records in this instance.

Further, Defendants interpretation of Government authority would have perilous consequences, providing Congress unfettered authority to investigate every detail of the personal life of any political opponent or associate with endless subpoenas to his accountants, bankers, lawyers, doctors, family, friends, and anyone else with information the Select Committee finds interesting. This cannot be the case.  Moreover, this result would betray the text, context, and purpose of RFPA, which is to provide safeguards and a process in light of the "serious concern for the privacy interests of individuals in their bank records." Botero-Zea v. United States, 915 F. Supp. 614, 619 (S.D.N.Y. 1996).

At bottom, Congress is not exempt from the procedures outlined in RFPA.  Accordingly, RFPA covers the congressional subpoena at issue and Defendant JPMorgan's unlawful production of Plaintiffs' private financial records violated the statute.  Neither Defendant JPMorgan nor the Select Committee made any attempt to comply with RFPA.  The Select Committee did not certify to

Defendant JPMorgan that it provided the requisite notice to Plaintiffs in accordance with RFPA.  See § 3403(b); see also § 3411.

## V.   PLAINTIFFS HAVE ALLEGED PROTECTIBLE INTERESTS SUPPORTING THEIR CONSTITUTIONAL CLAIMS.

Plaintiffs asserted several liberty and property interests warranting due process protection. "'[T]he existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law.' In other words, property interests 'attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.'" Ralls Corp., 758 F.3d at 315 (citations omitted) (quoting Phillips v. Wash. Legal Found., 524 U.S. 156, 164 (1998), and Paul v. Davis, 424 U.S. 693, 710 (1976)). "[T]hat the property interest is recognized under state law is enough to trigger the protections of the Due Process Clause." Id. at 316.  Further, "liberty interests protected by the fifth amendment may arise either from the Constitution or from federal . . . law." Mosrie v. Barry, 718 F.2d 1151, 1159 (D.C. Cir. 1983). Federal law can create a liberty interest, safeguarded by the Fifth Amendment, when the federal law provides special protection for a given interest beyond the general protection of tort law. Cf. id. (explaining that D.C. law did not provide special protection to reputation beyond general tort law and therefore injury to reputation was not a protectible liberty interest under the Fifth Amendment). To determine whether a particular statute creates a constitutionally protected property interest, [the court] asks whether the statute or implementing regulations place 'substantive limitations on official discretion.'" Wash. Legal Clinic for the Homeless v. Barry, 107 F.3d 32, 36 (D.C. Cir. 1997) (quoting Olim v. Wakinekona, 461 U.S. 238, 249 (1983)). For a statute, regulation, or rule to create a protectible liberty interest it must use "'explicitly mandatory language,' in connection with the establishment of 'specified substantive predicates' to limit discretion . . . ." Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 463 (1989).

Here, Plaintiffs allege multiple protectible interests under the Fifth Amendment's Due Process Clause. First, Plaintiffs allege a valid First Amendment interest. Am. Compl. ¶¶ 104–14; see Mosrie, 718 F.2d at 1159 (stating that Constitution can give rise to interests protected by Fifth Amendment). The First Amendment creates inherent liberty interests that are protectible under the Fifth Amendment's Due Process Clause. See Mosrie, 718 F.2d at 1159; Sherrill v. Knight, 569 F.2d 124, 128 (D.C. Cir. 1977) ("[B]ecause the denial of a pass potentially infringes upon first amendment guarantees[,] [s]uch impairment of this interest cannot be permitted to occur in the absence of adequate procedural due process."). Accordingly, Plaintiffs' First Amendment interests warranted an opportunity to challenge the subpoena before the records were turned over. See Eastland v. U.S. Servicemen's Fund, 421 U.S. at 501 n.14 (stating that Circuit Court correctly found that District Court had jurisdiction to evaluate First Amendment Claim in relation to legitimate legislative purpose); U.S. Servicemen's Fund v. Eastland, 488 F.2d at 1259–60 (holding that the plaintiff's assertion of First Amendment right in subpoenaed documents authorized federal court to entertain action challenging congressional subpoena to third party record holder).

Further, Plaintiffs possess a protectible interest pursuant to RFPA. See 12 U.S.C. § 3402. RFPA was "a congressional response to the Supreme Court decision in United States v. Miller" and "is intended to protect the customers of financial institutions from unwarranted intrusion into their records . . . ." H.R. Rep. No. 95-1383, at 9305–06 (1978). RFPA contains substantive predicates that limit discretion, i.e. the requirements contained in §§ 3404–08. See Thompson, 490 U.S. at 463. Further, RFPA mandates that, absent satisfying the substantive predicates, no governmental entity may have access to an individual's financial records. § 3402. Thus, RFPA qualifies as a statute creating a protectible Fifth Amendment interest because it contains "explicitly mandatory language," and "specified substantive predicates to limit discretion . . . ." Thompson, 490 U.S. at 463 (quotations omitted).

Lastly, the Supreme Court has repeatedly emphasized that the proper method for challenging congressional subpoenas to third parties—including those holding financial records—is for the individual whose information is sought to sue to challenge the subpoena. See Mazars, 140 S. Ct. at 2035; Eastland, 421 U.S. at 501 n.14. In Eastland, the Supreme Court stated that the district court properly entertained the action because when Congress subpoenas records from a third party, the normal process for challenging the subpoena is unavailable to the individual whose records are at issue. 421 U.S. at 501 n.14. Thus, the only way to challenge whether the subpoena furthers a legitimate legislative purpose is to sue to challenge the subpoena. Id.; see also Eastland, 488 F.2d at 1259–60 (explaining that the proper process is to sue to challenge the subpoena in court because "plaintiffs have no alternative means to vindicate their rights.").

Despite Defendants' assertions, United States v. Miller, 425 U.S. 435, 440 (1976) does not compel the opposite conclusion. First, Miller involved a Fourth Amendment claim and relied on the zone of privacy analysis, which differs from protectible interest determination under the Fifth Amendment. This is significant because the Fifth Amendment protects liberty and property interests created by statute. Congress enacted RFPA in response to the Supreme Court's decision in Miller and, thus, its application is inappropriate here. Moreover, Miller did not involve the expansive breadth of documents requested here. See Am. Compl., Ex. B.

These distinguishing factors are equally applicable to Plaintiffs' Fourth Amendment claim. In Miller, the defendant was being investigated for tax violations as a whiskey distiller. 425 U.S. at 436. The subpoena requested less than four months of financial records. Id. at 437–38. Government agents were allowed to review microfilm and were provided with checks, deposit slips, two financial statements, and three-monthly statements. Id. at 438. The Supreme Court noted that the narrowly tailored request for documents was significant to its decision. Id. at 444 n.6 ("We are not confronted with a situation in which the Government . . . has made a wide-ranging inquiry . . . . Here the

Government has exercised its powers through narrowly directed subpoenas Duces tecum subject to the legal restraints attendant to such process." (quoting <u>Cal. Bankers Assn. v. Shultz</u>, 416 U.S. 21, 78-79 (1974) (Powell, J., concurring))). Here, the subpoena requested expansive records spanning more than a year without any relation to the purported legitimate legislative purpose. <u>See</u> Am. Compl., Ex. B. Moreover, Financial institutions collect and compile much more information—both in type and amount—than was conceivable when <u>Miller</u> was decided. Plaintiffs believe that the vastness of information produced to the Select Committee will differ drastically from the limited documents in <u>Miller</u>, and more closely resemble the detailed, comprehensive records that the Supreme Court has now found protectible. <u>See</u> <u>Carpenter v. United States</u>, 138 S. Ct. 2206 (2018) (finding CSLI tracking information protectible under the Fourth Amendment, notwithstanding <u>Miller</u>, because <u>Miller</u> considered 'the nature of the particular documents sought' to determine whether 'there [wa]s a legitimate expectation of privacy concerning their contents.'" (quoting <u>Miller</u>, 425 U.S. at 442)). Of course, examining whether Plaintiffs have a legitimate expectation of privacy in the records provided to the Select Committee can only be accomplished after discovery.

## <u>CONCLUSION</u>

Based on the foregoing, Plaintiffs respectfully request this Court deny the Motion to Dismiss Amended Complaint (ECF No. 33) filed by the Select Committee and promptly enter a Scheduling Order setting a Pretrial Conference in accordance with Rule 16, Federal Rules of Civil Procedure, and further directing the Parties to exchange initial disclosures and file a Report under Rule 26(f), Federal Rules of Civil Procedure, such that discovery may be meaningfully exchanged between the Parties in order to develop the multiple claims of Plaintiffs.

Date:  April 8, 2022

Respectfully submitted,

**ABEL BEAN LAW, P.A.**

***s/ Christopher W. Dempsey***
CHRISTOPHER W. DEMPSEY
DANIEL K. BEAN
JARED J. BURNS
100 N Laura Street, Suite 501
Jacksonville, Florida 32202
Telephone:  (904) 944-4100
Fax:  (904) 944-4122
Email: cdempsey@abelbeanlaw.com
dbean@abelbeanlaw.com
jburns@abelbeanlaw.com

***Attorneys for Plaintiffs***