# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TAYLOR BUDOWICH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 1:21-cv-03366-JEB |
| | ) | |
| NANCY PELOSI, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT
## BY J.P. MORGAN CHASE BANK, N.A.

Defendant J.P. Morgan Chase Bank, N.A. ("JPMorgan") prevented this Court from performing its constitutional duty of reviewing a motion to restrain the production of Plaintiffs Taylor Budowich and Strategic Consultants, Inc.'s private financial records. JPMorgan did this by producing Plaintiffs' private financial records despite notice that Plaintiffs were challenging the subpoena for those records. JPMorgan's reasoning for refusing to withhold its production despite notice of Plaintiffs' legal challenge: Plaintiffs did not have a court order. But a court order, of course, was impossible to secure by the arbitrary Christmas Eve deadline because this Court, JPMorgan—and all U.S. financial institutions for that matter—and Congress were all closed. Now JPMorgan argues that Plaintiffs' claims should be dismissed. But JPMorgan's arguments misrepresent the law and raise affirmative defenses that are inappropriate for a motion to dismiss.

Accordingly, under LCvR 7(b), Plaintiffs Taylor Budowich and Strategic Consultants, Inc. respectfully oppose the Motion to Dismiss Amended Complaint (ECF No. 34) filed by Defendant J.P. Morgan Chase Bank, N.A.

## FACTS & BACKGROUND

### I.   THE SELECT COMMITTEE SUBPOENAS.

On November 22, 2021, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") served Plaintiff Budowich with a congressional subpoena for production of documents and testimony at a deposition.  See Am. Compl., Ex. A (ECF No. 30-1).  The congressional subpoena requested, *inter alia*, identification of all financial accounts for which Plaintiff Budowich was the direct or indirect beneficial owner, or over which he exercised control, into which funds were transferred or withdrawn for any purpose in connection with the Ellipse Rally, along with documents sufficient to identify all account transactions for the time period December 19, 2020, to January 31, 2021, in connection with the Ellipse Rally.  Id., Ex. A at 5-6.

The Select Committee set December 6, 2021, as Plaintiff Budowich's deadline for production of documents and December 16, 2021, as the date of Plaintiff Budowich's deposition. Id., Ex. A at 1.  However, at Plaintiff Budowich's request, the Select Committee agreed to extend its deadline for production of documents to December 13, 2021, and rescheduled Plaintiff Budowich's deposition to December 22, 2021.  See id., Ex. C (ECF No. 30-3).

On December 14, 2021, counsel for Plaintiff Budowich produced to the Select Committee three-hundred ninety-one (391) documents responsive to the congressional subpoena, including all financial account transactions for the time period December 19, 2020, to January 31, 2021, in connection with the Ellipse Rally.  See id., Ex. D (ECF No. 30-4).  Counsel for Plaintiff Budowich made supplemental production of forty-nine (49) additional documents on December 17, 2021. See id., Ex. D at 5.  Additionally, Plaintiff Budowich traveled to Washington, D.C. at his own expense and sat for a four (4) hour deposition before the Select Committee on December 22, 2021.

In an abundance of caution, on December 16, 2021, counsel for Plaintiffs transmitted

correspondence to Defendant JPMorgan noting that Plaintiffs objected to the production of any private financial records pursuant to any congressional subpoena and requesting immediate notification should Defendant JPMorgan be served with a congressional subpoena. See id., Ex. E (ECF No. 30-5). That correspondence was received by Defendant JPMorgan at 5:41 a.m. EST on December 22, 2021. Id., Ex. E at 2.

Unbeknownst to Plaintiff Budowich, on November 23, 2021, the Select Committee served Defendant JPMorgan with a congressional subpoena for production of documents, at least in part requiring production of private financial records belonging to Plaintiff Budowich. See id., Ex. B. The Select Committee initially set December 7, 2021, as Defendant JPMorgan's deadline for production of documents. Id., Ex. B at 1. However, before December 7, 2021, the Select Committee extended Defendant JPMorgan's production deadline until December 24, 2021, a date specifically requested by Defendant JPMorgan. See id., Ex. C.

At 2:33 p.m. EST on December 21, 2021, while Plaintiff Budowich was in Washington, D.C. for his deposition before the Select Committee, and *before* receiving correspondence from counsel for Plaintiffs demanding notice of any congressional subpoena, Defendant JPMorgan sent correspondence to Plaintiff Budowich at an address in Sacramento, California, advising that it received a congressional subpoena for his private financial records and would produce those records on December 24, 2021 at 5:00 p.m. See id., Ex. F. Related to his travel from Washington, D.C., Plaintiff Budowich did not receive this correspondence from Defendant JPMorgan until 7:00 p.m. EST on December 23, 2021. He immediately informed his counsel of the JPMorgan letter. Counsel for Plaintiffs then immediately contacted Defendant JPMorgan to object to any production of his private financial records and request an extension of time for Defendant JPMorgan's production to the Select Committee. See id., Ex. G (ECF No. 30-7).

On December 24, 2021, counsel for Plaintiffs—via phone conversation and in writing to both the Select Committee and Defendant JPMorgan—requested an extension of Defendant JPMorgan's production deadline until January 3, 2021, in light of the long holiday weekend and federal government closures.  See id., Exs. H, I, J.  Despite prior extensions provided to both Plaintiff Budowich and Defendant JPMorgan, the Select Committee and Defendant JPMorgan refused to extend the December 24, 2021production deadline, notwithstanding their notice that Plaintiff Budowich "intend[ed] to exercise his legal rights in court" and that refusing to allow an extension of time would make Defendant JPMorgan "complicit in preventing its customer, who it promised to treat with equity and fairness . . . from having his day in court." See id., Ex. I at 1.

Defendant JPMorgan then proceeded to produce Plaintiffs' private financial records to the Select Committee. It then argued to this Court, along with the Select Committee, that Plaintiffs' request to enjoin production of their private financial records was moot given that it had already produced the financial records at issue. It made this argument notwithstanding that it had directly created the circumstances it now avers preclude this Court from granting meaningful relief.

Incredibly, Defendant JPMorgan has now doubled-down on its argument that this action is moot, contending that the Court cannot review the lawfulness of the subpoena or JPMorgna's unlawful, post-notice acts because it already produced Plaintiffs' private financial records.  See ECF No. 34 at 16.  Specifically, Defendant JPMorgan now attempts to evade any judicial review, accountability, and consequences concerning its unlawful and improper conduct by reliance on a timeline and scenario it purposefully created and intentionally manufactured to deny Plaintiffs their day in court.

Moreover, Defendant JPMorgan refuses to advise whether it produced Plaintiffs' private financial records to the Select Committee beyond November 23, 2021, notwithstanding the Select Committee's unequivocal declaration that its subpoena only compelled production of records up

to and including November 23, 2021. Am. Compl. ¶ 8; see ECF No. 28 at ¶ 3.  Inexplicably, Defendant JPMorgan likewise failed to provide Plaintiffs copies of their own financial records as produced to the Select Committee.  Plaintiffs remain without knowledge of what Defendant JPMorgan produced to the Select Committee and whether Defendant JPMorgan produced private financial records of Plaintiffs without any legal authority whatsoever.  Considering these actions by the Select Committee Defendants and Defendant JPMorgan, Plaintiffs have sufficiently alleged multiple causes of action that will provide them meaningful redress.

## II.   <u>PROCEDURAL HISTORY</u>.

On December 24, 2021, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief and Emergency Motion for Temporary Restraining Order ("TRO").  See ECF Nos. 1-2.  On December 29, 2021, the Court denied without prejudice Plaintiffs' TRO Motion.  On January 4, 2022, Plaintiffs filed an Amended Emergency Motion for TRO.  See ECF No. 14.  The Court heard arguments by the Parties on the Amended TRO Motion on January 20, 2022, and denied the motion.  See TRO Hr'g Tr. (ECF No. 26) at 32:9 to 35:1. This Court, however, declined to grant the Select Committee's motion to dismiss this matter entirely.  Id. at 36:16-21.

On February 18, 2022, Plaintiffs filed an Amended Complaint for Declaratory and Injunctive Relief, alleging six (6) declaratory judgment counts applicable to all Defendants— concerning the improper constitution of the Select Committee, lack of any valid legislative purpose, constitutional violations, and The Right to Financial Privacy Act, 12 U.S.C. §§ 3401-23—along with claims under the California Constitution and the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 1700, et seq., unlawful and unfair prongs, against Defendant JPMorgan.  See ECF No. 30 at ¶¶ 115-195.  Both the Select Committee and Defendant JPMorgan have now filed Motions to Dismiss averring that this Court lacks subject matter jurisdiction and

that Plaintiffs failed to state a claims upon which relief can be granted.  See ECF Nos. 33-34. These motions should be denied.

## LEGAL STANDARD

### I.   MOTIONS TO DISMISS UNDER RULE 12(b)(1).

A motion to dismiss brought pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges a court's subject matter jurisdiction—that is, a court's power to hear a plaintiff's legal claims.  When a defendant files a Rule 12(b)(1) motion based on mootness—as is the case here— the burden is on the party asserting such jurisdictional bar to establish mootness. Reid v. Hurwitz, 920 F.3d 828, 832 (D.C. Cir. 2019). In deciding whether to grant the motion, a district court must "accept all of the factual allegations in [the] complaint as true[.]" Jerome Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253–54 (D.C. Cir. 2005).

### II.   MOTIONS TO DISMISS UNDER RULE 12(b)(6).

A motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of a complaint's factual allegations in support of a plaintiff's legal claims.  See Howard Univ. v. Watkins, 857 F. Supp. 2d 67, 71 (D.D.C. 2012).  Thus, courts considering a motion to dismiss under Rule 12(b)(6) must accept as true all of the plaintiff's allegations of fact and must also "grant [a] plaintiff the benefit of all inferences that can be derived from the facts alleged[.]" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks and citation omitted).

To withstand a Rule 12(b)(6) motion, the complaint need only set forth sufficient factual allegations to "state a claim to relief that is plausible on its face[,]" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), meaning that the complaint's "factual content [must] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged[,]" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A motion to dismiss for failure to state a claim upon which

relief can be granted is generally viewed with disfavor and rarely granted." <u>Link v. U.S.</u>, 539 F.

Supp. 2d 360,361 (D.D.C. 2008) (citing <u>Doe v. U.S. Dep't of Justice</u>, 753 F.2d 1092, 1102 (D.C.

Cir.1985)).  Rule 12(b)(6) "places th[e] burden on the moving party" to show that the complaint

is legally insufficient.  <u>Cohen v. Bd. of Trs. of the Univ. of D.C.</u>, 819 F.3d 476, 481 (D.C. Cir.

2016) (citing 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357

(3d ed. 2015)).  A court assessing whether a complaint states a claim is limited to a review of the

four corners of the complaint, as well as any "documents attached as exhibits or incorporated by

reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies[.]"

<u>Page v. Mancuso</u>, 999 F. Supp. 2d 269, 275 (D.D.C. 2013) (internal quotation marks and citations

omitted).

## **LEGAL ARGUMENT**

### I.   <u>THE MOOTNESS DOCTRINE DOES NOT PRECLUDE REVIEW</u>.

#### A.   <u>Plaintiffs Seek Damages and Proper Injunctive Relief and Challenge an Ongoing Policy and Practice of the Select Committee.</u>

Both Defendants argue that this case is moot. They are wrong for multiple reasons. Article

III limits federal courts to deciding cases or controversies. <u>See</u> U.S. Const. art. III, § 2. A case

becomes moot if "events have so transpired that the decision will neither presently affect the

parties' rights nor have a more-than-speculative chance of affecting them in the future." <u>Reid</u>, 920

F.3d at 832 (quotations omitted) (quoting <u>Clarke v. United States</u>, 915 F.2d 699, 701 (D.C. Cir.

1990). "In considering possible mootness [the court] assume[s] that the plaintiffs would be

successful on the merits." <u>Jud. Watch, Inc. v. Kerry</u>, 844 F.3d 952, 955 (D.C. Cir. 2016).  The

burden is on the party asserting such jurisdictional bar to establish mootness. <u>Reid</u>, 920 F.3d at

832. Of course, "it is impossible for a plaintiff, when she initially files a Complaint, to make

plausible allegations supporting a mootness exception." <u>Id.</u> at 833. Therefore, the district court can

focus on legal theories in addition to the facts alleged. <u>Id.</u>

First, Both Defendants failed to establish mootness. Reid, 920 F.3d at 832. "The burden of demonstrating mootness 'is a heavy one.'" Los Angeles Cnty. v. Davis, 440 U.S. 625, 631 (1979); Doe v. Harris, 696 F.2d 109, 112 (D.C. Cir. 1982) ("We conclude . . . that defendant-appellees have not shouldered the heavy burden of demonstrating mootness . . . ."). In their motions, Defendants ignore that Plaintiffs seek monetary damages and a return of their documents. See Off. of Thrift Supervision Dep't of Treasury v. Dobbs, 931 F.2d 956, 958 (D.C. Cir. 1991) ("[W]here the government retains property obtained through a subpoena, the controversy remains open as to the government's continued right to custody of those documents."); LaRouche v. Fowler, 152 F.3d 974, 977 (D.C. Cir. 1998) (stating that the mooting of requests for injunctive relief does not moot a case in which claims for damages remain). These are future acts for which the Court can afford meaningful relief and that presently affect Plaintiffs' rights.

Second, this case is not moot because Plaintiffs' challenge an ongoing policy:  the Select Committee's issuance of unnoticed, overbroad subpoenas that exceed a valid legislative purpose and are issued by a committee that is not duly formed. See Super Tire Eng'g Co. v. McCorkle, 416 U.S. 115, 124 (1974); Better Gov't Ass'n v. Dep't of State, 780 F.2d 86, 91 (D.C. Cir. 1986). More specifically, Plaintiffs challenge the legality of the Select Committee's authority to issue subpoenas despite not being formed in accordance with its authorizing charter; that issuing subpoenas to third parties without notice to the individual whose information is sought violates the Fifth Amendment; that the Select Committee's law enforcement purpose violates the separation of power's doctrine and the Fourth Amendment; that the Select Committee's targeting of former President Trump's supporters violates the First Amendment; along with other claims related to practices and conduct of the Select Committee. Ultimately, these are all ongoing policies of the Select Committee that are being challenged and for which there is a live controversy concerning their constitutionality. See McCorkle, 416 U.S. at 124; Better Gov't Ass'n, 780 F.2d at 91.

**B.  The Select Committee's Conduct and Actions are Capable of Repetition Yet Evading Review.**

Lastly, this case fits into the mootness exception for cases capable of repetition yet evading review. "This exception 'applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'" Cierco v. Lew, 190 F. Supp. 3d 16, 27 (D.D.C. 2016), aff'd Cierco v. Mnuchin, 857 F.3d 407 (D.C. Cir. 2017) (quoting FEC v. Wis. Right To Life, Inc., 551 U.S. 449, 462 (2007)). "To evade review, the challenged action must be incapable of surviving long enough to undergo Supreme Court review." J. T. v. D.C., 983 F.3d 516, 523–24 (D.C. Cir. 2020) (quoting United Bhd. of Carpenters & Joiners of Am. v. Operative Plasterers' & Cement Masons' Int'l Ass'n of the U.S. & Can., 721 F.3d 678, 688 (D.C. Cir. 2013)). "As a rule of thumb, 'agency actions of less than two years' duration cannot be fully litigated prior to cessation or expiration, so long as the short duration is typical of the challenged action." Ralls Corp. v. Comm. on Foreign Inv. in U.S., 758 F.3d 296, 321 (D.C. Cir. 2014) (quoting Del Monte Fresh Produce Co. v. United States, 570 F.3d 316, 322 (D.C. Cir. 2009)).

The Select Committee's issuance of unlawful third-party subpoenas satisfies the "evading review" prong because the mere two-week response time is too short to fully adjudicate the issue. This is particularly true where the third-party, such as Defendant JPMorgan here, requires a court order—not just a legal challenge—to refuse to produce documents. Because these subpoenas typically provide a response time of merely two weeks, Am. Compl. at Exhibit B (providing two weeks to respond to subpoena); Harris v. U.S. House Select Cmte. to Investigate the Jan. 6th Attack on the U.S. Capitol, 1:21-cv-03290-CJN (ECF No. 1) (alleging that a two-week response time violates due process), a challenge to the subpoena cannot be fully litigated before the production of documents, see, e.g., Ralls Corp., 758 F.3d at 323 (finding that fifty-seven day response time

evaded review despite party withdrawing its motion for TRO and preliminary injunction); J. T.,
983 F.3d at 524 (finding that one-year is short enough to satisfy the "evading review" prong).

Plaintiffs also satisfy the second prong of this exception because there is a reasonable
probability that Plaintiffs will be subject to the same action again. This prong does not require the
exact same facts, but rather looks at "the legal questions it presents for decision." J. T., 983 F.3d
at 524 (quoting PETA v. Gittens, 396 F.3d 416, 422–23 (D.C. Cir. 2005)). This prong "is not to
be applied with excessive 'stringency'" and "a controversy need only be *capable* of repetition,'
not 'more probable than not.'" Ralls Corp., 758 F.3d at 324 (quoting Honig v. Doe, 484 U.S. 305,
318 n.6 (1988)). "Moreover, when a complaint identifies official conduct as wrongful and the
legality of that conduct is vigorously asserted by the officers in question, the complainant may
justifiably project repetition, albeit in a different setting, and involving different official actors."
Doe, 696 F.2d at 113.

Here, it is likely that Select Committee Defendants will issue unnoticed subpoenas to
additional third-parties that maintain Plaintiffs' private information. The Select Committee
routinely issues third party subpoenas without notice to the impacted individuals. Am. Compl. at
¶¶ 67, 69; see also, e.g., Pl.'s Mot. for Preliminary Injunction, Republican Nat'l Cmte. v. Pelosi,
No. 1:22-cv-00659-TJK (ECF No. 8-1 at 4) ("The Select Committee provided no notification to
the RNC that it had subpoenaed Salesforce and demanded RNC information."); Compl., Harris,
1:21-cv-03290-CJN (ECF No. 1) (explaining that the Select Committee subpoenaed Verizon for
the plaintiff's records without notice to the plaintiff). The Select Committee has issued at least
eighty-nine (89) subpoenas, and likely many more. See Mychael Schnell and Monique Beals,
*These people have been subpoenaed by the Jan. 6 panel*, THE HILL, (available at:
https://thehill.com/policy/national-security/592861-these-people-have-been-subpoenaed-by-the-
jan-6-panel/) (last visited Apr. 1, 2022); see also Claudia Grisales, *House Panel Investigating the*

*Capitol Attack Orders 35 Companies to Preserve Records*, NPR, (available at: https://www.npr.org/2021/08/30/1032615984/house-panel-investigating-the-capitol-attack-orders-35-companies-to-preserve-rec) (last visited Apr. 2, 2022) (hereinafter "*Telecomm Preservation Letters*") (explaining that the Select Committee requested telecommunications and social media companies to preserve records relating to a non-public list of individuals). It is expected, because of Plaintiff Budowich's ties to former President Trump and individuals who planned former President Trump's rally at the Ellipse on January 6, 2021, Am. Compl. at ¶¶ 55, 57–64, that the Select Committee will subpoena other third-parties that maintain Plaintiffs' private information. For example, Defendant JPMorgan is not Plaintiffs' only financial institution. Further, the Select Committee has issued unnoticed subpoenas to numerous individuals' cellular phone carriers. See, e.g., Harris, 1:21-cv-03290-CJN (ECF No. 1); Mitchell v. U.S. House Select Cmte. to Investigate the Jan. 6th Attack on the U.S. Capitol, 1:22-cv-00250-CJN (ECF No. 1); *Telecomm Preservation Letters*. Thus, it is likely that Plaintiffs will be subject to additional unnoticed subpoenas directed to third-parties maintaining their private information.

Additionally, the Select Committee's repeated assertions that its process was lawful, despite allegations in the Amended Complaint to the contrary, allows Plaintiffs to "justifiably project repetition, albeit in a different setting, and involving different official actors." Doe, 696 F.2d at 113. In Doe, an Assistant United States Attorney subpoenaed the plaintiff's psychiatric medical records from the VA without notice. Id. at 110. The plaintiff filed a lawsuit asserting that the unnoticed subpoena had violated numerous laws and constitutional provisions. Id. The United States Attorney's Office moved to dismiss the complaint as moot and, in support, submitted declarations stating that "no use had been made of the VA records in connection with the grand jury matter, that in fact the records were of no value to the investigation concerning fraudulent collection of unemployment compensation, . . . that defendant law enforcement officers

contemplated no future acquisition or use of the records . . . that no copies of the records had been made, that no notes had been taken, and that few persons had had access to the records." Id. at 110–11. The defendants also offered to surrender the documents to the district court. Id. at 111. The district court dismissed the complaint as moot, but the D.C. Circuit reversed, finding that the plaintiff's declaratory judgment action concerning an executed subpoena remained a live controversy. Id. at 111, 114–15. The D.C. Circuit held that the case was not moot because the United States Attorney's Office adamantly argued that its conduct was lawful and the VA "supplied no indication in either forum that the VA would not again, upon official request, release Doe's files without affording him notice and opportunity to object." Id. at 113.

        In this instance, Select Committee Defendants have vigorously defended their actions, repeatedly asserting that they are lawful and authorized. See generally ECF No. 30; see also Doe, 696 F.2d at 113 ("Defendant-appellees' insistence . . . that their conduct was lawful indicates a risk we cannot dismiss as negligible that Doe may encounter repetition of the official conduct that gave rise to this suit."). Additionally, Defendant JPMorgan refuses to provide Plaintiffs with ten (10) days prior notice if it intends to produce additional documents to the Select Committee. See ECF No. 35; Doe, 696 F.2d at 113 (finding that because the VA provided no indication that it would not release plaintiff's records without notice and an opportunity to object, that "asserted apprehension concerning further VA disclosure of his existing or future records cannot be dismissed as fanciful."). Given the Select Committee's past conduct and actions, along with public comments by its Members regarding their investigation, it is likely that the Select Committee will subpoena other third-parties that maintain Plaintiffs' private information. Therefore, the Court should find that Defendants' actions are likely to recur and consequently that Plaintiffs' claims are not moot.

**C. <u>Plaintiffs Will Suffer Irreparable Damages and Harm Absent Judicial Relief</u>.**

Finally, the continuing failure and refusal of the Select Committee Defendants to return the private financial records of Plaintiffs to Defendant JPMorgan, as demanded, will result in irreparable harm to Plaintiffs.  First, given the nature of Plaintiff Budowich's occupation and line of business, his financial records contain information protected by the First Amendment concerning his clients. <u>See</u> Am. Compl. ¶¶ 104–14. Second, aspects of Plaintiff Budowich's business dealings rely on discretion, such that disclosure of any payments by clients would chill and threaten the very existence of his enterprise. <u>Id.</u> Third, Plaintiff Budowich will suffer irreparable injury to his reputation and goodwill if his private financial records are not removed from the public domain and restored to the sole custody of his financial institution.

The continuing failure and refusal of Select Committee Defendants to disgorge, promptly return, sequester, or destroy private financial records belonging to Plaintiffs, is particularly imminent and acute in light of the Select Committee's planned "televised hearings" and release of a "series of reports" to "reveal their findings" as it prepares to "go public" in the coming months. <u>See</u> Associated Press, "Jan. 6 Committee Prepares to Go Public as Findings Mount," U.S. News (Jan. 2, 2022).  While it is a harm and affront to the right of financial privacy of Plaintiffs that the Select Committee Defendants have obtained the private financial records concerned, the gravity of the harm suffered by Plaintiffs is due to increase exponentially as the Select Committee makes public its findings, reports, and supporting evidence therefor.  <u>See</u> Benjamin Siegel & Katherine Faulders, "House Jan. 6 committee faces time crunch ahead of public hearings," ABC News (Mar. 30, 2022) (available at  [https://abcnews.go.com/US/house-jan-committee-faces-time-crunch-ahead-public/story?id=83765172](https://abcnews.go.com/US/house-jan-committee-faces-time-crunch-ahead-public/story?id=83765172)) (last visited Apr. 8, 2022) (stating that public hearings to commence May 2022).

II.   **THE RIGHT TO FINANCIAL PRIVACY ACT APPLIES TO JPMORGAN'S PRODUCTION OF PRIVATE FINANCIAL RECORDS TO THE SELECT COMMITTEE.**

The Right to Financial Privacy Act, 12 U.S.C. §§ 3401-23 ("RFPA") provides for liability of agencies or departments of the United States or financial institutions upon violation of RFPA provisions, including fines, actual damages, punitive damages for "willful or intentional" violations, and an award of costs and reasonable attorney's fees as determined by the Court.  See 12 U.S.C. § 3417(a).  RFPA also provides for disciplinary action by agents or employees of departments or agencies where "an officer or employee acted willfully or intentionally with respect to the violation."  See id. § 3417(b).  Finally, "in addition to any other remedy," RFPA provides for injunctive relief, which "shall be available to require that the procedures of this chapter are complied with."  See id. § 3418.

In pertinent part, RFPA provides that:  "No financial institution, or officers, employees or agent of the financial institution, may provide to any Government authority access to or copies of, or the information contained in, the financial records of any customer except in accordance with the provision of this chapter."  Id. § 3403(a).  RFPA additionally mandates that "[a] financial institution shall not release the financial records of a customer until the Government authority seeking such records *certifies in writing* to the financial institution that it has complied with the applicable provisions of this chapter."  Id. § 3403(b) (emphasis added); see also § 3411 ("deliver the records to the Government authority *upon receipt of the certificate required* under section 3402(b) of this title" (emphasis added)).  Thus, contrary to the JPMorgan's arguments, RFPA does impose an obligation on financial institutions.  See ECF No. 34 at 11.[1]

RFPA also provides that:

[N]o Government authority may have access to or obtain copies of, or the information contained in the financial records of any customer from a financial

---

[1] Plaintiffs respectfully concede that RFPA does not apply to Conservative Strategies, Inc., which is not a "partnership of five or fewer individuals."  See 12 U.S.C. §§ 3401(4).

institution unless the financial records are reasonably described and . . . such financial records are disclosed in response to an administrative subpoena or summons which meets the requirements of section 3405 of this title . . . [or] such financial records are disclosed in response to a formal written request which meets the requirements of section 3408 of this title.

§§ 3402(2), (5).  Both §§ 3405 (administrative subpoena or summons) and 3408 (formal written request) require that a copy of the subpoena or request be "served upon the customer or mailed to his last known address on or before the date on which the subpoena or summons was served on the financial institution." Additionally, the subpoena or request must be accompanied by a formal statutory notice that, within ten (10) days from the date or service or fourteen (14) days from the date of mailing the required notice, allows the customer to challenge the request for records. See §§ 3405, 3408.  Additional provisions of RFPA establish the right of a financial institution customer to challenge a request for their financial records in an appropriate United States District Court and that those proceedings should be completed or decided within seven (7) calendar days of the filing of any Government response.  See § 3410(a)-(b).

### A. **RFPA Applies to the Select Committee Subpoena.**

RFPA applies to any "Government authority," which is broadly defined as "any agency or department of the United States, or any officer, employee, or agent thereof . . . ."  § 3401(c). JPMorgan's argument that RFPA does not apply to Congress is inconsistent with the plain and unambiguous statutory text.

First, by its express terms, RFPA applies to "any Government authority" which is defined as "any agency or department of the United States . . . ."  §§ 3403(a), 3401(3).  As the United States Supreme Court has opined, "the phrase *any* . . .  suggests a broad meaning . . ." that when "[r]ead naturally . . . has an expansive meaning, that is, one or some indiscriminately of whatever kind." Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 219 (2008) (internal citations and quotations omitted).

As the "cardinal canon" of statutory construction, courts must "presume that a legislature says in a statute what it means and means in a statute what is says there . . . [and] when the words of a statute are unambiguous, then, this first canon is also the last:  judicial inquiry is complete." Public Citizen, Inc. v. Rubber Manufacturers Ass'n, 533 F.3d 810, 816 (D.C. Cir. 2008) (citing Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992)).  When the words of a statute are unambiguous, the courts have "no need to employ, nor any legitimate purpose in employing, canons of construction designed to reconcile confusing language."  Atkinson v. Inter-Am. Dev. Bank, 156 F.3d 1335, 1341 (D.C. Cir. 1998); see also United States v. Hunt, 526 F.3d 739, 744 (11th Cir. 2008) ("When the text of a statute is plain . . . [the Court] need not concern [itself] with contrary intent or purpose revealed by the legislative history.").

The terminology "any Government authority" defined as "any agency or department of the United States, or any officer, employee, or agent thereof" is so categorically plain and unambiguous that soon-to-be Supreme Court Associate Justice Ketanji Brown Jackson without hesitation or comment noted that "RFPA provides that a *federal government entity* may subpoena a bank to obtain financial records . . . ."  Nicksolat v. U.S. Dep't of Trans., 277 F. Supp. 3d 122, 124 (D.D.C. 2017).  This Court should conclude the same.

Another "fundamental canon of statutory construction" is that words should be "interpreted as taking their ordinary, contemporary, common meaning  . . . at the time Congress enacted the statute."  Wis. Cent. Ltd. v. United States, 138 S. Ct. 2067, 2074 (2018).  In accordance with the record and this authority, the term "Government authority" cannot be narrower than its ordinary meaning. The Legislative Branch is both an agency and department of the United States Government.

**B.  The U.S. House of Representatives is an Agency of the United States.**

The U.S. House of Representatives is defined and characterized as a "Legislative Branch Agency" within the Legislative Branch of the United States Government.  See "Branches of the U.S. Government," USAGov ("Official Guide to Government Information and Services") (available at https://www.usa.gov/branches-of-government#item-214496) (last visited Apr. 5, 2022).  Just like the United States Botanic Garden, United States Capitol Police, and United States Capitol Visitor Center, the United States House of Representatives operates, at least in part, in an administrative capacity and is therefore a "Government authority" and "agency . . . of the United States . . . ."  for purposes of RFPA.

The applicability of RFPA to the Select Committee proceedings at issue should come as no surprise given the nature of the express objectives and proclaimed goals of the Select Committee, to wit:   "investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021," "examine and evaluate evidence developed by relevant Federal, State, and local governmental agencies regarding the facts and circumstances" of January 6, 2021," and "build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other executive branch, congressional, or independent bipartisan or nonpartisan commission investigations."  See H. Res. 503, § 3(1)-(3).  These are purely and quintessentially law enforcement functions, the kind of which are governed by RFPA.

To demonstrate this point, the congressional subpoena to Defendant JPMorgan itself notes that production may be made "to any authorized staff member or the U.S. Marshals Service."  See Am. Compl., Ex. B at 1.  The U.S. Marshals Service is an Executive Branch agency.  See 28 U.S.C. § 561; see also U.S. Marshals Service Policy Directives at Section 11.2(C)(2)(d) (governing congressional subpoenas) and Section 11.1(D)(1)(a) ("Government Civil Process . . . subpoena . . .

originating from a government agency or U.S. District Court."). It is clear that while the Select Committee originates from a Legislative Branch entity, it is operating as a *de facto* "agency . . . of the United States . . . ." See 12 U.S.C. § 3401(3); see also Daniel Chaitin, "Capitol Riot Investigators 'Engaged' With US Marshals," Washington Examiner (Oct. 14, 2021) (Defendant Murphy: "We have engaged with a wide variety of law enforcement offices, including the U.S. Marshals, in order to issue the subpoenas . . . [and] we will use all of the agencies and all of the tools at our disposal to issue the subpoenas and enforce them."); Tom Hamburger, "Thompson Says Jan. 6 Committee . . . Weighing Criminal Referrals, Washington Post (Dec. 23, 2021) (Defendant Thompson: "I can assure you that if a criminal referral would be warranted, there would be no reluctance on the part of this committee to do that.").

**C. The U.S. House of Representatives is a Department of the United States.**

Congress is commonly referred to as a "department" of the federal government. See, e.g., Calif. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972); Nixon v. Admin'r of Gen. Servs., 433 U.S. 425, 443 (1977) ("each of the three general *departments* of government (must remain) entirely free from the control or coercive influence, direct or indirect, of either of the others . . . .") (emphasis added); see also Oetjen v. Central Leather Co., 246 U.S. 297, 311 (1918) (referring "to the executive and legislative – 'the political' – *departments* of the government"); Ping v. U.S., 130 U.S. 581, 628 (1889) ("the legislative *department* of the government") (emphasis added); Marbury v. Madison, 5 U.S. 137, 177 (1803) (referring to the Judicial Branch as the "judicial department"); Schneider v. Kissinger, 412 F.3d 190, 194 (D.C. Cir. 2005) (referring to the executive and legislative "*departments*" of the government) (emphasis added).

Indeed, in the five (5) years before and after passage of RFPA, the Supreme Court and the D.C. Circuit referred to Congress as a department at least six (6) times. See, e.g., Palmore v. United

States, 411 U.S. 389, 406 (1973) ("Moreover, these courts, constituted as they were, and being closer to the legislative department . . . ."); Consumers Union of U. S., Inc. v. Periodical Correspondents' Ass'n, 515 F.2d 1341, 1346 (D.C. Cir. 1975) ("[W]e are of the opinion that this case is nonjusticiable because it involves matters committed by the Constitution to the Legislative Department . . . ."); Buckley v. Valeo, 424 U.S. 1, 271 (1976) (White, J., concurring in part and dissenting in part) ("The basic approach was that official power should be divided among the Executive, Legislative, and Judicial Departments."); Pacifica Found. v. F.C.C., 556 F.2d 9, 26 n.24 (D.C. Cir. 1977) (Bazelon, C.J., concurring) ("The Banzhaf court relied squarely on the announced policy of both the executive and legislative departments, which were themselves based on convincing evidence, that cigarettes are carcinogens."); Washington v. Confederated Tribes of Colville Indian Rsrv., 447 U.S. 134, 153 (1980) ("In these respects the present cases differ sharply from Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S. Ct. 1011, 55 L.Ed.2d 209 (1978), in which we stressed the shared assumptions of the Executive, Judicial, and Legislative Departments that Indian tribes could not exercise criminal jurisdiction over non-Indians."). Even the 93d Congress, only a few years before the passage of RFPA, referenced the legislative "department" in its "Rules Governing Periodical Press Gallery." See Cong. Directory, 93d Cong., 1st Sess., 1973, pp. 916-17 (prohibiting press gallery admittance to anyone "employed in any legislative or executive department of the Government."). Congress' referral to itself as a Department of the United States Government contemporaneous with its implementation of RFPA is persuasive evidence that it intended for RFPA to apply to the legislature.

D. **The Purpose, Context, Structure, and Internal Provisions of RFPA Demonstrate the Act Applies to Congress**.

Even if this Court were to look beyond the plain and unambiguous statutory text of § 3401(3), it should apply "the familiar interpretative canon *noscitur a sociis*," which means "a word is known by the company it keeps" and dictates that the Court should "look to the context in

which the words appear." McDonnell v. U.S., 136 S. Ct. 2355, 2368 (2016) (citing Yates v. United States, 135 S. Ct. 528, 1085 (2015).

The term "any Government authority" is defined as "any agency or department of the United States . . . ." See 12 U.S.C. §§ 3403(a), 3401(3). This provision is broad and expansive. It was also enacted in response to the United States Supreme Court decision in United States v. Miller, 425 U.S. 435, 440 (1976), which held that a bank customer had no Fourth Amendment right to prevent a bank from disclosing his financial records in response to a grand jury subpoena. Nicksolat v. U.S. Dep't of Transp., 277 F. Supp. 3d 122, 124 (D.D.C. 2017) (Jackson, J.).

RFPA was designed to strike a balance between customers' right of privacy and the need for law enforcement agencies to obtain financial records pursuant to legitimate investigations. See H. Rep. No. 95-1383, at 33 (1978). The impetus behind RFPA was to protect a customer's right of privacy concerning disclosure of financial records without qualification as to what character of federal government entity was seeking the records.

If Congress wanted to exempt itself from RFPA, it had the chance and declined to do so. A draft bill submitted by the United States Department of Justice and the Treasury Department would have explicitly covered access to financial records by Congress and distinguished Congress from "any agency or department of the United States." See Electronic Funds Transfer & Financial Privacy: Hrgs. on S. 2096, S. 2293, & 1460 Before the Subcomm. On Fin. Insts. of the S. Comm. on Banking, Housing & Urban Affairs, 95th Cong. 397 (1978). However, given the already broad and expansive definition of Government authority at § 3401(3), Congress apparently felt no need to state the obvious.

Further, at § 3413(j), RFPA specially exempts circumstances where "financial records are being sought by the Government Accountability Office." § 3413(j). The United States Government Accountability Office ("GAO") is a Legislative Branch government agency that

provides auditing, evaluation, and investigative services for Congress.  See Bowsher v. Synar, 478 U.S. 714, 731 (1986); Cause of Action v. NARA, 753 F.3d 210, 213-14 (D.C. Cir. 2014) (GAO is among the "legislative agencies"); see also U.S. Government Accountability Office (available at https://www.gao.gov/about) (last visited Jan. 3, 2022).  If RFPA was limited to the Executive Branch, then there would be no need to provide an exemption for the GAO, let alone a partial one. It follows that Congress appreciated that RFPA applied to its activities, given that it specifically exempted certain of its authorities from the Act's coverage.  But Congress did not intend to exclude itself from RFPA's modest protections.

At the time it enacted RFPA, unlike the present circumstances, Congress was more concerned with protecting individual rights to financial privacy than arguing it is above the law. It would be surprising if Congress determined to expand privacy rights of financial customers, yet at the same time provide a wholesale exemption for its own subpoenas.

The Select Committee Defendants argue that RFPA's definition of "Government authority" extends only to the Executive Branch and not more broadly to Congress.  See ECF No. 33-1 at 13.  That reading does not work.  To begin, the Select Committee Defendants would ask this Court to read an implied exception into the statutory scheme.  Although RFPA contains a number of specific exemptions, see, e.g., §§ 3413(c) (tax proceedings); 3413(g) (certain law-enforcement inquiries); 3413(i) (grand jury subpoenas), it does not provide a general exemption for congressional subpoenas.  "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."  United States v. Smith, 499 U.S. 160, 167 (1991).

Moreover, the statutory context confirms that Congress expected RFPA to apply beyond the Executive Branch.  Notably, the statute specifically addresses the one circumstance where Congressional inquiries are *not* subject to RFPA's procedures:  when the records request is from

"a duly authorized committee or subcommittee of Congress" to "any officer or employee of a supervisory agency."  § 3412(d).  If congressional subpoenas were never intended to come within RFPA's scope, there would be no reason to include this provision; any other interpretation would render this provision superfluous.  See Duncan v. Walker, 533 U.S. 167, 167 (2001) (stating that the judiciary must avoid "treat[ing] statutory terms as surplusage"); see also Nat'l Ass'n Manufacturers v. Dep't of Defense, 138 S. Ct. 617, 632 (2018) (stating that the judiciary is "obliged to give effect, if possible, to every word Congress used . . . .").  In contrast to any contrary reading, Plaintiffs' interpretation gives this provision a logical purpose:  when a supervisory agency has already obtained these documents (presumably in compliance with RFPA's procedures), Congress is not required to go through RFPA's notice and certification procedures anew.  Of course, the congressional subpoena at issue was directed to Defendant JPMorgan, and not a supervisory agency; accordingly, § 3412(d) provides no authority for the Select Committee's receipt of private financial records in this instance.

Further, Defendants interpretation of Government authority would have perilous consequences, providing Congress unfettered authority to investigate every detail of the personal life of any political opponent or associate with endless subpoenas to his accountants, bankers, lawyers, doctors, family, friends, and anyone else with information the Select Committee finds interesting.  This cannot be the case.  Moreover, this result would betray the text, context, and purpose of RFPA, which is to provide safeguards and a process in light of the "serious concern for the privacy interests of individuals in their bank records." Botero-Zea v. United States, 915 F. Supp. 614, 619 (S.D.N.Y. 1996).

At bottom, Congress is not exempt from the procedures outlined in RFPA.  Accordingly, RFPA covers the congressional subpoena at issue and Defendant JPMorgan's unlawful production of Plaintiffs' private financial records violated the statute.  Neither Defendant JPMorgan nor the

Select Committee made any attempt to comply with RFPA.  The Select Committee did not certify to Defendant JPMorgan that it provided the requisite notice to Plaintiffs in accordance with RFPA.  See § 3403(b); see also § 3411.  And Defendant JPMorgan went on to produce Plaintiffs' private financial records absent this required certification.  Defendant JPMorgan therefore had no authority to disclose the private financial records of Plaintiffs pursuant to a congressional subpoena and thus violated express provisions of RFPA.[2]

### E. The Amended Complaint Sufficiently Alleges Actual and Punitive Damages under RFPA.

Defendant JPMorgan incorrectly argues that Plaintiffs failed to adequately plead actual and punitive damages.  See ECF No. 34 at 11-14.  As a threshold point, Plaintiffs sufficiently plead actual (nominal) damages.  See Am. Compl. at ¶¶ 172-73.  In addition, as discussed *infra* at II.C, Plaintiff Budowich is now in jeopardy of suffering irreparable injuries to his reputation and goodwill as a professional political consultant and strategist due to the imminent disclosure of his private and First Amendment protected financial information and records by the Select Committee.

Additionally, RFPA allows for punitive damages in cases of "willful or intentional" violations, along with an award of costs and reasonable attorney's fees as determined by the Court.  § 3417(a).  For purposes of RFPA, "intentional or willful" conduct "means more than gross negligence" and requires actions "so patently egregious and unlawful that anyone undertaking the conduct should have known it is unlawful." Bond v. U.S. Postal Serv. Fed. Credit

---

[2] Additionally, in light of the Select Committee's unequivocal declaration that its subpoena only compelled production of records up to and including November 23, 2021, see ECF No. 28 at ¶ 3, any production of Plaintiffs' private financial records by Defendant JPMorgan for any period after November 23, 2021, was without any lawful authority whatsoever and constitutes a clear violation of RFPA.  This explains why Defendant JPMorgan has repeatedly refused to disclose to Plaintiffs whether it produced any financial records beyond November 23, 2021, and further highlights the need for discovery and compulsory process in this action.

Union, 164 F. Supp. 3d 740 (D. Md. 2015) (citing Taylor v. Dep't of Air Force, 18 F. Supp. 2d 1184, 1192 (D. Colo. 1998)). Plaintiffs allege the requisite conduct for punitive damages under RFPA. Am. Compl. ¶¶ 66–75, 95–114.

Plaintiffs were not afforded the opportunity to challenge the subpoena before Defendant JPMorgan disclosed private financial records of Plaintiffs despite Defendant JPMorgan and the Select Committee having actual notice that Plaintiffs were bringing an imminent legal challenge to the congressional subpoena. Id. ¶¶ 67–74. Plaintiffs were given less than twenty-four (24) hours to file a complaint and motion for temporary restraining order *and* obtain a court order restraining Defendant JPMorgan from releasing the private financial records. Id. ¶¶ 69–72. This all occurred on a federal holiday—Christmas Eve.  This Court was closed.  Congress was closed.  Banks were closed.   Nonetheless, Defendant JPMorgan unreasonably refused to delay its self-selected Christmas Eve production deadline to the Select Committee so that Plaintiffs' challenge could be adjudicated by the Court.  See Am. Compl., Ex. J (Select Committee Investigative Counsel: "the current December 24 deadline is a date that JPMC selected").

Plaintiffs have made sufficient factual allegations to state a claim under RFPA, including allegations of both actual and punitive damages. Plaintiffs' claims for relief are plausible and support reasonable inferences that Defendant JPMorgan is liable under the theories alleged.[3]  See Twombly, 550 U.S. at 570; Iqbal, 556 U.S. at 678.

---

[3] Defendant JPMorgan's averment it thought it was responding to "a facially valid subpoena from a congressional committee," see ECF No. 34 at 31, is without merit.  Certainly, the several verbal and written protestations by Plaintiffs' counsel, citing RFPA among other authorities, combined with its actual knowledge of an imminent legal challenge in this Court, see Am. Compl., Exs. G & I, all put Defendant JPMorgan on sufficient notice that its production of Plaintiffs' private financial records to the Select Committee involved far more than a routine response.  Defendant JPMorgan was far from innocent and clearly culpable for its improper and unlawful production to the Select Committee.

III.   **PLAINTIFFS SUFFICIENTLY ALLEGE CONSTITUTIONAL CLAIMS AGAINST DEFENDANT JPMORGAN BECAUSE IT OPERATED AS A STATE ACTOR.**

   A.  **Defendant JPMorgan's Conduct Constitutes State Action.**

Defendant JPMorgan, in responding to the Select Committee's subpoena and providing Plaintiffs' private financial records, operated as a state actor. In determining whether a private entity's actions can be deemed state action, a court looks to "the specific conduct of which the plaintiff complains," and then asks whether such conduct is "fairly attributable to the state." Brentwood Acad. v. Tenn. Sec. Sch. Athl. Ass'n, 531 U.S. 288, 295 (2001). In making this determination the court considers "a host of facts" that "lack rigid simplicity." Id. at 295–96. "[A] challenged activity may be state action when it results from the [government's] exercise of 'coercive power,' when the [government] provides 'significant encouragement, either overt or covert,' or when a private actor operates as a 'willful participant in joint activity with the [government] or its agents[.]'" Id. (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982); Lugar v. Edmondson Oil Co., 457 U.S. 922, 941 (1982)). The Supreme Court has "consistently held that a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment." Lugar, 457 U.S. at 941; see also Adickes v. S. H. Kress & Co., 398 U.S. 144, 171 (1970) (private restaurant's discrimination under compulsion of state law was state action).

Defendant JPMorgan repeats throughout its Motion that it was required to comply with the subpoena. See ECF No. 34 at 17. But this self-professed requirement is exactly what made Defendant JPMorgan a state actor. See Adickes, 398 U.S. at 171; Lugar, 457 U.S. at 941. This is because a private actor is considered a state actor where it is "subjected to the 'coercive power' of the state or 'significant encouragement, either overt or covert' by the state . . . ." Simms v. D.C., 699 F. Supp. 2d 217, 224 (D.D.C. 2010) (quoting Brentwood Acad., 531 U.S. at 296). Additionally, the Supreme Court has found state action by private entities that effectuate a search

under compulsion of federal law. <u>Skinner v. Ry. Lab. Executives' Ass'n</u>, 489 U.S. 602, 614 (1989). In <u>Skinner</u>, 489 U.S. at 614, the Supreme Court found that the railroad's post-accident breath and urine test constituted state-action controlled by the Fourth Amendment because federal regulation required the tests. <u>Id.</u> ("A railroad that complies with the provisions of Subpart C of the regulations does so by compulsion of sovereign authority, and the lawfulness of its acts is controlled by the Fourth Amendment."). Therefore, Defendant JPMorgan's actions were state action.

Additionally, Defendant JPMorgan was a state actor because it was "a willful participant in a joint activity with the" Select Committee. <u>See Brentwood Acad.</u>, 531 U.S. at 296; Am. Compl. at ¶¶ 68–75. Plaintiffs alleged that Defendant JPMorgan and the Select Committee acted in concert to deny Plaintiffs the opportunity to challenge the subpoena. <u>See</u> Am. Compl. at ¶¶ 71–75. This sufficiently demonstrates that Defendant JPMorgan and the Select Committee acted together to infringe Plaintiffs' constitutional rights. Accordingly, Defendant JPMorgan's actions constituted state action.

Defendant JPMorgan's citation to cases finding that banks were not state actors is irrelevant; each cited case is inapposite and of no analytical value. <u>See Swope v. Northumberland Nat. Bank</u>, 625 F. App'x 83, 86 (3d Cir. 2015) (finding plaintiff failed to allege that bank was acting under color of law for § 1983 action); <u>Dailey v. Bank of Am.</u>, 106 F. App'x 533, 533 (9th Cir. 2004) (affirming, without analysis, dismissal of *pro se* complaint in a three-sentence opinion); <u>Elsman v. Standard Fed. Bank</u>, 46 F. App'x 792, 798 (6th Cir. 2002) (stating that the plaintiff did "not argue that the activities of these private actors [could] be attributed to the state and [the Sixth Circuit panel] decline[d] to make that argument for him."); <u>Hoskins v. TCF Nat. Bank</u>, 248 F. App'x 742, 743 (7th Cir. 2007) (affirming dismissal of *pro se* prisoner complaint, in seven sentence opinion, "because his allegations against the bank describe[d] purely private business activities."). None of these cases hold that a bank can never be deemed a state actor, none provide substantive

-26-

analysis on when a bank could be acting pursuant to government compulsion, and none are even binding in their own circuits.

Ultimately, Defendant JPMorgan either acted under compulsion or as a willful joint participant. Under either scenario, its actions were state action and Defendant JPMorgan is thus liable under Plaintiffs' constitutional claims. See New York Times Co. v. Sullivan, 376 U.S. 254, 265 (1964) (applying Fourteenth Amendment to private parties in First Amendment context); Brentwood, 531 U.S. at 303 (holding that private entity was state actor under First Amendment claim); Skinner, 489 U.S. at 614 (finding that private railroad was state actor under Fourth Amendment); Lugar, 457 U.S. at 941 (holding that private entity violated due process clause).[4]

**B.  Plaintiffs Alleged Protectible Interests Supporting Their Constitutional Claims.**

Plaintiffs assert several liberty and property interests warranting due process protection. "'[T]he existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law.' In other words, property interests 'attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.'" Ralls Corp., 758 F.3d at 315 (citations omitted) (quoting Phillips v. Wash. Legal Found., 524 U.S. 156, 164 (1998), and Paul v. Davis, 424 U.S. 693, 710 (1976)). "[T]hat the property interest is recognized under state law is enough to trigger the protections of the Due Process Clause." Id. at 316. Further, "liberty interests protected by the fifth amendment may arise either from the Constitution or from federal . . . law." Mosrie v. Barry, 718 F.2d 1151, 1159 (D.C. Cir. 1983). Federal law can create a liberty interest, safeguarded by the Fifth Amendment, when the federal law provides special protection for a given interest beyond the

---

[4] Many cases discussing when a private party's conduct can qualify as "state action" arise under the Due Process Clause of the Fourteenth Amendment. However, because "[t]he Fourteenth Amendment is substantially the same [as the Fifth Amendment,] cases analyzing States' liability under the Fourteenth Amendment can be relied upon to analyze the [United States'] liability under the Fifth Amendment." Colbert v. D.C., 78 F. Supp. 3d 1, 8 n.5 (D.D.C. 2015).

general protection of tort law. Cf. id. (explaining that D.C. law did not provide special protection to reputation beyond general tort law and therefore injury to reputation was not a protectible liberty interest under the Fifth Amendment). To determine whether a particular statute creates a constitutionally protected property interest, [the court] asks whether the statute or implementing regulations place 'substantive limitations on official discretion.'" Wash. Legal Clinic for the Homeless v. Barry, 107 F.3d 32, 36 (D.C. Cir. 1997) (quoting Olim v. Wakinekona, 461 U.S. 238, 249 (1983)). For a statute, regulation, or rule to create a protectible liberty interest it must use "'explicitly mandatory language,' in connection with the establishment of 'specified substantive predicates' to limit discretion . . . ." Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 463 (1989).

Here, Plaintiffs allege multiple protectible interests under the Fifth Amendment's Due Process Clause. First, Plaintiffs allege a valid First Amendment interest. Am. Compl. ¶¶ 104–14; see Mosrie, 718 F.2d at 1159 (stating that Constitution can give rise to interests protected by Fifth Amendment). The First Amendment creates inherent liberty interests that are protectible under the Fifth Amendment's Due Process Clause. See Mosrie, 718 F.2d at 1159; Sherrill v. Knight, 569 F.2d 124, 128 (D.C. Cir. 1977) ("[B]ecause the denial of a pass potentially infringes upon first amendment guarantees[,] [s]uch impairment of this interest cannot be permitted to occur in the absence of adequate procedural due process."). Accordingly, Plaintiffs' First Amendment interests warranted an opportunity to challenge the subpoena before the records were turned over. See Eastland v. U.S. Servicemen's Fund, 421 U.S. at 501 n.14 (stating that Circuit Court correctly found that District Court had jurisdiction to evaluate First Amendment Claim in relation to legitimate legislative purpose); U.S. Servicemen's Fund v. Eastland, 488 F.2d at 1259–60 (holding that the plaintiff's assertion of First Amendment right in subpoenaed documents authorized federal court to entertain action challenging congressional subpoena to third party record holder).

Further, Plaintiffs possess a protectible interest pursuant to RFPA. See 12 U.S.C. § 3402. RFPA was "a congressional response to the Supreme Court decision in United States v. Miller" and "is intended to protect the customers of financial institutions from unwarranted intrusion into their records . . . ." H.R. Rep. No. 95-1383, at 9305–06 (1978). RFPA contains substantive predicates that limit discretion, i.e. the requirements contained in §§ 3404–08. See Thompson, 490 U.S. at 463. Further, RFPA mandates that, absent satisfying the substantive predicates, no governmental entity may have access to an individual's financial records. § 3402. Thus, RFPA qualifies as a statute creating a protectible Fifth Amendment interest because it contains "explicitly mandatory language," and "specified substantive predicates to limit discretion . . . ." Thompson, 490 U.S. at 463 (quotations omitted).

Lastly, the Supreme Court has repeatedly emphasized that the proper method for challenging congressional subpoenas to third parties—including those holding financial records—is for the individual whose information is sought to sue to challenge the subpoena. See Mazars, 140 S. Ct. at 2035; Eastland, 421 U.S. at 501 n.14. In Eastland, the Supreme Court stated that the district court properly entertained the action because when Congress subpoenas records from a third party, the normal process for challenging the subpoena is unavailable to the individual whose records are at issue. 421 U.S. at 501 n.14. Thus, the only way to challenge whether the subpoena furthers a legitimate legislative purpose is to sue to challenge the subpoena. Id.; see also Eastland, 488 F.2d at 1259–60 (explaining that the proper process is to sue to challenge the subpoena in court because "plaintiffs have no alternative means to vindicate their rights.").

Despite Defendants' assertions, United States v. Miller, 425 U.S. 435, 440 (1976) does not compel the opposite conclusion. First, Miller involved a Fourth Amendment claim and relied on the zone of privacy analysis, which differs from protectible interest determination under the Fifth Amendment. This is significant because the Fifth Amendment protects liberty and property

interests created by statute. Congress enacted RFPA in response to the Supreme Court's decision in <u>Miller</u> and, thus, its application is inappropriate here. Moreover, <u>Miller</u> did not involve the expansive breadth of documents requested here. <u>See</u> Am. Compl., Ex. B.

These distinguishing factors are equally applicable to Plaintiffs' Fourth Amendment claim. In <u>Miller</u>, the defendant was being investigated for tax violations as a whiskey distiller. 425 U.S. at 436. The subpoena requested less than four months of financial records. <u>Id.</u> at 437–38. Government agents were allowed to review microfilm and were provided with checks, deposit slips, two financial statements, and three-monthly statements. <u>Id.</u> at 438. The Supreme Court noted that the narrowly tailored request for documents was significant to its decision. <u>Id.</u> at 444 n.6 ("We are not confronted with a situation in which the Government . . . has made a wide-ranging inquiry . . . . Here the Government has exercised its powers through narrowly directed subpoenas Duces tecum subject to the legal restraints attendant to such process." (quoting <u>Cal. Bankers Assn. v. Shultz</u>, 416 U.S. 21, 78-79 (1974) (Powell, J., concurring))). Here, the subpoena requested expansive records spanning more than a year without any relation to the purported legitimate legislative purpose. <u>See</u> Am. Compl., Ex. B. Moreover, Financial institutions collect and compile much more information—both in type and amount—than was conceivable when <u>Miller</u> was decided. Plaintiffs believe that the vastness of information produced to the Select Committee will differ drastically from the limited documents in <u>Miller</u>, and more closely resemble the detailed, comprehensive records that the Supreme Court has now found protectible. <u>See</u> <u>Carpenter v. United States</u>, 138 S. Ct. 2206 (2018) (finding CSLI tracking information protectible under the Fourth Amendment, notwithstanding <u>Miller</u>, because <u>Miller</u> considered 'the nature of the particular documents sought' to determine whether 'there [wa]s a legitimate expectation of privacy concerning their contents.'" (quoting <u>Miller</u>, 425 U.S. at 442)). Of course, examining whether

Plaintiffs have a legitimate expectation of privacy in the records provided to the Select Committee

can only be accomplished after discovery.

## IV.   PLAINTIFF BUDOWICH SUFFICIENTLY STATES CLAIMS UNDER CALIFORNIA LAW.

### A.   California Invasion of Privacy.

The Amended Complaint states an invasion of privacy claim under the California

Constitution. "A 'party claiming a violation of the constitutional right of privacy established in

article I, section 1 of the California Constitution must establish (1) a legally protected privacy

interest, (2) a reasonable expectation of privacy under the circumstances, and (3) a serious invasion

of the privacy interest.'" Tourgeman v. Collins Fin. Servs., Inc., No. 08-CV-01392 JLS NLS, 2009

WL 6527758, at *2 (S.D. Cal. Nov. 23, 2009) (quoting Int'l Fed'n of Prof'l & Technical Eng'rs v.

Superior Court, 165 P.3d 488, 499 (Cal. 2007)).

The first and second elements are easily established. Plaintiff Budowich "has a legally

protected privacy interest in his private financial information." Id. [5] "It is also 'established' under

California law 'that a bank customer has [ ] a reasonable expectation of privacy . . . when his bank

records are subpoenaed.'" Lin v. Suavei, Inc., No. 3:20-CV-862-L-AHG, 2021 WL 6077621, at

*5 (S.D. Cal. Dec. 23, 2021) (quoting Athearn v. State Bar, 571 P.2d 628, 629 (Cal. 1977)).

The third element, "whether a defendant's actions were 'highly offensive to a reasonable

person[,]' requires a holistic consideration of factors such as the likelihood of serious harm to the

victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether

countervailing interests or social norms render the intrusion inoffensive." In re Facebook, Inc.

Internet Tracking Litig., 956 F.3d 589, 606 (9th Cir. 2020), cert. denied sub nom. Facebook, Inc.

v. Davis, 141 S. Ct. 1684, 209 L. Ed. 2d 464 (2021). This determination is factual and is typically

---

[5] Plaintiff Conservative Strategies, Inc. respectfully concedes that it cannot assert an invasion of
privacy claim under the California Constitution.

inappropriate for the pleading stage. Id. ("The ultimate question of whether Facebook's tracking and collection practices could highly offend a reasonable individual is an issue that cannot be resolved at the pleading stage."); see also, e.g., Strawn v. Morris, Polich & Purdy, LLP, Cal. Rptr. 3d 216, 227 (Cal. Ct. App. 2019); In re Google Assistant Priv. Litig., 457 F. Supp. 3d 797, 830 (N.D. Cal. 2020) ("[D]etermining whether an intrusion is 'highly offensive' requires a fact-intensive inquiry . . . . Such an inquiry cannot be conducted at the motion to dismiss stage where, as here, there are open factual questions.").

Here, Plaintiffs allege that Defendant JPMorgan received the subpoena on November 23, 2021, Am. Compl. at ¶¶ 4, 67, self-selected an extended response deadline of December 24, 2021, Am. Compl. at ¶ 68, and then waited until it knew Plaintiff Budowich was in Washington, D.C. for his deposition to provide him mere days' notice of its intent to produce his private financial records, Am. Compl. at ¶¶ 68–70. Defendant JPMorgan then refused to extend its self-selected deadline to allow Plaintiff Budowich to obtain a court order on his motion for temporary restraining order, produced Plaintiff Budowich's private financial records despite being on notice of his legal challenge to the subpoena, and then argued that Plaintiff Budowich's motion was moot because Defendant JPMorgan had already ignored it. Am. Compl. ¶¶ 72–74. These allegations could and should lead a reasonable juror to find Defendant JPMorgan's disclosure "highly offensive."

Moreover, the seriousness of Defendant JPMorgan's disclosure depends on a multitude of unresolved facts. For example, a jury would need to compare the information contained in the documents Defendant JPMorgan provided to the Select Committee with what Plaintiffs had already provided to the Select Committee and what the Select Committee actually needed to conduct a legitimate legislative inquiry. Cf. Strawn, Cal. Rptr. 3d at 227 ("Similarly, the seriousness of the privacy invasion worked by disclosure of the tax returns would depend on what

information was contained in the returns that was not also contained in the voluntarily disclosed financial documents from which the tax returns were prepared. In short, the seriousness of the alleged invasion of privacy presented a question of fact that could not be resolved on demurrer."). Additionally, whether Defendant JPMorgan intended to preclude Plaintiffs from having an opportunity to challenge the subpoena, whether it knew Mr. Budowich was in Washington D.C. for his deposition when it sent him notice, whether it normally halts production once it is on notice that a subpoena will be challenged, why it waited more than a month to provide notice to Plaintiffs, and why it chose Christmas Eve as its self-selected deadline are all factual questions that bear on whether a reasonable person would find Defendant JPMorgan's actions highly offensive.

Defendant JPMorgan also claims that its "competing interest" defeats any claim for invasion of privacy. ECF No. 34 at 24. However, to prevail on a competing interest defense, a defendant must "plead[] and prov[e], *as an affirmative defense*, that the invasion of privacy is justified because it substantively furthers one or more countervailing interests." Hill v. Nat'l Collegiate Athletic Ass'n, 865 P.2d 633, 657 (Cal. 1994) (emphasis added). Of course, Defendant JPMorgan has not pled anything and its assertion of an affirmative defense in its motion to dismiss is premature. See Berlin v. Bank of Am., N.A., 101 F. Supp. 3d 1, 26 (D.D.C. 2015) (declining to dismiss complaint based on affirmative defense).

Moreover, when a defendant raises a "competing interest" defense, a plaintiff can rebut such defense by "demonstrating the availability and use of protective measures, safeguards, and alternatives to defendant's [allegedly invasive] conduct that would minimize the intrusion on privacy interests." Los Angeles Police Protective League v. City of Los Angeles, No. CV 08-0784 GAF (RCX), 2010 WL 11622793, at *8 (C.D. Cal. Feb. 3, 2010) (citations and quotations omitted). Specifically, if "feasible safeguards are slipshod or nonexistent, or if defendant's legitimate objectives can be readily accomplished by alternative means having little or no impact on privacy

interests, the prospect of actionable invasion of privacy is enhanced,' despite the presence of the competing government interest." Id. (quoting Hill, 865 P.2d 633, 657).

Here, Defendant JPMorgan undertook no protective measures or safeguards and did not seek any alternatives to providing more limited information that was reasonably related to the inquiry at hand. Defendant JPMorgan could have, and should have, provided Plaintiff Budowich with sufficient notice that allowed him to challenge the subpoena, delayed responding until a court had ruled on the challenge, and demanded that the Select Committee implement safeguards for its customers' private financial information. Further, Defendant JPMorgan should have sought safeguards from the Select Committee for Plaintiff Budowich's information. Accordingly, Plaintiff Budowich has adequately alleged an invasion of privacy under the California Constitution and the Court should deny Defendant JPMorgan's motion as to Count VII.

**B.   Plaintiffs Have Alleged a Violation of the California's Unfair Competition Law's Unlawful Prong.**

California's Unfair Competition Law ("UCL") prohibits unlawful, unfair, or fraudulent business acts and practices. Cal. Bus. & Prof. Code § 17200. The UCL was designed to protect consumers, and, therefore, is framed in "broad sweeping language" and "provide[s] courts with broad equitable powers to remedy violations." Kwikset Corp. v. Superior Ct., 246 P.3d 877, 883 (2011) (quotations omitted).

Plaintiffs alleged violations of California's Unfair Competition Law under its unlawful prong. Defendant JPMorgan only argues in its motion that Plaintiffs fail to adequately allege a predicate violation for their unlawful prong claim. ECF No. 34 at 25. However, Defendant JPMorgan is incorrect; Plaintiffs have alleged several predicate violations supporting Count VIII.

Plaintiffs alleged a violation of the California Financial Information Privacy Act ("CalFIPA") as a predicate offense for Count VII. Defendant JPMorgan argues that Plaintiffs have not alleged a violation of CalFIPA because that act has an exception for liability based on

disclosure pursuant to a subpoena. But Defendant JPMorgan ignores that this argument is directly contrary to its position regarding Plaintiffs' RFPA claim. Specifically, CalFIPA prohibits a financial institution from disclosing nonpublic personal information "without the explicit prior consent of the consumer to whom the nonpublic personal information relates." Cal. Fin. Code § 4052.5. As Defendant JPMorgan points out, CalFIPA provides an exception to this prohibition to comply with "a properly authorized civil, criminal, administrative, or regulatory investigation or subpoena . . . ." (ECF No. 34 at 26 (quoting Cal. Fin. Code § 4056(b)(7))). First, the requirement that the subpoena be properly authorized would exclude the subpoena here because the Select Committee is not duly constituted. See Opp. to Motion to Dismiss by Select Committee (ECF No. 38 at Section II).  Second, a legislative subpoena is not civil, criminal, or regulatory. Black's Law Dictionary defines an administrative subpoena as "[a] subpoena issued by an administrative agency to compel an individual to provide information to the agency." *Subpoena*, BLACK'S LAW DICTIONARY (11th ed. 2019). To the extent the Court agrees with Defendants that the Select Committee is not an agency, then the subpoena at issue here does not qualify for the exceptions under section 4056(b)(7).[6]

Defendant JPMorgan's argument that CalFIPA is preempted by federal law is also wrong. First, Defendant JPMorgan points to no federal statute that conflicts with or expressly preempts CalFIPA. Moreover, to the extent that Defendant JPMorgan is arguing that compliance with CalFIPA "undermines" Congress's inherent power to investigate, this argument is also incorrect because conflict preemption does not apply here. Under conflict preemption, a state law is "preempted to the extent it actually conflicts with federal law . . . ." Silkwood v. Kerr-McGee

---

[6] Pursuant to Federal Rule of Civil Procedure 8(d)(3), Plaintiff is entitled to plead inconsistent theories for relief. However, Counts IV and VIII can be construed consistently if the Court or a jury were to find that the Select Committee (or Congress) is a department under RFPA and not an agency.

Corp., 464 U.S. 238, 248 (1984). A state law conflicts with federal law "when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress[.]" Id. (citations omitted).

Here, the requirements in CalFIPA can be practically enforced in conjunction with Defendant JPMorgan's obligation under the congressional subpoena without rendering compliance with both impossible. Defendant JPMorgan needed to seek Plaintiff Budowich's consent to release the records, and do so with sufficient time for Plaintiff Budowich to challenge the congressional subpoena *before* Defendant JPMorgan's compliance. This is the precise procedure the Supreme Court has directed for congressional subpoenas directed to third parties. See Mazars, 140 S. Ct. at 2035; Eastland, 421 U.S. at 501 n.14. Had Defendant JPMorgan provided meaningful notice to Plaintiffs, it would have met the spirit of the CalFIPA without shirking its responsibility under the congressional subpoena.

The Gramm-Leach-Bliley Act ("GLBA") likewise prohibits Defendant JPMorgan's disclosure. See 15 U.S.C. § 6802(a). The GLBA, like the CalFIPA, has an exception to this prohibition "to comply with a properly authorized civil, criminal, or regulatory investigation or subpoena or summons by Federal, State, or local authorities . . . ." Id. § 6802(e)(8); see also ECF No. 35 at p. 27 ("GLBA, however, explicitly permits financial institutions to disclose nonpublic personal information '[t]o comply with a properly authorized civil, criminal, or regulatory investigation or subpoena or summons by Federal, State, or local authorities.'" (quoting 12 C.F.R. § 1016.15(a)(7)(ii))). However, as with CalFIPA, a congressional subpoena is not civil, criminal, or regulatory. Thus, this exception does not apply. As it particularly relates to GLBA, Congress surely could have added its own subpoenas to the list of exceptions but chose not to do so. See *supra* at Section I.D (p. 16).

Further, as more fully explained in Section I above, Defendant JPMorgan's actions violated RFPA, which is also a predicate violation for the Unlawful Prong UCL claim.

Lastly, to the extent Defendant JPMorgan produced Plaintiffs' private financial records post-dating November 23, 2021, those records would not have been produced pursuant to a lawful subpoena (because the Select Committee only requested records up until November 23, 2021, see ECF No. 28) and would therefore violate CalFIPA, GLBA, RFPA, and other laws. See Am. Compl. ¶ 8. Accordingly, Defendant JPMorgan's motion to dismiss Count VIII should be denied.

**C.  Plaintiffs Have Alleged a Violation of the UCL Under its Unfair Prong.**

The UCL unfair prong creates a cause of action for business practices that are unfair even if not proscribed by some other law. In re iPhone Application Litig., 844 F. Supp. 2d 1040, 1072 (N.D. Cal. 2012) (citing Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 943 (Cal. 2003)). There are two tests for determining whether a business practice is unfair: the balancing test and the tethering test. Id. Under the balancing test, courts "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." Id. (quotation marks omitted) (quoting McKell v. Washington Mut., Inc., 49 Cal. Rptr. 3d 227, 240 (Cal. Ct. App. 2006)). The tethering test requires a plaintiff to demonstrate "that a practice violates public policy as declared by 'specific constitutional, statutory or regulatory provisions' or that the practice is 'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.'" Id. (quoting Bardin v. Daimlerchrysler Corp., 39 Cal. Rptr. 3d 634 (Cal. Ct. App. 2006)).

Here, Plaintiffs adequately alleged a violation of the UCL unfair prong. Plaintiffs allege that California has a strong public policy of restricting disclosure of consumer's private information and cite five different constitutional or statutory provisions demonstrating this strong public policy. See Am. Compl. at ¶ 188. The underpinning of this policy is that consumers have reasonable notice of disclosure of their private information. See, e.g., Cal. Fin. Code § 4051 ("The

Legislature intends for financial institutions to provide their consumers *notice and meaningful choice* about how consumers' nonpublic personal information is shared or sold by their financial institutions." (emphasis added)). Had Defendant JPMorgan provided Plaintiffs with reasonable notice, they would have been afforded due process to challenge the subpoena before the disclosure of records.

Plaintiffs also alleged that Defendant JPMorgan's conduct was immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and thus a violation of the unfair prong. Plaintiffs allege that Defendant JPMorgan intended to preclude any opportunity for Plaintiffs to challenge the production of their private financial information, Am. Compl. ¶¶ 68–75, and intended to violate Plaintiffs First Amendment Rights, id. ¶¶ 104–14. If proven, a reasonable jury could conclude that such conduct was unethical, oppressive, unscrupulous, and substantially injurious. Accordingly, Plaintiffs have sufficiently alleged a violation of the UCL unfair prong and Defendant JPMorgan's motion as to Count IX should be denied.

## **CONCLUSION**

Based on the foregoing, Plaintiffs respectfully request this Court deny the Motion to Dismiss Amended Complaint (ECF No. 34) filed by Defendant JPMorgan and promptly enter a Scheduling Order setting a Pretrial Conference in accordance with Rule 16, Federal Rules of Civil Procedure, and further directing the Parties to exchange initial disclosures and file a Report under Rule 26(f), Federal Rules of Civil Procedure.

Date:  April 8, 2022                          Respectfully submitted,

                                               **ABEL BEAN LAW, P.A.**

                                               *s/ Christopher W. Dempsey*
                                               CHRISTOPHER W. DEMPSEY
                                               DANIEL K. BEAN
                                               JARED J. BURNS
                                               100 N Laura Street, Suite 501
                                               Jacksonville, Florida 32202

Telephone:  (904) 944-4100
Fax:  (904) 944-4122
Email: cdempsey@abelbeanlaw.com
dbean@abelbeanlaw.com
jburns@abelbeanlaw.com

***Attorneys for Plaintiffs***