### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TAYLOR BUDOWICH,** *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 21-3366 (JEB)** |
| **NANCY PELOSI,** *et al.*, | |
| **Defendants.** | |

### <u>MEMORANDUM OPINION</u>

In the wake of last year's attempted insurrection, the House of Representatives established the Select Committee to Investigate the January 6th Attack on the United States Capitol. The House tasked the Committee with investigating and reporting the circumstances and causes of the riot and its interference with the peaceful transfer of power. In furtherance of that mission, the Committee issued subpoenas in late 2021 to Plaintiff Taylor Budowich and his bank, J.P. Morgan Chase Bank. The Committee sought Budowich's financial records, as it had reason to believe that he had directed significant funds from undisclosed sources to bankroll the promotion of the rally on the Ellipse that immediately preceded the attack on the Capitol. After Budowich sat for a deposition and produced responsive records, the bank — over his objection — also complied with the subpoena and disclosed documents to the Committee in late December.

Unhappy with this turn of events, Plaintiffs Budowich and his business, Conservative Strategies, Inc., brought this multiple-count lawsuit against Defendants Speaker Nancy Pelosi, the Select Committee, its members, and JPMorgan. Plaintiffs seek, among other things, the

return of the produced documents.  The Congressional Defendants and JPMorgan now separately move to dismiss on a number of grounds.  Because the Constitution's Speech or Debate Clause bars the claims against the Congressional Defendants and because Plaintiffs' variegated claims against JPMorgan bear their own assorted infirmities, the Court will grant Defendants' Motions.

**I.      Background**

      A.  <u>The Select Committee</u>

"On January 6, 2021, a mob professing support for then-President Trump violently attacked the United States Capitol in an effort to prevent a Joint Session of Congress from certifying the electoral college votes designating Joseph R. Biden the 46th President of the United States."  <u>Trump v. Thompson</u>, 20 F.4th 10, 15 (D.C. Cir. 2021), <u>cert. denied</u>, 142 S. Ct. 1350 (2022).  The "rampage left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol."  <u>Id.</u> (citations omitted).  In response to the attack, the House of Representatives adopted House Resolution 503, which established the Select Committee to Investigate the January 6th Attack on the United States Capitol.  <u>See</u> H.R. Res. 503, 117th Cong. § 3(1) (2021).

The Resolution directs the Committee to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol," "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol," and "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures" as necessary.  <u>Id.</u> § 4(a)(1)–(3).  Such "corrective measures" may include recommendations for any "changes in law, policy, procedures, rules, or regulations that could be taken" to prevent "future acts of violence . . . including acts targeted at American democratic institutions."  <u>Id.</u> § 4(c)(1).

The authorizing Resolution states that the Speaker of the House "shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." Id. § 2(a).  It also allows the Speaker to designate "one member to serve as chair of the Select Committee." Id. § 2(b).  The Amended Complaint alleges that, during the relevant period in this case, the Committee operated with only nine members, seven of whom are Democrats and two of whom are Republicans.  See ECF No. 30 (Am. Compl.), ¶ 77.

The Resolution also expressly incorporates Rule XI of the Rules of the House of Representatives.  See H.R. Res. § 5(c).  That incorporated rule, in turn, empowers the Committee "to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memoranda, papers, and documents as it considers necessary."  Rules of the U.S. House of Reps., 117th Cong., Rule XI.2(m)(1).  It also states that such subpoenas "may be issued to any person or entity." Id., Rule XI.2(m)(3).

B. Factual and Procedural History

Taking the facts alleged in the Amended Complaint as true — as the Court must at this stage — on November 22, 2021, the Committee served Budowich, who lives in California, with a subpoena for production of documents and testimony at a deposition.  See Am. Compl., ¶ 57.  In a cover letter accompanying the subpoena, Chairman Bennie Thompson advised Plaintiff that the Committee had "credible evidence of [his] involvement in and knowledge of the events within the scope of the Select Committee's inquiry."  ECF No. 30-1, Exh. A (Budowich Subpoena) at 4.  More specifically, the cover letter stated, the Committee had "reason to believe" that Budowich had directed "approximately $200,000 from a source or sources that was not disclosed" to pay for an "advertising campaign to encourage people to attend the rally held on the Ellipse in Washington, D.C. on January 6, 2021, in support of then-President Trump and his

allegations of election fraud." Id. (citations omitted).  This rally occurred just "before the attack on the Capitol," with the speakers "urging the crowd to 'fight much harder' and to 'stop the steal.'"  Id. at 5.  The subpoena thus sought Plaintiff's deposition and documents concerning financial transactions related to the rally, among other things.  Id. at 5–7.

Budowich substantially complied with the subpoena.  On December 14, he produced 391 responsive documents, "including all financial account transactions for the time period December 19, 2020, to January 31, 2021, in connection with the Ellipse Rally."  Am. Compl., ¶ 60; see also ECF No. 30-4, Exh. D (Budowich Response to Subpoena).  He also made an additional production several days later.  See Am. Compl., ¶ 61.  Plaintiff then sat for a four-hour deposition on December 22, 2021, before the Committee in Washington, during which he "answered questions concerning payments made and received regarding his involvement in the planning" of the rally.  Id., ¶¶ 63–64.

On November 23, meanwhile, the Committee also issued a subpoena to JPMorgan, Budowich's bank.  Id., ¶ 4; see ECF No. 30-2, Exh. B (JPMorgan Subpoena).  That subpoena sought Budowich's bank records dating back to October 2020.  See JPMorgan Subpoena at 5–6.  On December 16, Plaintiff's counsel notified JPMorgan that he "objects to JP Morgan Chase disclosing his customer/banking records to Congress without a warrant."  ECF No. 30-5, Exh. E (Budowich Letter to JPMorgan) at 2.  The bank responded to him days later, explaining that it "will comply with this subpoena in a timely manner unless it receives documentation legally obligating it to stop taking such steps."  ECF No. 30-6, Exh. F (JPMorgan Letter to Budowich) at 2.  It further advised Plaintiff that any such documentation must be received by December 24, the deadline for JPMorgan's response to the subpoena.  Id.; see ECF No. 30-10, Exh. J, at 2.  Having

not received such documentation, JPMorgan produced a number of records responsive to the subpoena to the Committee on December 24.  See Am. Compl., ¶ 73.

That same day, Budowich and Conservative Strategies filed this lawsuit against Speaker Pelosi, the Committee, its members, and JPMorgan.  See ECF No. 1 (Complaint).  They concurrently filed a Motion for Temporary Restraining Order, which the Court denied without prejudice as moot after a hearing on December 29.  See Minute Order of Dec. 29, 2021. Plaintiffs refiled an Amended Motion for Temporary Restraining Order days later, which the Court again denied after allowing for briefing and holding another hearing.  See ECF No. 27 (TRO Hearing Transcript) at 32–34.

In early February 2022, the parties submitted a Joint Status Report.  The Congressional Defendants explained that, "to their knowledge, they have received all of the financial records requested, and do not anticipate issuing any more subpoenas to Defendant JPMorgan concerning Plaintiffs."  ECF No. 28 (JSR of Feb. 3, 2022) at 1.  They further stated that they believed that the initial subpoena "does not compel production of more financial records beyond Defendant JPMorgan's production made on December 24, 2021."  Id. at 2.  JPMorgan, for its part, stated that it "has no present intention to produce additional documents pursuant to the subpoena."  Id.

Later in February, Plaintiffs filed an Amended Complaint against the Congressional Defendants and JPMorgan.  See Am. Compl. at 1–2.  This pleading — the operative one here — contains nine counts.  Id., ¶¶ 115–95.  Two allege that the Committee was not "duly authorized" (Count I) and that it lacked a valid legislative purpose (Count II).  Id., ¶¶ 115–29.  Three others assert Constitutional violations of the following provisions: the Fifth Amendment's Due Process Clause (Count III), the First Amendment (Count V), and the Fourth Amendment (Count VI).  Id., ¶¶ 130–35, 147–55.  One count invokes a federal statute — to wit, the Right to Financial Privacy

Act (Count IV).  Id., ¶¶ 136–46.  The last three allege violations of the California Constitution

(Count VII) and of two different provisions of the California Unfair Competition Law (Counts

VIII and IX).  Id., ¶¶ 156–95.  Plaintiffs' first six counts are brought against all Defendants,

while the final three name only JPMorgan.  Budowich and his business seek declaratory and

injunctive relief, as well as actual and punitive damages.  Id. at 35–36.

The Congressional Defendants and JPMorgan now separately move to dismiss the

Amended Complaint.  See ECF No. 33-1 (Cong. Defs.' MTD); ECF No. 34 (JPMorgan MTD).

## II.   Legal Standard

Defendants' Motions invoke the legal standards for dismissal under Federal Rules of

Civil Procedure 12(b)(1) and 12(b)(6).  When a defendant seeks dismissal under Rule 12(b)(1),

the plaintiff must demonstrate that the court has subject-matter jurisdiction to hear his claims.

See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992); US Ecology, Inc. v. U.S. Dep't of

Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  "Because subject-matter jurisdiction focuses on the

court's power to hear the plaintiff's claim," the court has "an affirmative obligation to ensure that

it is acting within the scope of its jurisdictional authority."  Grand Lodge of the Fraternal Order

of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  "Absent subject matter jurisdiction

over a case, the court must dismiss it."  Bell v. U.S. Dep't of Health & Human Servs., 67 F.

Supp. 3d 320, 322 (D.D.C. 2014).

In policing its jurisdictional borders, the court must scrutinize the complaint, granting the

plaintiff the benefit of all reasonable inferences that can be derived from the alleged facts.  See

Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The court need not

rely "on the complaint standing alone," however, but may also look to undisputed facts in the

record or resolve disputed ones.  See Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C.

Cir. 1992).  Nor need the court accept inferences drawn by the plaintiff if those inferences are

unsupported by facts alleged in the complaint or merely amount to legal conclusions.  See

Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).

Under Federal Rule of Civil Procedure 12(b)(6), by contrast, a court must dismiss a suit

when the complaint "fail[s] to state a claim upon which relief can be granted."  In evaluating a

motion to dismiss, the Court must "treat the complaint's factual allegations as true and must

grant plaintiff the benefit of all inferences that can be derived from the facts alleged." Sparrow

v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation and internal quotation

marks omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A court need not accept as

true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported

by the facts set forth in the complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006)

(quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).  Although "detailed factual allegations"

are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S.

544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to

state a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at 678 (internal quotation

omitted).  A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and

unlikely," but the facts alleged in the complaint "must be enough to raise a right to relief above

the speculative level."  Twombly, 550 U.S. at 555–56 (quoting Scheuer v. Rhodes, 416 U.S. 232,

236 (1974)).

## III.   Analysis

In their Motion, the Congressional Defendants contend that the Speech or Debate Clause

mandates dismissal of all six causes of action against them.  See Cong. Defs.' MTD at 8.

JPMorgan, for its part, takes on the numerous counts in a more piecemeal fashion, maintaining

that certain counts are moot and that others fail to state a plausible claim for a variety of reasons. See JPMorgan MTD at 9–31.  The Court thus first considers the Congressional Defendants' main argument before turning to JPMorgan's disparate contentions.  At the end of the day, the Court agrees with all Defendants that none of the nine counts survives.

     A.  <u>Congressional Defendants</u>

     Right out of the gate, the Congressional Defendants posit that the Speech or Debate Clause bars all of Plaintiffs' claims against them.  <u>See</u> Cong. Defs.' MTD at 8; <u>see also</u> ECF No. 42 (Cong. Defs.' Reply) at 2–9.  While they also contend that the counts against them are moot, "[b]oth those arguments state jurisdictional objections."  <u>McCarthy v. Pelosi</u>, 5 F.4th 34, 38 (D.C. Cir. 2021), <u>cert. denied</u>, 142 S. Ct. 897 (2022); <u>see also</u> <u>Rangel v. Boehner</u>, 785 F.3d 19, 22 (D.C. Cir. 2015) (Speech or Debate challenge is jurisdictional).  "And while [a court] must resolve jurisdictional questions before [it] can address the merits of a dispute, [it] can take up jurisdictional issues in any order."  <u>McCarthy</u>, 5 F.4th at 38 (citing <u>Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.</u>, 549 U.S. 422, 431 (2007)).  Here, the Court "opt[s] to begin with the question of Speech-or-Debate-Clause immunity," and because it concludes that "the Clause bars consideration" of Plaintiffs' causes of action, it has "no need to consider whether" the claims are also moot as to these Defendants.  <u>Id.</u>

     The Speech or Debate Clause states that "Senators and Representatives . . . for any Speech or Debate in either House . . . shall not be questioned in any other Place."  U.S. Const. art. I, § 6, cl. 1.  The central purpose of the Clause is "to protect the individual legislator, not simply for his own sake, but to preserve the independence and thereby the integrity of the legislative process."  <u>United States v. Brewster</u>, 408 U.S. 501, 524 (1972).  The Clause does so by preventing "intimidation of legislators by the Executive and accountability before a possibly

hostile judiciary." Gravel v. United States, 408 U.S. 606, 617 (1972).  It thereby "serves the additional function of reinforcing the separation of powers so deliberately established by the Founders." Eastland v. U. S. Servicemen's Fund, 421 U.S. 491, 502 (1975) (quoting United States v. Johnson, 383 U.S. 169, 178 (1966)).

"The Supreme Court has consistently read the Speech or Debate Clause 'broadly' to achieve its purposes." Rangel, 785 F.3d at 23 (quoting Eastland, 421 U.S. at 501).  As a result, while the Clause "by [its] terms prohibits 'Speech or Debate in either House' from being 'questioned in any other Place,' it is long settled that the Clause's protections range beyond just the acts of speaking and debating." McCarthy, 5 F.4th at 38 (quoting U.S. Const. art. I, § 6, cl. 1).  Rather, the Clause applies to all "legislative acts." Doe v. McMillan, 412 U.S. 306, 312 (1973).  Legislative acts, the Supreme Court has explained, are those "generally done in a session of the House by one of its members in relation to the business before it." Kilbourn v. Thompson, 103 U.S. 168, 204 (1880).  That means that the Clause covers all matters that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." Gravel, 408 U.S. at 625.

Applying those principles to this case, the Speech or Debate Clause plainly immunizes the Congressional Defendants from all six of the claims against them, given that each challenge arises from a legislative act.  In so holding, the Court concurs with the conclusion reached by Judge Timothy Kelly of this district in a recent opinion involving a similar suit against the Committee and its members challenging the Committee's issuance of a different subpoena.  See Republican Nat'l Comm. v. Pelosi, No. 22-659, 2022 WL 1294509, at *7–10 (D.D.C. May 1,

9

2022).  As Judge Kelly recognized in that case, "Eastland, in which the Supreme Court resolved a challenge to a subpoena issued by a Senate subcommittee, provides a useful analytical template" for this type of dispute.  Id. at *7.

Eastland involved two main inquiries.  The Supreme Court first examined whether the subcommittee investigation at issue was "related to and in furtherance of a legitimate task of Congress."  421 U.S. at 505.  The Court explained that, as a general matter, "[t]he power to investigate and to do so through compulsory process plainly falls within" that ambit because "the power to investigate is inherent in the power to make laws."  Id. at 504.  Thus, the "issuance of a subpoena pursuant to an authorized investigation is similarly an indispensable ingredient of lawmaking."  Id. at 505.  Without the subpoena power, the power to investigate "would be meaningless."  Id.  Indeed, "[t]o hold that Members of Congress are protected for authorizing an investigation, but not for issuing a subpoena in exercise of that authorization, would be a contradiction denigrating the power granted to Congress in Art. I and would indirectly impair the deliberations of Congress."  Id.  Eastland thus held that because the "Subcommittee was acting under an unambiguous resolution from the Senate authorizing it," and that resolution showed that the investigation "concerned a subject on which legislation could be had," the investigation at issue fell "within the sphere of legitimate legislative activity."  Id. at 506 (internal quotation marks and citations omitted).

Here, the Select Committee's investigation and subsequent subpoena easily satisfy this threshold inquiry.  The D.C. Circuit has already held that the "Committee plainly has a 'valid legislative purpose' and its inquiry 'concern[s] a subject on which legislation could be had.'"  Thompson, 20 F.4th at 41 (quoting Trump v. Mazars USA, LLP, 140 S. Ct. 2019, 2031–32 (2020)); see also Republican Nat'l Comm., 2022 WL 1294509, at *8.  Indeed, Plaintiffs

themselves "do not dispute that the Select Committee has some legislative purpose."  ECF No. 38 (Pl. Opp. to Cong. Defs.) at 17.  This conclusion obtains regardless of Plaintiffs' complaints about the Committee's composition, id. at 13–16, because "[a]n 'act does not lose its legislative character' for Speech or Debate Clause purposes 'simply because a plaintiff alleges that it violated the House Rules.'"  Republican Nat'l Comm., 2022 WL 1294509, at *10 (quoting Rangel, 785 F.3d at 24).  Rather, "legislative immunity applies whether the disputed legislative action 'was regular, according to the Rules of the House, or irregular and against their rules.'"  Id. (quoting Kilbourn, 103 U.S. at 203); see also id. ("Thus, House Defendants are immune from suit even assuming the subpoena was issued . . . against the House's rules governing the committee.").

In addition to the legitimate-task inquiry, Eastland also considered "the propriety of making [the subpoena target] a subject of the investigation and subpoena."  421 U.S. at 506.  The Supreme Court there emphasized, "The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province."  Id. (quoting Tenney v. Brandhove, 341 U.S. 367, 378 (1951)).  Courts should instead cabin themselves to only a "cursory look at the facts presented by the pleadings" to conclude that the subpoena at issue has a legitimate target and scope.  Id.

The same limits apply here.  As explained, the House instructed the Select Committee to "investigate and report upon the facts, circumstances, and causes relating to" the January 6 attack, including "the influencing factors that fomented such an attack."  H.R. Res. 503, § 3(1).  The House further empowered the Committee to investigate how "technology" and "financing" "may have factored into the motivation, organization, and execution of the domestic terrorist attack on the Capitol."  Id. § 4(a)(1)(B).  In light of that charge, the Committee validly made

Budowich "a subject of the investigation and subpoena."  Eastland, 421 U.S. at 506.  In fact, not only do Plaintiffs not dispute that the Committee has "some legislative purpose," they further "do not dispute that some of the records Plaintiff Budowich had already provided to the Select Committee could be relevant to its investigation."  Pl. Opp. to Cong. Defs. at 17.  That concession makes sense: the Committee had "reason to believe that" Budowich had directed significant funds to pay for the Ellipse rally that immediately preceded the attack on the Capitol.  See Budowich Subpoena at 4–5.  It thus logically follows that its decision to subpoena his financial information for the period surrounding January 6, 2021, "may fairly be deemed within its province and thus falls within the scope of the Clause."  Republican Nat'l Comm., 2022 WL 1294509, at *8 (citing Eastland, 421 U.S. at 506).

 The fact that Budowich has already produced the subpoenaed documents to the Committee makes the Court's decision even easier.  That conclusion flows inexorably from Senate Permanent Subcommittee on Investigations v. Ferrer, 856 F.3d 1080 (D.C. Cir. 2017).  There, an individual who was subpoenaed by a Senate Subcommittee "turned over some of the [requested] documents, and the Subcommittee completed its investigation" during the pendency of the appeal.  Id. at 1083.  Relying on a line of circuit precedent tracing back nearly a century, the Court of Appeals held that "the separation of powers, including the Speech or Debate Clause, bars this court from ordering a congressional committee to return, destroy, or refrain from publishing the subpoenaed documents."  Id. at 1086 (citing Brown & Williamson Tobacco Corp. v. Williams, 62 F.3d 408 (D.C. Cir. 1995), and Hearst v. Black, 87 F.2d 68 (D.C. Cir. 1936)).  That holding only fortifies the Court's conclusion here that the Speech or Debate Clause precludes Budowich — who seeks the return of his produced documents, see Am. Compl. at 36 — from pursuing this case against the Congressional Defendants.

Plaintiffs' arguments to the contrary do not hold water.  They first contend that under the "unique and egregious facts of this case, the Speech or Debate Clause does not immunize the unlawful acts of the Select Committee."  Pl. Opp. at 24.  But a version of "[t]his 'familiar' argument — made in almost every Speech or Debate Clause case — has been rejected time and again."  Rangel, 785 F.3d at 24 (quoting Eastland, 421 U.S. at 510).  Indeed, "[a]n act does not lose its legislative character simply because a plaintiff alleges that it violated the House Rules, or even the Constitution."  Id. (citations omitted).

Plaintiffs next argue that the Committee's subpoena was overbroad and exceeded any legitimate legislative purpose.  See Pl. Opp. at 24–27.  As explained, however, the Court's inquiry into such an assertion is deferential, and the Committee has put forth an adequate basis for its investigation and subpoena.  See Eastland, 421 U.S. at 508–09 ("If the mere allegation that a valid legislative act was undertaken for an unworthy purpose would lift the protection of the Clause, then the Clause simply would not provide the protection historically undergirding it.").  In fact, the D.C. Circuit recently rejected the similar argument that a congressional committee's subpoenas "served no legitimate legislative purpose" and were "too tangential to the purpose of an impeachment inquiry."  Jud. Watch, Inc. v. Schiff, 998 F.3d 989, 992 (D.C. Cir. 2021) (internal quotation marks and citation omitted).  There, the panel emphasized that the "scope of inquiry is narrow," and that the "wisdom of congressional approach or methodology is not open to judicial veto."  Id. (internal quotation marks and citation omitted).  The Court of Appeals thus concluded that, "based on the record, the unsupported objections to the relevance of the information sought by the Committee's subpoenas fail."  Id.  So, too, here, especially in light of the Select Committee's purpose and knowledge of Budowich's role in funding the Ellipse rally.

Plaintiffs' last two primary counterarguments can be swiftly disposed of.  First, they somewhat perplexingly argue that "the Speech or Debate Clause is not a jurisdictional bar to suit."  Pl. Opp. at 25.  The D.C. Circuit has repeatedly made clear, however, that "[t]he Speech or Debate Clause operates as a jurisdictional bar when the actions upon which a plaintiff [seeks] to predicate liability [are] legislative acts."  Howard v. Off. of Chief Admin. Officer of U.S. House of Representatives, 720 F.3d 939, 949 (D.C. Cir. 2013) (quoting Fields v. Office of Eddie Bernice Johnson, 459 F.3d 1, 13 (D.C. Cir. 2006) (en banc)).  As the Supreme Court has explained, the cases Plaintiffs cite in support of their position stand for the uncontroversial proposition that "the speech or debate privilege was . . . unavailable to certain House and committee employees" who were not involved "in the performance of legislative acts."  Gravel, 408 U.S. at 618 (distinguishing Powell v. McCormack, 395 U.S. 486 (1969), and Kilbourn, 103 U.S. at 168); see also McCarthy, 5 F.4th at 41 ("The three decisions principally relied on by the plaintiffs — Kilbourn[ ], [Dombrowski v. Eastland, 387 U.S. 82, 87 (1967)], and Powell[ ] — are not to the contrary.").

The final arrow in Plaintiffs' speech-or-debate quiver relies on a supposed waiver of the immunity.  They contend that under the Right to Financial Privacy Act, "Congress waived Speech or Debate Clause immunity by authorizing suits against it."  Pl. Opp. at 31.  But this arrow veers off course upon release.  For starters, Plaintiffs themselves admit that they are not sure whether Congress ever "can waive the Speech or Debate Clause protections."  Id.  Indeed, they have not supplied a single case holding that the Clause's immunity may be waived, and the Court is not aware of one.  Further, in the instances in which courts have assumed — without deciding — that the Clause's protections may be waived under some circumstances, they apply an unusually high standard for finding waiver.  In fact, "assuming that [waiver] is possible," it

"can be found only after explicit and unequivocal renunciation of the protection."  United States v. Helstoski, 442 U.S. 477, 490–91 (1979).  The Supreme Court has explained, "The ordinary rules for determining the appropriate standard of waiver do not apply in this setting" because the Clause "was designed neither to assure fair trials nor to avoid coercion."  Id.  Here, Plaintiffs have not even attempted to identify in the RFPA an "explicit and unequivocal renunciation" of the Clause's protection, nor could they.  See Pl. Opp. at 31–32; 12 U.S.C. § 3417.  Congress did not somehow unwittingly waive its Speech or Debate Clause immunity by enacting the RFPA.

In sum, the Speech or Debate Clause precludes Plaintiffs' claims against the Congressional Defendants, who will be dismissed for lack of subject-matter jurisdiction.

B.  JPMorgan

That leaves Defendant JPMorgan and Plaintiffs' nine counts against it.  The Court takes these up in three tranches, first addressing the Constitutional and non-statutory federal claims (Counts I–III, V, and VI), then the federal statutory count (Count IV), and last the state-law causes of action (Counts VII–IX).  Although the Amended Complaint does not distinguish between counts brought by Conservative Strategies and Budowich, Plaintiffs now concede that the former cannot bring certain counts against JPMorgan.  See ECF No. 39 (Pl. Opp. to JPMorgan) at 14 n.1 ("Plaintiffs respectfully concede that RFPA does not apply to Conservative Strategies, Inc."); id. at 31 n.5 ("Plaintiff Conservative Strategies, Inc. respectfully concedes that it cannot assert an invasion of privacy claim under the California Constitution.").  They also never assert that Conservative Strategies has claims that are broader than Budowich's or that require additional examination.  To streamline its analysis, the Opinion thus discusses only Budowich's counts against JPMorgan without separately addressing Conservative Strategies'.

1.  *Counts I–III, V, and VI*

The Court first takes up JPMorgan's contention that Counts I–III, V, and VI are moot, with which it agrees.  Out of an abundance of caution, however, the Court will also explain why, at any rate, Counts III, V, and VI — which raise constitutional claims — independently founder because JPMorgan is not a state actor.

a.  Mootness

Defendant posits that Counts I–III, V, and VI are moot because the bank has already produced the documents required by the subpoena and Plaintiff does not seek damages on these counts.  See JPMorgan MTD at 15–16; ECF No. 41 (JPMorgan Reply) at 3–6.  Plaintiff counters with several theories: he actually is seeking damages and is challenging an ongoing policy and practice, or, in the alternative, these counts are capable of repetition yet evading review.  See Pl. Opp. to JPMorgan at 7–12.  None of those theories prevails.

"Article III of the Constitution limits [the Court's] jurisdiction to 'actual, ongoing controversies.'"  Foretich v. United States, 351 F.3d 1198, 1210 (D.C. Cir. 2003) (quoting Honig v. Doe, 484 U.S. 305, 317 (1988)).  "A lawsuit becomes moot — and is therefore no longer a 'Case' or 'Controversy' — 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'"  Almaqrami v. Pompeo, 933 F.3d 774, 779 (D.C. Cir. 2019) (quoting Chafin v. Chafin, 568 U.S. 165, 172 (2013)).  "This happens 'only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'"  Zukerman v. United States Postal Serv., 961 F.3d 431, 442 (D.C. Cir. 2020) (quoting Knox v. Serv. Emps. Int'l Union, 567 U.S. 298, 307 (2012)).  If "intervening events make it impossible to grant the prevailing party effective relief," no live controversy remains.  See Lemon v. Geren, 514 F.3d 1312, 1315 (D.C. Cir. 2008) (citation omitted).

Here, it is uncontroverted that JPMorgan produced records responsive to the subpoena to the Committee on December 24, 2021.  See Am. Compl., ¶¶ 72–73.  It is similarly undisputed that JPMorgan "has no present intention to produce additional documents pursuant to the subpoena."  JSR of Feb. 3, 2022, at 2.  The Court is thus powerless to order the bank to withhold Budowich's financial records from the Committee, as he requests.  See Am. Compl. at 35. Critically, Plaintiff does not also seek damages from JPMorgan on the claims at issue here.  Id. at 36.  That means that a finding in his favor would entitle him to neither injunctive relief nor damages.  In other words, "intervening events" have made "it impossible to grant the prevailing party effective relief" on these claims, even if Budowich were to succeed on the merits.  See Lemon, 514 F.3d at 1315.  The counts are thus moot.  See Crooker v. U.S. State Dep't, 628 F.2d 9, 10 (D.C. Cir. 1980) ("Once the records are produced the substance of the controversy disappears and becomes moot.").

Plaintiff's rejoinders go nowhere.  He first argues that "Defendants ignore that Plaintiffs seek monetary damages and a return of their documents."  Pl. Opp. to JPMorgan at 8.  While Budowich is correct that he seeks monetary damages on certain counts — specifically those alleging violations of the RFPA and California law (Counts IV, VII, VIII, and IX) — his prayer for relief makes plain that he does not seek damages from JPMorgan on the counts now at issue. See Am. Compl. at 36.  In any event, damages would be unavailable against JPMorgan for any constitutional violations (alleged in Counts III, V, and VI).  That is because under Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), and its progeny, such a claim is unavailable against a private entity, even when it is acting under color of federal law.  See Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66 (2001) (declining to extend Bivens to "confer a right of action for damages against private entities acting under color of federal law").  Similarly, while

17

Plaintiff is correct that he seeks an injunction "mandating that the Select Committee Defendants disgorge, promptly return, sequester, or destroy private financial records belonging to Plaintiffs," Am. Compl. at 36 (emphasis added), he does not seek an injunction ordering JPMorgan to return the documents.  That makes sense: the bank has already produced the documents to the Committee and is thus powerless to return them, even upon a court order.

Budowich next asserts that these counts are not moot because he is challenging "an ongoing policy: the Select Committee's issuance of unnoticed, overbroad subpoenas that exceed a valid legislative purpose and are issued by a committee that is not duly formed."  Pl. Opp. to JPMorgan at 8.  Notably, however, he does not dispute that JPMorgan has no intention or plan to produce additional documents to the Committee, nor that the Committee has no intention to again subpoena JPMorgan.  To the extent that Plaintiff is challenging a Committee policy that remains ongoing, that has no bearing on whether certain claims against JPMorgan — which is not alleged to have any such "ongoing policy" — are moot.

Not to worry, Budowich says, because "this case fits into the mootness exception for cases capable of repetition yet evading review."  Id. at 9.  Nope.  "To satisfy the exception, a party must demonstrate that (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again."  Ralls Corp. v. Comm. on Foreign Inv. in U.S., 758 F.3d 296, 321 (D.C. Cir. 2014) (internal quotation marks and citation omitted).  "When these two circumstances are simultaneously present, the plaintiff has demonstrated an exceptional circumstance in which the exception will apply."  Id. (internal quotation marks and citation omitted).  Here, even assuming that Budowich has carried his burden as to the first prong of the exception, he falls short on the second.

To satisfy the latter prong, "[t]he party invoking the exception must show 'a reasonable degree of likelihood that the issue will be the basis of a continuing controversy between the[ ] two parties.'" J. T. v. D.C., 983 F.3d 516, 524 (D.C. Cir. 2020) (quoting Pharmachemie B.V. v. Barr Labs., Inc., 276 F.3d 627, 633 (D.C. Cir. 2002)).  Indeed, "[t]his prong requires that the same parties will engage in litigation over the same issues in the future."  Id. (internal quotation marks and citation omitted; emphasis added).  "The relevant inquiry, however, is not 'whether the precise historical facts that spawned the plaintiff's claims are likely to recur.'"  Id. (quoting Del Monte Fresh Produce Co. v. United States, 570 F.3d 316, 324 (D.C. Cir. 2009)).  Instead, "'[t]he wrong that is, or is not, capable of repetition must be defined in terms of the precise controversy it spawns,' to wit, 'in terms of the legal questions it presents for decision.'"  Id. (quoting PETA v. Gittens, 396 F.3d 416, 422–23 (D.C. Cir. 2005)).

Here, Plaintiff has not carried his burden to show that the same issue may continue to arise between him and JPMorgan.  Critically, he asserts in his Opposition merely that "it is likely that Select Committee Defendants will issue unnoticed subpoenas to additional third-parties that maintain Plaintiffs' private information."  Pl. Opp. to JPMorgan at 10.  Perhaps.  But he nowhere alleges (neither in the Opposition nor in the Amended Complaint) that the Committee will again subpoena JPMorgan, or that JPMorgan will again produce more of Budowich's financial records to the Committee.  Rather, the Committee explained that, "to their knowledge, they have received all of the financial records requested, and do not anticipate issuing any more subpoenas to Defendant JPMorgan concerning Plaintiffs."  JSR of Feb. 3, 2022, at 1.  JPMorgan, meanwhile, "has no present intention to produce additional documents pursuant to the subpoena."  Id. at 2.  Budowich has thus not shown the requisite "reasonable degree of likelihood

that the issue will be the basis of a continuing controversy between" him and his bank.  J. T., 983

F.3d at 524 (internal quotation marks and citation omitted).

        Counts I, II, III, V, and VI are therefore moot as to JPMorgan.

           b.   State Action

        In any event, even if certain claims against JPMorgan — which allege violations of the

First Amendment (Count III), the Fourth Amendment (Count V), and the Fifth Amendment

(Count VI) — were not moot, they also fail to state a claim.  That is because the bank did not

engage in state action when it responded to the Committee's subpoena.

         It is axiomatic that, in order for claims under the Constitution to go forward, "the party

charged with the deprivation must be a person who may fairly be said to be a state actor."  Lugar

v. Edmondson Oil Co., 457 U.S. 922, 937 (1982); see Cheeks v. Fort Myer Const. Co., 722 F.

Supp. 2d 93, 111 (D.D.C. 2010) ("A cognizable constitutional deprivation requires that the

deprivation be the result of government action.") (internal quotation marks and citation omitted).

While the precise formulations for determining when to attribute action taken by a private entity

to the state vary by the context and right at issue, at bottom the inquiry examines whether "there

is such a close nexus between the State and the challenged action that seemingly private behavior

may be fairly treated as that of the State itself."  Brentwood Acad. v. Tennessee Secondary Sch.

Athletic Ass'n, 531 U.S. 288, 295 (2001) (internal quotation marks and citation omitted).  Courts

have looked at factors, for instance, such as "the extent to which the actor relies on governmental

assistance and benefits," "whether the actor is performing a traditional governmental function,"

and "whether the injury caused is aggravated in a unique way by the incidents of governmental

authority."  Edmonson v. Leesville Concrete Co., 500 U.S. 614, 621–22 (1991) (internal citations

omitted).  In the Fourth Amendment context, the Supreme Court has explained, "Although

the . . . Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative, the Amendment protects against such intrusions if the private party acted as an instrument or agent of the Government." Skinner v. Ry. Lab. Executives' Ass'n, 489 U.S. 602, 614 (1989). Under the Fifth Amendment, meanwhile, our Court of Appeals has inquired into whether the private entity has "undertaken to perform a service for the government or entered into a symbiotic relationship with the government." Anderson v. USAir, Inc., 818 F.2d 49, 56 (D.C. Cir. 1987).

Here, under any of the above standards, it is plain that JPMorgan did not engage in state action when it complied with the congressional subpoena. For starters, it is worth noting that Plaintiff has cited no cases in which a bank or other private entity's compliance with a congressional subpoena constitutes state action for purposes of evaluating a constitutional claim. See Pl. Opp. to JPMorgan at 25–27. On the contrary, courts have routinely held that banks are not state actors under an array of circumstances. See, e.g., Swope v. Northumberland Nat. Bank, 625 Fed. Appx. 83, 87 (3d Cir. 2015) ("[T]he Bank Defendants neither deprived him of a constitutional right nor acted under color of law."); Hoskins v. TCF Nat. Bank, 248 Fed. Appx. 742, 743 (7th Cir. 2007) ("The bank is not a state actor."); Dailey v. Bank of Am., 106 Fed. Appx. 533, 533 (9th Cir. 2004) ("We conclude that the district court did not err in concluding that the Bank was neither a state actor nor acting under color of state law, and in dismissing Dailey's 1983 action."); Elsman v. Standard Fed. Bank, 46 Fed. Appx. 792, 798 (6th Cir. 2002) ("[T]hese defendants are not state actors.").

To be sure, these decisions do not bind this Court and arose in different procedural postures from how this case arrives here. But these decisions — together with the complete lack of cases supporting Plaintiff's position — are consistent with the common-sense conclusion that

a private party's compliance with a congressional subpoena does not somehow transform that

entity into a state actor.  If it were otherwise, then presumably all private parties that comply

with a government subpoena would become state actors and thus be bound by the U.S. and state

constitutions.  Such a sweeping holding could force subpoena recipients to choose between

facing penalties (perhaps including contempt and criminal prosecution) for non-compliance or

being sued for constitutional violations.  Budowich supplies no compelling reason to adopt such

a broad position, and the Court declines to be the first to do so.

2.   *Count IV*

Moving from the Constitution to a federal statute, next up is Plaintiff's RFPA count

against JPMorgan (Count IV).  Budowich there alleges that the bank violated the statute by

producing his financial records to the Committee without complying with various requirements

imposed by the Act.  See Am. Compl., ¶¶ 136–46.  Defendant points out that the RFPA, by its

terms, simply does not apply to congressional subpoenas such as this one.  The Court concurs.

The RFPA states, "No financial institution, or officer, employees, or agent of a financial

institution, may provide to any Government authority access to or copies of, or the information

contained in, the financial records of any customer except in accordance with the provisions of

this chapter."  12 U.S.C. § 3403(a).  The Act goes on to list a number of procedural requirements

that must be followed for covered subpoenas or document productions.  Id.  §§ 3405–3408.  The

critical issue here is not whether those procedures were followed, but whether the Select

Committee is a "Government authority" within the meaning of the RFPA.  If not, then the

statute's procedural requirements do not apply.  To that end, the Act further specifies that the

phrase "'Government authority' means any agency or department of the United States, or any

officer, employee, or agent thereof."  Id.  § 3401(3).  The precise statutory issue here,

consequently, is whether a congressional committee is an "agency or department of the United States."

The Court's analysis on this point is guided by the Second Circuit's lengthy examination of the same issue in <u>Trump v. Deutsche Bank AG</u>, 943 F.3d 627, 641 (2d Cir. 2019), <u>vacated and remanded sub nom.</u> <u>Trump v. Mazars USA, LLP</u>, 140 S. Ct. 2019 (2020).  There, relying on the RFPA's text, context, structure, and legislative history, the majority "conclude[d] that RFPA does not apply to Congress."  <u>Id.</u> at 641–45.  Although Judge Debra Livingston dissented in part on other issues in the case, she unequivocally concurred with the majority on the RFPA issue: "[W]e agree that the Right to Financial Privacy Act . . . does not apply to Congress because, as the majority correctly concludes, Congress is not a 'Government authority' within the meaning of that statute."  <u>Id.</u> at 677 (Livingston, J., concurring in part and dissenting in part).  Further, while the Supreme Court vacated and remanded the Second Circuit's decision on other grounds, the appellants did not challenge the RFPA ruling, and the Supreme Court did not pass on the issue.  <u>See</u> <u>Mazars USA, LLP</u>, 140 S. Ct. at 2036.

Consider first the RFPA's text.  "[T]he plain meaning of 'agency or department' at the time RFPA was enacted in 1978" does not encompass Congress or its committees.  <u>See</u> <u>Deutsche Bank AG</u>, 943 F.3d at 641.  In <u>Deutsche Bank AG</u>, there was no dispute that the term "agency" "could possibly refer to Congress."  <u>Id.</u>  While Plaintiff here contends otherwise, that position lacks support.  For instance, dictionary definitions contemporaneous with the enactment of the RFPA define "agency" as a "department or other instrumentality <u>of the executive branch</u> of the federal government."  <u>Agency</u>, <u>Black's Law Dictionary</u> (5th ed. 1979) (emphasis added).  That definition is in keeping with the ordinary usage of the term "agency" as referring to executive agencies.

23

As for whether the Committee is a "department of the United States," 12 U.S.C.

§ 3401(3), the plain meaning similarly favors JPMorgan.  As the Second Circuit explained,

"Contemporary dictionaries support the" conclusion that "department" refers to "[o]ne of the

major administrative divisions of the executive branch of the government."  Deutsche Bank AG,

943 F.3d at 641 (quoting Black's Law Dictionary (5th ed. 1979)) (emphasis added); see also

Webster's Third New International Dictionary (1971) (defining "department" as "an

administrative division or branch of a national or municipal government").  Similarly, the

ordinary, everyday usage of the term "department" refers to executive-branch divisions, such as

the Department of Justice or the Department of Labor.

Looking beyond just the statutory definition at issue, "other contextual clues in RFPA

indicate that neither Congress nor its committees are an 'agency or department of the United

States' within the meaning of RFPA, and therefore Congress did not subject itself or its

committees to the Act."  Deutsche Bank AG, 943 F.3d at 642.  Section 3408 of the Act, for

example, authorizes a "Government authority" to request financial records "pursuant to a formal

written request only if . . . the request is authorized by regulations promulgated by the head of

the agency or department."  12 U.S.C. § 3408(2).  But "Congress does not promulgate

regulations, and its leadership and that of its committees are not considered the 'head' of an

'agency or department.'"  Deutsche Bank AG, 943 F.3d at 642.  Rather, the Supreme Court has

explained, "The term 'head of a Department' means . . . the Secretary in charge of a great

division of the [E]xecutive [B]ranch of the government, like the State, Treasury, and War, who is

a member of the Cabinet."  Burnap v. United States, 252 U.S. 512, 515 (1920); see also Freytag

v. Commissioner of Internal Revenue, 501 U.S. 868, 886 (1991).  Relatedly, the RFPA's

provisions for obtaining financial records all require that the records sought are "relevant to a

legitimate law enforcement inquiry." 12 U.S.C. §§ 3405(1), 3407(1), 3408(3). Congress, however, cannot exercise "the powers of law enforcement" because "those powers are assigned under our Constitution to the Executive and the Judiciary." Quinn v. United States, 349 U.S. 155, 161 (1955). These contextual clues confirm that the RFPA's definition of a "Government authority" does not encompass Congress or its committees.

The legislative history of the statute is in accord. As the Second Circuit explained, "A draft bill [of the Act] submitted by the Departments of Justice and the Treasury would have explicitly covered access to financial records by Congress, and distinguished Congress from 'any agency or department of the United States.'" Deutsche Bank AG, 943 F.3d at 642 (citations omitted). Congress rejected this proposal, however, omitting the provision covering access to records by Congress in the final law that it enacted. Id. at 643. "Although the failure of Congress to enact is often an unreliable indication of congressional intent[,] . . . , the omission of pertinent language from a bill being considered by Congress is far more probative of such intent, especially when the omission is from a draft bill submitted by the Department of Justice, a principal source of proposed legislation." Id. (citation omitted). Even if this legislative history is not determinative, it buttresses the Court's text-based statutory construction.

Plaintiff may resist this conclusion, but as Star Trek's Dr. Spock intoned, "Resistance is futile." Budowich contends that "Congress is commonly referred to as a 'department' of the federal government," and he supports that position by citing to cases using that phrase to refer to non-executive agencies. See Pl. Opp. to JPMorgan at 18–19 (collecting cases). For instance, as far back as 1803, he points out, the Supreme Court famously stated, "It is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803) (emphasis added). But Budowich's argument ignores entirely

the Supreme Court's more recent explanation addressing such language and the meaning of the phrase "department" or "agency."  In <u>Hubbard v. United States</u>, 514 U.S. 695 (1995), the Court acknowledged that "while we have occasionally spoken of the three branches of our Government, including the Judiciary, as 'department[s],' that locution is not an ordinary one." <u>Id.</u> at 699 (cleaned up).  Rather, "[f]ar more common is the use of 'department' to refer to a component of the Executive Branch."  <u>Id.</u>  Indeed, "[i]n ordinary parlance, federal courts are not described as 'departments' or 'agencies' of the Government," and "it would be strange indeed to refer to a court as an 'agency.'"  <u>Id.</u>  The same logic applies to Congress.

Budowich also makes much of the fact that another provision of the RFPA specifically addresses Congress and its committees.  Section 3412(d) states, "Nothing in this chapter shall authorize the withholding of information by any officer or employee of a supervisory agency from a duly authorized committee or subcommittee of the Congress."  12 U.S.C. § 3412(d).  In Plaintiff's view, "If congressional subpoenas were never intended to come within RFPA's scope, there would be no reason to include this provision; any other interpretation would render this provision superfluous."  Pl. Opp. to JPMorgan at 22.  Hardly.  Section 3412, which is titled "Use of information," governs the transfer of records between agencies or departments.  <u>See</u> 12 U.S.C. § 3412(a), (d).  In that light, the language at issue is best read to make clear that the RFPA does not authorize a supervisory agency within the government (defined in section 3401(7)) to withhold information from a congressional committee.  While the Court believes that Defendant thus has the better reading of this provision, it need not rely on this tangential subsection because the plain text of the more relevant section resolves the issue.  <u>See</u> <u>Deutsche Bank AG</u>, 943 F.3d at 645 n.28 (deeming neither side's argument about § 3412(d) particularly "persuasive,

especially in light of the textual and legislative history support for our conclusion, explained

above, that RFPA does not apply to Congress").

      3.  *Counts VII–IX*

Having struck out under federal law, Plaintiff heeds well-known advice from the 19th

century: Go West, young man.  For Budowich, a California resident, that means alleging that

JPMorgan violated the Golden State's laws when it complied with the Committee's subpoena.

More specifically, he alleges an invasion of privacy under California law (Count VII) and

violations of two aspects of the California Unfair Competition Law (Counts VIII and IX).  See

Am. Compl., ¶¶ 156–95.  Unfortunately for Plaintiff, however, all he finds here is fool's gold.

      a.  Invasion of Privacy

Budowich's first state-law count alleges that JPMorgan's production of his financial

records constituted an unlawful invasion of privacy under the California Constitution.  Id.,

¶¶ 156–68.  To prevail on such a claim, "[p]laintiffs must show that (1) they possess a legally

protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the

intrusion is 'so serious . . . as to constitute an egregious breach of the social norms' such that the

breach is 'highly offensive.'"  In re Facebook, Inc. Internet Tracking Litig., 956 F.3d 589, 601

(9th Cir. 2020), cert. denied sub nom. Facebook, Inc. v. Davis, 141 S. Ct. 1684 (2021) (quoting

Hernandez v. Hillsides, Inc., 211 P.3d 1063 (2009)).  Defendant appears to not contest that

Budowich has satisfied the first two elements, and the Court will thus assume that those

threshold factors are met.  See JPMorgan MTD at 21–24.  JPMorgan vigorously contests the

third element, however, and the Court ultimately concurs that Plaintiff has not satisfied the "high

bar for an invasion of privacy claim."  Low v. LinkedIn Corp., 900 F. Supp. 2d 1010, 1025 (N.D.

Cal. 2012).

As stated, the California Constitution requires a plaintiff to "show more than an intrusion upon reasonable privacy expectations" to prevail.  In re Facebook, Inc. Internet Tracking Litig., 956 F.3d at 606 (quoting Hernandez, 211 P.3d at 1063).  Instead, "[a]ctionable invasions of privacy also must be 'highly offensive' to a reasonable person, and 'sufficiently serious' and unwarranted so as to constitute an 'egregious breach of the social norms.'"  Id. (quoting Hernandez, 211 P.3d at 1063).  "Determining whether a defendant's actions were 'highly offensive to a reasonable person' requires a holistic consideration of factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive."  Id. (quoting Hernandez, 211 P.3d at 1063).  Further, while "analysis of a reasonable expectation of privacy primarily focuses on the nature of the intrusion, the highly offensive analysis focuses on the degree to which the intrusion is unacceptable as a matter of public policy."  Id.

Any intrusion upon Budowich's reasonable privacy expectations here was neither highly offensive nor so serious as to constitute an egregious breach of the social norms.  As a threshold matter, the nature of the intrusion likely cuts against Plaintiff, although the Court need not rely on this as the overriding consideration.  Courts have routinely held that "[e]ven disclosure of personal information, including social security numbers, does not constitute an egregious breach of the social norms to establish an invasion of privacy claim."  Low, 900 F. Supp. 2d at 1025 (internal quotation marks omitted).  For instance, in addition to social security numbers, disclosure of sensitive personal information such as unique device-identifier numbers and geolocation information, the personal information of job applicants, and personal addresses have been deemed insufficiently egregious to establish such a claim.  See, e.g., In re iPhone

Application Litig., 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) (unique device-identifier number and geolocation information); Ruiz v. Gap, Inc., 540 F. Supp. 2d 1121, 1127–28 (N.D. Cal. 2008), aff'd, 380 Fed. Appx. 689 (9th Cir. 2010) (personal information of job applicants); Folgelstrom v. Lamps Plus, Inc., 195 Cal. App. 4th 986, 992 (2011) (personal address).  While Budowich's financial records are no doubt ordinarily private, he has not persuasively explained how his bank's sharing portions of them in response to a valid subpoena constitutes an egregious breach of social norms.

In any event, regardless of the precise nature of any intrusion, the circumstances surrounding JPMorgan's production of Budowich's financial records strongly counter the notion that such invasion was "highly offensive."  Consider first the "degree and setting of the intrusion."  In re Facebook, Inc. Internet Tracking Litig., 956 F.3d at 606 (quoting Hernandez, 211 P.3d at 1063).  Defendant provided Plaintiff's financial records only in response to a congressional subpoena, as it was legally required to do.  Such compliance by private entities is routine; indeed, Budowich himself complied with a similar subpoena in the days leading up to JPMorgan's producing the records at issue.  See Am. Compl., ¶¶ 60–64; see also Budowich Response to Subpoena.  What is more, before disclosing the records to the Committee, the bank notified Plaintiff that it "will comply with this subpoena in a timely manner unless it receives documentation legally obligating it to stop taking such steps."  JPMorgan Letter to Budowich at 2.  Defendant then produced the responsive records only once the deadline for doing so came without its receiving such documentation from Budowich.  Id.; see Am. Compl., ¶ 73.  In that context, the setting and circumstances of any intrusion on Budowich's privacy heavily favor JPMorgan's position.

Defendant's "motives and objectives" are in accord.  There is no indication that JPMorgan produced the documents in order to harm Budowich or to maliciously advance its own interests.  On the contrary, there is every reason to believe that the production was motivated by the belief that compliance with the congressional subpoena was mandated by law.  So, too, there are strong "countervailing interests or social norms [that] render the intrusion inoffensive."  In re Facebook, Inc. Internet Tracking Litig., 956 F.3d at 606.  There is a strong norm of complying with congressional subpoenas and promptly producing the requested information.  As the Supreme Court has stated, "It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action.  It is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation."  Watkins v. United States, 354 U.S. 178, 187–88 (1957).  Relatedly, there is also a societal interest in promoting compliance with such subpoenas.  Id.

    The Supreme Court of California has explained, "No community could function if every intrusion into the realm of private action, no matter how slight or trivial, gave rise to a cause of action for invasion of privacy."  Hill v. Nat'l Collegiate Athletic Ass'n., 865 P.2d 633, 655 (1994).  At bottom, that common-sense principle guides the resolution of this claim.  As discussed in the context of Plaintiff's counts under the U.S. Constitution, it would be problematic and unprecedented to hold that everyday compliance with a governmental subpoena subjects a third party to legal liability.  Indeed, were Budowich's theory here to carry the day, it stands to reason that any financial institution that produces financial information in response to a government subpoena would be violating California law.  He has not put forth any compelling

evidence in favor of adopting such a dramatic rule with such far-reaching consequences, and the Court declines to take such a position.

Plaintiff unsurprisingly objects, contending that it is inappropriate to make this determination at the pleading stage.  See Pl. Opp. to JPMorgan at 31–32.  The Court disagrees. While it is true that resolving an invasion-of-privacy claim can implicate factual questions that require further litigation, see In re Facebook, Inc. Internet Tracking Litig., 956 F.3d at 606, courts also dismiss California invasion-of-privacy claims at the pleading stage when appropriate. For instance, a federal court in California recently relied on the "weight of the case law" to conclude that the plaintiff's "allegations simply do not approach the sort of 'egregious' or 'highly offensive' conduct which courts have typically permitted to proceed beyond the motion to dismiss stage." Mastel v. Miniclip SA, 549 F. Supp. 3d 1129, 1142 (E.D. Cal. 2021) (collecting cases); see also In re iPhone Application Litig., 844 F. Supp. 2d at 1063.  In fact, the Supreme Court of California has directed that the elements discussed above "must be viewed simply as 'threshold elements' that may be utilized to screen out" or "weed out claims" at the appropriate stage. Loder v. City of Glendale, 927 P.2d 1200, 1230 (1997); see also Hill, 865 P.2d at 655.  Even assuming the veracity of Budowich's Amended Complaint — which the Court must — he has not "state[d] a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (internal quotation omitted).  In other words, even if his allegations were borne out in discovery and at trial, JPMorgan's compliance with the subpoena simply does not constitute an "egregious breach of the social norms" as a matter of law.  In re Facebook, Inc. Internet Tracking Litig., 956 F.3d at 606 (quoting Hernandez, 211 P.3d at 1063).  This count proceeds no further.

### b.   Unfair Competition Law

Budowich's final two counts invoke California's Unfair Competition Law.  The UCL prohibits "unlawful, unfair or fraudulent business act[s] or practice[s] and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code §§ 17200, *et seq.*  For those readers not on the West Coast, "[e]ach prong of the UCL is a separate and distinct theory of liability; thus, the 'unfair' practices prong offers an independent basis for relief" from the "unlawful" prong.  Lozano v. AT & T Wireless Servs., Inc., 504 F.3d 718, 731 (9th Cir. 2007) (citation omitted).  Here, Count VIII alleges that JPMorgan violated the UCL's "unlawful" prong, while Count IX alleges a separate violation of the "unfair" prong.  The Court takes them up in turn.

### i.   Unlawful

"To prevail on a claim under the unlawful prong of the unfair competition law, the plaintiff must show that a challenged advertisement or practice violates any federal or California statute or regulation."  Shaeffer v. Califia Farms, LLC, 44 Cal. App. 5th 1125, 1136 (2020) (internal quotation marks and citation omitted).  In other words, "[s]ection 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable."  Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1168 (9th Cir. 2012) (internal quotation marks and citation omitted).  While Budowich's precise theory of liability here is not crystal clear, he appears to allege that JPMorgan's document production contravened the California Financial Information Privacy Act (CalFIPA) as well as the Gramm-Leach-Bliley Act (GLBA), and that those violations form the predicate for a claim under the UCL's unlawful prong.  See Pl. Opp. to JPMorgan at 34–37; Am. Compl., ¶¶ 169–85. Defendant counters that he has not sufficiently made out the requisite predicate violation of either.  See JPMorgan MTD at 26–27.

Start with CalFIPA, which states, "Except as provided in Sections 4053, 4054.6, and 4056, a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates."  Cal. Fin. Code § 4052.5.  Here, the violation was simple, says Budowich: JPMorgan disclosed nonpublic personal information to a third party without his explicit prior consent.  Not so fast, responds Defendant: Plaintiff's theory overlooks one of the enumerated exceptions in CalFIPA.  More specifically, section 4056 states, as relevant here:

> (b) Notwithstanding Sections 4052.5, 4053, 4054, and 4054.6, a financial institution may release nonpublic personal information under the following circumstances:
>
> . . .
>
> (7) The nonpublic personal information is released to comply with federal, state, or local laws, rules, and other applicable legal requirements; to comply with a properly authorized civil, criminal, administrative, or regulatory investigation or subpoena or summons by federal, state, or local authorities; or to respond to judicial process or government regulatory authorities having jurisdiction over the financial institution for examination, compliance, or other purposes as authorized by law.

Id. § 4056(b)(7).

For two independent reasons, the Court agrees with the bank.  First, assuming that JPMorgan's production would otherwise be covered by section 4052.5, the bank shared Budowich's personal information "to comply with federal . . . and other applicable legal requirements."  Id.  JPMorgan's obligation to comply with federal law includes the mandates of 2 U.S.C. § 192, which makes noncompliance with a congressional subpoena a federal crime.  Id. ("Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before . . . any

committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor."); see also Watkins, 354 U.S. at 187 ("It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action.").  Defendant's production thus plainly falls within CalFIPA's exception allowing financial institutions to disclose nonpublic personal information when doing so is necessary "to comply with federal . . . and other applicable legal requirements."  Cal. Fin. Code § 4056(b)(7).

Second, JPMorgan's production also satisfied another provision of section 4056(b)(7).  Specifically, the bank's release of Budowich's financial information was done "to comply with a properly authorized civil, criminal, administrative, or regulatory investigation or subpoena or summons by federal, state, or local authorities."  Id.  The subpoena at issue in this case fits within this provision, as the code's expansive language covers the range of subpoenas issued by both state and federal governments.  Id.  Plaintiff suggests otherwise, but he provides no cases or other compelling reason causing the Court to doubt that the subpoena falls within the exception's plain language — which includes both an "investigation or subpoena."  Id.; see Pl. Opp. to JPMorgan at 34–37.  For instance, the Committee itself believes that it is "investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power."  JPMorgan Subpoena at 4 (emphasis added).  Similarly, there is no reason to think that a congressional committee does not constitute a "federal authority" within the meaning of CalFIPA.  Once again, adopting Budowich's interpretation of state law (this time, CalFIPA) would lead to the unlikely scenario in which state law prohibits third parties from complying with a wide range of subpoenas issued by the federal government.  Wisely, however, the plain

text of section 4056(b)(7) forecloses such an anomalous result by excepting from CalFIPA's coverage disclosures made pursuant to legitimate government investigations or subpoenas, such as the one at issue here.

Pivoting from state to federal law as the alleged predicate for UCL liability, Budowich has similarly not made out a claim by way of an underlying violation of the GLBA. That Act's requirements largely parallel CalFIPA, and the Court's analysis therefore does as well. Similar to the state law, the federal statute states, "Except as otherwise provided in this subchapter, a financial institution may not, directly or through any affiliate, disclose to a nonaffiliated third party any nonpublic personal information, unless such financial institution provides or has provided to the consumer a notice that complies with section 6803 of this title." 15 U.S.C. § 6802(a). Like CalFIPA, the GLBA and its implementing regulations also go on to create an exception when such disclosure is necessary to comply with "Federal, state, or local laws, rules and other applicable legal requirements," or with "a properly authorized civil, criminal, or regulatory investigation, or subpoena or summons by Federal, state, or local authorities." 12 C.F.R. § 1016.15(a)(7). Astute readers should recognize the language of that exception. In fact, its reference to compliance with federal laws or "other applicable legal requirements," as well as to valid investigations or subpoenas from "Federal . . . authorities," mirrors the corresponding exceptions in CalFIPA. Compare id., with Cal. Fin. Code § 4056(b)(7). Same exceptions, same result.

In sum, as Budowich has not pled a predicate violation of federal or state law, he has not alleged an "unlawful" claim under the UCL.

ii.  Unfair

Last but not least is unfairness, which is distinct from the statute's "unlawful" provision. "To determine whether conduct is 'unfair' under the UCL, California courts have articulated two main tests." Hall v. Fiat Chrysler Am. US LLC, 550 F. Supp. 3d 847, 853 (C.D. Cal. 2021), aff'd in part, rev'd in part and remanded sub nom. on other grounds Hall v. FCA US LLC, No. 21-55895, 2022 WL 1714291 (9th Cir. May 27, 2022); see also Colgate v. JUUL Labs, Inc., 402 F. Supp. 3d 728, 758 (N.D. Cal. 2019) ("In California, the unfairness standard is currently in flux.") (internal quotation marks and citation omitted).  One line of cases follows the so-called Sperry test, which defines "unfair" as "prohibiting conduct that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." Bardin v. DaimlerChrysler Corp., 136 Cal. App. 4th 1255, 1260 (2006).  The other line follows the "tethering" test, which "requires the public policy at issue to be tethered to specific constitutional, statutory, or regulatory provisions." Colgate, 402 F. Supp. 3d at 758–59 (internal quotation marks and citation omitted).

Budowich's UCL claim passes neither test.  Under the Sperry one, he has provided no basis for concluding that JPMorgan's compliance with a congressional subpoena was "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Bardin, 136 Cal. App. 4th at 1260.  To reiterate: it is "unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action." Watkins, 354 U.S. at 187.  Indeed, "[i]t is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees." Id.  Far from acting immorally or oppressively, Defendant was thus following the law and the Committee's instructions when it produced

Budowich's financial records.  See 2 U.S.C. § 192.  Plaintiff's claim of unfairness therefore does not get out of the gates.

To the extent that the Court must "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim," Bardin, 136 Cal. App. 4th at 1260, the scales also tip in JPMorgan's favor.  There is undeniably utility in promoting compliance with congressional subpoenas such as this one.  On the other side of the ledger, it is far from clear from the Amended Complaint precisely what harm was inflicted on Budowich beyond a compressed timeframe — especially in light of the fact that he had previously produced many of his own documents and sat for a lengthy deposition.

Plaintiff also meets the same fate under the other main test, which looks at whether there was a violation of a public policy that is tethered to a specific legal provision.  See Colgate, 402 F. Supp. 3d at 758–59.  As explained in connection with Budowich's claim under the UCL's unlawful prong, he has not demonstrated that JPMorgan violated any predicate federal or state law.  At bottom, that conclusion all but dooms him under the tethering test.  Plaintiff contends otherwise, submitting that "California has a strong public policy of restricting disclosure of consumer's private information" and that the Amended Complaint "cite[s] five different constitutional or statutory provisions demonstrating this strong public policy."  Pl. Opp. to JPMorgan at 37 (citing Am. Compl., ¶ 188).  The main state law he appears to rely on, however, merely states in general terms the "[l]egislative intent" of CalFIPA.  See Cal. Fin. Code § 4051. That provision of CalFIPA provides, "The Legislature intends for financial institutions to provide their consumers notice and meaningful choice about how consumers' nonpublic personal information is shared or sold by their financial institutions."  Id.  As discussed, however, CalFIPA includes an express carve-out for the disclosure of records in circumstances such as

these.  Id. § 4056(b)(7).  That carve-out makes clear that any general policy preference for restricting the disclosure of a consumer's information must be balanced against other legitimate countervailing policies and priorities.

What is more, even without looking at the applicable exceptions in CalFIPA, there is a strong argument that JPMorgan's disclosure did not contravene the purported general policy animating the law.  The provision Budowich cites states merely that the legislative intent of CalFIPA is to protect consumers from having their personal information sold to third parties.  Id. § 4051.  But the production at issue in this case — which involves no such sale of personal data to a private third party — arose in a far different posture.  It thus did not contravene any "public policy" that is "tethered to specific constitutional, statutory, or regulatory provisions."  Colgate, 402 F. Supp. 3d at 758–59 (internal quotation marks and citation omitted).

## IV.    Conclusion

For the foregoing reasons, the Court will grant Defendants' Motions to Dismiss.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  June 23, 2022